

RECEIVED
APR 27 2009
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE J. EZRA MERKIN AND BDO
SEIDMAN SECURITIES LITIGATION

08 Civ. 10922 (DAB)

## PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs New York Law School ("NYLS") and Scott Berrie ("Berrie") (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by the undersigned Lead Counsel, for their Consolidated Amended Class Action Complaint (the "Complaint") allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based, *inter alia*, on the investigation made by and through their attorneys, which investigation included among other things, a review of Ascot Partners, L.P. and Gabriel Capital, L.P. documents; complaints filed by the Securities and Exchange Commission ("SEC") (including the complaints filed in *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008) and *SEC v. David G. Friehling*, 09 Civ. 2467 (S.D.N.Y. Mar. 19, 2009)); documents obtained by the Office of the Attorney General of the State of New York ("NYAG") in connection with the complaint filed in *Andrew Cuomo v. J. Ezra Merkin et al.*, 450879/2009 (N.Y. Sup. Ct. Apr. 6, 2009), *New York v. Merkin*, 450879/2009, New York State Supreme Court (Manhattan) and *In the Matter of: Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.*, Docket No. 2009-0028 (the administrative complaint filed by the Enforcement Section of the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts), other reports and interviews published in the financial press and information obtained by Plaintiffs.

## INTRODUCTION

1.      This case arises from a massive fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and others, and which was facilitated by defendant J. Ezra Merkin ("Merkin") and others named herein, who, recklessly or negligently and/or in breach of fiduciary duties owed to Plaintiffs and other class members, caused and permitted $1.8 billion (virtually the entire investment capital of Ascot Partners, L.P. (the "Ascot Partnership" or the "Ascot Fund")) and $1.4 billion (at least 25% of the investment capital of Gabriel Capital, L.P. (the "Gabriel Partnership" or the "Gabriel Fund")) to be handed over to Madoff to be "invested" for the benefit of Plaintiffs and the other limited partners of the Ascot Fund and Gabriel Fund.

2.      This action is brought as a class action on behalf of investors in the Ascot Fund and Gabriel Fund to recoup losses caused by Defendants' violations of federal and New York State law. The Ascot Fund and Gabriel Fund are each domestic hedge funds organized as limited partnerships managed by the same general partner -- Merkin. Merkin alone had ultimate responsibility for the management, operations and investment decisions made on behalf of both Funds.

3.      Plaintiff NYLS and other Ascot Fund class members are qualified investors that purchased limited partnership interests in the Ascot Fund. Plaintiff Berrie and other Gabriel Fund class members are qualified investors that purchased limited partnership interests in the Gabriel Fund.

4.      Merkin is also the sole shareholder and sole director of Gabriel Capital Corporation ("GCC"). According to the offering materials of both the Ascot Fund and the

Gabriel Fund, GCC provides administrative and managerial services to both the Ascot Fund and the Gabriel Fund.

5.     On December 11, 2008, Bernard Madoff was arrested after confessing to running a $50 billion Ponzi scheme.

6.     Also on December 11, 2008, defendant Merkin sent a letter to investors in the Ascot Fund and disclosed to Plaintiff NYLS and other class members for the first time that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) had been allocated to Madoff and were likely lost.

7.     On December 18, 2008, defendant Merkin sent a letter to investors in the Gabriel Fund and disclosed to Plaintiff Berrie and other class members that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio that the Gabriel Fund would be dissolved and liquidated.

8.     Prior to December 11, 2008, Ascot Fund investors were never informed that since the Ascot Fund's inception, nearly 100% of its assets were actually being funneled to and invested directly with Madoff. Similarly, prior to December 18, 2008, Gabriel Fund investors were never informed that at least 25% of the assets of the Gabriel Fund were invested directly with Madoff.

9.     Further, Merkin consistently represented to Plaintiffs and other investors in offering materials, periodic correspondence and other statements made to all investors, that he was actively managing the assets of the Funds and making investment decisions pursuant to specified investment strategies when, in truth, Merkin was doing nothing more than handing over a material portion of the assets of the Funds to Madoff.

3

10. Defendants, in breach of their fiduciary duties to investors in the Ascot Fund and Gabriel Fund, invested the assets of those funds with Madoff, who was allegedly using a trading strategy described as a "split strike conversion" strategy. Madoff in fact had no strategy at all and was using the assets of the Ascot Fund and Gabriel Fund to pay bogus returns as part of a massive Ponzi scheme.

11. Defendant Merkin, as the General Partner and Manager of the Ascot Fund and Gabriel Fund, recklessly failed to supervise, monitor and manage the investments of the Funds, in violation of his fiduciary duties, and contrary to his representations and undertaking that he as the General Partner was exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Ascot Fund and Gabriel Fund.

12. The investments of Plaintiffs and other class members in the Ascot Fund and Gabriel Fund have been decimated, as a direct result of: (a) defendant Merkin's abdication of his responsibilities and duties as General Partner and Manager of the Ascot Fund and Gabriel Fund and; (b) the complete failure of BDO Seidman, LLP ("BDO") (the independent auditor for the Ascot Fund and Gabriel Fund), to perform its audits and provide its annual audit reports in conformance with generally accepted auditing standards.

13. Defendant Merkin has profited handsomely as he was charging and receiving from Ascot Fund investors an annual fee of between 1.0%-1.5% and from Gabriel Fund investors an annual fee of 1% of their investments in exchange for his purported "management" services, which ultimately proved to be no more than turning money over to another investment manager. Merkin also received 20% of the net income in excess of the management fee of the Gabriel Fund each year as an incentive award. These incentive awards flowed from Fund profits which

now have shown to be illusory. Merkin's fees from managing the Ascot Fund and Gabriel Fund for the years 1995 to 2008 totaled approximately $471 million.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5, as well as under the laws of the State of New York. This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa and pursuant to the supplemental jurisdiction of this Court. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District, and defendants reside in and/or maintain principal executive offices in this District.

16.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### Lead Plaintiffs

17.     Co-lead Plaintiff NYLS is currently located at 57 Worth Street, New York, New York 10013 and was first chartered by the State of New York in 1891. NYLS has approximately 1500 students to whom it offers a course of study leading to the J.D. degree through full-time

day and part-time evening divisions, as well as joint degree programs with other educational institutions. During the proposed class period, NYLS, through its endowment entity, invested $3 million in the Ascot Fund in 2006, as set forth in the certification attached hereto, and continues to own that investment, which is now worthless. NYLS's investment in the Ascot Fund is in the form of a limited partnership interest, as is true with respect to all members of the proposed class.

18. During the proposed class period, Co-lead Plaintiff Berrie invested $500,000 in the Gabriel Fund, as set forth in the certification attached hereto, and continues to own that investment, which is now worth substantially less. Berrie's investment in the Gabriel Fund is in the form of a limited partnership interest, as is true with respect to all members of the proposed class.

**Defendants**

19. Defendant Ascot Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on August 17, 1992 to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons, including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests which are held by Tax-Exempt U.S. Persons.

20. Defendant Gabriel Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on January 1, 1991 to operate as a private investment partnership for the benefit of U.S. taxable investors.

21.     Defendant GCC is a Delaware corporation with its principal place of business at 450 Park Avenue, New York, New York 10022. GCC is an investment management business. All of the outstanding capital stock of GCC is owned or controlled by Merkin.

22.     Defendant Merkin is the founder, General Partner and Manager of the Ascot Fund and Gabriel Fund. Merkin maintains his business office at 450 Park Avenue, New York, New York 10022. Merkin is also the President, sole shareholder and director of GCC. Merkin has sole responsibility for the management, operations and investment decisions made on behalf of both Funds. On April 6, 2009, the NYAG charged Merkin with civil fraud for secretly steering at least $2.4 billion in client money into Madoff's massive Ponzi scheme.

23.     Defendant BDO is a national accounting and consulting firm with officers and partners having offices all over the world, including at 135 West 50th Street, New York, New York 10020 and 330 Madison Avenue, New York, New York 10017. BDO is a member of BDO International, a worldwide network of public accounting firms. The firm's website describes its services and qualifications as follows:

> BDO Seidman, LLP is a national professional services firm providing assurance, tax, financial advisory and consulting services to a wide range of publicly traded and privately held companies. Guided by core values including competence, honesty and integrity, professionalism, dedication, responsibility and accountability, for almost 100 years we have provided quality service and leadership through the active involvement of our most experienced and committed professionals.

During the relevant period, BDO was the independent auditor for the Ascot Fund and Gabriel Fund and issued clean audit reports on the annual financial statements of the Ascot Fund and Gabriel Fund which were relied on by Plaintiffs and other class members. BDO knew that the audited financial statements would be provided to and relied on by Ascot Fund and Gabriel Fund limited partners.

24. Defendants the Ascot Fund, the Gabriel Fund, GCC, Merkin and BDO are sometimes referred to herein collectively as "Defendants."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased limited partnership interests of the Ascot Fund and Gabriel Fund: (a) between December 11, 2003 and December 11, 2008 (the "Class Period") for claims arising under the Securities Exchange Act; and (b) who held limited partnership interests at the end of the Class Period for claims arising under state law, and who were injured thereby (the "Class"). Excluded from the Class are the Defendants, members of the immediate family of Defendant Merkin, any affiliate of the Ascot Fund, Gabriel Fund, Merkin, GCC, executive officers of the Ascot Fund or Gabriel Fund, partners of Defendant BDO, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

26. This action is properly maintainable as a class action because:

 a. The members of the proposed Class in this action are dispersed geographically and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds;

 b. Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws and New York law as alleged herein;

c.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seeks to represent;

d.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.     Plaintiffs anticipate no unusual difficulties in the management of this action as a class action; and

f.     The questions of law and fact common to the members of the Class predominates over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i.     whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

ii.     whether Defendants' Class Period representations to Plaintiffs and the other class members misrepresented and/or omitted material facts;

iii.     whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

iv.     whether Defendants conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary duties owed to Plaintiffs and other Class members; and

v.     to what extent the members of the Class have sustained damages and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Madoff Ponzi Scheme

27.     On December 10, 2008, Bernard Madoff confessed to running the largest Ponzi scheme in history, a fraud that Madoff himself admitted could have taken as much as $50 billion from investors. According to Madoff, he was "finished," and had "absolutely nothing." Madoff also admitted that his entire business was "just one big lie."

28.     On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on advisory clients of BMIS. Those clients included the Ascot Fund and Gabriel Fund. Unknown to Plaintiffs and other Class members and contrary to representations made to Plaintiffs and the Class, Merkin and GCC had entrusted virtually all of the investment capital of the Ascot Fund and at least 25% of the investment capital of the Gabriel Fund (capital provided by Plaintiffs and the Class through their purchase of investment interests in the Ascot Fund and Gabriel Fund) to Madoff.

29.     Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office of the Southern District of New York with securities fraud. According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.

30.     On December 12, 2008, the SEC was granted emergency relief to halt the ongoing Madoff fraud and preserve any assets for injured investors, including orders freezing assets, appointing a receiver, appointing a Trustee pursuant to SIPA, allowing expedited discovery and preventing destruction of documents.

31.    On February 20, 2009, Irving Picard, the court-appointed Trustee liquidating Madoff's assets, stated that he had found no evidence that, from at least 1996 to the present, any stocks or options were purchased or traded by Madoff for investors.

32.    On March 12, 2009, Madoff pleaded guilty to securities fraud charges, admitting that beginning in the early 1990s, he stopped purchasing securities for his investment management clients and began operating a Ponzi scheme.

33.    On March 18, 2009, the SEC charged BMIS' auditors David G. Friehling ("Friehling") and his firm, Friehling & Horowitz, CPAs, P.C. ("F&H"), with committing securities fraud by representing that they had conducted legitimate audits, when in fact they had not.

**Merkin's Relationship With Madoff**

34.    Madoff, by the 1970s and 1980s, had pioneered electronic trading and founded his own trading firm, BMIS, which became a major market-maker for stocks and options. BMIS was both a broker-dealer and investment advisor registered with the SEC.

35.    Madoff's purported trading strategy was known as a "split strike conversion" strategy. The strategy was to (a) buy stocks of selected corporations that were included in the blue-chip Standard & Poor's 100 Index (the "Index"), and simultaneously (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options. The call options would also, to some degree, limit any gains that would be earned on the underlying stocks. Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined. Madoff's description of his purported strategy evolved only slightly over time. He soon began to claim that he was using a

larger "basket" of stocks selected from the Index, combined with put and call options on the Index itself rather than options on individual stocks. The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated. Madoff claimed to execute the "split strike conversion" strategy six to eight times per year. At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries").

36. In the late 1980s, defendant Merkin began running his own investment funds. Through his extensive professional network, connections in his community and in the philanthropic world, Merkin marketed several funds to numerous individuals and charities. Merkin's primary role was to raise money for the funds and discretely feed the funds to third parties to actually manage the investment activity.

37. Sometime in the very early 1990s, Merkin met Madoff and they started doing business together. Thereafter, Merkin started raising large sums of money from investors, including Plaintiffs and Class members, who were unaware that their investments were being fed to Madoff and BMIS and who believed, as they were told by Merkin, that their investments were being managed by him pursuant to stated investment strategies and were being placed in a diverse portfolio of securities. Merkin's business relationship with Madoff and BMIS helped earn Merkin and his investment firm millions of dollars in management and incentive fees.

**The Ascot Fund**

38. In 1992, defendant Merkin created the Ascot Fund, a private investment partnership. The sole purpose of this investment fund (which was undisclosed to investors) was to serve as a feeder to Madoff and BMIS. According to the complaint filed by the NYAG, Merkin testified that he formed the Ascot Fund "largely" for the purpose of investing with

Madoff, and that, from the beginning, "substantially all" of the assets of the Ascot Fund were tendered to Madoff.

39.     Investors in the Ascot Fund, like NYLS, are limited partners of the Ascot Partnership. According to a Confidential Offering Memorandum dated October 2006 (the " 2006 Offering Memorandum"), the Ascot Partnership had three different classes of limited partnership interests:

- Class A limited partnership interests issued to certain investors prior to February 1, 2006.

- Class B interests held by the Ascot Fund Limited, an investment vehicle created to facilitate investments by foreign investors in the Ascot Partnership.

- Class C limited partnership interests issued to certain Ascot Fund investors after October 2006.

40.     As general partner of the Ascot Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Ascot] Partnership." As Merkin acknowledged in testimony before the NYAG, "I had fiduciary responsibilities [to investors] for oversight of the portfolio."

41.     As of the end of the third quarter of 2008, the Ascot Fund had at least 300 investors with a total of approximately $1.8 billion under management.

**Ascot Offering Memoranda and Other Disclosures**
**Were False and Misleading**

42.     Throughout and prior to the Class Period, Merkin offered participation in the Ascot Fund to qualified investors such as NYLS and other Class members, through a series of Confidential Offering Memoranda issued in 1992, 1996, 2002, and 2006 (the "Confidential Offering Memoranda"). While these documents were prepared, amended or revised from time to time, they were the same in all material respects relevant hereto. Through these Confidential

Offering Memoranda, Merkin provided assurances to Ascot Fund investors, upon which they reasonably and foreseeably relied when deciding to invest in the Ascot Fund. The Confidential Offering Memoranda remained consistent with respect to the material information they concealed. Indeed, the Confidential Offering Memoranda used to solicit investments in the Ascot Fund never disclosed that the majority of the Ascot Partnership's assets were invested with Madoff, BMIS or other Madoff controlled entities.

**False and Misleading Statements In the Confidential Offering Memoranda**

43.     Plaintiff NYLS, like other investors in the Ascot Fund, relied on the identity and role of the manager of the Ascot Partnership. Plaintiff NYLS and other Class members invested in the Ascot Fund based on the understanding that Merkin was the day-to-day manager and that he would devote the majority of his time to managing the Ascot Partnership.

44.     The Confidential Offering Memoranda were misleading in that they falsely state that Merkin was involved in the Fund's management on a day-to-day and transaction-by-transaction basis, and that the success of the fund depended on Merkin's abilities as a money manager. Merkin led Ascot Fund investors to believe that it was Merkin, not a third party, who was actively managing their investments. However, in truth, Merkin did very little other than bookkeeping as he was feeding all assets invested in the Ascot Partnership directly to Madoff.

45.     By way of example, the December 2002 Confidential Offering Memorandum (the "2002 Offering Memorandum") and the 2006 Offering Memorandum stated, among other things, under the heading "Dependence on the Managing Partner" that: "All decisions with respect to the management of the capital of the [Ascot] Partnership are made exclusively by J. Ezra Merkin. Consequently, the [Ascot] Partnership's success depends to a great degree on the skill and

experience of Mr. Merkin." This was of course untrue, as the investment strategies and performance of the Ascot Fund were entirely in the hands of Madoff.

46.     The Confidential Offering Memoranda were also false and misleading because Merkin represented to investors that he was spending the majority of his time managing the assets of the Ascot Fund. For example, the 2002 Offering Memorandum stated, "The Managing Partner is required to devote substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the [Ascot] Partnership." Similarly, the 2006 Offering Memorandum stated, "The General Partner has agreed to devote substantially his entire time and effort during normal business hours to the management of the [Ascot] Partnership...."

47.     In truth, Merkin's management of the Ascot Fund was minimal at best and consisted only of a few monthly conversations with Madoff each year. Merkin admitted in his deposition with the NYAG that his "monitoring" of the Ascot Fund consisted of:

> It was monitoring. It was talking to [Madoff]. It was a very long relationship. I spoke to him ten or 15 time[s] a year. I spoke to or saw him 10 or 12 times a year. It might have been as often as once a month depending on what was going on. It wasn't so much second guessing. . . . Fifteen would be high in a given year, ten could be low in a given year, and my guess it was more in the beginning[,] then a bit less, and then it developed back up again.

48.     Merkin's personal attention to individual trades is also repeatedly touted in the risk disclosures that take up a large portion of each memorandum:

- "The Partnership also may take position  . . . in options on stock of companies which may, *in the judgment of the managing partners,* be potential acquisition candidate . . ." (emphasis added).

- "Such purchases may include securities which *the Managing partner believes* to be undervalued." (emphasis added).

- "Investments in debt claims and the securities of companies that have field for bankruptcy . . . may be made at various stages in the bankruptcy process *based on*

*the Managing partner's judgment that there is sufficient profit potential."* (emphasis added).

- The imposition of controls by governmental authorities might also limit such forward (and futures) trading to *less than that which the General Partner would otherwise recommend . . ."* (emphasis added).

- Merkin has "ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership."

49.     Ascot Fund investors were led to believe that Merkin's role was so central to the management of the Ascot Fund that the entire Partnership would need to be terminated in the event of his death or incapacity. Under a heading in the 2006 Offering Memorandum entitled "Outline of the Partnership Agreement", it stated in relevant part:

> "The Partnership will continue indefinitely the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days...."

This representation was of course misleading, as the management of the Ascot Fund was entirely in the hands of Madoff.

50.     The Confidential Offering Memoranda were also false and misleading because they gave Ascot Fund investors the perception that Merkin was actively managing their investments with a very specific strategy. By way of example, the 2006 Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Ascot] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

- Generally, the [Ascot] Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities;

- The [Ascot] Partnership primarily follows a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the [Ascot] Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the [Ascot] Partnership's long portfolio. The purchase of the put option allows the [Ascot] Partnership to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the [Ascot] Partnership to partially finance the purchase of the put option while at the same time partially hedging the [Ascot] Partnership's portfolio against any downward movement in the S&P 100;

- The [Ascot] Partnership will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the [Ascot] Partnership's;

- The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely; and

- The General Partner reserves the right to alter or modify some or all of the [Ascot] Partnership's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk.

These representations about the Ascot Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Ascot Fund would certainly have wanted to know. In particular, the representations that the Ascot Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was following "a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100"; and was making investments through "third-party managers using managed accounts" all falsely implied that Merkin was actively pursuing a specific strategy for the Ascot Fund in a prudent manner and was using multiple third-party managers with varying execution strategies, thereby avoiding the risk of concentrating capital in

17

too few investments or managers. In fact, the investment strategies of the Ascot Fund were a sham and the General Partner, defendant Merkin, had abandoned any diversification strategy because he had given a single third-party manager, Madoff, complete and total management responsibility and discretion over the Ascot Fund. Merkin admitted in his deposition with the NYAG that substantially all of the assets of the Ascot Fund were invested with Madoff:

> Q.     And from the time that Ascot started to invest with Mr. Madoff, [ ] were substantially all of the assets of Ascot with Madoff?
>
> A.     Substantially all, yes.

51.     The section of the 2006 Offering Memorandum entitled "Risk Factors" also covered a wide variety of investment strategies that had nothing to do with the Ascot Fund's actual trading strategy (*i.e.*, Madoff's "split strike conversion" strategy). The risk warnings included, among others, "Arbitrage Transactions", "Options Transactions", "Futures Contracts", "Forward Trading", "Swap Agreements", "Short Selling", and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Ascot Fund investors of the far greater risk, that Merkin had entrusted a single third-party manager with custody and trading discretion for the entire capital of the Ascot Fund.

52.     The statement in the 2006 Offering Memorandum that the General Partner (Merkin) "intends to adopt a selective approach in evaluating potential investment situations" so "he can follow more closely" relatively fewer transactions was also false and misleading because it omitted to state that Merkin had, with no or inadequate due diligence or oversight, abdicated his responsibility and entrusted the assets of the Ascot Fund to Madoff.

53.     As acknowledged during testimony given to the NYAG, Merkin always intended for the Ascot Fund to serve solely as a conduit to Madoff and as a result none of the affirmative representations regarding purported investment strategies described in the Confidential Offering

Memoranda were true. Despite this admission to the NYAG, Merkin never disclosed this important fact to Ascot Fund investors.

54. In the 2006 Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Ascot Fund's assets to multiple independent money managers. As part this disclosure, Merkin assured investors that he would exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities....

Notwithstanding the false assurances that Merkin would exercise reasonable care in selecting independent money managers, these statements were false and misleading because: (1) all of the Ascot Partnership's assets were entrusted to one single manager, Madoff; and (2) Merkin never exercised any care in delegating such investment discretion to Madoff.

55. During his deposition taken by the NYAG, Merkin was asked whether the Ascot Fund Offering Memoranda disclosed Madoff's role in the Fund. Merkin directed the NYAG to certain statements made in Ascot Fund Offering Memoranda and claimed that Madoff's role was disclosed: "Bernie playing a role of prime broker" for the Ascot Fund and that this description "would certainly convey some sense that the accounts were custodied" with Madoff. The disclosure to which Merkin was referring was in the 2006 Offering Memorandum:

The Partnership will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms. Morgan Stanley & Co., Inc. and Bernard L. Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the principal prime brokers and custodians for the Partnership, and clear (generally on the basis of payment against delivery) the Partnership's securities transactions that are effected through other brokerage firms. The Partnership is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Partnership.

This disclosure is in fact completely false and misleading. The disclosure only describes Madoff's involvement in the Ascot Fund as a "principal prime broker," a purely administrative function. The disclosure also creates the impression that the Ascot Fund had established a separation between the entity that cleared trades and kept custody of the securities on the one hand, and the investment managers making investments decisions on the other. There is no disclosure that all Fund assets had been entrusted to Madoff or that Madoff was the person making all purported investment decisions for the Ascot Fund.

56. The 2006 Offering Memorandum also misrepresented the role of Morgan Stanley & Co. by referring to it also as a "principal prime broker." In fact, in 2006, approximately 98% of the Ascot Fund's transaction were both effected and cleared by Madoff, not Morgan Stanley. According to the NYAG Complaint, from at least 1999 through 2008, Madoff, not Morgan Stanley, held virtually all securities purportedly acquired by the Ascot Fund. The account statements for the Ascot Fund's Morgan Stanley accounts show that Morgan Stanley's role was almost entirely limited to acting as a bank to transfer cash between the Ascot Fund and investors, and between the Ascot Fund and Madoff's Chase Manhattan Bank account. The disclosure in the 2006 Offering Memorandum, describing Morgan Stanley as a prime broker, was just another

way for Merkin to conceal the fact that he was simply feeding the assets of the Ascot Partnership directly to Madoff.

**False and Misleading Statements In Ascot Fund Quarterly Reports and Investor Presentations**

57. In addition to the false and misleading statements in the Confidential Offering Memoranda, Merkin and others made misstatements to Ascot Fund investors through fraudulent quarterly reports and investor presentation materials and concealed and misrepresented the role Madoff played in managing the Ascot Fund.

58. During the Class Period, defendant Merkin sent quarterly account statements to Ascot Fund investors purporting to reflect the investments and returns of those limited partners. The quarterly statements disclosed only the value of each investor's account and the purported appreciation during the prior quarter. Annual audited financial statements for the Ascot Fund were also sent to investors. The quarterly and annual statements sent to Ascot Fund investors were, of course, completely false and never revealed that all assets of the Ascot Fund were held in an account managed by Madoff.

59. Throughout the Class Period, Plaintiffs and other Class members met with defendant Merkin and, based on his representations, thought they were entrusting their money to him. This was not the case.

60. Prior to their investing in the Ascot Fund, Merkin made presentations to Plaintiff NYLS and other Class members. Based on these presentations, investors were led to believe that Merkin would be managing the Partnership and that he would be protecting the assets of the Ascot Fund. In a 2008 PowerPoint document used by Merkin in making presentations to potential investors, Merkin described the Ascot Fund as having "Actively Managed Strategies."

That presentation never disclosed that it was actually Madoff who was actively managing the strategies of the Ascot Fund.

61. Merkin told several investors, concerned about rumors that the Ascot Fund was being managed by Madoff, that only a small or insubstantial portion of the Ascot Fund's assets were held by Madoff. For example, in 2005, an investor was told by an employee at another hedge fund that the assets of the Ascot Fund were invested with Madoff. When that investor asked Merkin about Madoff's role, Merkin acknowledged that when he started the Ascot Fund, it was managed by Madoff, but after Merkin and his staff learned about Madoff's strategies, they were able to produce the same results without Madoff. Merkin also claimed that while a small amount of the Ascot Fund was still being managed by Madoff, the majority of it was being managed in-house by Merkin and his staff.

62. Similarly, in 2007, Merkin told two investors, during a meeting they requested after hearing rumors that Madoff managed the Ascot Fund, that all but an insubstantial portion of the Ascot Fund was managed directly by Merkin and that Madoff did not play any role in the investments of the Ascot Fund.

63. Sometimes Merkin outright denied Madoff's role in the Ascot Fund. For example, a member of the Investment Committee of a non-profit organization noticed that the Ascot Fund's returns were similar to those reported by another hedge fund that was widely known to be a feeder to Madoff. After being told by a Merkin employee that Ascot assets were "held" at Madoff's firm and that Madoff had some management role, the committee member directly asked Merkin if he was investing Ascot funds with Madoff. Merkin responded that he was not, but that Ascot used a strategy similar to Madoff's.

64. During a November 14, 2006 meeting of the finance committee of Plaintiff NYLS, Merkin made a presentation concerning the Ascot Fund. The minutes of this meeting reflect a number of Merkin's false statements, including the following:

| False Statements by Merkin | Truth |
|---|---|
| "Ezra explained that he tries to exploit short-term pricing discrepancies in the options market. Proprietary, computer driven models guide him and his team . . . ." | Neither Merkin nor any "team" of his was involved in the Ascot Fund's trading, and Merkin did not have any "computer-driven" models relating to the Ascot Fund's strategy. |
| "About 15% of the fund utilizes longer duration options ('Leaps') which he trades through Bernie Madoff." | In his testimony before the Attorney General, Merkin admitted that "we were not doing any Leaps traded through Bernie Madoff." |
| "Ezra noted that up to 60% of Ascot's assets come from his personal family trusts." | In his testimony given to the Attorney General, Merkin admitted that "nothing like 60 percent of Ascot's total assets" came from those trusts. |
| [    ] asked why Merkin's strategy "is not exploited by other banks and competitors" and "Ezra replied that the strategy is not scaleable." | Merkin knew that Madoff purported to exploit the strategy on a far larger scale than just Ascot's assets. |

**The Gabriel Fund**

65. In 1988, Merkin created the Gabriel Fund (known at first as Ariel Capital, L.P.). Investors in the Gabriel Fund are limited partners of the Gabriel Partnership. According to a Confidential Offering Memorandum dated March 2006 (the "March 2006 Offering Memorandum"), the Gabriel Partnership had two different classes of limited partnership interests:

- Class A limited partnership interests were issued to certain investors prior to February March 2006. The Class A limited partnership interests had different redemption rights and less exposure to certain investments than the other limited partners.

- Class B limited partnership interests were issued to certain investors after March 2006.

66.     As general partner of the Gabriel Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Gabriel] Partnership."

67.     As of the end of the third quarter of 2008, the Gabriel Fund had at least 200 investors with a total of at least $1.4 billion under management.

**The Gabriel Offering Memoranda and Other Disclosures**
**Were False and Misleading**

68.     Throughout and prior to the Class Period, Merkin offered participation in the Gabriel Fund to qualified investors such as Berrie and other Class members, through a series of Confidential Offering Memoranda. While these documents were prepared, amended or revised from time to time, they were the same in all material respects relevant hereto. Through these Confidential Offering Memoranda, Merkin provided assurances to Gabriel Fund investors, upon which they reasonably and foreseeably relied when deciding to invest in the Gabriel Fund. The Confidential Offering Memoranda remained consistent with respect to the material information it concealed.

**False and Misleading Statements In the**
**March 2006 Confidential Offering Memorandum**

69.     Plaintiff Berrie, like other investors in the Gabriel Fund, relied on the identity and role of the manager of the Gabriel Fund. Plaintiff Berrie and other Class members invested in the Gabriel Fund based on the understanding that Merkin was the day-to-day manager and that he would devote the majority of his time to managing the Gabriel Fund.

70.     The Gabriel Fund Confidential Offering Memoranda were misleading in that they falsely stated that Merkin was involved in the Gabriel Fund's management on a day-to-day and transaction-by-transaction basis, and that the success of the fund depended on Merkin's abilities

as a money manager. Merkin led Gabriel Fund investors to believe that it was Merkin, not a third party, who was actively managing their investments. However, in truth, Merkin did very little other than bookkeeping as he was feeding at least 25% of the investments from the Gabriel Partnership directly to Madoff and the remainder to two other third party money managers.

71.    By way of example, the March 2006 Confidential Offering Memorandum (the "March 2006 Offering Memorandum") stated, among other things, that:

- Merkin personally managed the Gabriel Fund's assets on a day-to-day basis and would devote "substantially his entire time and effort during normal business hours to the management of the [Gabriel] Partnership."

- "The management of the [Gabriel] Partnership will be vested exclusively in the General Partner."

- Merkin's personal attention to individual trades is also repeatedly touted in the risk disclosures. The March 2006 Offering Memorandum specifically stated that: "The General Partner will attempt to assess risk in determining the nature and extent of the investment the [Gabriel] Fund will make in specific securities."

- Gabriel Fund investors were led to believe that Merkin's role was so central to the management of the Gabriel Fund that the Gabriel Partnership would need to be terminated in the event of his death or incapacity. Under a heading in the 2006 Offering Memorandum entitled "Dissolution", it stated in relevant part: "The Partnership will dissolve upon the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days...."

In truth, all of these representations were false and misleading because Merkin was not the day-to-day manager, and was devoting little if any time to managing the investments of the Gabriel Fund as he was simply feeding a substantial portion of the assets of the Gabriel Fund to Madoff and two other third party managers.

72.    In 1990, Merkin started giving Madoff and other outside managers some of the Gabriel Fund's capital to manage. From 1990 to 1992, he gave a significant portion of the assets

to Madoff to manage. In 1993, after creating the Ascot Fund as a feeder fund to Madoff, Merkin temporarily discontinued placing Gabriel Fund assets with Madoff, and entered into an agreement with Cerberus Capital Management ("Cerberus") under which Cerberus would manage a large portion of the Gabriel Fund (the "Cerberus Account"). All due diligence, research, and trading decisions for the Cerberus Account were made by Cerberus with little input from Merkin other than occasional conversations between Merkin and the principals of Cerberus. Cerberus also incurred millions of dollars in legal fees and other expenses in managing assets in the Cerberus Account, which Merkin reimbursed from the Gabriel Fund.

73.     In 2002, Merkin also opened a managed account with fund manager Cohanzick Capital, L.P. ("Cohanzick"), which partially moved into Merkin's offices.

74.     Based on information contained in the NYAG Complaint, between 2002 through 2008, between 80-95% of the Gabriel Fund assets were managed by just three outside money managers: Cerberus, Madoff, and Cohanzick.

75.     The Gabriel Fund Offering Memoranda were false and misleading because they gave Gabriel Fund investors the perception that Merkin was actively managing their investments with a very specific strategy. The March 2006 Confidential Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Gabriel] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

- Generally, the [Gabriel] Partnership will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts;

- The [Gabriel] Partnership will invest in the securities of corporations believed to be fundamentally undervalued;

- The [Gabriel] Partnership will also make indirect investments with third-party managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles, which engaged in similar investment strategies as the [Gabriel] Partnership;

- The [Gabriel] Partnership expects to invest in private and restricted securities;

- From time to time, the General Partner may, in his sole discretion, acquire assets or securities that the General Partner believes lack a readily ascertainable market value or otherwise lack sufficient liquidity; and

- The General Partner will not permit more than the greater of 50% of the [Gabriel] Partnership's capital and 25% of the [Gabriel] Partnership's total assets to be invested in a single investment. Moreover, it will not permit more than 10% of the [Gabriel] Partnership's capital to be placed at risk in a single investment. The General Partner will have discretion to determine how much is at risk for purposes of this test.

These representations about the Gabriel Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Gabriel Fund would certainly have wanted to know. In particular, the representations that the Gabriel Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was generally investing in "marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts"; was investing in the "securities of corporations believed to be fundamentally undervalued"; was making investments through "third-party managers", all falsely implied that Merkin was actively pursuing a specific strategy for the Gabriel Fund in a prudent manner. In truth, the investment strategies of the Gabriel Fund

were a sham as Merkin was not managing the assets of the Gabriel Fund and was simply feeding Gabriel Fund investments to Madoff and two other third party managers.

76. The statement in the March 2006 Offering Memorandum that the General Partner (*i.e.*, defendant Merkin) "will not permit more than the greater of 50% of the Partnership's capital and 25% of the Partnership's total assets to be invested in a single investment", that "it will not permit more than 10% of the Partnership's capital to be placed at risk in a single investment" and that "the General Partner will have discretion to determine how much is at risk for purposes of this test" was also false and misleading because during the Class Period, Merkin was handing over at least 25% of the Gabriel Fund's assets to Madoff.

77. The section of the March 2006 Offering Memorandum entitled "Risk Factors" covered a wide variety of investment strategies that had nothing to do with the Gabriel Fund's actual trading strategy. The risk warnings included, among others, "Non-marketable Obligations", "Arbitrage Transactions", "Proxy Contests", "Options Transactions", "Futures Contracts", "Forward Trading", "Participation in Unfriendly Transactions", "Short Selling" and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Gabriel Fund investors of the far greater risk, that Merkin had entrusted Madoff with custody and trading discretion for at least 25% of the assets of the Gabriel Fund and the remainder of the assets with two other third party managers.

78. In the March 2006 Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Gabriel Fund's assets to multiple independent money managers. As part this disclosure, Merkin assured investors that he would exercise reasonable care in selecting such managers:

The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Although the General Partner *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities.... (emphasis added)

This representation and assurance that Merkin would exercise reasonable care in selecting independent money managers was false and misleading because in truth Merkin never exercised any care or conducting any due diligence in his delegation of at least 25% of the Gabriel Partnership's assets to Madoff.

**False and Misleading Statements in Gabriel Fund**
**Quarterly Reports and Investor Presentations**

79.     In addition to the false and misleading statements in the Gabriel Fund Offering Memoranda, Defendants made misstatements to Gabriel Fund investors through fraudulent quarterly reports and investor presentations by concealing the role Madoff played in managing the Gabriel Fund and by misrepresenting the purported investment strategies being used by Merkin for the fund.

80.     During the Class Period, defendant Merkin sent quarterly account statements to Gabriel Fund investors purporting to reflect the investments and returns of those limited partners. These quarterly statements usually were accompanied with a written report by Merkin describing the investment strategies and performance of the Gabriel Fund. In those reports, Merkin made specific representations about the allocations of the funds' assets among those strategies. The quarterly reports were misleading to Gabriel Fund investors because they gave investors the impression that: (1) Merkin and his staff were directly managing the Gabriel Fund assets; and (2) the assets of the Gabriel Fund were being invested in specific types of securities. In truth, the

Gabriel Fund portfolio was being managed by Madoff, Cerberus and one other third party manager.

81. The quarterly issued reports, signed by Merkin and printed on GCC's stationery, consistently made it appear that Merkin was responsible for all investment strategy and decisions of the Gabriel Fund. For example, Merkin stated in a January 20, 2007 report that, "Our effort has been to migrate from increasingly efficient markets to our private positions, where we enjoy both much more complete information about our investments and, thanks to our sourcing network, much less competition for our ideas. There, we have worked diligently to establish a reputation for creativity and reliability, which further enhances the access to ideas conferred by our sourcing advantage." Similarly, in a October 20, 2008 report, Merkin stated, "Our favorite hedge is to sell some of a position and thereby reduce risk. We prefer that to finding and selling a vaguely corresponding short that increases the aggregate broad exposure of the fund while weakening the power of an idea."

82. Many of the quarterly reports disseminated to Gabriel Fund investors also represented that the fund was investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage. Starting in 2004, Merkin provided a detailed table in each quarterly report showing the precise percent distribution of the Gabriel Fund's assets which were allocated into the following seven categories: "Distressed Debt," "Debt or Equity Subject to a Deal or Legal Process," "Credit Opportunities," "Arbitrage of Related Securities," "Long-term Equity," "Short Securities Outright and Portfolio Hedges," and "Cash (Including Proceeds From Short Sales)." The percentages reported always added up to 100% and thus purported to fully describe the portfolios. Accompanying the reports was an Appendix defining each of the categories of investments. All of the categories, with the exception of

"Cash," were directly related to a strategy of investing in distressed companies or companies involved with a reorganization. None of the investment categories described in these written materials encompassed or was at all consistent with Madoff's "split strike conversion" strategy.

83. In a January 2001 quarterly report entitled "Arbitrage and Distressed Investing Some Year-End Thoughts," Merkin stated, among other things, that the Gabriel portfolio consisted of "approximately 60% distressed positions and 40% [merger] arbitrage." He also proclaimed that "we see ourselves as specialists in distressed investing who maintain an arbitrage portfolio in order to maintain performance and liquidity standards."

84. In an April 2005 report entitled "We Do Beans", Merkin described in detail the current state of his investment strategy for the Gabriel Fund as "a tapestry of six threads of different colors, each representing one of the full range of debt-related asset classes in our repertoire." The six "threads" were described as: (a) "'dented' high-yield bonds"; (b) "public distressed names"; (c) "asset-based lending"; (d) "'private' distressed" debt; (e) "private equity, usually with a distressed flavor"; and (f) "U.S. distressed credits sourced in Japan." He also proclaimed that "we bring to the table over thirty years combined experience in bankruptcy investing."

85. The representations by Merkin in the quarterly reports misled investors into believing that the purported primary strategy of the Gabriel Fund was investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage.

86. In addition, Merkin would often give Gabriel Fund investors presentations relating to the strategies and performance of the Fund. During these presentations, Merkin usually described the Gabriel Fund as consisting of distressed debt and securities of companies subject to reorganization. He never disclosed that a significant portion of the funds were

31

invested with Madoff or that the funds were invested in Madoff's "split strike conversion" trading strategy.

## Despite Numerous "Red Flags," Defendants
## Failed To Perform a Due Diligence Review

87.     Against the backdrop of Merkin's complete management and investing control over the Ascot Fund and Gabriel Fund and despite Defendants' due diligence obligations and representations, Defendants invested all of the Ascot Partnership's capital and at least 25% of the Gabriel Partnership's capital with Madoff. Given the level of control that Merkin ceded to Madoff over the Ascot Fund and Gabriel Fund, Defendants' failure to conduct proper due diligence and blatant disregard of the various red flags that existed is shocking.

88.     Defendants had responsibilities to establish due diligence procedures for all fund managers with whom they invested client assets. However, despite their representations that they were doing so, Defendants failed to perform even a minimal level of due diligence regarding the activities of Madoff and BMIS to safeguard the investments of Plaintiffs and other Class members in the Ascot Fund and Gabriel Fund.

89.     Defendants' disclosures regarding their investment of Plaintiffs' money, including information disseminated both in various offering memoranda and the statements of monthly investment returns, led Plaintiffs and the Class to believe that Defendants conducted thorough investigations into the "managers" with whom Defendants invested when indeed no due diligence at all was undertaken and in fact, all of the Ascot Fund's investments and at least 25% of the Gabriel Fund's investment were with one manager, Madoff.

90.     In the days and weeks following Madoff's arrest (and his being charged with crimes by both the SEC and the US Attorney's office for the Southern District of New York),

information became known to the general public that should have been known to investment professionals such as defendants Merkin and BDO.

91.   However, despite numerous red flags and the fairly simple methods available to test Madoff's most basic numbers, Defendants failed to conduct adequate due diligence that would have alerted an investor ordinary prudence that Madoff's "investment strategy" was really a massive Ponzi scheme. The numerous red flags that Defendants failed to uncover or blatantly disregarded include, but are not limited to:

- The description of Madoff's split-strike strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses in a 14 year period. Moreover, the strategy's returns could never be replicated by quantitative analysts who attempted to do so.

- Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in the documents.

- The options contracts that Madoff would have had to trade did not show up on any of the options exchanges. Even if the trading was being done over-the-counter ("OTC") - outside of the exchanges - a good number of those trades would still have to have been offset in the listed market, and there was no evidence that they ever were.

- At one point in time, the entire value of listed index call options was $9 billion, which was insufficient to allow Madoff to hedge the exposure of the $50 billion of assets Madoff claimed. Even in Madoff purchased and sold options through the OTC market, this market is not several times larger than the exchange listed market, especially for these traditional derivative products. Moreover, OTC options are more expensive than listed options and the bid-ask spreads would be so wide as to preclude earning of any profit.

- BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.

- Madoff initiated trades in the accounts, executed the trades and custodied and administered the assets through discretionary brokerage agreements, a clear conflict of interest.

- Madoff's auditor, F&H, had three employees, a 78 year-old living in Florida, a secretary and a 47 year-old accountant. This operation was suspiciously

minuscule given the scale and scope of Madoff's activities. Moreover, the comptroller of BMIS was based in Bermuda, despite the fact that most mainstream hedge fund investment advisers have their comptroller in-house.

- BMIS audit reports showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker -- not a firm with $17 billion in customer accounts.

- Despite his "success," Madoff operated under a veil of secrecy and he did not allow outside performance audits by investors.

- Key positions at BMIS were held by members of Madoff's family: Peter Madoff (director of trading and general counsel); his sons Mark and Andrew (directors of trading) and his niece Shana (a compliance lawyer). Only Madoff's family was privy to his investment strategy.

- Investors had no electronic access to their accounts at Madoff. Thus, Madoff had the ability to manufacture paper trade tickets that confirmed fictitious results.

- Madoff settled for charging undisclosed commissions on all of the trades done in investors' accounts rather than collecting larger standard hedge fund fees.

- Madoff chose to fund at a high implied interest rate even though cheaper money was available in the highly regulated short-term credit markets. This provided a way to promise lucrative returns in an unregulated area of capital markets.

92. Merkin admitted in his testimony before the NYAG that he was aware of a number of people who were suspicious of the returns Madoff claimed to achieve, stating that "[t]here were over time persons who expressed skepticism about one or another aspect of the Madoff strategy or the Madoff return." Moreover, according to the complaint filed against Merkin by the NYAG, at least two of Merkin's most trusted colleagues repeatedly told Merkin that Madoff's returns were too good to be true – one warning that it could be a Ponzi scheme.

93. According to media reports, Madoff was the subject of constant SEC investigations – commenced in 1992, 2005, and 2007 – into the legitimacy of his business. Madoff was also the subject of scrutiny by members of the investment community who understood that his business was a fraud.

94.     Defendants invested all of the assets of the Ascot Fund and at least 25% of the Gabriel Fund with Madoff despite numerous "red flags," indicating that Madoff did not employ a split strike conversion strategy and was actually a fraud.   While collecting substantial fees, Defendants ignored these red flags in violation of their duties to the limited partners that had invested in the Funds.

95.     In 1999, Harry Markopolos, wrote a letter to the SEC which stated that: "Madoff Securities is the world's largest Ponzi Scheme."   Markopolos, who years ago worked for a rival firm, researched Madoff's stock-options strategy and, based upon publicly available information, was convinced that the results were phony.   Markopolos was not alone.   In 2000, Credit Suisse warned its clients to pull their investments from Madoff, due to suspicions concerning his operations.

96.     In a May 2001 article, Michael Ocrant, managing editor of MAR/Hedge, a New York-based hedge fund publication, also eyed Madoff's success with skepticism because of the unrealistic nature of Madoff's returns and their consistency.   Specifically troubling to Ocrant was Madoff's determined reluctance to justify or explain his firm's strategy or success:

(a)     "As for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I', not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'  He reiterates the undisputed strength and advantages the firm's operations provide that make it possible."

(b)     "The inability of other firms to duplicate his firm's success with the strategy, says Madoff, is attributable, again, to its highly regarded operational infrastructure. He notes that one could make the same observation about many businesses, including market making firms."

(c)     "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

97.    In the same month, *Barron's* published an article discussing the remarkably steady returns purportedly achieved by Madoff. The *Barron's* article discussed the belief of many hedge fund professionals and options strategists that Madoff could not achieve the returns he reported – an average annual return of 15% for the preceding decade – using the strategy that Madoff described. In addition to the suspicious consistency of Madoff's high returns, the article discussed several other warning signs that suggested Madoff might be committing fraud, including Madoff's secrecy and the inability of "more than a dozen hedge fund professionals, including current and former Madoff traders" to duplicate Madoff's returns using his strategy.

98.    Merkin's in-house counsel e-mailed Merkin a copy of the *Barron's* article on May 6, 2001 and Merkin also had a copy of the MAR/Hedge article. Seven years later, Merkin still had copies of both of these article in his files.

99.    In addition, Merkin, to a greater extent than many of Madoff's direct investors, had personal knowledge of the many warning signs of fraud:

(a)    Merkin knew that Madoff reported trades using paper trade confirmations sent to investors by mail, without providing any form of electronic real-time access, even though Madoff's firm pioneered electronic screen-based trading in the 1970s and 1980s and claimed that it used the most advanced technology.

(b)    Merkin knew Madoff's family, and knew that Madoff family members occupied the most senior positions in Maodff's firm.

(c)    Merkin knew that Madoff maintained strict secrecy about his management of money entrusted to him.

(d)    Merkin knew that Madoff consistently converted all holdings to Treasuries at the end of each quarter, a practice that, in light of Madoff's claim that his strategy depending on entering and exiting the market when the conditions were likely to render his strategy profitable, had no legitimate purpose other than to reduce transparency.

(e)    Merkin knew of the unusual long-term stability of Madoff's alleged returns, and that other sophisticated investors had themselves been unable to achieve those returns using Madoff's stated strategy.

(f)    Merkin knew the identity of Madoff's accounting firm, and knew (or was reckless in not knowing) that it was a small, unknown accounting firm in Rockland County occupying a 13' by 18' office rather than a recognized audit firm.

(h)    Merkin knew that Madoff was self-clearing, a failure to segregate responsibilities that increased the risk of fraud.

100.    Merkin also knew that Madoff charged no fees of any kind for his money management services and that Madoff claimed that his only compensation was the normal commissions generated by his trades, commissions that he could have earned if his clients directed the trading themselves. Merkin, who himself charged the standard hefty management and incentive fees for the money he purported to manage, should have recognized that Madoff's willingness to do something for nothing was suspicious.

101.    In 2002, investment advisor Acorn Partners blacklisted Madoff as a result of the countless red flags uncovered during routine due diligence.

102.    In early 2003, Société Générale similarly blacklisted Madoff after performing routine due diligence and strongly discouraged its clients from investing with him:

> What [Société Générale] found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him and also strongly discouraged wealthy clients at its private bank from its investments.
>
> The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

103.    *Business Week* reported that:

> managers of [a] Fort Worth pension fund, who first [invested indirectly with Madoff in 2003], started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The [Madoff investments] raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had

urged clients for nearly a decade to avoid [Madoff]. In July, the pension board voted unanimously to dump its [Madoff Investments].

104.    Drago Indjic, a project manager at the Hedge Fund Center of the London Business School, noted that "Madoff did not pass due diligence for many European hedge fund companies. Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

105.    In 2005, Harry Markopolos wrote another letter to the SEC detailing numerous red flags which indicated that Madoff's fund was a fraud.

106.    In addition, on November 7, 2005, an anonymous author wrote a letter (the "November 7 Letter") to the SEC entitled "The World's Largest Hedge Fund is a Fraud." Based on the same information that was available to Defendants herein, the author concluded that Madoff's operation was a fraud and identified 29 "red flags" to prove it.

107.    The very first "red flag" set forth in the November 7 Letter noted that Madoff's fee structure made no sense, because, while Madoff was running a hedge fund, he did not charge the standard fees a hedge fund would charge (1% management fee and 20% profits) and instead charged only a commission on the purported trades his company was making with investors' money. Regardless of whether the November 7 letter was available to Defendants, they were aware of Madoff's fee structure and failed to investigate.

108.    The November 7 Letter also stated that various third party "funds of funds" obtain investors who "pony up the money" and "don't know that [Madoff] is managing their money," the exact practice perpetrated by Defendants herein.

109.    Among the other 28 red flags raised by the letter:

(a)    the lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

(b)     Madoff's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

(c)     the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

(d)     Madoff acted as his own prime broker, whole most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers; and

(e)     monthly account statements sent to Madoff's investors did not support the returns they reported.

110.     Defendants knew, or should have known had they conducted the due diligence and risk management they purported to conduct, of the existence of each of these red flags.

111.     Indeed, Defendants could have discovered many red flags had they conducted any due diligence at all. In a January 15, 2009 article entitled "Madoff Might not Have Made Any Trades," the *Boston Globe* reported that, on many client account statements (to which Defendants had access but Plaintiffs did not), Madoff reported making trades that were worth more than the entire amount the clients had invested with Madoff. The same article revealed that Madoff had reported investments in Fidelity's Spartan US Treasury Money Market fund --- a fund which did not exist.

112.     By early 2007, the research department of Union Bancaire Privée, a Swiss bank, raised concerns about Madoff's legitimacy and recommended that Madoff be stricken from the list of managers with which UBP invested.

113.     Robert Rosenkranz, the principal of a major investment advisor to wealthy clients, Acorn Partners, was reported in the financial press to have stated that his firm's earlier due diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by Madoff and in part on inconsistencies between customer account statements and

audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.

114.    Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, reported that it had concluded that Madoff was a fraud and advised clients not invest with him. Aksia had concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC were too small to support the size of the assets Madoff claimed to be managing. "There were no smoking guns, but too many things that didn't add up," Mr. Fludgate said. The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff had been operating a secret, unregistered investment vehicle from his office.

115.    Similarly, the *Financial Times* reported on January 22, 2009, that two simple risk management techniques, available at low cost during the Class Period, would have alerted Defendants to the Madoff fraud. The article stated, in part:

> Two simple risk management techniques, available to investors at low cost, could have shown the hedge fund run by Bernard Madoff, which is at the centre of allegations of a $50bn fraud, was claiming investment returns that were all but impossible.
>
> A study to be published today by Riskdata, a risk management specialist, argues that Mr. Madoff's returns are called into question by the bias ratio - a mathematical technique that identifies abnormalities in the distribution of a series of investment returns.
>
> Forensic accountants use a similar method - known as Benford's law - to identify potential accountancy fraud.
>
> In addition, the study says that comparing the risk profile of Mr. Madoff to his peer group would have shown it to be inconsistent with his claimed investment style.

116.    Defendants recklessly failed to supervise, monitor and manage the investments of the Ascot Fund and Gabriel Fund, in violation of their fiduciary duties, and contrary to their

representations that they were exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Ascot Fund and Gabriel Fund and, notwithstanding potential conflicts of interest, that they were providing investment management services consistent with their respective fiduciary duties to investors in the Ascot Fund and Gabriel Fund.

117.    Defendants acted with knowledge that they had abdicated responsibility for the management of the Ariel Fund and Gabriel Fund, and with gross negligence in failing to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations and financial reporting of Madoff.

118.    Defendants were aware, or should have been aware, of the many red flags described above. At the very least, these red flags should have caused Merkin to lessen his reliance on Madoff by moving funds and/or to fully disclose the nature and extent of his reliance on Madoff to Plaintiffs and the Class.

119.    Defendants knew, or reasonably should have known, that Madoff's investment holdings and returns had not been verified, and that investors' capital was not being safeguarded by a reliable custodian.

120.    Defendants' lack of scrutiny into Madoff and BMIS and their carelessness with Plaintiffs' assets falls far short of the representations made to Plaintiffs and other Class members to induce their investments in the Ascot Fund and Gabriel Fund and their legal duties to Plaintiffs and the Class.

**Merkin Unjustly Reaped Hundreds of Millions of Dollars in Management Fees**

121.    During the Class Period, Merkin pocketed hundreds of millions of dollars in management and incentive fees from investors in the Ascot Fund and Gabriel Fund in return for

his purported services as manager of the funds. However, Merkin did absolutely nothing to earn these fees as he simply acted as a marketer and a middleman for Madoff whom Merkin failed to adequately oversee, audit, or investigate.

122. Merkin had a major incentive to avoid asking questions about Madoff's strategies because he collected annual management fees equal to 1% of the capital invested in the Ascot Fund prior to 2002. In 2002, Merkin decided to raise the management fees he received from the Ascot Fund, as of January 1, 2003, from 1% to 1.5% (a difference of $5.3 million per year based on the $1.06 billion under management in 2003). This change required investor approval. To obtain approval, Merkin made false or misleading statements to justify the increase. In a letter to investors seeking approval of the increase, Merkin vaguely cited "rising expenses." This misrepresentation perpetuated and reinforced Merkin's falsehood that he was doing work related to the management of the Ascot Fund. In testimony before the NYAG, Merkin similarly claimed that the fee increase was due to increased general operating costs, but during his deposition with the NYAG, he could not give specific reasons for the increase.

123. Merkin's fees from managing the Ascot Fund for the years 1995 to 2007, totaled more than $169 million. In 2008, Merkin had received annual income of approximately $25.5 million from fees he generated through the Ascot Fund.

124. Similarly, Merkin's compensation under his agreements with the Gabriel Fund included an annual management fee of 1% of assets under management, and an incentive fee of 20% of any profits. From 1989 to 2007, Merkin's fees from Gabriel totaled approximately $277 million. The incentive fee Merkin collected included 20% of the profits reported by Madoff, which, of course, were fictitious. Even after subtracting expenses and fees paid to other outside managers, Merkin's fees for the Gabriel Fund totaled more than $280 million.

125. On March 2, 2009, *New York Magazine* reported in a news article entitled "The Monster Mensch," that at the height of defendant Merkin's hedge-fund business he earned approximately $35 million a year simply for funneling money to Bernie Madoff.

126. Merkin's management fees were incredibly egregious when one looks at the fact that if an investor wanted to place money with Madoff, Madoff did not charge any advisory fees because he claimed he was content with merely earning the trading commissions in his broker-dealer business that were generated by his trades on behalf of clients whose money he managed. Basically, if an Ascot Fund or Gabriel Fund investor wanted Madoff to invest their money, they could have gotten that service for free rather than paying Merkin a fee who was merely handing over the money to Madoff.

127. To the extent that the computation of Merkin's fees were based on fictitious assets and profits of the Ascot Fund and Gabriel Fund, the payments to Merkin resulted in his unjust enrichment, for which Plaintiffs and other Class members are entitled to disgorgement of all fees paid.

128. In addition, according to the NYAG Complaint, Merkin commingled his personal funds, including his management fees from the Ascot Fund and Gabriel Funds, with the funds of his management company, GCC. Merkin used GCC funds to make purchases for his personal benefit, including purchases of over $91 million of artwork for his apartment.

**The Merkin Fraud is Revealed**

129. On December 11, 2008, defendant Merkin sent a letter to investors in the Ascot Fund and disclosed *for the first time* that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) were managed by Madoff. The letter from Merkin also stated,

in part, "[a]t this point, it is impossible to predict what recovery, if any, may be had on these assets."

130.    One week later, on December 18, 2008, defendant Merkin sent a follow-up letter to investors in the Ascot Fund and informed them that the Ascot Fund would need to be dissolved. That same day, defendant Merkin also sent a letter to investors in the Gabriel Fund and disclosed *for the first time* that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio that the Gabriel Fund would be dissolved and liquidated.

131.    Ascot Fund and Gabriel Fund investors were shocked by the news that their investments had been entirely invested with Madoff. Several investors sent defendant Merkin e-mails to express their disbelief and anger with the news that they were now exposed to the Madoff Ponzi scheme. One e-mail stated that, "We never knew that ASCOT FUND was not [itself] investing its money [but] giving it to third-party people to invest." Another person wrote "Are you serious? Why was Ascot trading with one fund?" Another investor, a personal friend of Merkin's, could not believe that Merkin had deceived him. He wrote on December 14, 2008, "It would be dishonest of me to hide our deep sense of shock, disappointment and frustration in you and your fund but we cannot accept the basis of the claims that are being bandied about." After speaking with Merkin on the phone, this investor learned the truth and took a different view of Merkin, writing on January 7, 2009: "[Y]ou took substantial management fees when you were not managing the funds; you were nothing more than a glorified mailbox who took upside payments when there simply wasn't any upside."

132.    As a result of the exposure to Madoff, Ascot Fund and Gabriel Fund investors have lost approximately $2.4 billion.

133. On January 15, 2009, the *Financial Times* reported that the NYAG had issued subpoenas to three investment funds (including the Ascot Fund and Gabriel Fund) run by defendant Merkin, as part of a probe related to the Madoff Ponzi scheme.

134. On February 27, 2009, defendant Merkin sent a letter to investors in the Ascot Fund confirming that all investments in the Ascot Fund were worthless.

135. On April 6, 2009, the NYAG announced charges against Merkin and the funds he controlled for violating New York's Martin Act by concealing from his clients the investment of more than $2.4 billion with Madoff. The NYAG's Complaint charges Merkin with violations of the Martin Act, General Business Law § 352 et seq., for fraudulent conduct in connection with the sale of securities, Executive Law § 63(12) for persistent fraud in the conduct of business, and New York's Not-For-Profit Corporation Law §§ 112, 717, and 720 for breaches of fiduciary duty in connection with Merkin's service on the boards of certain non-profit organizations. The NYAG's lawsuit seeks payment of damages and disgorgement of all fees by Merkin, restitution and other equitable relief.

**BDO**

136. Defendant BDO failed to perform its work as auditor of the annual financial statements of both the Ascot Fund and Gabriel Fund in a manner consistent with the standards of the auditing profession and as required by Generally Accepted Auditing Standards ("GAAS"). GAAS set the minimum level of performance and quality that auditors are expected, by clients and the public, to achieve. Under GAAS, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements examined are free of material misstatement, whether caused by error or fraud.

137. The 2006 Offering Memorandum for investments in the Ascot Fund explained that the Ascot Partnership would provide unaudited financial statements to limited partners of the Ascot Fund within 35 days after the end of each calendar quarter and an annual financial statement, audited by BDO, within 90 days after year end:

> BDO Seidman, LLP serves as the Partnership's auditor. The Partnership will provide to the Limited Partners unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 90 days after year end, and tax information as soon thereafter as practicable. Certain Limited Partners may have access to certain information regarding the Partnership that may not be available to other Limited Partners. Such Limited Partners may make investment decisions with respect to their investment in the Partnership based on such information.

The 2003 Offering Memorandum for the Gabriel Fund contained identical language.

138. According to the NYAG Complaint, Merkin told an investor that Merkin required Ascot's auditor, BDO, to visit Madoff's offices two or three times a year to perform standard operational due diligence. The manager took comfort in this fact. However, this representation was false. BDO did not perform standard operational due diligence, or any other kind of appropriate examination of Madoff's operation, and Merkin had no reason to believe otherwise.

139. BDO consistently represented that it had conducted GAAS compliant audits and that the financial statements of the Ascot Fund and Gabriel Fund were presented in conformity with GAAP. For example, in Ascot's Financial Statements for the year ended December 31, 2007, BDO stated in its letter to the Partners of the Ascot Fund:

> We have audited the accompanying statement of assets and liabilities of Ascot Partners, L.P. (the "Partnership"), including the condensed schedule of investments, as of December 31, 2007, and the related statements of income, changes in partners' capital, and changes in net assets for the year then ended. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ascot Partners, L.P. as of December 31, 2007, and the results of its operation and changes in its net assets for the year then ended, in conformity with accounting principles generally accepted in the United States of America,

BDO Seidman LLP
March 27, 2008

140. This same letter to the Gabriel partners was contained in Financial Statements of the Gabriel Fund for the years ended December 31, 2006 and December 31, 2007. Upon information and belief, identical letters (but for the dates) were included in the annual audited Financial Statements of the Ascot Fund and Gabriel Fund during the relevant time period.

141. At the time of its audits, defendant BDO either knew or recklessly disregarded: (a) the concentration of the Ascot Fund's and Gabriel Fund's investments in a single third party investment manager, Madoff; (b) the violation of Ascot Funds's and Gabriel Fund's stated policies of investment diversity; (c) the materially heightened risk to the assets of the Ascot Fund and Gabriel Fund from such reliance on Madoff, especially given the lack of transparency of Madoff's operations; (d) the abnormally high and stable positive investment results reportedly obtained by Madoff; (e) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients

such as the Ascot Fund and Gabriel Fund; and (f) the fact the BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which had its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

142. By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, BDO's audits of the financial statements of the Ascot Fund and Gabriel Fund and reports thereon during the Class Period contained false statements, were grossly negligent, in violation of GAAS and constituted an extreme departure from the standards of the accounting and auditing industry.

143. As noted above, in its annual audit reports, BDO represented to the limited partners of the Ascot Fund and Gabriel Fund that it had performed its audits in accordance with GAAS and that the financial statements were prepared in conformity with Generally Accepted Accounting Principles (GAAP). The American Institute of Certified Public Accountants (AICPA) through its Auditing Standards Board has developed and codified Statements on Auditing Standards (AU §___) which interpret GAAS.

144. BDO has violated GAAS in a variety of ways including failing to use due professional care in the performance of its work, AU §230; failing to properly plan audits, AU §311; failing to maintain an appropriate degree of skepticism during the audits, AU §316; failing to assess internal controls, AU §319; failing to obtain sufficient competent evidential matter to support the conclusions of the audit reports, AU §326; and failing to audit investments in securities, AU §332.

145. GAAS requires that an auditor exercise due professional care in performing an audit and in preparing an audit report. GAAS also requires that each audit be planned and performed with an attitude of professional skepticism. BDO failed to exercise due professional

care in the performance of its audits of the financial statements of the Ascot Fund and Gabriel Fund during the relevant time period. BDO failed to adhere to professional auditing standards by, among other things, failing to understand the internal control structure of the Ascot Fund and Gabriel Funds failing to obtain sufficient competent evidential matter, failing to conduct an effective confirmation process and failing to extend its audit procedures in light of the warning signs of fraud.

146. Specifically, GAAS requires that BDO assess the internal accounting and reporting controls of the Ascot Fund and Gabriel Fund as part of performing its annual audits. An auditor must obtain an understanding of internal controls sufficient to plan an effective audit. BDO knew that the amounts reported in the financial statements of the Ascot Fund and Gabriel Fund were premised upon internal accounting and reporting coming from entities other than Ascot Fund and Gabriel Fund, including internal controls purportedly designed and implemented by Merkin and Madoff. In order for BDO to perform an audit in accordance with GAAS, it was required to obtain an understanding of the internal controls not only of the Ascot Fund and Gabriel Fund, but also of Merkin as General Partner and Madoff as an investment advisor to whom a material portion of the assets of the Ascot Fund and Gabriel Fund had been entrusted.

147. Under AU §332, Auditing Derivative Instruments, Hedging Activities, and Investment in Securities, BDO was required to assess the accounting performed by Madoff as an investment advisor to whom a material portion of the assets of the Ascot Fund and Gabriel Fund had been entrusted. BDO was required, but failed, to assess Madoff's accounting for the purchase and sale of securities, collection and distribution of income, maintenance of security records and the pricing of securities. At the very least, BDO was obligated to verify that the securities held by the Ascot Fund and Gabriel Fund actually existed and were appropriately

valued. BDO failed to take appropriate steps to assess these issues despite knowledge that, among other things, Madoff refused to allow electronic access to relevant information and that Madoff's own financial statements were audited by an obscure three-person accounting firm with no other clients. BDO knew further that Madoff, through BMIS, was the principal prime broker for the Funds; these overlapping roles should have been a warning sign to BDO leading to enhanced scrutiny and skepticism.

148.    BDO also failed to verify the assertions made in the financial statements it was hired to audit with sufficient supporting evidential documentation. Claims made in the financial statements of both the Ascot Fund and Gabriel Fund about purchase and sale transactions, dividends, interest and realized gains and investment assets were not supported by persuasive audit evidence, in violation of AU §326, Evidential Matter. While the particular circumstances of each audit dictate the amount and type of evidence that is persuasive, the general principles regarding evidential matter require an auditor to obtain evidence from independent sources, where there are effective internal controls or based on the auditor's direct knowledge.

149.    BDO should have obtained evidence directly from third parties about assertions made in the financial statements of the Ascot Fund and Gabriel Fund including, among others, assertions regarding the existence of security purchases and sales, interest and realized gains, and the investment assets held at year end. GAAS also cautions the auditor that if the third party providing evidence is the custodian of a material amount of his client's assets, the auditor should exercise a heightened degree of professional skepticism. Given that 100% of the Ascot Fund's assets and a material portion of the Gabriel Fund's assets had been entrusted to Madoff and that BMIS was functioning as prime broker, BDO should have approached the audit with skepticism. Further, the financial statements of Ascot for the year ended December 31, 2007 showed that the

Partnership's assets were 100% invested in U.S. Treasury Bills. Had BDO utilized the appropriate level of scrutiny, it would have discovered substandard audit evidence received to support the data provided in the financial statements of both the Ascot Fund and Gabriel Fund.

150. In its annual audit reports, BDO represented that it had examined evidence supporting the amounts and disclosures in the financial statements and that its audits provided it with a reasonable basis to conclude that the financial statements were not materially misstated. These statements were false, as BDO's audits did not comply with GAAS.

151. BDO conducted its audits in a reckless manner, ignoring obvious areas that required further inquiry. Had these areas of inquiry been pursued and had BDO not recklessly violated GAAS, it would have discovered the fraudulent information underlying the false financial statements of the Ascot Fund and Gabriel Fund. BDO's reckless audits, that ignored areas that required further inquiry, caused significant damages to Plaintiffs and the Class they seek to represent in that they have lost the full value of their investments in the Ascot Fund and Gabriel Fund. To the contrary, BDO and Merkin profited through the payment of professional fees to BDO and management and incentive fees to Merkin. The asset values purportedly verified by BDO in its audits were used by Merkin to calculate the fees owed to him by investors.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission Against All Defendants Other than BDO

152. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investors of the Ascot Fund and the Gabriel Fund, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase limited partnership interests in the Ascot Fund and the Gabriel Fund. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

154. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of limited partnership interests in the Ascot Fund and the Gabriel Fund in an effort to induce investment in the Ascot Fund and the Gabriel Fund in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

155. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, and operations of the Ascot Fund and Gabriel Fund as specified herein.

156. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs and the Class of the value of the limited partnership interests they purchased, performance and continued substantial growth, which included the making of, or the participation in the making of untrue statements of material

facts and omitting to state material facts necessary in order to make the statements made about the Ascot Fund and the Gabriel Fund not misleading.

157. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inducing Plaintiffs and the Class to invest in the Ascot Fund and the Gabriel Fund.

158. At the time of these misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known the truth regarding the lack of due diligence performed by Defendants, the nature of the investments made by Merkin on behalf of the Funds, and the degree to which the Funds were invested with Madoff, all facts that were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their limited partnership interests in the Ascot and Gabriel Funds.

159. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

160. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests in the Ascot and Gabriel Funds during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Merkin and GCC

161. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162. Defendants Merkin and GCC acted as controlling persons of both the Ascot Fund and the Gabriel Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of the power granted to Merkin and to GCC under the relevant offering materials and underlying corporate documents, these defendants had the power to influence and control and did directly influence and control all aspects of the business of the Ascot Fund and the Gabriel Fund, including the content and dissemination of the various statements alleged to be false and misleading. Defendants were provided with or had unlimited access to all communications made on behalf of the Ascot Fund and the Gabriel Fund prior to and/or shortly after these communications were issued and had the ability to prevent the issuance of any statements or cause the content of any statements issued to be corrected.

163. In particular, both Merkin and GCC had direct and supervisory involvement in the day-to-day operations of the Ascot Fund and the Gabriel Fund and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

164. As set forth above, all defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Merkin and GCC are also liable pursuant to Section 20(a) of the Exchange Act.

165. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their investments in the Ascot Fund and the Gabriel Fund during the Class Period.

## COUNT III

### Violations of Section 10(b) and Rule 10b-5 Against BDO

166. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167. During the Class Period, BDO was the auditor for both the Ascot Fund and the Gabriel Fund.

168. BDO knowingly or recklessly misrepresented that it conducted its annual audits of the financial statements of the Ascot Fund and the Gabriel Fund in compliance with GAAS; that its audits provided reasonable bases for its opinions; and that the financial statements of the Funds presented fairly, in all material respects, the financial position of the Funds at the time of the audits.

169. BDO, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Funds, which resulted in misstatements and omissions of material facts in the audited financial statements disseminated by the Funds each year. BDO employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the financial statements disseminated by the Funds not misleading.

170. As BDO knew, or should have known, the audited financial statements issued by the Funds were materially false and misleading and did not fairly present the financial positions of the Funds as stated by BDO in its Independent Auditors' Reports to the partners of both Funds. BDO failed to perform their audits and reviews in accordance with accepted accounting principles and procedures. BDO failed to meet its professional obligations to obtain sufficient competent evidential matter necessary to satisfy an auditor that the Ascot Fund's financial statements fairly presented the Ascot Fund's financial condition in all material respects. Thus, BDO made express misstatements regarding the financial position of the Funds without examining evidence supporting the amounts and disclosures in the financial statements.

171. BDO further failed to obtain reasonable assurances about whether the financial statements audited were free of material misstatement. Thus, BDO's statements were made without a genuine belief in their truth or a reasonable basis therefor.

172. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests in the Ascot and Gabriel Funds during the Class Period.

173. By virtue of the foregoing, BDO violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT IV

### Breach of Fiduciary Duty Against Defendants Merkin and GCC

174. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175. Plaintiffs and other Class members entrusted assets to Merkin and to GCC by purchasing limited partnership interests in the Ascot and Gabriel Funds, and reposed confidence

in Merkin and GCC with respect to the management of those assets. The superior position of both Merkin and GCC as to the management and control of those assets, as well as their superior access to confidential information about the investment of the assets and about Madoff, required investors in both Funds to place trust and confidence in Merkin and GCC which together had full managerial, administrative and overall control of the two Funds. Merkin held himself out as providing superior client investment services and as having appropriate policies and procedures in place governing investments so as to ensure the safety of Plaintiffs' assets and that transactions would be properly conducted.

176.     Merkin and GCC owed fiduciary duties to Ascot Fund investors and Gabriel Fund investors. These investors reasonably and foreseeably relied on the representations of Merkin and GCC and trusted in their expertise and skill. Merkin and GCC therefore owed a fiduciary duty to Plaintiffs and the Class with respect to their management and protection of the assets of both Funds.

177.     Merkin and GCC were obligated to deal fairly and honestly with Plaintiffs and all investors in the Ascot Fund and the Gabriel Fund; to act with loyalty and good faith toward these investors, to avoid placing themselves in situations involving a conflict of interest with these investors; to manage and operate Fund investments exclusively for the best interest of the Funds; to use due care in the handling of the assets of the Funds; and to oversee the investment of the assets of Ascot and Gabriel to confirm they were maintained in a prudent and professional manner.

178.     Merkin and GCC breached their fiduciary duties to Plaintiffs, and acted in reckless disregard of those duties:

a. by publishing and releasing materials that contained false and misleading descriptions of the care taken by the Merkin and GCC with respect to Fund assets, of the manner in which the assets of the Ascot Fund and the Gabriel Fund were being invested, and of the financial performance of both Funds;

b. by failing to act with reasonable care in ascertaining that the information set forth in the written materials provided to investors were accurate and did not contain misleading statements or omissions of material facts;

c. by failing to perform adequate due diligence, before investing with Madoff;

d. by failing to monitor the assets of the Funds after investing them with Madoff;

e. by failing to monitor the activities of Madoff, to whom a material portion of the Funds' assets had been entrusted, on an ongoing basis to any reasonable degree;

f. by failing to take adequate steps to analyze, test or otherwise confirm Madoff's purported account statements, transactions and holdings; and

g. by profiting handsomely from management and incentive fees paid by the Funds.

179. As a result of the breaches of fiduciary duty of Merkin and GCC, investors in the Ascot Fund and the Gabriel Fund have been damaged in an amount to be determined at trial. Plaintiffs have lost all, or substantially all, of their respective investments in the Ascot Fund and the Gabriel Fund, and have been forced to pay excessive investment and management fees in exchange for investment services that were promised but never provided.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty Against BDO

180. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181. Defendants Merkin and GCC owed Plaintiffs and the Class fiduciary duties as alleged herein.

182. By committing the acts alleged herein, Merkin and GCC have breached their fiduciary duties owed to Plaintiffs and the Class.

183. BDO aided and abetted Merkin and GCC in breaching their fiduciary duties owed to Plaintiffs and the Class. Defendant BDO knowingly or recklessly ignored information that indicated or should have indicated that the assets invested by Plaintiffs and the Class in the Ascot Fund and the Gabriel Fund were being invested with Madoff and BMIS and that Merkin and GCC did not have a genuine belief or a reasonable basis for the financial statements sent to Plaintiffs and the Class or for other statements made to Plaintiffs and other investors.

184. BDO aided and abetted this fiduciary breach by issuing clean audit opinions that were prepared in clear violation of GAAP and GAAS.

185. As a result of the breaches of fiduciary duty of Merkin and GCC, as aided and abetted by BDO, investors in the Ascot Fund and the Gabriel Fund have been damaged in an amount to be determined at trial.

## COUNT VI

### Gross Negligence Against Merkin and GCC

186. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187.    Merkin and GCC, as the managers and administrators of both the Ascot Fund and the Gabriel Fund, and with absolute control over their assets, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of the assets invested in the two Funds, and in the selection and monitoring of third-party managers. Merkin and GCC knew or should have known that Plaintiffs were relying on them to manage the investments entrusted to them with reasonable care, and that investors reasonably and foreseeably relied on them to exercise such care by entrusting assets to them.

188.    Merkin and GCC grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs and all investors in the Funds. Merkin and GCC failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional. Merkin and GCC failed to perform adequate due diligence before investing with Madoff, failed to monitor Madoff on an ongoing basis to any reasonable degree and failed to take adequate steps to confirm Madoff's purported account statements, transactions and holdings of Fund assets.

189.    If Merkin, GCC and BDO had not been grossly negligent with respect to the assets that were invested with them, they would not have entrusted the entirety of the Ascot Fund's assets and a material portion of Gabriel's assets to Madoff.

190.    As a direct and proximate result of Defendants' gross negligence with respect to the assets of the Funds, Plaintiffs and the Class have been harmed.

### COUNT VII

### Unjust Enrichment Against Merkin, GCC and BDO

191.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

192. Merkin and GCC were enriched at the expense of Plaintiffs and all investors in the Funds through the payment of management and incentive fees. Management fees were paid for management services that were not provided and incentive fees were paid for the purported, but in fact non-existent, capital appreciation of the assets of the Funds.

193. To the extent that the assets of the Funds were invested with Madoff, any profits purportedly generated from those investments were illusory. Thus, GCC and BDO were overpaid by the portion of management and incentive fees that stemmed from assets invested with and profits generated by, Madoff.

194. BDO has been paid substantial professional fees for audits that were not performed in a manner consistent with the standards of the auditing profession and as required by GAAS.

195. The performance of Merkin, GCC and BDO was so far below the fiduciary, business and professional standards that Plaintiffs and the Class involuntarily conferred a benefit upon the defendants without receiving adequate benefit or compensation in return. These defendants have been unjustly enriched.

196. Equity and good conscience require all incentive fees, management fees and professional fees that flowed from Fund investments with Madoff to be disgorged and refunded to the Ariel Fund and the Gabriel Fund for the benefit of their limited partners.

## COUNT VIII

### Common Law Fraud Against All Defendants

197. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198. Plaintiffs and other members of the Class in reasonable and justifiable reliance upon the representations and statements made by Defendants purchased limited partnership interests in the Ascot Fund and the Gabriel Fund.

199. Plaintiffs and other members of the Class would not have purchased their limited partnership interests in the Funds except for their reliance upon the representations made by Defendants, and would never have purchased them had they been aware of the material omissions and concealment by Defendants of the inadequate due diligence of Merkin and GCC, the absence of true monitoring by Merkin and GCC, and the failure of BDO to conduct its audits in accordance with GAAS.

200. At the time that Defendants made the statements and representations outlined herein, they knew or should have known them to be false, and Defendants intended to deceive Plaintiffs and the Class by making such statements and representations.

201. At the time the statements and misrepresentations outlined here were made, Defendants intended that Plaintiff and the members of the Class would act on the basis of the misrepresentations and omissions in determining whether to purchase limited partnership interests in the Funds. Plaintiffs and the Class reasonably relied thereon to their detriment in making their investment decisions.

202. Had Plaintiffs and the other members of the Class known of the material facts that Defendants wrongfully concealed and misrepresented material facts, Plaintiffs and other Class members would not have purchased limited partnership interests in the Ascot Fund and the Gabriel Fund.

203. As a direct and proximate result of Defendants' wrongful concealments and misrepresentations, Plaintiffs and the members of the Class purchased limited partnership interests and have sustained damages in an amount to be determined at trial.

## COUNT IX

### Negligent Misrepresentation Against Merkin, GCC and BDO

204. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

205. Defendants Merkin, GCC and BDO owed to Plaintiffs and other members of the Class a duty: (a) to act with reasonable care in preparing Offering Memoranda, financial statements, and auditor's letters and making other representations relied upon by Plaintiffs and other Class members in deciding to purchase limited partnership investment interest in the Ascot Fund and the Gabriel Funds; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Offering Memoranda and other communications to investors.

206. BDO knew that its audited financial statement reports would be provided to limited partners and potential investors in the Ascot Fund and the Gabriel Fund and would be relied upon by them in making investment decisions concerning the purchase of limited partnership interests. The goal of the audit engagement was to provide an audit report to the limited partners, who comprised a discrete and finite group of persons and entities whose identities were know to BDO.

207. BDO owed to Plaintiffs and the Class members a duty: (a) to act with reasonable care in preparing their audit reports of the financial statements of the Funds, which financial statements were relied upon by Plaintiffs and other Class members in deciding to purchase their

limited partnership interests; and (b) to use reasonable diligence in determining the accuracy of the information contained in the financial statements and in preparing the auditors' reports.

208.   Merkin, GSS and BDO each breached their duties to Plaintiffs and other Class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memoranda and other representations to investors, including the audited financial statements of each fund.

209.   Neither the Offering Memorandum nor any other materials used in soliciting investments in the Ascot Fund ever disclosed that virtually all of the Fund's assets were invested with Madoff or entities that he controlled.   The offering materials for both Funds instead misrepresented that controls were in lace to ensure that the Funds' assets were protected and that the Funds' assets were invested pursuant to a strategy that, in fact, was no strategy at all.   The financial statements of the Funds likewise failed to reveal that BDO had failed to probe the adequacy of Merkin's internal controls or the controls established by Madoff and BMIS, or the accuracy of the information received from Madoff regarding the investments of the assets of the Funds.

210.   As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Class members have sustained damages and have lost a substantial part (if not the entirety) of their respective investments in an amount to be determined at trial.

## COUNT X

### Professional Negligence Against BDO

211.   Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

212.    BDO's audit reports were specifically addressed to the Partners of the Ascot Fund and the Gabriel Fund.

213.    BDO expected and intended the Partners as investors to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of its audits.

214.    BDO assumed professional responsibility for independently auditing the financial reports of the Ascot Fund and the Gabriel Fund, undertook to exercise its professional skill and talent on behalf of and for the benefit of the Funds and their limited partners and had a duty to exercise professional care in doing so.

215.    BDO breached this duty of professional care and failed to provide to Plaintiffs the advice and services to which they were entitled. BDO's audits failed to comply with GAAP and GAAS and BDO failed to act as a professional auditor would act in auditing the financial reports of the Funds.

216.    As a direct and proximate result of BDO's negligence and/or gross negligence, Plaintiffs lost all or a substantial portion of their invested capital, and thereby suffered damaged in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding monetary damages against all defendants, in favor of Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the wrongdoings alleged herein, together with interest thereon;

C.     Disgorging all earnings, profits, compensation and benefits received by
Defendants as a result of their unlawful acts and practices;

D.     Awarding punitive damages as appropriate;

E.     Awarding Plaintiffs the fees and expenses incurred in this action, including
reasonable allowance of fees for plaintiffs' attorneys and experts; and

F.     Granting Plaintiffs and the other members of the Class such other and further
relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: April 27, 2009

ABBEY SPANIER RODD & ABRAMS, LLP

By: _____
Arthur N. Abbey, Esq. (AA 8074)
aabbey@abbeyspanier.com
Karin Fisch, Esq. (KF 1082)
kfisch@abbeyspanier.com
Nancy Kaboolian, Esq. (NK 6346)
nkaboolian@abbeyspanier.com
Stephanie Amin-Giwner, Esq. (SA 1248)
samin@abbeyspanier.com
Richard B. Margolies, Esq. (RM9311)
rmargolies@abbeyspanier.com
212 East 39th Street
New York, NY  10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Lead Counsel*

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Richard A. Matasar, Dean and President of New York Law School, on behalf of the New York Law

School ("NYLS"), declare as follows:

1. I have reviewed a copy of the complaint filed against Ascot Partners L.P., et. al. in this action.

2. NYLS did not invest in Ascot Partners L.P which is the subject of this action at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3. NYLS is willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. NYLS invested $3 million in Ascot Partners L.P. which is the subject of this litigation on December 13, 2006.

5. NYLS has not served as or sought to serve as a representative party on behalf of a class during the last three years.

6. NYLS will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the court or any award to it by the Court of reasonable costs and expenses (including lost wages) directly relating to its representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/6/08     Signed: _____
                            Richard A. Matasar
                            Dean and President
                            New York Law School

# CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Scott Berrie, declare as follows:

1. I have reviewed a copy of the complaint filed in this action.

2. I did not invest in Gabriel Capital L.P which is the subject of this action at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. I invested $500,000.00 in Gabriel Capital L.P which that is the subject of this litigation on July 1, 2007 during the class period specified in the complaint.

5. I have not served as or sought to serve as a representative party on behalf of a class during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _12-15-08_      Signed: _____
                              Scott Berrie