UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re

J. EZRA MERKIN AND BDO SEIDMAN
SECURITIES LITIGATION

No. 08 Civ. 10922 (DAB)

-----------------------------------------------------------x

MEMORANDUM OF DEFENDANT BDO SEIDMAN, LLP
IN SUPPORT OF MOTION TO DISMISS

New York Law School v. Ascot Partners, L.P. et al          Doc. 25

Ira G. Greenberg
Robert Novack
Florence A. Crisp
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant BDO Seidman, LLP
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411

Dockets.Justia.com

# TABLE OF CONTENTS

STATEMENT OF FACTS ............................................................................................1

ARGUMENT .........................................................................................................4

I.   THE EXCHANGE ACT CLAIM MUST BE DISMISSED...........................................4
   A.  Purchase and Sale.................................................................................4
   B.  Scienter...............................................................................................5
   C.  Causation.............................................................................................11

II.   ALL STATE LAW CLAIMS MUST BE DISMISSED .................................................13

III.  THE COMMON LAW FRAUD CLAIM MUST BE DISMISSED ...............................14
   A.  Scienter...............................................................................................14
   B.  Causation.............................................................................................16

IV.  THE AIDING AND ABETTING CLAIM BREACH OF ............................................16

V.   THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED.............................17

VI.  THE NEGLIGENCE-BASED CLAIMS MUST BE DISMISSED..............................18
   A.  Causation.............................................................................................19
   B.  Standing..............................................................................................19
   C.  No Breach of Duty.................................................................................20

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977) ...................................................5

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) .........................................5, 6, 7

Ambassador Factors v. Kandel & Co., 215 A.D.2d 305, 626 N.Y.S.2d 803 (1st Dep't 1995) ..............................................................................................................15

Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009)........................................................................24

ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)........6, 7, 11

AUSA Life Ins. Co. v. Ernst & Young, 119 F. Supp. 2d 394 (S.D.N.Y. 2000) ..................8

Baraliu v. Vinya Capital, L.P., 2009 WL 959578 (S.D.N.Y.)...........................................14

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)....................................4,5

Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002) ......................................................4

Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001) ...............................11

Chill v. General Elec. Co., 101 F.3d 263 (2d Cir. 1996)................................................5, 6

Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536 (1985) ...................19, 20

DaPuzzo v. Reznick Fedder & Silverman, 14 A.D.3d 302 (1st Dep't 2005).............15, 19

Decker v. Massey-Ferguson, Ltd., 681 F.2d 111 (2d Cir. 1982)..................................6, 8

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978)..................................................................8

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) .........................................11

Edison Fund v. Cogent Investment Strategies Fund, Ltd., 551 F. Supp. 2d 210 (S.D.N.Y. 2008).........................................................................................................14

Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, (2d Cir. 2003) ..........................................................................................................11,12

Gambella v. Guardian Investor Serv. Corp., 75 F. Supp. 2d 297 (S.D.N.Y. 1999) ..........5

Giant Group, Ltd. v. Arthur Andersen LLP, 2 A.D.3d 189, 770 N.Y.S.2d 291 (1st Dep't 2003) ..............................................................................................................14

Greater N.Y. Mut. Ins. Co. v. White Knight Restoration, Ltd., 7 A.D.3d 292, 776 N.Y.S.2d 257 (1st Dep't 2004) ................................................................16

Gurary v. Winehouse, 190 F.3d 37 (2d Cir. 1999) ...........................................5

Houbigant, Inc. v. Deloitte & Touche, LLP, 303 A.D.2d 92 (1st Dep't 2003).................16

In re AOL Time Warner, Inc. Secs. & "ERISA" Litigation, 381 F. Supp. 2d 192 (S.D.N.Y. 2004)..........................................................................7,9

In re Bayou Group LLC, 396 B.R. 810 (S.D.N.Y. 2008)................................12

In re Bayou Hedge Fund Litigation, 534 F. Supp. 2d 405 (S.D.N.Y. 2007)......................8

In re Bisys Secs. Litigation, 496 F. Supp. 2d 384 (S.D.N.Y. 2007) ..................................7

In re Carter-Wallace, Inc. Secs. Litigation, 220 F.3d 36 (2d Cir. 2000)............................6

In re Livent Inc. Secs. Litigation, 148 F. Supp. 2d 331 (S.D.N.Y. 2001) ..........................9

In re Livent, Inc. Secs. Litigation, 78 F. Supp. 2d 194 (S.D.N.Y. 1999) ..........................8

In re Oxford Health Plans, Inc. Secs. Litigation, 51 F. Supp. 2d 290(S.D.N.Y. 1999)......9

In re Wedtech Corp., 81 B.R. 240 (S.D.N.Y. 1987) ......................................................18

Indiana Elec. Workers Pension Trust Fund v. Millard, 2007 WL 2141697, (S.D.N.Y.) ......................................................................................13

Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340 (11th Cir. 2008)..........13,14

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001)..........................................................5,6, 7

Kaufman v. Cohen, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) .....................17

Kenneth Rothschild Trust v. Morgan Stanley Dean Witter, 199 F. Supp. 2d 993 (C.D. Cal. 2002) ..................................................................................13

Kingdom 5-KR-41 Ltd. v. Star Cruises PLC, 2004 WL 444554, 5 (S.D.N.Y.) ...............14

Klebanow v. New York Produce Exch., 344 F.2d 294 (2d Cir. 1965) ............................18

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996), ..............................................................12, 14

LaSalle Nat'l Bank v. Ernst & Young L.L.P., 285 A.D.2d 101, 729 N.Y.S.2d 671, (1st Dep't 2001) ..................................................................................15

Lentell v. Merrill Lynch & Co., 396 F.3d 168 (2d Cir. 2005) ..........................................11

Mecca v. Shang, 258 A.D.2d 569, 685 N.Y.S.2d 458 (2d Dep't 1999) ..........................18

Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71 (2006) ....................5, 13, 14

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ................................................5, 8

Parrott v. Coopers & Lybrand, LLP, 263 A.D.2d 316 (1st Dept. 2000) ..........................20

Pisani v. Westchester County Healthcare Corp., 424 F.Supp. 2d 710
    (S.D.N.Y. 2006).....................................................................21

Reiger v. Price Waterhouse Coopers, 117 F. Supp. 2d 1003 (S.D. Cal. 2000), .............9

Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 836 N.Y.S.2d 509, 868 N.E.2d
    189 (2007)......................................................................14, 16

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ....................................5,6, 7,8

SEC v. Zandford, 535 U.S. 813 (2002)........................................................13

Serio v. PricewaterhouseCoopers LLP, 9 A.D.3d 330 (1st Dep't 2004).........................15

Sheehan v. City of New York, 40 N.Y.2d 496, 387 N.Y.S.2d 92, 354 N.E.2d 832,
    (1976) ............................................................................19

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ...........................6

SIPC v. BDO Seidman, LLP, 95 N.Y.2d 702 (2001) .................................................19, 20

SIPC v. BDO Seidman, LLP, 222 F.3d 63, 75 (2d Cir. 2000) ....................................19,20

State Street Trust Co. v. Ernst, 278 N.Y. 104 (1938)........................................15

Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir. 1999) .........................................6

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)..............................7, 9

White v. Guarente, 43 N.Y.2d 356 (1977).......................................................20

**STATUTES**

Del. Code tit. 6, §§ 17-1001 to -04.........................................................18

15 U.S.C. § 78bb(f)(1) .....................................................................13

15 U.S.C. § 78u-4(b)(2) .......................................................................6

**RULES**

Fed. R. Civ. P. 9(b)......................................................................6, 14

Fed. R. Civ. P. 23.1 ............................................................................................18

**OTHER AUTHORITIES**

Rule 17a-5(f)(2), (g). (i), (j) under the Securities Exchange Act of 1934 ........................23

## STATEMENT OF FACTS

Defendant BDO Seidman, LLP ("BDO") moves to dismiss. The facts that follow come from the amended complaint ("Complaint"), a copy of which is annexed for the Court's convenience to the moving affidavit of Ira G. Greenberg as exhibit A.[1]

The representative plaintiffs, New York Law School and Scott Berrie, invested in limited partnership interests in defendants Ascot Partners, L.P. and Gabriel Capital, L.P., which were domestic hedge funds  Complaint ¶¶ 2-3. They made these investments in, respectively, 2006 and 2007.  Id. ¶¶ 17-18 & Berrie Certification annexed to Complaint.  They purport to sue on behalf of a class of investors from December 11, 2003, for claims under the Securities Exchange Act of 1934, and for all investors under pendent state law claims.  Id. ¶ 25.

As the complaint details, defendants Ezra Merkin, Gabriel Capital Corporation (Merkin's management vehicle), and the two funds (collectively, "the Merkin defendants") made any number of knowing misrepresentations, principally about how the funds were to be managed and invested and what Merkin's role was to be, that induced plaintiffs to invest.  See generally id. ¶¶ 42-64, 68-86.  Most significantly, despite representing that he would personally control investment decision making, Merkin abdicated all such responsibility to Bernard Madoff. E.g., id. ¶ 9, 11. Moreover, despite representing that the funds would be diversified, Merkin concentrated the investing through Madoff – in the case of Ascot Partners, nearly one hundred percent, and in the case of Gabriel Partners, at least twenty-five percent, id. ¶ 8.

---

[1] BDO does not admit that these allegations are factually correct.  Rather, as required on a motion of this kind it merely assumes their validity.

Madoff was an industry figure who had pioneered electronic trading, was a major market maker, and apparently had an nearly unbroken history of investing success. Id. ¶¶ 34, 109. The Securities and Exchange Commission and the Financial Industry Regulatory Authority regulated his business. Id. ¶ 34.

In fact, Madoff was running a Ponzi scheme – using new investments to pay off old investors -- since the early 1990s. Id. ¶¶ 1 ("massive fraudulent scheme"), 5 ("Ponzi scheme"), 10 ("using assets . . . to pay bogus returns as part of a massive Ponzi scheme"). He had not made an actual investment with the money entrusted to him since about that time. Id. ¶ 32; see id. ¶ 31 (trustee found no evidence of investment since at least 1996). Over the years a whistleblower had repeatedly reported to the SEC that Madoff was a fraud. Id. ¶¶ 95, 105. In addition, some articles in the financial press had questioned how Madoff was so successful, id. ¶¶ 96-97, and some in the financial community had decided for themselves or had counseled their clients not to invest with Madoff based on their conclusion that his reported results could not be trusted, id. ¶¶ 101-02, 112-14.

Nevertheless, "'[t]here were no smoking guns,'" id. ¶ 114 (quoting Aksia's head of operational due diligence); although the SEC constantly investigated Madoff, id. ¶ 93, it took no action; and the very size of the losses – as much as $50 billion, id. ¶ 27 – meant that many sophisticated investors were taken in. The scheme only unraveled in late 2008. Id. ¶ 27. The denouement, see id. ¶¶ 28-33, is now well-known.

BDO's only role was to serve as an auditor; and it served as the auditor not of Madoff or of any of his entities, but rather of the two Merkin-related funds. See id. ¶ 136. "Merkin alone had ultimate responsibility for the . . . investment decisions made

on behalf of both Funds." Id. ¶ 2; accord, id. ¶ 22. There is nothing in the complaint to support factually the proposition that BDO had any role in the funds' investment decisions or that BDO knew or had some obligation as an auditor to know of the whistleblower's statements to the SEC, the articles in the financial press, or the decisions of other investment companies not to invest with Madoff.[2]

According to the complaint, BDO knew that Ascot Fund and Gabriel Fund limited partners would receive and rely on the audited financial statements. Id. ¶ 23. The funds were to distribute them within ninety days after year-end. Id. ¶ 137.

The only misrepresentation that BDO is alleged to have made is that "it had conducted GAAS[-]compliant audits and that the financial statements of the Ascot Fund and Gabriel Fund were presented in accordance with GAAP."[3] Id. ¶¶ 139-40. The thrust of the allegations against BDO is that, because it failed to perform its audits in accordance with GAAS, its opinions that the funds' financial statements were fairly presented under GAAP were erroneous. E.g., id. ¶¶ 12, 168.

In contrast to the well-organized factual allegations against the Merkin defendants, paragraphs 136 through 151 (beginning on page 45) of the amended complaint contain a hodgepodge of assertions against BDO. The amended complaint does not plead that BDO actually knew that the funds' financial statements were erroneous or that Madoff was a fraud. Rather, it says that by the terms of the applicable

---

[2] There are some general allegations about what "defendants" did or knew, but in context it is clear that those allegations relate only to the Merkin defendants. See, e.g., Complaint ¶¶ 88-89, 94, 110, 116-20. In addition, there is a stray reference to BDO as an "investment professional[]," id. ¶ 90, for which there is no factual support cited or in existence.

[3] "GAAS" is an acronym for generally accepted auditing standards. "GAAP" is an acronym for generally accepted accounting principles.

auditing standards, id. ¶ 144, a number of facts to which it points, id. ¶ 141, should have caused BDO to have conducted further audit work, id. ¶ 151, including getting audit evidence from third parties, id. ¶ 149. In addition, it alleges that BDO should have learned more about Merkin's (the individual's) and Madoff's internal controls and should have assessed Madoff's own accounting. Id. ¶¶ 146-47.

As the result of BDO's not having advised them of Madoff's fraud, plaintiffs say, they continued to hold and did not sell their interests in Ascot and Gabriel, respectively. See id. ¶ 151. They do not plead, however, that BDO's false statements induced them to purchase those interests in securities.

Based on these factual assertions, the amended complaint alleges claims against BDO for violation of section 10(b) of the Exchange Act and of rule 10b-5 under it (count III), aiding and abetting a breach of fiduciary duty (count V), unjust enrichment (count VI), common law fraud (count VIII), negligent misrepresentation (count IX), and negligence (count X).

ARGUMENT

I.     THE EXCHANGE ACT CLAIM MUST BE DISMISSED.

There are three reasons why the Exchange Act claim must be dismissed: lack of a purchase and sale; lack of scienter; and lack of causation.

A.     Purchase and Sale

Standing to bring a private action under section 10 of the Exchange Act and rule 10b-5 is limited to "actual purchasers and sellers of securities." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 737-38, 750, 754-55 (1975); Caiola v. Citibank, N.A., 295 F.3d 312, 322 (2d Cir. 2002). Holders of securities lack standing to

sue under this rule. Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71, 79-81 (2006); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 737-38, 754-55; Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977). Thus, plaintiffs who claim that they were fraudulently induced not to sell securities may not sue under rule 10b-5. E.g., Abrahamson v. Fleschner, 568 F.2d at 868 (citing Blue Chip Stamps); Gurary v. Winehouse, 190 F.3d 37, 46 n.9 (2d Cir. 1999) (plaintiff must allege that he sold shares to state a rule 10b-5 claim); Gambella v. Guardian Investor Serv. Corp., 75 F. Supp. 2d 297, 299-300 (S.D.N.Y. 1999) (no standing to sue under rule 10b-5 for individuals induced to retain securities by a defendant's fraudulent conduct).

Here, plaintiffs do not allege that they purchased or sold securities based on any alleged fraudulent conduct by BDO. Because they only allege that BDO's conduct induced them to hold their interests in the Ascot and Gabriel Funds, their claims fall directly within Blue Chip Stamps. That is the first reason why their Exchange Act claim must be dismissed.

B.  Scienter

1.  What It Is. Scienter – a guilty state of mind -- is another element of a rule 10b-5 claim. E.g., Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Chill v. General Elec. Co., 101 F.3d 263, 266 (2d Cir. 1996); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995). "The requisite state of mind . . . that the plaintiff must allege is '"an intent to deceive, manipulate or defraud."'" Kalnit v. Eichler, 264 F.3d at 138 (citations omitted). This inference of fraudulent intent requires a finding that the defendant in effect actually intended to participate in the fraud. Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000); Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000) ("a state

of mind 'approximating actual intent, and not merely a heightened form of negligence'"); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir. 1982) ("approximate an actual intent to aid in the fraud being perpetrated").

Through passage of the Private Securities Litigation Reform Act, the Congress has required that a complaint "state with particularity facts giving rise to a strong inference" that the defendant "acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), as a prerequisite to maintaining such a claim. To the same effect, see, e.g., ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); Acito v. IMCERA Group, Inc., 47 F.3d at 52. See also Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (same requirement derived from Fed. R. Civ. P. 9(b)'s "why" element).

That intent is different in kind, and not just in degree, from negligence. Alleged violations of professional standards, such as GAAS and GAAP do not suffice. E.g., Stevelman v. Alias Research, Inc., 174 F.3d at 84; Chill v. General Elec. Co., 101 F.3d at 270. That one should have been more alert or more skeptical does not suffice either. Chill v. General Elec. Co., 101 F.3d at 270; Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994). After all, neither "recklessness" nor "gross negligence" is a "state of mind," as the PSLRA requires; rather, it is at most evidence of a state of mind. Thus, the cases require that the defendant have acted in a highly unreasonable way , such that either the defendant actually knew of the danger or it was so obvious that the defendant had to have known of it. Kalnit v. Eichler, 264 F.3d 142; In re Carter-Wallace, Inc. Secs. Litigation, 220 F.3d 36, 39 (2d Cir. 2000); Rothman v. Gregor, 220 F.3d at 93.

2.    <u>How It Is Tested</u>.  The Supreme Court emphasized the importance

of the <u>scienter</u> element and explained its application in <u>Tellabs, Inc. v. Makor Issues &</u>

<u>Rights, Ltd.</u>, 551 U.S. 308 (2007), when it held that a district court "must engage in a

comparative evaluation" by considering "competing inferences rationally drawn from the

facts alleged." "To qualify as 'strong'" within the meaning of the statute, "an inference of

scienter must be more than merely plausible or reasonable – it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent." <u>Accord</u>, <u>ATSI</u>

<u>Communications, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d at 99.  After <u>Tellabs</u>, "[i]f anything,

the law is more favorable" to auditor defendants than it had been before.  <u>In re Bisys</u>

<u>Secs. Litigation</u>, 496 F. Supp. 2d 384, 386 n.1 (S.D.N.Y. 2007).

In the absence of concrete benefits to be realized by the defendant from

participating in the fraud,[4] the Court of Appeals has held that a plaintiff must plead facts

constituting strong circumstantial evidence of conscious misbehavior or recklessness.

<u>E.g.</u>, <u>Kalnit v. Eichler</u>, 264 F.3d at 142 ("Where motive is not apparent, . . . the strength

of the circumstantial allegations must be correspondingly greater").  In assessing the

facts put forward, the Court is required to take a prospective view – how the facts

looked before the fraud became apparent.

> Hindsight is always 20/20.  Once a result is known,
> along with all the intervening events which caused it, it is all
> but humanly impossible to put that knowledge out of mind
> when determining whether those occurrences could
> reasonably have been anticipated.  But the present inquiry
> demands that we strive as scrupulously as possible to view

---

[4] The so-called "motive and opportunity" method of proving scienter, <u>e.g.</u>, <u>Rothman v.</u>
<u>Gregor</u>, 220 F.3d 81, 93 (2d Cir. 2000), is inapplicable, as the receipt of compensation
for professional services is not a sufficiently particularized benefit to provide the
requisite motive. <u>E.g.</u>, <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d at 54; <u>In re AOL Time</u>
<u>Warner, Inc.</u>, 381 F. Supp. 2d 192, 239 (S.D.N.Y. 2004).

> the situation as it existed at the time of [the services], with
> the knowledge [the auditor] then had, and without the
> knowledge we now have of what actually happened
> thereafter.

AUSA Life Ins. Co. v. Ernst & Young, 119 F. Supp. 2d 394, 402 (S.D.N.Y. 2000). Put another way, "fraud by hindsight" is not actionable. E.g., Novak v. Kasaks, 216 F.3d at 309; Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978). Nor may the Court evade this stricture by purporting to infer fraudulent intent solely from the magnitude of a fraud committed by another, especially when the other has undertaken extensive efforts to hide that fraud. In re Livent, Inc. Secs. Litigation, 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999) (and cases cited); see Decker v. Massey-Ferguson, Ltd., 681 F.2d at 120 ("When records of a company's improper payments are hidden from its auditor, the auditor should not be held responsible because . . . the auditor lent its 'imprimatur' to the company's financial statement").

Our courts recognize that they must apply these standards rigorously in actions against auditors. See, e.g., AUSA Life Ins. Co. v. Ernst & Young, 119 F. Supp. 2d at 405 ("public policy requires that auditors be held liable for only those losses which foreseeably result from their deliberate deception or reckless insoucience"). Courts should be particularly chary of drawing inferences of scienter when an auditor's not discovering fraud puts it on a par with the regulatory body with cognizance over the entity that committed the fraud. See In re Bayou Hedge Fund Litigation, 534 F. Supp. 2d 405, 418 (S.D.N.Y. 2007).

Liberal use of the colorful term "red flags" does not substitute for testing the facts as pleaded against Tellabs. More particularly, the proffered "red flag" must put the auditor on clear notice of the wrongdoing, such that a failure to do more would

necessarily imply its implication in the wrongdoing.  See, e.g., In re AOL Time Warner, Inc. Secs. & "ERISA" Litigation, 381 F. Supp. 2d 192, 240 & n.51 (S.D.N.Y. 2004) (and cases cited); In re Oxford Health Plans, Inc. Secs. Litigation, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999).  "Where a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the accountant's awareness of those details."  Reiger v. Price Waterhouse Coopers, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000), aff'd, 288 F.3d 385 (9th Cir. 2002); In re Livent Inc. Secs. Litigation, 148 F. Supp. 2d 331, 369 (S.D.N.Y. 2001).

3.      Application to this Complaint.  One searches this complaint in vain for any basis from which to infer, at any level, that BDO was part of Madoff's fraud.

The key point to remember is that BDO made no statements about, and had no role in determining, whether delegating the funds' investment decisions to Madoff was a good thing or a bad thing; the only issue is whether, ex ante, BDO knew or was willfully blind in not knowing that the accuracy of the funds' financial statements was in substantial doubt because the assets on their balance sheets held by Madoff did not exist.  Those assets at year-end – the time as of which the financial statements spoke -- were United States Treasury bills.  See Complaint ¶¶ 35, 149.  Their valuation, if they existed, was not subject to any doubt.  Even during the year, the assets were purportedly held as S&P 100 securities, id. – again, easy to value and, if they existed, not speculative investments.  When those facts are understood, most of the supposed "red flags" on which the complaint relies are irrelevant to the claim against BDO; for example, the heavy reliance on Madoff to make investment decisions.

Similarly, Madoff's use of what turned out to be a relatively small accounting firm would not have been significant to the question whether Madoff actually had the securities it said it did. The complaint does not allege that BDO failed to seek and to obtain a confirmation of these assets' existence from their custodian, Madoff Securities. To the extent that the amended complaint suggests that BDO should have obtained additional evidence from "independent" third parties, Complaint ¶ 149, it ignores the fact that Madoff Securities was precisely that. Madoff Securities was a registered broker-dealer, no different in this regard from Goldman Sachs, equally subject to regulation by the SEC; and its auditor was required to make inspections and filings with the SEC to assure that body that the securities under its custody were actually there. Complaint ¶ 33; see SEC Rule 17a-5 under the Securities Exchange Act of 1934. The absence of any action by the SEC could only provide comfort to an auditor in BDO's position, such that consideration of this fact as audit evidence was consistent with the auditor's good faith.

In addition, the amended complaint fails to specify which independent third parties might have had information about the existence of the securities in question. The reason is easily deduced: There was none. (The United States Government was the counter-party to the Treasury bills; it does not do confirmations for auditors; and, in any event, Madoff, and not BDO's audit client, was the only one with standing to seek a confirmation even if the Government would have been willing to provide one.)

As a corollary, to the extent that the supposed "red flags" hinged on expertise in complex securities trading strategies, the amended complaint pleads nothing to suggest that BDO had or was required to have such expertise or that the

supposed anomalies in Madoff's returns or strategies were brought to BDO's attention. To the contrary, the complaint (¶ 115) makes BDO's point in noting that "forensic accountants" use tests to detect potential securities fraud in situations such as this. BDO was not acting as a "forensic accountant," which is essentially an accounting-savvy fraud investigator. The procedures that forensic accountants use far exceed those that GAAS requires for a financial statement audit. As such, these "red flags" are also nothing of the kind.

BDO was not alone in not catching Madoff's Ponzi scheme, as the SEC, FINRA, and any number of financial institutions, hedge funds, charitable organizations, and sophisticated investors did not catch it; nor did the auditors of the many other funds and institutions around the world. Yet no one would seriously contend that all of them were in on Madoff's scheme. Without knowledge of the fraud and without "red flags" to which to turn a blind eye, there can be no finding of <u>scienter</u>. Dismissal is required for that reason alone.

C.     Causation

A plaintiff alleging a federal securities fraud claim must plead causation. <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 346 (2005). Causation has two elements – transaction causation and loss causation. <u>E.g.</u>, <u>ATSI Communications, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d at 106; <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 168, 172 (2d Cir. 2005). The former is a variant of reliance and requires that the plaintiff would not have entered into the transaction absent the claimed misrepresentation. <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. at 343, 345-46; <u>Emergent Capital Inv.</u>

Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001).

Class plaintiffs do not plead reliance on BDO's audited financial statements in making their investments in the first place. Rather, they plead that they received the financials only after they had already made their investments. Thus, the complaint effectively alleges that BDO committed a fraud because it did not tell plaintiffs after they had made their investment that the funds' financials were wrong, based on BDO's having found out that Madoff was a sham. The implicit but invalid assumption of this allegation is that no one else would have known. Of course, if the audited financials had revealed that Madoff was a sham, every investor, all of whom would have received the financials at about the same time, would have known; and obviously, every investor, not just plaintiffs, would have made a claim for the return of his or her investment more or less simultaneously.

The fraud causes of action assume, but also do not plead, that Madoff had enough money to be able to pay all of the investors back when they simultaneously made such claims. That assumption is also invalid. Madoff has publicly declared that he was insolvent from a time well before plaintiffs made their investment; and, in any event, the recipient of money to which one is not legally entitled under such circumstances is subject to a clawback. E.g., Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d at 1370 (1996); In re Bayou Group, LLC, 396 B.R. 810 (S.D.N.Y. 2008). So even if BDO had revealed the errors in the financial statements after plaintiffs had invested, there is no pleaded basis for the assertion that

plaintiffs would have recovered their investment or, put another way, that BDO's alleged "misrepresentations" on which plaintiffs supposedly relied caused them any injury at all.

## II.   ALL STATE LAW CLAIMS MUST BE DISMISSED.

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA") precludes all the state law claims alleged in the amended complaint. All four prerequisites to SLUSA's applicability are met. 15 U.S.C. § 78bb(f)(1); see Indiana Elec. Workers Pension Trust Fund v. Millard, 2007 WL 2141697, at *2-3 (S.D.N.Y.)

This is a "covered class action" because it seeks damages on behalf of more than fifty persons. Complaint ¶ 26.

It seeks relief based on state or local laws. The complaint alleges five counts against BDO under New York common law.

The state claims concern a "covered security" although the limited partnership interests are neither traded on a national exchange or issued by a registered investment company. This condition is met because plaintiffs gave their money to a third-party manager who then used or purported to use the money to purchase a covered security. Kenneth Rothschild Trust v. Morgan Stanley Dean Witter, 199 F. Supp. 2d 993, 998-1000 (C.D. Cal. 2002); see Complaint ¶¶ 38, 48, 70-71. In addition, Madoff purported to invest in covered securities. Id. ¶¶ 34-36.

Finally, the state claims are based on alleged misrepresentations or omissions "in connection with" the purchase or sale of securities – a term that is more inclusive than the purchase and sale requirement under rule 10b-5 and includes claims by securities holders. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 84-85 (2006); see SEC v. Zandford, 535 U.S. 813, 820, 822 (2002); Instituto de

Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1349 (11th Cir. 2008). The fraud claim is not the only one within this rubric. See Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d at 1350 (negligence, breach of fiduciary duty, and fraud claims precluded); Kingdom 5-KR-41 Ltd. v. Star Cruises PLC, 2004 WL 444554, at *3, 5 (S.D.N.Y.) (negligence, unjust enrichment, and breach of contract claims precluded). Here, the allegations are that plaintiffs held their limited partnership interests as the result of BDO's misrepresentations or omissions. As they "coincide" with purported securities transactions, Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. at 85, the fourth and last element is satisfied as well.

    III.    THE COMMON LAW FRAUD CLAIM MUST BE DISMISSED.

    A.    Scienter

As under rule 10b-5, the elements of a fraud cause of action include scienter. E.g., Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 515, 868 N.E.2d 189, 195 (2007); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d at 421, 646 N.Y.S.2d at 80, 668 N.E.2d at 1373. Plaintiffs making this claim must also plead facts that give rise to "a strong inference of fraudulent intent." Fed. R. Civ. P. 9(b), Baraliu v. Vinya Capital, L.P., 2009 WL 959578, at *8 (S.D.N.Y.); Edison Fund v. Cogent Investment Strategies Fund, Ltd., 551 F. Supp. 2d 210, 232 (S.D.N.Y. 2008).

The discussion of federal scienter law is fully applicable here. As on the federal securities fraud count, a plaintiff's employment of the labels "recklessness" or "gross negligence" without substance to back them up does not suffice, e.g., Giant Group, Ltd. v. Arthur Andersen LLP, 2 A.D.3d 189, 190, 770 N.Y.S.2d 291, 292 (1st Dep't 2003) ("'[N]egligence claims cannot be deemed fraud solely because of the

nomenclature used'"); and GAAS or GAAP violations "do[] not make out fraud." LaSalle Nat'l Bank v. Ernst & Young L.L.P., 285 A.D.2d 101, 109, 729 N.Y.S.2d 671, 677 (1st Dep't 2001). "'[A]n opinion, especially an opinion by an expert, may be found to be fraudulent if the grounds supporting it are so flimsy as to lead to the conclusion that there was no genuine belief back of it. Further than that this court has never gone. . . .'" Ambassador Factors v. Kandel & Co., 215 A.D.2d 305, 308, 626 N.Y.S.2d 803, 806 (1st Dep't 1995) (citation omitted).

Consistent with these definitions and the requirement that fraud be inferred from such conduct, cases involving auditors that have upheld fraud complaints against a motion to dismiss have involved situations in which the auditor either knew that the audit opinion was erroneous or, at a minimum, had actual knowledge of facts that made it obvious that the opinion was wrong.

Thus, for example, in State Street Trust Co. v. Ernst, 278 N.Y. 104, 112, 121 (1938), the auditor had actually found an error in a previously distributed balance sheet but disclosed it only to the company under audit and only thirty days later. In DaPuzzo v. Reznick Fedder & Silverman, 14 A.D.3d 302, 303 (1st Dep't 2005), the complaint alleged that the auditor had not only "ignored and failed to report the client's lack of internal controls [and] blindly accepted information provided by the client's chief financial officer without independent verification," but it also "gave in to the CFO's demands to fix the financial reports to represent a more favorable financial position in order not to jeopardize its fee." In Serio v. PricewaterhouseCoopers LLP, 9 A.D.3d 330, 331 (1st Dep't 2004), the auditor "failed to undertake even the most minimal audit" of an insurance company's reinsurance profit-sharing receivables and case reserves "despite

notice that many cases carried either no reserves or obviously insufficient reserves of $1 each." In <u>Houbigant, Inc. v. Deloitte & Touche, LLP</u>, 303 A.D.2d 92, 95 (1st Dep't 2003), the auditor issued an unqualified opinion on a company's financial statements even though it "knew, but failed to acknowledge, that [the company's] financial statements actually contained numerous serious irregularities and inaccuracies, which it knew could have a material impact on the accuracy of the financial statements' recitation of the corporation's net worth."

This complaint does not allege facts from which one may plausibly infer that BDO had the intent to engage in fraud, that BDO was complicit in the Merkin defendants' allegedly fraudulent representations to the funds' limited partners, or that BDO had knowledge of another's fraud that it intentionally ignored.

### B.  Causation

Also as with the rule 10b-5 claim, one element of the fraud claim is causation. <u>Ross v. Louise Wise Servs., Inc.</u>, 8 N.Y.3d at 488, 836 N.Y.S.2d at 515, 868 N.E.2d at 195-96; <u>Greater N.Y. Mut. Ins. Co. v. White Knight Restoration, Ltd.</u>, 7 A.D.3d 292, 293, 776 N.Y.S.2d 257, 258 (1st Dep't 2004).  This element is absent for the reasons set forth in Point I.B. <u>supra</u>.

### IV.  THE AIDING AND ABETTING CLAIM BREACH OF FIDUCIARY DUTY CLAIM MUST BE DISMISSED.

The aiding and abetting breach of fiduciary duty claim must be dismissed.

The complaint does not plead its elements.  "A claim for aiding and abetting a breach of fiduciary duty requires:  (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." <u>Kaufman v. Cohen</u>, 307 A.D.2d

113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003). In connection with the second element, "there must be an allegation that such defendant had actual knowledge of the breach of duty"; "[c]onstructive knowledge of the breach of fiduciary duty by another is legally insufficient." Id. Moreover, the defendant must have provided "'substantial assistance'" to the primary violator, which only occurs when it "affirmatively assists, helps conceal or fails to act when required to do so." Id. at 126, 760 N.Y.S.2d at 170.

This complaint is devoid of any allegations that BDO had actual knowledge of any breach of fiduciary duty by the Merkin defendants. To the contrary, paragraph 183 of the amended complaint alleges that BDO may have "recklessly ignored information that indicated or should have indicated" that the Merkin defendants "did not have [a] genuine belief [in] or a reasonable basis" for their financial statements. Likewise, the amended complaint does not allege that BDO did any more than incorrectly "issuing clean audit opinions" when it should not have. Complaint ¶ 184. There is nothing to support the assertion that it knowingly induced or participated in the breach. Finally, for the reasons set out in Point I.C above, plaintiffs did not suffer damages from any assumed breach.

V. THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED.

The unjust enrichment claim, seeking the return of auditing fees, must be dismissed on two grounds.

First, class plaintiffs are not the proper parties to bring the claim, as they were not damaged directly. Rather, the only party with standing to bring the claim were those who had paid the fees to BDO. Even if a limited partner may bring a derivative action on behalf of a limited partnership, Del. Code tit. 6, §§ 17-1001 to -04; see

Klebanow v. New York Produce Exch., 344 F.2d 294 (2d Cir. 1965), the requirements of Fed. R. Civ. P. 23.1 must still be met. Here, class plaintiffs have done nothing even to attempt to meet those requirements.

The problem is not just a pleading one, however. The claim should be dismissed, second, because it in effect seeks a duplicative recovery. Underlying all of the claims against BDO is the premise that BDO's audits at the least did not meet professional standards. If class plaintiffs were to prevail on the other claims and to receive a damages award, they would be made whole; that is, they would have been put in the same position as if the audits had been fully satisfactory. To receive a return of fees under those circumstances would constitute a windfall. On the other hand, if class plaintiffs do not prevail on the other claims, they cannot prevail on this one. Either way this claim does not survive analysis.

VI.   THE NEGLIGENCE-BASED CLAIMS MUST BE DISMISSED.

Though alleged in two separate counts, denominated negligent misrepresentation and professional negligence, the claim is actually one. See Mecca v. Shang, 258 A.D.2d 569, 570, 685 N.Y.S.2d 458, 460 (2d Dep't 1999) ("[T]he court should have also dismissed Dr. Mecca's negligent misrepresentation and gross negligence causes of action, since these claims . . . arise from the same facts as his . . . malpractice claim and are duplicative of that cause of action"); In re Wedtech Corp., 81 B.R. 240, 241 (S.D.N.Y. 1987) (Sand, J.) (treating same claim against accountant, essentially charging malpractice under different legal rubrics, as one).

A. Causation

Proximate cause is also an element of the claim. E.g., Sheehan v. City of New York, 40 N.Y.2d 496, 501-02, 387 N.Y.S.2d 92, 95, 354 N.E.2d 832, 834 (1976). For the reasons set forth in section I.C. supra, that element is lacking here as well.

B. Standing

As ones not BDO's client, plaintiffs lacks standing to sue it for negligent misrepresentation. Since the Court of Appeals' decision in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 (1985), one in their position could only sue an accountant if three criteria were met:  the accountant was aware that the report was to be used for a particular purpose; a known party was intended to rely on the report in furtherance of that purpose; and there was some linking conduct between the accountant and that known party.  See also SIPC v. BDO Seidman, LLP, 95 N.Y.2d 702, 711, 723 N.Y.S.2d 750, 756, 746 N.E.2d 1042, 1048 (2001).  These criteria are not met here.

The mere knowledge that certain people in a class might rely on the accountant's work is not enough.  "Rather, the accountant must have known when preparing the audit that the particular plaintiffs bringing the action rely on its representations."  SIPC v. BDO Seidman, LLP, 222 F.3d 63, 75 (2d Cir. 2000).  See also DaPuzzo v. Reznick Fedder & Silverman, 14 A.D.3d at 303 (precluding outside directors' suit for negligent misrepresentation in face of allegation that accountants knew or should have known that they would invest again because audits were "not for the purpose of inducing the particular investments involved").  Here, the complaint

pleads nothing to demonstrate that BDO knew of plaintiffs' reliance on its audit reports, either generally or to decide whether to hold onto their investments.

In addition, "[w]here direct contact between the accountant and the plaintiff has been nonexistent or even minimal, . . . the plaintiff cannot recover for negligence." SIPC v. BDO Seidman, LLP, 222 F.3d at 75. "To demonstrate linking conduct, a plaintiff generally must show some form of direct contact between the accountant and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other 'substantive communications' between the parties." Id. See also Parrott v. Coopers & Lybrand, LLP, 263 A.D.2d 316, 322 (1st Dept. 2000) ("The factors utilized in demonstrating the requisite relationship depends not only on the number of contacts but also on the substantive nature of the contacts. . . . [T]here . . . must be a demonstrably direct relationship").[5]

There is nothing concerning any direct contact between plaintiffs and BDO. The operative complaint only alleges that they received from others the audited financial statements that Seidman had audited. That allegation is insufficient as a matter of law. See SIPC v. BDO Seidman, LLP, 222 F.3d at 76 ("At best, [the complaint] alleges contact between Seidman [defendant] and the SIPC regulators, who themselves operate at least one step removed from the . . . investors [plaintiffs]").

---

[5] White v. Guarente, 43 N.Y.2d 356 (1977), does not require a different outcome because, as the Appellate Division held in Parrott, 263 A.D.2d at 324, "with the subsequent Credit Alliance ruling, the Court of Appeals refined the analysis, superseding White." See also SIPC v. BDO Seidman, L.L.P., 95 N.Y.2d at 711 ("As we have made clear, 'end and aim' is not the only focus of the negligent misrepresentation analysis").

C.    No Breach of Duty

The mere fact that an audit opinion turns out to be invalid does not mean that the audit failed to comply with generally accepted auditing standards. "In the observance of generally accepted auditing standards, the independent auditor must exercise his [or her] judgment in determining which auditing procedures are necessary in the circumstances to afford a reasonable basis for his [or her] opinion." Greenberg Aff. exh. B (AU 110.05).[6] "Because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement." Id. exh. C (AU 230.12).

The complaint does not allege that BDO performed no audit at all or that it failed to exercise its professional judgment in deciding what audit steps to take. Indeed, it does not even state what steps the auditors did take to audit.

Insofar as it complains that BDO did not understand the internal controls at Merkin, there is nothing – the complaint certainly points to nothing – even to suggest that there were an internal control problem at Merkin or at the funds.

As to internal controls at Madoff, it is well to start with two facts.

The first fact is that Madoff was a registered broker-dealer that the SEC and FINRA regulated extensively.

The second fact is that the complaint admits (¶ 146) that BDO was not auditing Madoff; it was auditing the funds. The auditing standards therefore limit the amount of inquiry that an auditor must make, because the practicalities of the situation limit the amount of access that the auditor has. It is impossible to picture, for example,

---

[6] Because the amended complaint cites auditing standards and the audited financial statements, Seidman is entitled on this motion to dismiss to refer to them as well. See, e.g., Pisani v. Westchester County Healthcare Corp., 424 F. Supp. 2d 710, 714-15 (S.D.N.Y. 2006).

every auditor with a client who cleared through Shearson or Merrill Lynch insisting on access to Shearson's or Merrill Lynch's financial systems. Yet it is clear that the fraud was effectuated at the Madoff broker-dealer. That was the entity that issued the false monthly and quarterly statements and that claimed to have custody of large quantities of securities – United States Treasury bills at period end – that did not actually exist.

The complaint cites AU 332, a copy of which is exhibit D to the Greenberg Affidavit, as the basis for some special requirement that overcomes common sense and requires that the auditor perform procedures to understand internal controls at the Madoff broker-dealer. On its face it does not.

AU 332 addresses controls at a "service organization" when the service organization is part of the "information system" of the entity under audit. The standard itself specifically says that one in Madoff's position is not part of the "information system" of the entity under audit for purposes of the assessment of that entity's internal controls. For one thing, it does not meet the definition of a "service organization," a paradigm of which would be ADP, the payroll service. See AU 332.11 (requires that it as "the procedures . . and records established by an entity" for certain processes relative to entity transactions). In addition, AU 332.13 provides:

> Examples of a service organization's services that would not be part of an entity's information system are the following:
> - The execution by a securities broker of trades that are initiated by either the entity or its investment adviser
> - The holding of an entity's securities

Here, the very services at issue are the broker's execution of trades (first bullet point) and holding of the securities that belonged to the funds (second bullet point). By its own terms, AU 332 is not applicable.

Even if AU 332.13 did not specifically exclude the very acts at issue, the auditor has considerable discretion about what, if anything, the auditor needs to do to look into a service organization's controls. See AU 332.11 (extent of understanding required "depends on how much information the auditor needs to identify and assess the risk of material misstatement"). Indeed, AU 332.14 indicates that the auditor may be able to gather information about the service organization in order to plan the audit "from a variety of sources," including "[t]he contract between the entity and the service organization" and "[i]nquiry or observation of personnel at the entity." If the services are standardized, information about the services or about the service organization's controls may be "obtained through the auditor's prior experience with the service organization." Here, BDO had years of experience during which the information from the funds and, Madoff all tied out and during which all claims for redemptions had been met.

Even if it be assumed that additional audit evidence were required, the complaint does not allege that Seidman lacked it. For example, at a minimum Seidman could (and did) trace and agree the trade tickets to the monthly and quarterly statements. In addition, it had the internal control letters that Madoff was obliged to file with the SEC under rule 17a-5(f)(2), (g). (i), (j) under the Securities Exchange Act of 1934. The SEC annually accepted those letters, which attested to the adequacy of Madoff's internal controls over custody of customer assets, and did so based on the attestation of the very same small firm about which the complaint complains. See Rule 17(a)-5(f)(2) (auditor of broker-dealer to be identified and filed with SEC). Yet plaintiffs are claiming that BDO was negligent in not concluding the opposite.

The complaint's allegations about BDO's alleged malpractice are all over the place. Beyond AU 332 they consist almost entirely of broad generalities. Yet the complaint does not say what BDO should have done that it did not, does not provide any support for the proposition that it had to have done so or commit a GAAS violation, and does not let on how having done so would have revealed Madoff's Ponzi scheme.

The simple fact is that the error in the financials was saying that the United States Treasury bills that supposedly constituted all of the funds' assets held by Madoff at year-end, see Complaint ¶ 149, existed when they did not. In order to audit those Treasury bills the accounting firm that audited Madoff only had to assure itself that the T-bills existed. Madoff's auditor's statement that they did when they did not was not the product of too few auditors or too little expertise to audit Madoff; it was the product of the fact that its lead auditor was in cahoots with Madoff – a fact that BDO did not and could not know. On the other hand, the notion that BDO could have verified their existence by obtaining a confirmation from the counterparty – the United States Treasury Department – lacks plausibility, which the recent Supreme Court decision in Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009), requires.

## CONCLUSION

Class plaintiffs may not maintain this action against BDO. It should be dismissed.

Dated: New York, NY
June 25, 2009

Respectfully submitted,

Ira G. Greenberg
Robert J. Novack
Florence A. Crisp
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant BDO Seidman, LLP
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411