# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE J. EZRA MERKIN AND BDO SEIDMAN SECURITIES LITIGATION | 08 Civ. 10922 (DAB) |

## PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs New York Law School ("NYLS") and Scott Berrie ("Berrie") (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by the undersigned Lead Counsel, for their Second Consolidated Amended Class Action Complaint (the "Complaint") allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based, *inter alia*, on the investigation made by and through their attorneys, which investigation included among other things, a review of Ascot Partners, L.P., Gabriel Capital, L.P. and Ariel Fund Limited documents; complaints filed by the Securities and Exchange Commission ("SEC") (including the complaints filed in *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008) and *SEC v. David G. Friehling*, 09 Civ. 2467 (S.D.N.Y. Mar. 19, 2009)); documents obtained by the Office of the Attorney General of the State of New York ("NYAG") in connection with the complaint filed in *Andrew Cuomo v. J. Ezra Merkin et al.*, 450879/2009 (N.Y. Sup. Ct. Apr. 6, 2009), *New York v. Merkin*, 450879/2009, New York State Supreme Court (Manhattan) and *In the Matter of: Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.*, Docket No. 2009-0028 (the administrative complaint filed by the Enforcement Section of the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts), other reports and interviews published in the financial press and information obtained by Plaintiffs.

## INTRODUCTION

1.     This case arises from a massive fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and others, and which was facilitated by defendant J. Ezra Merkin ("Merkin") and others named herein, who, recklessly or negligently and/or in breach of fiduciary duties owed to Plaintiffs and other class members, caused and permitted $1.8 billion (virtually the entire investment capital of Ascot Partners, L.P. (the "Ascot Partnership" or the "Ascot Fund")); and at least 25% of the investment capital of both Gabriel Capital, L.P. (the "Gabriel Partnership" or the "Gabriel Fund")) and Ariel Fund Limited (the "Ariel Fund")) to be handed over to Madoff to be "invested" for the benefit of Plaintiffs, the other limited partners of the Ascot Fund and Gabriel Fund and the owners of shares of the Ariel Fund.

2.     This action is brought as a class action on behalf of investors in the Ascot Fund, the Gabriel Fund and the Ariel Fund to recoup losses caused by Defendants' violations of federal and New York State law. The Ascot Fund and Gabriel Fund are each domestic hedge funds organized as limited partnerships managed by the same general partner -- Merkin. The Ariel Fund is an off-shore "fund of funds." Merkin is the sole shareholder and sole director of the entity that was the Investment Advisor to the Ariel Fund. Thus, Merkin alone had ultimate responsibility for the management, operations and investment decisions made on behalf of all three Funds.

3.     Plaintiff NYLS and other Ascot Fund class members are qualified investors that purchased limited partnership interests in the Ascot Fund. Plaintiff Berrie and other Gabriel Fund class members are qualified investors that purchased limited partnership interests in the

Gabriel Fund. Ariel Fund class members are qualified investors who purchased redeemable participating preference shares in the Ariel Fund.

4.     Merkin is also the sole shareholder and sole director of Gabriel Capital Corporation ("GCC"). According to the offering materials of both the Ascot Fund and the Gabriel Fund, GCC provides administrative and managerial services to both the Ascot Fund and the Gabriel Fund. According to the offering materials of the Ariel Fund, GCC is the Investment Advisor to the Ariel Fund.

5.     On December 11, 2008, Bernard Madoff was arrested after confessing to running a $50 billion Ponzi scheme.

6.     Also on December 11, 2008, defendant Merkin sent a letter to investors in the Ascot Fund and disclosed to Plaintiff NYLS and other class members for the first time that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) had been allocated to Madoff and were likely lost. That same day, Merkin advised Ariel investors that Madoff had been arrested by federal authorities "for perpetuating a massive securities fraud, alleged to have involved losses of $50 billion." Merkin also revealed for the first time to investors that he had invested Ariel funds with Madoff.

7.     On December 18, 2008, defendant Merkin sent a letter to investors in the Gabriel Fund and disclosed to Plaintiff Berrie and other class members that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio, the Gabriel Fund would be dissolved and liquidated.

8.     Also on December 18, 2009, defendant Merkin sent a letter to investors in the Ariel Fund and disclosed that Madoff related losses necessitated that he wind down the Ariel

Fund and sell off its holdings. According to the letter, the Ariel Fund suffered at least a 39%

decline due in large part to Madoff. Specifically, the letter stated that "our only realistic option

is to wind down Ariel Fund Limited and engage in an orderly disposition of its portfolio

positions."

9.      Prior to December 11, 2008, Ascot Fund investors were never informed that since

the Ascot Fund's inception, nearly 100% of its assets were actually being funneled to and

invested directly with Madoff. Similarly, prior to December 18, 2008, neither Gabriel Fund

investors nor Ariel Fund investors were ever informed that at a significant portion of the assets

of those Funds were invested directly with Madoff.

10.     Further, Merkin consistently represented to Plaintiffs and other class members in

offering materials, periodic correspondence and other statements made to all investors, that he

was actively managing the assets of the Funds and making investment decisions pursuant to

specified investment strategies when, in truth, Merkin was doing nothing more than handing over

a material portion of the assets of the Funds to Madoff.

11.     Defendants, in breach of their fiduciary duties to investors in the Ascot Fund,

Gabriel Fund, and Ariel Fund invested the assets of the Funds with Madoff, who was allegedly

using a trading strategy described as a "split strike conversion" strategy. Madoff in fact had no

strategy at all and was using the assets of the Ascot Fund, Gabriel Fund and Ariel Fund to pay

bogus returns as part of a massive Ponzi scheme.

12.     Defendant Merkin, as the General Partner and Manager of the Ascot Fund and

Gabriel Fund, and as the sole shareholder of GCC, recklessly failed to supervise, monitor and

manage the investments of the Funds, in violation of his fiduciary duties, and contrary to his

representations and undertaking that he as the General Partner or through GCC was exercising

ultimate responsibility for the management, operations and investment decisions made on behalf of the Funds.

13.    The investments of Plaintiffs and other class members in the Ascot Fund, Gabriel Fund and Ariel Fund have been decimated, as a direct result of: (a) defendant Merkin's abdication of his responsibilities and duties as General Partner and Manager of the Ascot Fund and Gabriel Fund and principal of GCC, the Investment Advisor to the Ariel Fund and; (b) the complete failure of BDO Seidman, LLP, BDO Tortuga, BDO Binder and BDO International (collectively, "BDO") (the independent auditor for the Funds), to perform its audits and provide its annual audit reports in conformance with generally accepted auditing standards.

14.    Defendant Merkin has profited handsomely as he was charging and receiving from Ascot Fund investors an annual fee of between 1.0%-1.5% and from Gabriel and Ariel Fund investors an annual fee of 1% of their investments in exchange for his purported "management" services, which ultimately proved to be no more than turning money over to another investment manager. In excess of the management fee of the Gabriel Fund and the Ariel Fund, Merkin also received 20% of the Funds' net income each year as an incentive award. These incentive awards flowed from Fund profits which now have shown to be illusory. From 1995 through 2007, Merkin received management fees of $169 million from the Ascot Fund. From 1989 through 2007, Merkin collected annual management and incentive fees from the Gabriel Fund that totaled approximately $277 million and from the Ariel Fund approximately $242 million.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17

C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5, as well as under the laws of the State of New York. This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa and pursuant to the supplemental jurisdiction of this Court. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District, and most Defendants reside in and/or maintain principal executive offices in this District.

17.    In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**THE PARTIES**

**Lead Plaintiffs**

18.    Co-lead Plaintiff NYLS is currently located at 57 Worth Street, New York, New York 10013 and was first chartered by the State of New York in 1891. NYLS has approximately 1500 students to whom it offers a course of study leading to the J.D. degree through full-time day and part-time evening divisions, as well as joint degree programs with other educational institutions. During the proposed class period, NYLS, through its endowment entity, invested $3 million in the Ascot Fund in 2006, as set forth in the certification attached hereto, and continues to own that investment, which is now worthless. NYLS's investment in the Ascot Fund is in the form of a limited partnership interest.

6

19. During the proposed class period, Co-lead Plaintiff Berrie invested $500,000 in the Gabriel Fund, as set forth in the certification attached hereto, and continues to own that investment, which is now worth substantially less. Berrie's investment in the Gabriel Fund is in the form of a limited partnership interest.

**Defendants**

20. Defendant GCC is a Delaware corporation with its principal place of business at 450 Park Avenue, New York, New York 10022. GCC is an investment management business. All of the outstanding capital stock of GCC is owned or controlled by Merkin.

21. Defendant Merkin is the founder, General Partner and Manager of the Ascot Fund and Gabriel Fund. Merkin maintains his business office at 450 Park Avenue, New York, New York 10022. Merkin is also the President, sole shareholder and director of GCC. Merkin has sole responsibility for the management, operations and investment decisions made on behalf of all three Funds. On April 6, 2009, the NYAG charged Merkin with civil fraud for secretly steering at least $2.4 billion in client money into Madoff's massive Ponzi scheme.

22. Defendant BDO International (also sometimes referred to as BDO Global Coordination B.V.) is a world wide network of public accounting firms, called BDO Member Firms. With more than 1,000 offices in over 100 countries, BDO is the fifth largest such network in the world.

23. Defendant BDO is a national accounting and consulting firm with officers and partners having offices all over the world, including at 135 West 50th Street, New York, New York 10020 and 330 Madison Avenue, New York, New York 10017. BDO is a member of BDO International, a worldwide network of public accounting firms. The firm's website describes its services and qualifications as follows:

> BDO Seidman, LLP is a national professional services firm providing assurance, tax, financial advisory and consulting services to a wide range of publicly traded and privately held companies. Guided by core values including competence, honesty and integrity, professionalism, dedication, responsibility and accountability, for almost 100 years we have provided quality service and leadership through the active involvement of our most experienced and committed professionals.

During the relevant period, BDO was the independent auditor for the Ascot Fund and Gabriel Fund and issued clean audit reports on the annual financial statements of the Ascot Fund and Gabriel Fund which were relied on by Plaintiffs and other class members. BDO knew that the audited financial statements would be provided to and relied on by Ascot Fund and Gabriel Fund limited partners.

24.     Defendant BDO Tortuga, located in Grand Cayman (P.O. Box 31118 SMB, 5th Floor Zephyr House, Mary Street, George Town, Grand Cayman, Cayman Islands), is one of the firms operating under the umbrella of BDO International, a worldwide network of public accounting firms. BDO Tortuga served as Ariel's independent auditors, conducted annual audits of Ariel purportedly in accordance with auditing standards that were generally accepted in the United States, and for all relevant times, issued clean audit opinions on the financial reporting of Ariel which were relied on by Ariel class members. BDO Tortuga knew that the audited financial statements would be provided to and relied on by Ariel shareholders.

25.     Defendant BDO Binder, located in the British Virgin Islands, is one of the firms operating under the umbrella of BDO International, a worldwide network of public accounting firms. During the Class Period, BDO Binder served as Ariel's independent auditors, conducted annual audits of Ariel purportedly in accordance with auditing standards that were generally accepted in the United States, and for all relevant times, issued clean audit opinions on the

8

financial reporting of Ariel which were relied on by Ariel class members. BDO Binder knew that the audited financial statements would be provided to and relied on by Ariel shareholders.

26. Defendants BDO International, BDO Global Coordination B.V., BDO, BDO Tortuga and BDO Binder are sometimes referred to herein collectively as the "BDO Defendants."

27. Defendant Fortis Bank (Cayman) Ltd. ("Fortis Cayman") provides financial and banking services and is organized under the laws of the Cayman Islands. The company was formerly known as MeesPierson (Cayman) Ltd and is located at 802 West Bay Road, Grand Pavilion Commercial Centre, George Town, KYI-1104, Cayman Islands. Fortis Cayman operates as a subsidiary of Fortis SA/NV. Fortis Cayman is the only shareholder of Ariel holding shares with the right to vote.

28. Defendant Fortis Prime Fund Solutions (Cayman) ("Fortis Solutions Cayman") is the successor to Fortis Fund Services (Cayman) Limited, and a subsidiary of Fortis Cayman, and served as Ariel's registrar.

29. Defendant Fortis Prime Fund Solutions (USA) LLC ("Fortis Solutions USA") is the New York division of Fortis servicing hedge funds and is located at 153 East 53rd Street, 27th Floor, New York, NY 10022.

30. Defendant Fortis Bank SA/NV ("Fortis Bank") is the parent of Fortis Cayman, and indirectly of Fortis Solutions."

31. Defendants Fortis Bank, Fortis Cayman and Fortis Solutions Cayman and Fortis Solution USA are sometimes referred to herein collectively as the "Fortis Defendants."

32.     Defendants GCC, Merkin, BDO International, BDO, BDO Tortuga, BDO Binder Fortis Cayman, Fortis Solutions Cayman, Fortis Solutions, USA and Fortis Bank are sometimes referred to herein collectively as "Defendants."

**Relevant Non-Parties**

33.     Non-party Ascot Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on August 17, 1992 to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons, including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests which are held by Tax-Exempt U.S. Persons.

34.     Non-party Gabriel Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on January 1, 1991 to operate as a private investment partnership for the benefit of U.S. taxable investors.

35.     Non-party Ariel Fund is an offshore "fund of funds" incorporated in the Cayman Islands.  The Ariel Fund is an exempted company under the Cayman Islands Companies Laws. The Articles of Association of the Fund provide for the Fund to undertake business as a corporate open-ended investment fund. Prospective shareholders in the Ariel Fund must be non-U.S. persons or U.S. persons subject to ERISA, or otherwise exempt from paying Federal Income Tax. The Ariel Fund is essentially a separate but parallel fund to the Gabriel Fund that is open to foreign investors and others not subject to U.S. taxes.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who

purchased limited partnership interests of the Ascot Fund and Gabriel Fund and shares of the Ariel Fund: (a) between December 11, 2003 and December 11, 2008 (the "Class Period") for claims arising under the Securities Exchange Act; and (b) who held limited partnership interests or shares at the end of the Class Period for claims arising under state law, and who were injured thereby (the "Class"). Excluded from the Class are the Defendants, members of the immediate family of Defendant Merkin, any affiliate of the Ascot Fund, Gabriel Fund, Ariel Fund, Merkin, GCC, the Fortis Defendants, executive officers of the Ascot Fund, Gabriel Fund or Ariel Fund, partners of Defendant BDO, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

37.    This action is properly maintainable as a class action because:

a.    The members of the proposed Class in this action are dispersed geographically and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds;

b.    Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws and New York law as alleged herein;

c.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seeks to represent;

d.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is

impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

  e. Plaintiffs anticipate no unusual difficulties in the management of this action as a class action; and

  f. The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   i. whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

   ii. whether Defendants' Class Period representations to Plaintiffs and the other class members misrepresented and/or omitted material facts;

   iii. whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

   iv. whether Defendants conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary duties owed to Plaintiffs and other Class members; and

   v. to what extent the members of the Class have sustained damages and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Madoff Ponzi Scheme

 38. On December 10, 2008, Bernard Madoff confessed to running the largest Ponzi scheme in history, a fraud that Madoff himself admitted could have taken as much as $50 billion from investors. According to Madoff, he was "finished," and had "absolutely nothing." Madoff also admitted that his entire business was "just one big lie."

39.     On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on advisory clients of BMIS. Those clients included the Funds. Unknown to Plaintiffs and other Class members and contrary to representations made to Plaintiffs and the Class, Merkin and GCC had entrusted virtually all of the investment capital of the Ascot Fund and at least 25% of the investment capital of the Gabriel Fund and Ariel Fund (capital provided by Plaintiffs and the Class through their purchase of investment interests in the Funds) to Madoff.

40.     Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office of the Southern District of New York with securities fraud. According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.

41.     On December 12, 2008, the SEC was granted emergency relief to halt the ongoing Madoff fraud and preserve any assets for injured investors, including orders freezing assets, appointing a receiver, appointing a Trustee pursuant to SIPA, allowing expedited discovery and preventing destruction of documents.

42.     On February 20, 2009, Irving Picard, the court-appointed Trustee liquidating Madoff's assets, stated that he had found no evidence that, from at least 1996 to the present, any stocks or options were purchased or traded by Madoff for investors.

43.     On March 12, 2009, Madoff pleaded guilty to securities fraud charges, admitting that beginning in the early 1990s, he stopped purchasing securities for his investment management clients and began operating a Ponzi scheme.

44. On March 18, 2009, the SEC charged BMIS' auditors David G. Friehling ("Friehling") and his firm, Friehling & Horowitz, CPAs, P.C. ("F&H"), with committing securities fraud by representing that they had conducted legitimate audits, when in fact they had not. Mr. Friehling pled guilty to these charges at the end of November 2009.

45. On June 29, 2009, Judge Denny Chin sentenced Madoff to 150 years in prison and condemned his crimes as "extraordinarily evil."

**Merkin's Relationship With Madoff**

46. Madoff, by the 1970s and 1980s, had pioneered electronic trading and founded his own trading firm, BMIS, which became a major market-maker for stocks and options. BMIS was both a broker-dealer and investment advisor registered with the SEC.

47. Madoff's purported trading strategy was known as a "split strike conversion" strategy. The strategy was to (a) buy stocks of selected corporations that were included in the blue-chip Standard & Poor's 100 Index (the "Index"), and simultaneously (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options. The call options would also, to some degree, limit any gains that would be earned on the underlying stocks. Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined. Madoff's description of his purported strategy evolved only slightly over time. He soon began to claim that he was using a larger "basket" of stocks selected from the Index, combined with put and call options on the Index itself rather than options on individual stocks. The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated. Madoff claimed to execute the "split strike conversion" strategy six to eight times per

year. At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries").

48. In the late 1980s, defendant Merkin began running his own investment funds. Through his extensive professional network, connections in his community and the philanthropic world, Merkin marketed several funds to numerous individuals and charities. Merkin's primary role was to raise money for the funds and discretely feed the funds to third parties to actually manage the investment activity.

49. Sometime in the very early 1990s, Merkin met Madoff and they started doing business together. Thereafter, Merkin started raising large sums of money from investors, including Plaintiffs and Class members, who were unaware that their investments were being fed to Madoff and BMIS and who believed, as they were told by Merkin, that their investments were being managed by him pursuant to stated investment strategies and were being placed in a diverse portfolio of securities. Merkin's business relationship with Madoff and BMIS helped earn Merkin and his investment firm millions of dollars in management and incentive fees.

**The Ascot Fund**

50. In 1992, defendant Merkin created the Ascot Fund, a private investment partnership. The sole purpose of this investment fund (which was undisclosed to investors) was to serve as a feeder to Madoff and BMIS. According to the complaint filed by the NYAG, Merkin testified that he formed the Ascot Fund "largely" for the purpose of investing with Madoff, and that, from the beginning, "substantially all" of the assets of the Ascot Fund were tendered to Madoff.

51. Investors in the Ascot Fund, like NYLS, are limited partners of the Ascot Partnership. According to a Confidential Offering Memorandum dated October 2006 (the " 2006

Offering Memorandum"), the Ascot Partnership had three different classes of limited partnership interests:

- Class A limited partnership interests issued to certain investors prior to February 1, 2006.

- Class B interests held by the Ascot Fund Limited, an investment vehicle created to facilitate investments by foreign investors in the Ascot Partnership.

- Class C limited partnership interests issued to certain Ascot Fund investors after October 2006.

52. As general partner of the Ascot Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Ascot] Partnership." As Merkin acknowledged in testimony before the NYAG, "I had fiduciary responsibilities [to investors] for oversight of the portfolio."

53. As of the end of the third quarter of 2008, the Ascot Fund had at least 300 investors with a total of approximately $1.8 billion under management.

**Ascot Offering Memoranda and Other Disclosures
Were False and Misleading**

54. Throughout and prior to the Class Period, Merkin offered participation in the Ascot Fund to qualified investors such as NYLS and other Class members, through a series of Confidential Offering Memoranda issued in 1992, 1996, 2002, and 2006 (the "Confidential Offering Memoranda"). While these documents were prepared, amended or revised from time to time, they were the same in all material respects relevant hereto. Through these Confidential Offering Memoranda, Merkin provided assurances to Ascot Fund investors, upon which they reasonably and foreseeably relied when deciding to invest in the Ascot Fund. The Confidential Offering Memoranda remained consistent with respect to the material information they concealed. Indeed, the Confidential Offering Memoranda used to solicit investments in the

Ascot Fund never disclosed that the majority of the Ascot Partnership's assets were invested with Madoff, BMIS or other Madoff controlled entities.

**False and Misleading Statements In the Confidential Offering Memoranda**

55.     Plaintiff NYLS, like other investors in the Ascot Fund, relied on the identity and role of the manager of the Ascot Partnership. Plaintiff NYLS and other Class members invested in the Ascot Fund based on the understanding that Merkin was the day-to-day manager and that he would devote the majority of his time to managing the Ascot Partnership.

56.     The Confidential Offering Memoranda were misleading in that they falsely state that Merkin was involved in the Fund's management on a day-to-day and transaction-by-transaction basis, and that the success of the fund depended on Merkin's abilities as a money manager. Merkin led Ascot Fund investors to believe that it was Merkin, not a third party, who was actively managing their investments. However, in truth, Merkin did very little other than bookkeeping as he was feeding all assets invested in the Ascot Partnership directly to Madoff.

57.     By way of example, the December 2002 Confidential Offering Memorandum (the "2002 Offering Memorandum") and the 2006 Offering Memorandum stated, among other things, under the heading "Dependence on the Managing Partner" that: "All decisions with respect to the management of the capital of the [Ascot] Partnership are made exclusively by J. Ezra Merkin. Consequently, the [Ascot] Partnership's success depends to a great degree on the skill and experience of Mr. Merkin." This was of course untrue, as the investment strategies and performance of the Ascot Fund were entirely in the hands of Madoff.

58.     The Confidential Offering Memoranda were also false and misleading because Merkin represented to investors that he was spending the majority of his time managing the assets of the Ascot Fund. For example, the 2002 Offering Memorandum stated, "The Managing

Partner is required to devote substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the [Ascot] Partnership." Similarly, the 2006 Offering Memorandum stated, "The General Partner has agreed to devote substantially his entire time and effort during normal business hours to the management of the [Ascot] Partnership...."

59. In truth, Merkin's management of the Ascot Fund was minimal at best and consisted only of a few monthly conversations with Madoff each year. Merkin admitted in his deposition with the NYAG that his "monitoring" of the Ascot Fund consisted of:

> It was monitoring. It was talking to [Madoff]. It was a very long relationship. I spoke to him ten or 15 time[s] a year. I spoke to or saw him 10 or 12 times a year. It might have been as often as once a month depending on what was going on. It wasn't so much second guessing. . . . Fifteen would be high in a given year, ten could be low in a given year, and my guess it was more in the beginning[,] then a bit less, and then it developed back up again.

60. Merkin's personal attention to individual trades is also repeatedly touted in the risk disclosures that take up a large portion of each memorandum:

- "The Partnership also may take position . . . in options on stock of companies which may, *in the judgment of the managing partners*, be potential acquisition candidate . . ." (emphasis added).

- "Such purchases may include securities which *the Managing partner believes* to be undervalued." (emphasis added).

- "Investments in debt claims and the securities of companies that have field for bankruptcy . . . may be made at various stages in the bankruptcy process *based on the Managing partner's judgment that there is sufficient profit potential.*" (emphasis added).

- The imposition of controls by governmental authorities might also limit such forward (and futures) trading to *less than that which the General Partner would otherwise recommend . . .*" (emphasis added).

- Merkin has "ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership."

61.     Ascot Fund investors were led to believe that Merkin's role was so central to the management of the Ascot Fund that the entire Partnership would need to be terminated in the event of his death or incapacity. Under a heading in the 2006 Offering Memorandum entitled "Outline of the Partnership Agreement", it stated in relevant part:

> "The Partnership will continue indefinitely the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days...."

This representation was of course misleading, as the management of the Ascot Fund was entirely in the hands of Madoff.

62.     The Confidential Offering Memoranda were also false and misleading because they gave Ascot Fund investors the perception that Merkin was actively managing their investments with a very specific strategy. By way of example, the 2006 Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Ascot] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

- Generally, the [Ascot] Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities;

- The [Ascot] Partnership primarily follows a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the [Ascot] Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the [Ascot] Partnership's long portfolio. The purchase of the put option allows the [Ascot] Partnership to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the [Ascot] Partnership to partially finance the purchase of the put option while at the same time partially hedging the [Ascot] Partnership's portfolio against any downward movement in the S&P 100;

- The [Ascot] Partnership will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the [Ascot] Partnership's;

- The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely; and

- The General Partner reserves the right to alter or modify some or all of the [Ascot] Partnership's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk.

These representations about the Ascot Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Ascot Fund would certainly have wanted to know. In particular, the representations that the Ascot Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was following "a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100"; and was making investments through "third-party managers using managed accounts" all falsely implied that Merkin was actively pursuing a specific strategy for the Ascot Fund in a prudent manner and was using multiple third-party managers with varying execution strategies, thereby avoiding the risk of concentrating capital in too few investments or managers. In fact, the investment strategies of the Ascot Fund were a sham and the General Partner, defendant Merkin, had abandoned any diversification strategy because he had given a single third-party manager, Madoff, complete and total management responsibility and discretion over the Ascot Fund. Merkin admitted in his deposition with the NYAG that substantially all of the assets of the Ascot Fund were invested with Madoff:

Q. And from the time that Ascot started to invest with Mr. Madoff, [ ] were substantially all of the assets of Ascot with Madoff?

A. Substantially all, yes.

63. The section of the 2006 Offering Memorandum entitled "Risk Factors" also covered a wide variety of investment strategies that had nothing to do with the Ascot Fund's actual trading strategy (*i.e.*, Madoff's "split strike conversion" strategy). The risk warnings included, among others, "Arbitrage Transactions", "Options Transactions", "Futures Contracts", "Forward Trading", "Swap Agreements", "Short Selling", and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Ascot Fund investors of the far greater risk, that Merkin had entrusted a single third-party manager with custody and trading discretion for the entire capital of the Ascot Fund.

64. The statement in the 2006 Offering Memorandum that the General Partner (Merkin) "intends to adopt a selective approach in evaluating potential investment situations" so "he can follow more closely" relatively fewer transactions was also false and misleading because it omitted to state that Merkin had, with no or inadequate due diligence or oversight, abdicated his responsibility and entrusted the assets of the Ascot Fund to Madoff.

65. As acknowledged during testimony given to the NYAG, Merkin always intended for the Ascot Fund to serve solely as a conduit to Madoff and as a result none of the affirmative representations regarding purported investment strategies described in the Confidential Offering Memoranda were true. Despite this admission to the NYAG, Merkin never disclosed this important fact to Ascot Fund investors.

66. In the 2006 Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Ascot Fund's assets to multiple

independent money managers. As part this disclosure, Merkin assured investors that he would exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and will *monitor the results of those money managers* and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities....

Notwithstanding the false assurances that Merkin would exercise reasonable care in selecting independent money managers, these statements were false and misleading because: (1) all of the Ascot Partnership's assets were entrusted to one single manager, Madoff; and (2) Merkin never exercised any care in delegating such investment discretion to Madoff.

67.     During his deposition taken by the NYAG, Merkin was asked whether the Ascot Fund Offering Memoranda disclosed Madoff's role in the Ascot Fund. Merkin directed the NYAG to certain statements made in Ascot Fund Offering Memoranda and claimed that Madoff's role was disclosed: "Bernie playing a role of prime broker" for the Ascot Fund and that this description "would certainly convey some sense that the accounts were custodied" with Madoff. The disclosure to which Merkin was referring was in the 2006 Offering Memorandum:

> The Partnership will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms. Morgan Stanley & Co., Inc. and Bernard L. Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the principal prime brokers and custodians for the Partnership, and clear (generally on the basis of payment against delivery) the Partnership's securities transactions that are effected through other brokerage firms. The Partnership is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Partnership.

This disclosure is in fact completely false and misleading. The disclosure only describes Madoff's involvement in the Ascot Fund as a "principal prime broker," a purely administrative function. The disclosure also creates the impression that the Ascot Fund had established a separation between the entity that cleared trades and kept custody of the securities on the one hand, and the investment managers making investments decisions on the other. There is no disclosure that all Ascot Fund assets had been entrusted to Madoff or that Madoff was the person making all purported investment decisions for the Ascot Fund.

68.     The 2006 Offering Memorandum also misrepresented the role of Morgan Stanley & Co. by referring to it also as a "principal prime broker." In fact, in 2006, approximately 98% of the Ascot Fund's transaction were both effected and cleared by Madoff, not Morgan Stanley. According to the NYAG Complaint, from at least 1999 through 2008, Madoff, not Morgan Stanley, held virtually all securities purportedly acquired by the Ascot Fund. The account statements for the Ascot Fund's Morgan Stanley accounts show that Morgan Stanley's role was almost entirely limited to acting as a bank to transfer cash between the Ascot Fund and investors, and between the Ascot Fund and Madoff's Chase Manhattan Bank account. The disclosure in the 2006 Offering Memorandum, describing Morgan Stanley as a prime broker, was just another way for Merkin to conceal the fact that he was simply feeding the assets of the Ascot Partnership directly to Madoff.

**False and Misleading Statements In Ascot Fund Quarterly**
**Reports and Investor Presentations**

69.     In addition to the false and misleading statements in the Confidential Offering Memoranda, Merkin and others made misstatements to Ascot Fund investors through fraudulent

23

quarterly reports and investor presentation materials and concealed and misrepresented the role Madoff played in managing the Ascot Fund.

70.     During the Class Period, defendant Merkin sent quarterly account statements to Ascot Fund investors purporting to reflect the investments and returns of those limited partners. The quarterly statements disclosed only the value of each investor's account and the purported appreciation during the prior quarter.  Annual audited financial statements for the Ascot Fund were also sent to investors.  The quarterly and annual statements sent to Ascot Fund investors were, of course, completely false and never revealed that all assets of the Ascot Fund were held in an account managed by Madoff.

71.     Throughout the Class Period, Plaintiffs and other Class members met with defendant Merkin and, based on his representations, thought they were entrusting their money to him.  This was not the case.

72.     Prior to their investing in the Ascot Fund, Merkin made presentations to Plaintiff NYLS and other Class members.  Based on these presentations, investors were led to believe that Merkin would be managing the Partnership and that he would be protecting the assets of the Ascot Fund.  In a 2008 PowerPoint document used by Merkin in making presentations to potential investors, Merkin described the Ascot Fund as having "Actively Managed Strategies." That presentation never disclosed that it was actually Madoff who was actively managing the strategies of the Ascot Fund.

73.     Merkin told several investors, concerned about rumors that the Ascot Fund was being managed by Madoff, that only a small or insubstantial portion of the Ascot Fund's assets were held by Madoff.  For example, in 2005, an investor was told by an employee at another hedge fund that the assets of the Ascot Fund were invested with Madoff.  When that investor

asked Merkin about Madoff's role, Merkin acknowledged that when he started the Ascot Fund, it was managed by Madoff, but after Merkin and his staff learned about Madoff's strategies, they were able to produce the same results without Madoff. Merkin also claimed that while a small amount of the Ascot Fund was still being managed by Madoff, the majority of it was being managed in-house by Merkin and his staff.

74.     Similarly, in 2007, Merkin told two investors, during a meeting they requested after hearing rumors that Madoff managed the Ascot Fund, that all but an insubstantial portion of the Ascot Fund was managed directly by Merkin and that Madoff did not play any role in the investments of the Ascot Fund.

75.     Sometimes Merkin outright denied Madoff's role in the Ascot Fund. For example, a member of the Investment Committee of a non-profit organization noticed that the Ascot Fund's returns were similar to those reported by another hedge fund that was widely known to be a feeder to Madoff. After being told by a Merkin employee that Ascot assets were "held" at Madoff's firm and that Madoff had some management role, the committee member directly asked Merkin if he was investing Ascot funds with Madoff. Merkin responded that he was not, but that Ascot used a strategy similar to Madoff's.

76.     During a November 14, 2006 meeting of the finance committee of Plaintiff NYLS, Merkin made a presentation concerning the Ascot Fund. The minutes of this meeting reflect a number of Merkin's false statements, including the following:

| False Statements by Merkin | Truth |
|---|---|
| "Ezra explained that he tries to exploit short-term pricing discrepancies in the options market. Proprietary, computer driven models guide him and his team . . . ." | Neither Merkin nor any "team" of his was involved in the Ascot Fund's trading, and Merkin did not have any "computer-driven" models relating to the Ascot Fund's strategy. |

| "About 15% of the fund utilizes longer duration options ('Leaps') which he trades through Bernie Madoff." | In his testimony before the Attorney General, Merkin admitted that "we were not doing any Leaps traded through Bernie Madoff." |
| --- | --- |
| "Ezra noted that up to 60% of Ascot's assets come from his personal family trusts." | In his testimony given to the Attorney General, Merkin admitted that "nothing like 60 percent of Ascot's total assets" came from those trusts. |
| [    ] asked why Merkin's strategy "is not exploited by other banks and competitors" and "Ezra replied that the strategy is not scaleable." | Merkin knew that Madoff purported to exploit the strategy on a far larger scale than just Ascot's assets. |

## The Gabriel Fund and Ariel Fund

77.　In 1988, Merkin created the Gabriel Fund (known at first as Ariel Capital, L.P.) a domestic fund for U.S. investors and what has been called its "offshore twin" the Ariel Fund, an offshore fund incorporated in the Cayman Islands for foreign investors and others, including non-profit organizations, not subject to certain U.S. taxes.

78.　Investors in the Gabriel Fund are limited partners of the Gabriel Partnership. According to a Gabriel Fund Confidential Offering Memorandum dated March 2006 (the "March 2006 Offering Memorandum"), the Gabriel Partnership had two different classes of limited partnership interests:

- Class A limited partnership interests were issued to certain investors prior to February March 2006. The Class A limited partnership interests had different redemption rights and less exposure to certain investments than the other limited partners.

- Class B limited partnership interests were issued to certain investors after March 2006.

79.　As general partner of the Gabriel Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Gabriel] Partnership."

80.     GCC, which Merkin has owned and managed since January 1989, is an Investment Advisor to the Ariel Fund. Ariel investors received different series of shares for their investments in the Ariel Fund. According to the Ariel Fund Confidential Offering Memorandum dated October 2001 (the "October 2001 Offering Memorandum"), GCC had "full discretionary authority to invest the assets of the [Ariel] Fund."

81.     In 1990, Merkin started giving Madoff and other outside managers some of the capital of the Gabriel Fund and Ariel Fund. From 1990 to 1992, he gave a significant portion of the assets to Madoff to manage. In 1993, after creating the Ascot Fund as a feeder fund to Madoff, Merkin temporarily discontinued placing Gabriel Fund and Ariel Fund assets with Madoff, and entered into an agreement with Cerberus Capital Management ("Cerberus") under which Cerberus would manage a large portion of the Gabriel Fund and Ariel Fund (the "Cerberus Account"). All due diligence, research, and trading decisions for the Cerberus Account were made by Cerberus with little input from Merkin other than occasional conversations between Merkin and the principals of Cerberus. Cerberus also incurred millions of dollars in legal fees and other expenses in managing assets in the Cerberus Account, which Merkin reimbursed from the Gabriel Fund and Ariel Fund.

82.     By 2002, Merkin turned back to Madoff to manage a significant portion of the assets of the Gabriel Fund and Ariel Fund. In fact, by the middle of 2002, one-third of the Ariel Fund's $385,703,794 portfolio was invested with Madoff ($125,089,730).

83.     Based on information contained in the NYAG Complaint, between 2002 through 2008, between 80-95% of the Gabriel Fund assets were managed by just three outside money managers: Cerberus, Madoff, and Cohanzick Capital, L.P. ("Cohanzick").

84.     As of the end of the third quarter of 2008, the Gabriel Fund had at least 200

investors with a total of at least $1.4 billion under management and the Ariel Fund had at least

78 investors with a total of at least $1.3 billion under management.

**The Gabriel and Ariel Offering Memoranda and Other Disclosures
Were False and Misleading**

85.     Throughout and prior to the Class Period, Merkin offered participation in the

Gabriel Fund and Ariel Fund to qualified investors, through a series of Confidential Offering

Memoranda.  While these documents were prepared, amended or revised from time to time, they

were the same in all material respects relevant hereto.  Through these Confidential Offering

Memoranda, Merkin provided assurances to Gabriel Fund and Ariel Fund investors, upon which

they reasonably and foreseeably relied when deciding to invest in the Gabriel Fund and Ariel

Fund.  The Confidential Offering Memoranda remained consistent with respect to the material

information they concealed.

**False and Misleading Statements In the
Gabriel Fund March 2006 Confidential Offering Memorandum**

86.     Plaintiff Berrie, like other investors in the Gabriel Fund, relied on the identity and

role of the manager of the Gabriel Fund.  Plaintiff Berrie and other Class members invested in

the Gabriel Fund based on the understanding that Merkin was the day-to-day manager and that

he would devote the majority of his time to managing the Gabriel Fund.

87.     The Gabriel Fund Confidential Offering Memoranda were misleading in that they

falsely stated that Merkin was involved in the Gabriel Fund's management on a day-to-day and

transaction-by-transaction basis, and that the success of the fund depended on Merkin's abilities

as a money manager.  Merkin led Gabriel Fund investors to believe that it was Merkin, not a

third party, who was actively managing their investments.  However, in truth, Merkin did very

little other than bookkeeping as he was feeding at least 25% of the investments from the Gabriel Partnership directly to Madoff and the remainder to two other third party money managers.

88.     By way of example, the March 2006 Confidential Offering Memorandum (the "March 2006 Offering Memorandum") stated, among other things, that:

- Merkin personally managed the Gabriel Fund's assets on a day-to-day basis and would devote "substantially his entire time and effort during normal business hours to the management of the [Gabriel] Partnership."

- "The management of the [Gabriel] Partnership will be vested exclusively in the General Partner."

- Merkin's personal attention to individual trades is also repeatedly touted in the risk disclosures. The March 2006 Offering Memorandum specifically stated that: "The General Partner will attempt to assess risk in determining the nature and extent of the investment the [Gabriel] Fund will make in specific securities."

- Gabriel Fund investors were led to believe that Merkin's role was so central to the management of the Gabriel Fund that the Gabriel Partnership would need to be terminated in the event of his death or incapacity. Under a heading in the 2006 Offering Memorandum entitled "Dissolution", it stated in relevant part: "The Partnership will dissolve upon the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days...."

In truth, all of these representations were false and misleading because Merkin was not the day-to-day manager, and was devoting little if any time to managing the investments of the Gabriel Fund as he was simply feeding a substantial portion of the assets of the Gabriel Fund to Madoff and two other third party managers.

89.     The Gabriel Fund Offering Memoranda were false and misleading because they gave Gabriel Fund investors the perception that Merkin was actively managing their investments with a very specific strategy. The March 2006 Confidential Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Gabriel] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

- Generally, the [Gabriel] Partnership will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts;

- The [Gabriel] Partnership will invest in the securities of corporations believed to be fundamentally undervalued;

- The [Gabriel] Partnership will also make indirect investments with third-party managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles, which engaged in similar investment strategies as the [Gabriel] Partnership;

- The [Gabriel] Partnership expects to invest in private and restricted securities;

- From time to time, the General Partner may, in his sole discretion, acquire assets or securities that the General Partner believes lack a readily ascertainable market value or otherwise lack sufficient liquidity; and

- The General Partner will not permit more than the greater of 50% of the [Gabriel] Partnership's capital and 25% of the [Gabriel] Partnership's total assets to be invested in a single investment. Moreover, it will not be permit more than 10% of the [Gabriel] Partnership's capital to be placed at risk in a single investment. The General Partner will have discretion to determine how much is at risk for purposes of this test.

These representations about the Gabriel Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Gabriel Fund would certainly have wanted to know. In particular, the representations that the Gabriel Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was generally investing in "marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of

distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts"; was investing in the "securities of corporations believed to be fundamentally undervalued"; was making investments through "third-party managers", all falsely implied that Merkin was actively pursuing a specific strategy for the Gabriel Fund in a prudent manner. In truth, the investment strategies of the Gabriel Fund were a sham as Merkin was not managing the assets of the Gabriel Fund and was simply feeding Gabriel Fund investments to Madoff and two other third party managers.

90.  The statements in the March 2006 Offering Memorandum that the General Partner (*i.e.*, defendant Merkin) "will not permit more than the greater of 50% of the Partnership's capital and 25% of the Partnership's total assets to be invested in a single investment", that "it will not permit more than 10% of the Partnership's capital to be placed at risk in a single investment" and that "the General Partner will have discretion to determine how much is at risk for purposes of this test" were also false and misleading because during the Class Period, Merkin was handing over at least 25% of the Gabriel Fund's assets to Madoff.

91.  The section of the March 2006 Offering Memorandum entitled "Risk Factors" covered a wide variety of investment strategies that had nothing to do with the Gabriel Fund's actual trading strategy. The risk warnings included, among others, "Non-marketable Obligations", "Arbitrage Transactions", "Proxy Contests", "Options Transactions", "Futures Contracts", "Forward Trading", "Participation in Unfriendly Transactions", "Short Selling" and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Gabriel Fund investors of the far greater risk, that Merkin had entrusted Madoff with custody and trading discretion for at least 25% of the assets of the Gabriel Fund and the remainder of the assets with two other third party managers.

92.     In the March 2006 Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Gabriel Fund's assets to multiple independent money managers. As part this disclosure, Merkin assured investors that he would exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Although the General Partner *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and will *monitor the results of those money managers* and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities.... (emphasis added)

This representation and assurance that Merkin would exercise reasonable care in selecting independent money managers was false and misleading because in truth Merkin never exercised any care or conducting any due diligence in his delegation of at least 25% of the Gabriel Partnership's assets to Madoff.

**False and Misleading Statements In the**
**Ariel Fund October 2001 Prospectus and Other Offering Materials**

93.     According to the Prospectus for the Ariel Fund dated October 2001 (the "October 2001 Prospectus") and to an Investment Advisory Agreement  (the "Advisory Agreement") between Ariel and GCC, GCC (and therefore Merkin) made all of the investment and executive decisions for Ariel and communicated through quarterly reports with Ariel Investors about Ariel's financial performance. According to the October 2001 Prospectus, the success of Ariel "depends primarily upon Gabriel Capital Corporation, Investment Advisor to the Fund;" the "death or incapacity of J. Ezra Merkin . . . would result in the required redemption of all

Participating Shares;" and the "Participating Shares must rely on the Investment Advisor with respect to the management and investment decisions of the Fund."

94.     Ariel Fund investors therefore relied on the identity and role of the manager and Investment Advisor of the Ariel Fund.  Investors invested in the Ariel Fund based on the understanding that GCC, and therefore Merkin, was the day-to-day manager and Investment Advisor to the Fund and that Merkin would devote the majority of his time to managing the Ariel Funds.

95.     The arrangement with GCC as described in the October 2001 Prospectus provided that Merkin could place monies invested in Ariel in indirect investments, including with other money managers, but that he would "retain overall investment responsibility for the portfolio," and would conduct "periodic reviews" of the indirect investments; and would "exercise reasonable care in selecting independent money manager," and would "monitor the results of those money managers."

96.     The statements made in the October 2001 Prospectus were repeated in other Prospectuses and offering materials during the relevant time period, including the Prospectus disseminated by the Ariel Fund dated November 2002 (the "November 2002 Prospectus") (collectively, the "Ariel Fund Prospectuses") and the March 2006 Confidential Offering Memorandum.  The Ariel Fund Prospectuses and other offering materials remained essentially the same document in all material respects, contained the same misrepresentations and omitted similar material facts.

97.     The Ariel Fund Prospectuses and the March 2006 Confidential Offering Memorandum were misleading in that they falsely stated that GCC, through Merkin, was involved in the Ariel Fund's management on a day-to-day and transaction-by-transaction basis,

and that the success of the Ariel Fund depended on Merkin and his abilities as a money manager. Merkin led investors in the Ariel Fund to believe that he, and not a third party, was actively managing their investment. However, in truth, Merkin did very little other than bookkeeping as he was feeding a significant portion of the assets of the Ariel Fund directly to Madoff and the remainder to two other third party money managers.

98. By way of example, the October 2001 Prospectus states, among other things:

- "Under the Amended and Restated Investment Advisory Agreement, the Investment Advisor has full discretionary authority to invest the assets of the Fund."

- "The Investment Advisor will attempt to assess risk in determining the nature and extent of the investment the Fund will make in specific securities."

- "… The Investment Advisor will retain overall investment responsibility for the portfolio of the Fund…."

- Ariel Fund investors were led to believe that the success of the Fund depended primarily on GCC, and therefore on Merkin. The Prospectus states that the death or incapacity of Merkin would result in liquidation.

The Prospectuses also tout Merkin's credentials listing his previous job history as well as his educational background. The March 2006 Confidential Offering Memorandum expressly states that the "Investment Advisor has ultimate responsibility for the management, operations and investment decisions made on behalf of the Fund."

99. All of these representations were false and misleading because Merkin was not the day-to-day manager, and was devoting little if any time to managing the investment of the Ariel Fund as he was simply feeding a substantial portion of the assets of the Ariel Fund to Madoff and to two other third party managers. If anything, Merkin was acting solely as a marketer looking to raise additional capital from unsuspecting investors and charities.

100. The Ariel Prospectuses and the March 2006 Confidential Offering Memorandum were false and misleading because they gave Ariel Fund investors the perception that GCC

through Merkin was actively managing their investments with a very specific strategy. The Ariel Prospectuses stated, among other things, that:

- The Fund will engage primarily in investing and trading in marketable securities and instruments of companies or other entities which are the subject of a Reorganization.

- The securities and other instruments in which the Fund primarily invests include common stock, preferred stock and other evidences of ownership interest; bonds, trade creditor claims and other evidences of indebtedness and put and call options on securities. The Fund will endeavor to purchase these securities at a discount to their anticipated value upon consummation of the Reorganization.

- The Fund also may make other types of investment, including the purchase of securities and other instruments which appear to be undervalued and selling short securities which appear to be overvalued and, subject to the further provisions of this Prospectus, commodity contracts.

- The Fund also may make indirect investments, including investments in mutual funds, private investment partnerships, closed end funds and other pooled investment vehicles which engage in similar investment strategies.

- In addition, from time to time, the Fund may acquire assets or securities which Gabriel Capital Corporation (the "Investment Advisor") believes lack a readily ascertainable market value or otherwise lack sufficient liquidity.

- The Fund may invest in restricted securities.

- The Fund may on occasion itself initiate or actively participate in acquisition or restructuring transactions or in proxy contests.

- The Investment Advisor will not permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets (on a cost basis, giving consideration to hedging techniques utilized) to be invested in a single investment. Moreover, it will not be permit more than 10% of the Fund's capital to be placed at risk in a single investment. The Investment Advisor will have the discretion to determine how much is at risk for purposes of this test.

These representations about the Ariel Fund's investment policy were materially false and misleading and omitted to state material facts that all investors in the Ariel Fund would certainly have wanted to know. In particular, the representations detailed above all falsely implied that GCC, through Merkin, was actively pursuing a specific strategy for the Ariel Fund in a prudent

35

manner. In truth, the investment policies of the Ariel Fund were a sham as Merkin was not managing the assets of the Ariel Fund and was simply feeding assets to Madoff and two other third party managers.

101. The statements in the Ariel Prospectuses that the Investment Advisor "will not permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets ... to be invested in a single investment", that "it will not permit more than 10% of the Fund's capital to be placed at risk in a single investment" and that "the Investment Advisor will have the discretion to determine how much is at risk for purposes of this test" were also false and misleading because during the Class Period, Merkin was handing over at least 25% of the Ariel Fund's assets to Madoff.

102. The section of the Prospectuses entitled "Risk Factors" covered a wide variety of investment strategies that had nothing to do with the Ariel Fund's actual trading strategy. The risk warnings included, among others, "Reorganizations", "Non-marketable Obligations", "Proxy Contests", "Options Transactions", "Commodities", "Participation in Unfriendly Transactions", "Short Selling" and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Ariel Fund investors of the far greater risk, that Merkin had entrusted Madoff with custody and trading discretion for at least 25% of the assets of the Ariel Fund and the remainder of the assets with two other third party managers.

103. The March 2006 Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," discloses that GCC had authority to delegate investment discretion for all or a portion of the Ariel Fund's assets to money managers. As part this disclosure, Merkin assured investors that GCC would exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the Investment Advisor, or make investments with Other Investment Entities. Consequently, the success of the Fund may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the Investment Advisor *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities.... (emphasis added)

This representation and assurance that the Investment Advisor would exercise reasonable care in selecting independent money managers was false and misleading because in truth Merkin never exercised any care or conducting any due diligence in his delegation of at least 25% of the Ariel Fund's assets to Madoff.

104. These Ariel offering materials were also false and misleading because they included statements inconsistent with the fact that Madoff managed and had custody of a significant portion of Ariel's assets. In particular, the offering documents stated that Ariel did not use any self-clearing money managers when, in fact, Madoff managed, executed and had custody of a significant portion of Ariel's assets. The November 2002 Prospectus stated that brokers who effected transactions for the Ariel Fund "will not perform managerial or policy-making functions for the Fund." The March 2006 Confidential Offering Memorandum states that Morgan Stanley served as the prime broker for the Ariel Fund and cleared trades effected by other brokerage firms when, in fact, Morgan Stanley was not the custodian for the securities managed by Madoff and did not clear Madoff's trades. These statements in the Ariel offering materials concealed Madoff's role and the fact that Madoff was self-clearing.

**False and Misleading Statements in Gabriel Fund
and Ariel Fund Quarterly Reports and Investor Presentations**

105. In addition to the false and misleading statements in the Gabriel Fund and Ariel Fund Offering Memoranda, Defendants made misstatements to Gabriel Fund and Ariel Fund

investors through fraudulent quarterly reports and investor presentations by concealing the role Madoff played in managing the Gabriel Fund and Ariel Fund and by misrepresenting the purported investment strategies being used by Merkin for the Funds.

106. During the Class Period, defendant Merkin sent quarterly account statements to Gabriel Fund and Ariel Fund investors purporting to reflect the investments and returns of those limited partners and shareholders. These quarterly statements usually were accompanied with a written report by Merkin describing the investment strategies and performance of the Gabriel Fund and Ariel Fund. Since the Gabriel Fund and Ariel Fund purportedly consisted of very similar portfolios, the text of Merkin's reports was usually the same for both of these Funds. In those reports, Merkin made specific representations about the allocations of the funds' assets among those strategies. The quarterly reports were misleading to Gabriel Fund and Ariel Fund investors because they gave investors the impression that: (1) Merkin and his staff were directly managing the Gabriel Fund and Ariel Fund assets; and (2) the assets of the Gabriel Fund and Ariel Fund were being invested in specific types of securities. In truth, the Gabriel Fund and Ariel Fund portfolios were being managed by Madoff, Cerberus and one other third party manager.

107. The quarterly issued reports, signed by Merkin and printed on GCC's stationery, consistently made it appear that Merkin was responsible for all investment strategy and decisions of the Gabriel Fund and Ariel Fund. For example, Merkin stated in a January 20, 2007 report that, "Our effort has been to migrate from increasingly efficient markets to our private positions, where we enjoy both much more complete information about our investments and, thanks to our sourcing network, much less competition for our ideas. There, we have worked diligently to establish a reputation for creativity and reliability, which further enhances the access to ideas

conferred by our sourcing advantage." Similarly, in a October 20, 2008 report, Merkin stated, "Our favorite hedge is to sell some of a position and thereby reduce risk. We prefer that to finding and selling a vaguely corresponding short that increases the aggregate broad exposure of the fund while weakening the power of an idea."

108.    Many of the quarterly reports disseminated to Gabriel Fund and Ariel Fund investors also represented that the fund was investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage. Starting in 2004, Merkin provided a detailed table in each quarterly report showing the precise percent distribution of the Gabriel or Ariel Fund's assets which were allocated into the following seven categories: "Distressed Debt," "Debt or Equity Subject to a Deal or Legal Process," "Credit Opportunities," "Arbitrage of Related Securities," "Long-term Equity," "Short Securities Outright and Portfolio Hedges," and "Cash (Including Proceeds From Short Sales)." The percentages reported always added up to 100% and thus purported to fully describe the portfolios. Accompanying the reports was an Appendix defining each of the categories of investments. All of the categories, with the exception of "Cash," were directly related to a strategy of investing in distressed companies or companies involved with a reorganization. None of the investment categories described in these written materials encompassed or was at all consistent with Madoff's "split strike conversion" strategy.

109.    In a January 2001 quarterly report entitled "Arbitrage and Distressed Investing Some Year-End Thoughts," Merkin stated, among other things, that the Gabriel and Ariel portfolio consisted of "approximately 60% distressed positions and 40% [merger] arbitrage." He also proclaimed that "we see ourselves as specialists in distressed investing who maintain an arbitrage portfolio in order to maintain performance and liquidity standards."

110. In an April 2005 report entitled "We Do Beans", Merkin described in detail the current state of his investment strategy for the Gabriel and Ariel Funds as "a tapestry of six threads of different colors, each representing one of the full range of debt-related asset classes in our repertoire." The six "threads" were described as: (a) "'dented' high-yield bonds"; (b) "public distressed names"; (c) "asset-based lending"; (d) "'private' distressed" debt; (e) "private equity, usually with a distressed flavor"; and (f) "U.S. distressed credits sourced in Japan." He also proclaimed that "we bring to the table over thirty years combined experience in bankruptcy investing."

111. In the quarterly report for the period ended March 31, 2006, dated April 24, 2006, sent to investors in the Ariel Fund, Merkin falsely touted the Ariel Fund's diversification across a "tapestry of asset classes" and that Merkin "spen[t] a lot of time quantifying, preparing and analyzing the numbers." Similarly, in the quarterly report for the period ended June 30, 2006, dated July 20, 2006, Merkin continued to misrepresent that he was actively managing the Ariel Fund by shifting assets from shorter maturities to longer maturities, and that he was employing proprietary investment ideas and strategies on behalf of investors.

112. The quarterly report for the Ariel Fund for the period ending September 30, 2006, dated October 20, 2006, similarly represented that Merkin was actively managing risk, and touted the purported "fiduciaries" entrusted with the Fund's assets. Specifically, the report stated that "we intend to remain similarly vigilant about risk.... We will have good fiduciaries for your capital, and that has a certain nobility of its own."

113. The quarterly report for subsequent periods all perpetuated the false impression that GCC and Merkin were actively managing the Ariel and Gabriel Funds:

- "We want our [investors] to have a sense of ... the approach we take to investing, and how we try to control risk. (March 31, 2004 Report);

- "We are particularly enthusiastic about some large position that we put on at the end of the first quarter." (June 30, 2006 Report);

- "Our effort has been to migrate from increasingly efficient markets to our private positions .... We have worked diligently to establish a reputation for creativity and reliability..." (December 31, 2006 Report);

- "As we've been telling investors forever, we try to build a portfolio of high-risk, high-reward ideas in a conservative style." (June 30, 2007 Report);

- "We have to structure our portfolio with a view toward protecting your capital in case the existing maps, like the maps of the Northwest Passage, fail to represent reality accurately once again.... While we wait for markets to stabilize, we take that the deals we play hold a low correlation to broad markets." (December 31, 2007 Report);

- "Our hedging strategies helped to mitigate the effects of global decline in securities prices.... We've often made the point that we are conservative in our marks, pricing in bad news promptly but waiting for the chickens to hatch before marking up position in good news.... Therefore we are careful about maintaining this disciple. We are confident in the accuracy – indeed, conservatism – of our marks, thus preserving the upside you have in these positions should they recover, not to mention the benefits you can enjoy from appreciation in other current and future positions." (June 30, 2008 Report);

- "We take risk on the position sheet and manage risk on the balance sheet, that is, we run money in high-margin ideas that are managed in a very conservative way. As such, we are very different from the typical levered long/short hedge fund. Rather, in the simple English language use of the term, we hedge ideas. Our favorite hedge is to sell some of a position and thereby reduce risk." (September 30, 2008 Report).

114. The representations by Merkin in the quarterly reports misled Gabriel and Ariel investors into believing that the purported primary strategy of the Gabriel and Ariel Funds was investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage. The quarterly reports were false and misleading in failing to disclose that a material portion of the Funds' assets were invested with Madoff and overly concentrated in those investments; in falsely stating that Merkin was engaged in active and thorough due diligence designed to minimize risk and presence and grow capital; and in falsely leading investors to

believe that Merkin personally and actively managed the Funds and executed strategies based upon proprietary investment ideas and his expertise.

115. In addition, Merkin would often give Gabriel Fund and Ariel Fund investors presentations relating to the strategies and performance of the Funds. During these presentations, Merkin usually described the Gabriel and Ariel Funds as consisting of distressed debt and securities of companies subject to reorganization. He never disclosed that a significant portion of the funds were invested with Madoff or that the funds were invested in Madoff's "split strike conversion" trading strategy.

**Despite Numerous "Red Flags," Defendants**
**Failed To Perform a Due Diligence Review**

116. Against the backdrop of Merkin's complete management and investing control over the Ascot Fund, Gabriel Fund and Ariel Fund and despite Defendants' due diligence obligations and representations, Merkin invested all of the Ascot Fund's capital and at least 25% of the Gabriel Fund's capital and 25% of the Ariel Fund's capital with Madoff. Given the level of control that Merkin ceded to Madoff over the three Funds, Defendants' failure to conduct proper due diligence and blatant disregard of the various red flags that existed is shocking.

117. Defendants had responsibilities to establish due diligence procedures for all fund managers with whom they invested client assets. However, despite their representations that they were doing so, Defendants failed to perform even a minimal level of due diligence regarding the activities of Madoff and BMIS to safeguard the investments of Plaintiffs and other Class members in the Ascot Fund, Gabriel Fund and Ariel Fund.

118. Defendants' disclosures regarding their investment of Plaintiffs' money, including information disseminated both in various offering memoranda and the statements of monthly investment returns, led Plaintiffs and the Class to believe that Defendants conducted thorough