investigations into the "managers" with whom Defendants invested when indeed no due diligence at all was undertaken and in fact, all of the Ascot Fund's investments and at least 25% of the Gabriel and Ariel Fund's investment were with one manager, Madoff.

119.    In the days and weeks following Madoff's arrest (and his being charged with crimes by both the SEC and the US Attorney's office for the Southern District of New York), information became known to the general public that should have been known to investment professionals such as Defendants.

120.    However, despite numerous red flags and the fairly simple methods available to test Madoff's most basic numbers, Defendants failed to conduct adequate due diligence that would have alerted an investor ordinary prudence that Madoff's "investment strategy" was really a massive Ponzi scheme. The numerous red flags that Defendants failed to uncover or blatantly disregarded include, but are not limited to:

- The description of Madoff's split-strike strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses in a 14 year period. Moreover, the strategy's returns could never be replicated by quantitative analysts who attempted to do so.

- Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in the documents.

- The options contracts that Madoff would have had to trade did not show up on any of the options exchanges. Even if the trading was being done over-the-counter ("OTC") - outside of the exchanges - a good number of those trades would still have to have been offset in the listed market, and there was no evidence that they ever were.

- At one point in time, the entire value of listed index call options was $9 billion, which was insufficient to allow Madoff to hedge the exposure of the $50 billion of assets Madoff claimed. Even in Madoff purchased and sold options through the OTC market, this market is not several times larger than the exchange listed market, especially for these traditional derivative products. Moreover, OTC options are more expensive than listed options and the bid-ask spreads would be so wide as to preclude earning of any profit.

- BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.

- Madoff initiated trades in the accounts, executed the trades and custodied and administered the assets through discretionary brokerage agreements, a clear conflict of interest.

- Madoff's auditor, F&H, had three employees, a 78 year-old living in Florida, a secretary and a 47 year-old accountant. This operation was suspiciously minuscule given the scale and scope of Madoff's activities. Moreover, the comptroller of BMIS was based in Bermuda, despite the fact that most mainstream hedge fund investment advisers have their comptroller in-house.

- BMIS audit reports showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker -- not a firm with $17 billion in customer accounts.

- Despite his "success," Madoff operated under a veil of secrecy and he did not allow outside performance audits by investors.

- Key positions at BMIS were held by members of Madoff's family: Peter Madoff (director of trading and general counsel); his sons Mark and Andrew (directors of trading) and his niece Shana (a compliance lawyer). Only Madoff's family was privy to his investment strategy.

- Investors had no electronic access to their accounts at Madoff. Thus, Madoff had the ability to manufacture paper trade tickets that confirmed fictitious results.

- Madoff settled for charging undisclosed commissions on all of the trades done in investors' accounts rather than collecting larger standard hedge fund fees.

- Madoff chose to fund at a high implied interest rate even though cheaper money was available in the highly regulated short-term credit markets. This provided a way to promise lucrative returns in an unregulated area of capital markets.

121. Merkin admitted in his testimony before the NYAG that he was aware of a number of people who were suspicious of the returns Madoff claimed to achieve, stating that "[t]here were over time persons who expressed skepticism about one or another aspect of the Madoff strategy or the Madoff return." Moreover, according to the complaint filed against

Merkin by the NYAG, at least two of Merkin's most trusted colleagues repeatedly told Merkin

that Madoff's returns were too good to be true – one warning that it could be a Ponzi scheme.

122.    According to media reports, Madoff was the subject of constant SEC investigations – commenced in 1992, 2005, and 2007 – into the legitimacy of his business. Madoff was also the subject of scrutiny by members of the investment community who understood that his business was a fraud.

123.    Defendants invested all of the assets of the Ascot Fund and at least 25% of the Gabriel Fund and 25% of the Ariel Fund with Madoff despite numerous "red flags," indicating that Madoff did not employ a split strike conversion strategy and was actually a fraud. While collecting substantial fees, Defendants ignored these red flags in violation of their duties to the limited partners and shareholders that had invested in the Funds.

124.    In 1999, Harry Markopolos, wrote a letter to the SEC which stated that: "Madoff Securities is the world's largest Ponzi Scheme." Markopolos, who years ago worked for a rival firm, researched Madoff's stock-options strategy and, based upon publicly available information, was convinced that the results were phony. Markopolos was not alone. In 2000, Credit Suisse warned its clients to pull their investments from Madoff, due to suspicions concerning his operations.

125.    In a May 2001 article, Michael Ocrant, managing editor of MAR/Hedge, a New York-based hedge fund publication, also eyed Madoff's success with skepticism because of the unrealistic nature of Madoff's returns and their consistency. Specifically troubling to Ocrant was Madoff's determined reluctance to justify or explain his firm's strategy or success:

(a)    "As for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I', not interested in educating the world on our strategy, and I won't get

into the nuances of how we manage risk.' He reiterates the undisputed strength and advantages the firm's operations provide that make it possible."

(b)  "The inability of other firms to duplicate his firm's success with the strategy, says Madoff, is attributable, again, to its highly regarded operational infrastructure. He notes that one could make the same observation about many businesses, including market making firms."

(c)  "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

126.    In the same month, *Barron's* published an article discussing the remarkably steady returns purportedly achieved by Madoff. The *Barron's* article discussed the belief of many hedge fund professionals and options strategists that Madoff could not achieve the returns he reported – an average annual return of 15% for the preceding decade – using the strategy that Madoff described. In addition to the suspicious consistency of Madoff's high returns, the article discussed several other warning signs that suggested Madoff might be committing fraud, including Madoff's secrecy and the inability of "more than a dozen hedge fund professionals, including current and former Madoff traders" to duplicate Madoff's returns using his strategy.

127.    Merkin's in-house counsel e-mailed Merkin a copy of the *Barron's* article on May 6, 2001 and Merkin also had a copy of the MAR/Hedge article. Seven years later, Merkin still had copies of both of these articles in his files.

128.    In addition, Merkin, to a greater extent than many of Madoff's direct investors, had personal knowledge of the many warning signs of fraud:

(a)  Merkin knew that Madoff reported trades using paper trade confirmations sent to investors by mail, without providing any form of electronic real-time access, even though Madoff's firm pioneered electronic screen-based trading in the 1970s and 1980s and claimed that it used the most advanced technology.

(b)  Merkin knew Madoff's family, and knew that Madoff family members occupied the most senior positions in Maodff's firm.

(c)     Merkin knew that Madoff maintained strict secrecy about his management of money entrusted to him.

(d)     Merkin knew that Madoff consistently converted all holdings to Treasuries at the end of each quarter, a practice that, in light of Madoff's claim that his strategy depending on entering and exiting the market when the conditions were likely to render his strategy profitable, had no legitimate purpose other than to reduce transparency.

(e)     Merkin knew of the unusual long-term stability of Madoff's alleged returns, and that other sophisticated investors had themselves been unable to achieve those returns using Madoff's stated strategy.

(f)     Merkin knew the identity of Madoff's accounting firm, and knew (or was reckless in not knowing) that it was a small, unknown accounting firm in Rockland County occupying a 13' by 18' office rather than a recognized audit firm.

(h)     Merkin knew that Madoff was self-clearing, a failure to segregate responsibilities that increased the risk of fraud.

129.    Merkin also knew that Madoff charged no fees of any kind for his money management services and that Madoff claimed that his only compensation was the normal commissions generated by his trades, commissions that he could have earned if his clients directed the trading themselves.  Merkin, who himself charged the standard hefty management and incentive fees for the money he purported to manage, should have recognized that Madoff's willingness to do something for nothing was suspicious.

130.    In 2002, investment advisor Acorn Partners blacklisted Madoff as a result of the countless red flags uncovered during routine due diligence.

131.    In early 2003, Société Générale similarly blacklisted Madoff after performing routine due diligence and strongly discouraged its clients from investing with him:

> What [Société Générale] found that March was hardly routine:  Mr. Madoff's numbers simply did not add up.  Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him and also strongly discouraged wealthy clients at its private bank from its investments.

The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

132. *Business Week* reported that:

managers of [a] Fort Worth pension fund, who first [invested indirectly with Madoff in 2003], started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The [Madoff investments] raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid [Madoff]. In July, the pension board voted unanimously to dump its [Madoff Investments].

133. Drago Indjic, a project manager at the Hedge Fund Center of the London Business School, noted that "Madoff did not pass due diligence for many European hedge fund companies. Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

134. In 2005, Harry Markopolos wrote another letter to the SEC detailing numerous red flags which indicated that Madoff's fund was a fraud.

135. In addition, on November 7, 2005, an anonymous author wrote a letter (the "November 7 Letter") to the SEC entitled "The World's Largest Hedge Fund is a Fraud." Based on the same information that was available to Defendants herein, the author concluded that Madoff's operation was a fraud and identified 29 "red flags" to prove it.

136. The very first "red flag" set forth in the November 7 Letter noted that Madoff's fee structure made no sense, because, while Madoff was running a hedge fund, he did not charge the standard fees a hedge fund would charge (1% management fee and 20% profits) and instead charged only a commission on the purported trades his company was making with investors'

money. Regardless of whether the November 7 letter was available to Defendants, they were aware of Madoff's fee structure and failed to investigate.

137. The November 7 Letter also stated that various third party "funds of funds" obtain investors who "pony up the money" and "don't know that [Madoff] is managing their money," the exact practice perpetrated by Defendants herein.

138. Among the other 28 red flags raised by the letter:

(a) the lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

(b) Madoff's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

(c) the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

(d) Madoff acted as his own prime broker, whole most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers; and

(e) monthly account statements sent to Madoff's investors did not support the returns they reported.

139. Defendants knew, or should have known had they conducted the due diligence and risk management they purported to conduct, of the existence of each of these red flags.

140. Indeed, Defendants could have discovered many red flags had they conducted any due diligence at all. In a January 15, 2009 article entitled "Madoff Might not Have Made Any Trades," the *Boston Globe* reported that, on many client account statements (to which Defendants had access but Plaintiffs did not), Madoff reported making trades that were worth more than the entire amount the clients had invested with Madoff. The same article revealed that Madoff had reported investments in Fidelity's Spartan US Treasury Money Market fund --- a fund which did not exist.

141.     By early 2007, the research department of Union Bancaire Privée, a Swiss bank, raised concerns about Madoff's legitimacy and recommended that Madoff be stricken from the list of managers with which UBP invested.

142.     Robert Rosenkranz, the principal of a major investment advisor to wealthy clients, Acorn Partners, was reported in the financial press to have stated that his firm's earlier due diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by Madoff and in part on inconsistencies between customer account statements and audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.

143.     Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, reported that it had concluded that Madoff was a fraud and advised clients not to invest with him.  Aksia had concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC were too small to support the size of the assets Madoff claimed to be managing.  "There were no smoking guns, but too many things that didn't add up," Mr. Fludgate said.  The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff had been operating a secret, unregistered investment vehicle from his office.

144.     Similarly, the *Financial Times* reported on January 22, 2009, that two simple risk management techniques, available at low cost during the Class Period, would have alerted Defendants to the Madoff fraud.  The article stated, in part:

> Two simple risk management techniques, available to investors at low cost, could have shown the hedge fund run by Bernard Madoff, which is at the centre of allegations of a $50bn fraud, was claiming investment returns that were all but impossible.

A study to be published today by Riskdata, a risk management specialist, argues that Mr. Madoff's returns are called into question by the bias ratio - a mathematical technique that identifies abnormalities in the distribution of a series of investment returns.

Forensic accountants use a similar method - known as Benford's law - to identify potential accountancy fraud.

In addition, the study says that comparing the risk profile of Mr. Madoff to his peer group would have shown it to be inconsistent with his claimed investment style.

145. Defendants recklessly failed to supervise, monitor and manage the investments of the Ascot Fund, Gabriel Fund and Ariel Fund, in violation of their fiduciary duties, and contrary to their representations that they were exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Ascot Fund, Gabriel Fund and Ariel Fund and, notwithstanding potential conflicts of interest, that they were providing investment management services consistent with their respective fiduciary duties to investors in the Ascot Fund, Gabriel Fund and Ariel Fund.

146. Defendants acted with knowledge that they had abdicated responsibility for the management of the Ascot Fund, Gabriel Fund and Ariel Fund, and with gross negligence in failing to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations and financial reporting of Madoff.

147. Defendants were aware, or should have been aware, of the many red flags described above. At the very least, these red flags should have caused Merkin to lessen his reliance on Madoff by moving funds and/or to fully disclose the nature and extent of his reliance on Madoff to Plaintiffs and the Class.

148. Defendants knew, or reasonably should have known, that Madoff's investment holdings and returns had not been verified, and that investors' capital was not being safeguarded by a reliable custodian.

149. Defendants' lack of scrutiny into Madoff and BMIS and their carelessness with Plaintiffs' assets falls far short of the representations made to Plaintiffs and other Class members to induce their investments in the Ascot Fund, Gabriel Fund and Ariel Fund and their legal duties to Plaintiffs and the Class.

**Merkin Unjustly Reaped Hundreds of Millions of Dollars in Management Fees**

150. During the Class Period, Merkin pocketed hundreds of millions of dollars in management and incentive fees from investors in the Ascot, Gabriel and Ariel Funds in return for his purported services as manager of the funds. However, Merkin did absolutely nothing to earn these fees as he simply acted as a marketer and a middleman for Madoff whom Merkin failed to adequately oversee, audit, or investigate.

151. Merkin had a major incentive to avoid asking questions about Madoff's strategies because he collected annual management fees equal to 1% of the capital invested in the Ascot Fund prior to 2002. In 2002, Merkin decided to raise the management fees he received from the Ascot Fund, as of January 1, 2003, from 1% to 1.5% (a difference of $5.3 million per year based on the $1.06 billion under management in 2003). This change required investor approval. To obtain approval, Merkin made false or misleading statements to justify the increase. In a letter to investors seeking approval of the increase, Merkin vaguely cited "rising expenses." This misrepresentation perpetuated and reinforced Merkin's falsehood that he was doing work related to the management of the Ascot Fund. In testimony before the NYAG, Merkin similarly claimed

that the fee increase was due to increased general operating costs, but during his deposition with the NYAG, he could not give specific reasons for the increase.

152. Merkin's fees from managing the Ascot Fund for the years 1995 to 2007, totaled more than $169 million. In 2008, Merkin had received annual income of approximately $25.5 million from fees he generated through the Ascot Fund.

153. Similarly, Merkin's compensation under his agreements with the Gabriel and Ariel Funds included an annual management fee of 1% of assets under management, and an incentive fee of 20% of any profits. From 1989 to 2007, Merkin's fees from Gabriel totaled approximately $277 million and from Ariel, $242 million. The incentive fee Merkin collected included 20% of the profits reported by Madoff, which, of course, were fictitious. Even after subtracting expenses and fees paid to other outside managers, Merkin's fees for the Gabriel and Ariel Funds totaled more than $280 million.

154. On March 2, 2009, *New York Magazine* reported in a news article entitled "The Monster Mensch," that at the height of defendant Merkin's hedge-fund business he earned approximately $35 million a year simply for funneling money to Bernie Madoff.

155. Merkin's management fees were incredibly egregious when one looks at the fact that if an investor wanted to place money with Madoff, Madoff did not charge any advisory fees because he claimed he was content with merely earning the trading commissions in his broker-dealer business that were generated by his trades on behalf of clients whose money he managed. Basically, if an Ascot Fund, Gabriel Fund or Ariel Fund investor wanted Madoff to invest their money, they could have gotten that service for free rather than paying a fee to Merkin who was merely handing over the money to Madoff.

156.    To the extent that the computation of Merkin's fees were based on fictitious assets and profits of the Ascot, Gabriel and Ariel Funds, the payments to Merkin resulted in his unjust enrichment, for which Plaintiffs and other Class members are entitled to disgorgement.

157.    In addition, according to the NYAG Complaint, Merkin commingled his personal funds, including his management fees from the Ascot Fund, Gabriel Fund and Ariel Fund, with the funds of his management company, GCC.  Merkin used GCC funds to make purchases for his personal benefit, including purchases of over $91 million of artwork for his apartment.

**The Merkin Fraud is Revealed**

158.    On December 11, 2008, defendant Merkin sent a letter to investors in the Ascot Fund and disclosed *for the first time* that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) were managed by Madoff.  The letter from Merkin also stated, in part, "[a]t this point, it is impossible to predict what recovery, if any, may be had on these assets."

159.    One week later, on December 18, 2008, defendant Merkin sent a follow-up letter to investors in the Ascot Fund and informed them that the Ascot Fund would need to be dissolved.  That same day, defendant Merkin also sent a letter to investors in the Gabriel Fund and disclosed *for the first time* that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio that the Gabriel Fund would be dissolved and liquidated.  A similar letter was sent by Merkin to Ariel Fund investors on December 18, 2009, and disclosed that Madoff related losses necessitated that he wind down the Ariel Fund and sell off its holdings.

160.    Ascot Fund, Gabriel Fund and Ariel Fund investors were shocked by the news that their investments had been entirely and substantially invested with Madoff.  Several

investors sent defendant Merkin e-mails to express their disbelief and anger with the news that they were now exposed to the Madoff Ponzi scheme. One e-mail stated that, "We never knew that ASCOT FUND was not [itself] investing its money [but] giving it to third-party people to invest." Another person wrote "Are you serious? Why was Ascot trading with one fund?" Another e-mail dated December 19, 2008 said, "Please inform us since when ARIEL FUND invested with MADOFF 27% of its capital? ARIEL FUND invests in DISTRESSED securities. What MADDOF [sic] has to do with DISTRESSED DEBT?" Another investor, a personal friend of Merkin's, could not believe that Merkin had deceived him. He wrote on December 14, 2008, "It would be dishonest of me to hide our deep sense of shock, disappointment and frustration in you and your fund but we cannot accept the basis of the claims that are being bandied about." After speaking with Merkin on the phone, this investor learned the truth and took a different view of Merkin, writing on January 7, 2009: "[Y]ou took substantial management fees when you were not managing the funds; you were nothing more than a glorified mailbox who took upside payments when there simply wasn't any upside."

161.   As a result of the exposure to Madoff, Ascot Fund, Gabriel Fund and Ariel Fund investors have lost approximately $2.4 billion.

162.   On January 15, 2009, the *Financial Times* reported that the NYAG had issued subpoenas to three investment funds (including the Ascot Fund and Gabriel Fund) run by defendant Merkin, as part of a probe related to the Madoff Ponzi scheme.

163.   On February 9, 2009, defendant Merkin sent a letter to investors in the Ariel Fund conveying plans for the wind-down of the fund and confirming that he expected no recovery on the portion of Ariel's assets (approximately 25%) invested in "strategies managed by Madoff."

164. On February 27, 2009, defendant Merkin sent a letter to investors in the Ascot Fund confirming that all investments in the Ascot Fund were worthless.

165. On April 6, 2009, the NYAG announced charges against Merkin and the funds he controlled for violating New York's Martin Act by concealing from his clients the investment of more than $2.4 billion with Madoff. The NYAG's Complaint charges Merkin with violations of the Martin Act, General Business Law § 352 et seq., for fraudulent conduct in connection with the sale of securities, Executive Law § 63(12) for persistent fraud in the conduct of business, and New York's Not-For-Profit Corporation Law §§ 112, 717, and 720 for breaches of fiduciary duty in connection with Merkin's service on the boards of certain non-profit organizations. The NYAG's lawsuit seeks payment of damages and disgorgement of all fees by Merkin, restitution and other equitable relief. The Honorable Richard Lowe of the Supreme Court of the State of New York recently denied the motion to dismiss filed by defendants Merkin and GCC.

**The BDO Defendants**

166. Defendants BDO, BDO Binder and BDO Tortuga failed to perform its work as auditors of the annual financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund in a manner consistent with the standards of the auditing profession and as required by Generally Accepted Auditing Standards ("GAAS"). GAAS sets the minimum level of performance and quality that auditors are expected, by clients and the public, to achieve. Under GAAS, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements examined are free of material misstatement, whether caused by error or fraud.

167. The 2006 Offering Memorandum for investments in the Ascot Fund explained that the Ascot Partnership would provide unaudited financial statements to limited partners of the

Ascot Fund within 35 days after the end of each calendar quarter and an annual financial statement, audited by BDO, within 90 days after year end:

> BDO Seidman, LLP serves as the Partnership's auditor. The Partnership will provide to the Limited Partners unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 90 days after year end, and tax information as soon thereafter as practicable. Certain Limited Partners may have access to certain information regarding the Partnership that may not be available to other Limited Partners. Such Limited Partners may make investment decisions with respect to their investment in the Partnership based on such information.

The 2003 Offering Memorandum for the Gabriel Fund contained identical language. The 2001 October Ariel Offering Memorandum contained similar language explaining that "within 120 days of the last day of each fiscal year, the [Ariel] Fund will provide each shareholder an audited financial statement of the [Ariel] Fund for such fiscal year. At that time the Ariel Fund's accountants were BDO Binder.

168. According to the NYAG Complaint, Merkin told an investor that Merkin required Ascot's auditor, BDO, to visit Madoff's offices two or three times a year to perform standard operational due diligence. The manager took comfort in this fact. However, this representation was false. BDO did not perform standard operational due diligence, or any other kind of appropriate examination of Madoff's operation, and Merkin had no reason to believe otherwise.

169. BDO consistently represented that it had conducted GAAS compliant audits and that the financial statements of the Ascot Fund and Gabriel Fund were presented in conformity with GAAP. For example, in Ascot's Financial Statements for the year ended December 31, 2007, BDO stated in its letter to the Partners of the Ascot Fund:

> We have audited the accompanying statement of assets and liabilities of Ascot Partners, L.P. (the "Partnership"), including the condensed schedule of investments, as of December 31, 2007, and the related statements of income, changes in partners' capital, and changes in net assets for the year then ended. These financial statements are the responsibility of the Partnership's management.

Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ascot Partners, L.P. as of December 31, 2007, and the results of its operation and changes in its net assets for the year then ended, in conformity with accounting principles generally accepted in the United States of America,

BDO Seidman LLP
March 27, 2008

170. This same letter to the Gabriel Fund partners was contained in the Financial Statements of the Gabriel Fund for the years ended December 31, 2006 and December 31, 2007. Upon information and belief, identical letters (but for the dates) were included in the annual audited Financial Statements of the Ascot Fund and Gabriel Fund during the relevant time period. A similar letter by BDO Tortuga was contained in Financial Statements of the Ariel Fund for the year ended December 31, 2007. Upon information and belief, identical letters (but for the dates) were included in the annual audited Financial Statements of the Ariel Fund and during the relevant time period.

171. At the time of its audits, the BDO Defendants either knew or recklessly disregarded: (a) the concentration of the Ascot, Gabriel and Ariel Funds' investments in a single

third party investment manager, Madoff; (b) the violation of Ascot Fund's, Gabriel Fund's and Ariel Fund's stated policies of investment diversity; (c) the materially heightened risk to the assets of the Ascot Fund, Gabriel Fund and Ariel Fund from such reliance on Madoff, especially given the lack of transparency of Madoff's operations; (d) the abnormally high and stable positive investment results reportedly obtained by Madoff; (e) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as the Ascot Fund, Gabriel Fund and Ariel Fund; and (f) the fact the BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which had its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

172.     By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, the BDO Defendants' audits of the financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund and reports thereon during the Class Period contained false statements, were grossly negligent, in violation of GAAS and constituted an extreme departure from the standards of the accounting and auditing industry.

173.     As noted above, in its annual audit reports, the BDO Defendants represented to the limited partners of the Ascot Fund, Gabriel Fund and Ariel Fund that it had performed its audits in accordance with GAAS and that the financial statements were prepared in conformity with Generally Accepted Accounting Principles (GAAP).  The American Institute of Certified Public Accountants (AICPA) through its Auditing Standards Board has developed and codified Statements on Auditing Standards (AU §__) which interpret GAAS.

174.     The BDO Defendants have violated GAAS in a variety of ways including failing to use due professional care in the performance of its work, AU §230; failing to properly plan

audits, AU §311; failing to maintain an appropriate degree of skepticism during the audits, AU §316; failing to assess internal controls, AU §319; failing to obtain sufficient competent evidential matter to support the conclusions of the audit reports, AU §326; and failing to audit investments in securities, AU §332.

175. GAAS requires that an auditor exercise due professional care in performing an audit and in preparing an audit report. GAAS also requires that each audit be planned and performed with an attitude of professional skepticism. The BDO Defendants failed to exercise due professional care in the performance of their audits of the financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund during the relevant time period. The BDO Defendants failed to adhere to professional auditing standards by, among other things, failing to understand the internal control structure of the Ascot Fund, Gabriel Fund and Ariel Fund, failing to obtain sufficient competent evidential matter, failing to conduct an effective confirmation process and failing to extend its audit procedures in light of the warning signs of fraud.

176. Specifically, GAAS requires that the BDO Defendants assess the internal accounting and reporting controls of the Ascot Fund, Gabriel Fund and Ariel Fund as part of performing its annual audits. An auditor must obtain an understanding of internal controls sufficient to plan an effective audit. The BDO Defendants knew that the amounts reported in the financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund were premised upon internal accounting and reporting coming from entities other than Ascot Fund, Gabriel Fund and Ariel Fund including internal controls purportedly designed and implemented by Merkin and Madoff. In order for the BDO Defendants to perform an audit in accordance with GAAS, it was required to obtain an understanding of the internal controls not only of the Ascot Fund, Gabriel Fund and Ariel Fund, but also of Merkin as General Partner and Madoff as an investment advisor

to whom a material portion of the assets of the Ascot Fund, Gabriel Fund and Ariel Fund had been entrusted.

177.    Under AU §332, Auditing Derivative Instruments, Hedging Activities, and Investment in Securities, the BDO Defendants were required to assess the accounting performed by Madoff as an investment advisor to whom a material portion of the assets of the Ascot Fund, Gabriel Fund and Ariel Fund had been entrusted.   The BDO Defendants were required, but failed, to assess Madoff's accounting for the purchase and sale of securities, collection and distribution of income, maintenance of security records and the pricing of securities.  At the very least, the BDO Defendants were obligated to verify that the securities held by the Ascot Fund, Gabriel Fund and Ariel Fund actually existed and were appropriately valued.   The BDO Defendants failed to take appropriate steps to assess these issues despite knowledge that, among other things, Madoff refused to allow electronic access to relevant information and that Madoff's own financial statements were audited by an obscure three-person accounting firm with no other clients.  The BDO Defendants knew further that Madoff, through BMIS, was the principal prime broker for the Funds; these overlapping roles should have been a warning sign to the BDO Defendants leading to enhanced scrutiny and skepticism.

178.    The BDO Defendants also failed to verify the assertions made in the financial statements it was hired to audit with sufficient supporting evidential documentation.   Claims made in the financial statements of both the Ascot Fund, Gabriel Fund and Ariel Fund about purchase and sale transactions, dividends, interest and realized gains and investment assets were not supported by persuasive audit evidence, in violation of AU §326, Evidential Matter.   While the particular circumstances of each audit dictate the amount and type of evidence that is persuasive, the general principles regarding evidential matter require an auditor to obtain

evidence from independent sources, where there are effective internal controls or based on the auditor's direct knowledge.

179.    The BDO Defendants should have obtained evidence directly from third parties about assertions made in the financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund including, among others, assertions regarding the existence of security purchases and sales, interest and realized gains, and the investment assets held at year end. GAAS also cautions the auditor that if the third party providing evidence is the custodian of a material amount of his client's assets, the auditor should exercise a heightened degree of professional skepticism. Given that 100% of the Ascot Fund's assets and a material portion of the Gabriel and Ariel Fund's assets had been entrusted to Madoff and that BMIS was functioning as prime broker, the BDO Defendants should have approached the audit with skepticism. Further, the financial statements of Ascot for the year ended December 31, 2007 showed that the Partnership's assets were 100% invested in U.S. Treasury Bills. Had BDO utilized the appropriate level of scrutiny, it would have discovered substandard audit evidence received to support the data provided in the financial statements of both the Ascot Fund and Gabriel Fund.

180.    In its annual audit reports, the BDO Defendants represented that they had examined evidence supporting the amounts and disclosures in the financial statements and that its audits provided it with a reasonable basis to conclude that the financial statements were not materially misstated. These statements were false, as the BDO Defendant's audits did not comply with GAAS.

181.    The BDO Defendants conducted their audits in a reckless manner, ignoring obvious areas that required further inquiry. Had these areas of inquiry been pursued and had the BDO Defendants not recklessly violated GAAS, it would have discovered the fraudulent

information underlying the false financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund. The BDO Defendants' reckless audits, that ignored areas that required further inquiry, caused significant damages to Plaintiffs and the Class they seek to represent in that they have lost the full value of their investments in the Ascot Fund and substantial losses in the value of their investments in the Gabriel Fund and Ariel Fund. To the contrary, the BDO Defendants and Merkin profited through the payment of professional fees to the BDO Defendants and management and incentive fees to Merkin. The asset values purportedly verified by the BDO Defendants in its audits were used by Merkin to calculate the fees owed to him by investors.

182. According to defendant Merkin's testimony in an individual action against him related to an investment in Gabriel, employees of BDO, despite its role as the purported independent auditor of the Funds, recommended the strategy of the Funds to BDO's own clients. One particular auditor asked whether he could send a client or other relationship of his to Merkin's office to discuss investing in Ascot.

**The Fortis Defendants**

183. During the Class Period, the Fortis Defendants served as the Ariel Fund's administrator.

184. The Ariel Fund March 2006 Confidential Offering Memorandum stated that:

> Fortis Prime Fund Solutions (Cayman) Limited acts as share registration and transfer agent of the [Ariel] Fund (the "Registrar"), and is a company registered in the Cayman Islands. The Registrar has a Trust License issued under the Banks and Trust Companies Law (2003 Revision) of the Cayman Islands and has an unrestricted Mutual Fund Administrator's License issued under the Mutual Fudns Law (2003 Revision of the Cayman Islands.

> The Registrar is one of the largest of the Cayman Islands' licensed fund administrators providing full administrative services to over 450 funds with net assets in excess of $47 billion. The Registrar is a wholly-owned

subsidiary of Fortis Bank (Cayman) Limited and is part of the Fortis Group.

185.    The March 2006 Ariel Fund Offering Memorandum also stated that Ariel's two directors, then Don M. Seymour and Aldo Ghisletta, were each paid $5,500 per year, and had delegated the "day–to-day operation of the [Ariel] Fund to service providers, including the Investment Advisor and the Registrar [i.e. Fortis Solutions Cayman]."

186.    According to the Fortis Defendants' website, Fortis, as an administrator offers important administrative and oversight functions for a fund like Ariel:

> Since 1969, Prime Fund Solutions (PFS) has pioneered the provision of fund services to the alternative asset management industry. Our experience has helped shape a unique, client-oriented operating model that enables us to provide you with solutions across the entire alternative asset management value chain. We take care of all your operational requirements, allowing you to focus fully on the investment process and your most important asset: your investors.
>
> Our global network of offices serves virtually all types of clients, organisational structures and strategies, utilising an industry-leading infrastructure. Our clients include:
>
> - Hedge funds
> - Funds of hedge funds
> - Private equity funds
> - Sovereign/Government funds
>
> We provide a comprehensive suite of services tailored to your requirements:
>
> - Fund Administration and Custody
>
>   - Full NAV Calculation with comprehensive reporting
>   - Shareholder Services
>   - Independent price sourcing for illiquid/exotic instruments
>   - Fund of hedge fund custody
>   - Liquidity monitoring
>   - Cash flow forecasting
>   - FX hedging calculation services

- Banking

    - Including specialist treasury services

- Financing

    - Bridge and leverage finance for Fund of hedge funds
    - Transparent straightforward overdraft facilities

187. The main advantage a third party administrator brings to a hedge fund and to a fund of funds is the comfort that the administrator of the fund, and particularly the calculation of the net asset value of that fund, is being carried out by an independent third party (that is independent from the fund's manager), using independent pricing and transaction data sources. The administrator is an additional line of defense against self-dealing by the manager.

188. Throughout the Class Period, the Fortis Defendants prepared and sent materially false monthly NAV statements to Ariel Fund Class members. Instead of conducting an independent valuation of the Ariel Fund's portfolios, as it was obligated to do, the Fortis Defendants simply used the fraudulent valuations prepared and provided by Merkin and Madoffs one man accounting firm, to prepare NAV statements. These NAV statements were prepared and distributed on the Fortis Defendants' letterhead and were sent to the Ariel Fund's investors and prospective investors.

189. In addition to their own direct misrepresentations to Ariel Fund Class members, the Fortis Defendants negligently performed their duties. By creating and/or confirming false valuation of the Ariel Fund's assets, the Fortis Defendants each knowingly and materially participated in the fraud and breaches of fiduciary duty by the other defendants in this case.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission
### Against Defendants Merkin and GCC

190. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191. During the Class Period, Defendants Merkin and GCC carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investors of the Ascot Fund, Gabriel Fund and Ariel Fund, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase limited partnership interests in the Ascot Fund and the Gabriel Fund and shares in the Ariel Fund. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

192. Defendants Merkin and GCC: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of limited partnership interests in the Ascot Fund and the Gabriel Fund and shares in the Ariel Fund in an effort to induce investment in the Ascot Fund, Gabriel Fund and Ariel Fund in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Defendants Merkin and GCC are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

193. Defendants Merkin and GCC, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about the business, and operations of the Ascot Fund, Gabriel Fund and Ariel Fund as specified herein.

194.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs and the Class of the value of the limited partnership interests and shares they purchased, performance and continued substantial growth, which included the making of, or the participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Ascot Fund, Gabriel Fund and Ariel Fund not misleading.

195.    Defendants Merkin and GCC had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inducing Plaintiffs and the Class to invest in the Ascot Fund, Gabriel Fund and Ariel Fund.

196.    At the time of these misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known the truth regarding the lack of due diligence performed by Defendants, the nature of the investments made by Merkin on behalf of the Funds, and the degree to which the Funds were invested with Madoff, all facts that were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their limited partnership interests and shares in the Ascot Fund, Gabriel Fund and Ariel Fund.

197. By virtue of the foregoing, Defendants Merkin and GCC have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

198. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests and shares in the Ascot Fund, Gabriel Fund and Ariel Fund during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Merkin and GCC

199. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200. Defendants Merkin and GCC acted as controlling persons of the Ascot Fund, Gabriel Fund and Ariel Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of the power granted to Merkin and to GCC under the relevant offering materials and underlying corporate documents, these Defendants had the power to influence and control and did directly influence and control all aspects of the business of the Ascot Fund, Gabriel Fund and Ariel Fund, including the content and dissemination of the various statements alleged to be false and misleading. Defendants were provided with or had unlimited access to all communications made on behalf of the Ascot Fund, Gabriel Fund and Ariel Fund prior to and/or shortly after these communications were issued and had the ability to prevent the issuance of any statements or cause the content of any statements issued to be corrected.

201. In particular, both Merkin and GCC had direct and supervisory involvement in the day-to-day operations of the Ascot Fund, Gabriel Fund and Ariel Fund and, therefore, are

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

202. As set forth above, all Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Merkin and GCC are also liable pursuant to Section 20(a) of the Exchange Act.

203. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their investments in the Ascot Fund, Gabriel Fund and Ariel Fund during the Class Period.

## COUNT III

### Violations of Section 10(b) and Rule 10b-5 Against the BDO Defendants

204. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

205. During the Class Period, BDO was the auditor for both the Ascot Fund and the Gabriel Fund and BDO Tortuga and BDO Binder were auditors for the Ariel Fund.

206. The BDO Defendants knowingly or recklessly misrepresented that BDO conducted its annual audits of the financial statements of the Ascot Fund, Gabriel Fund and Ariel Fund in compliance with GAAS; that its audits provided reasonable bases for its opinions; and that the financial statements of the Funds presented fairly, in all material respects, the financial position of the Funds at the time of the audits.

207. The BDO Defendants, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Funds, which resulted in misstatements and omissions of material facts in the audited financial statements disseminated by the Funds each

year.  The BDO Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the financial statements disseminated by the Funds not misleading.

208.    As the BDO Defendants knew, or should have known, the audited financial statements issued by the Funds were materially false and misleading and did not fairly present the financial positions of the Funds as stated by the BDO Defendants in their Independent Auditors' Reports to the partners and investors of the Funds.  The BDO Defendants failed to perform their audits and reviews in accordance with accepted accounting principles and procedures.  The BDO Defendants failed to meet their professional obligations to obtain sufficient competent evidential matter necessary to satisfy an auditor that the Ascot, Gabriel and Ariel Funds' financial statements fairly presented the Fund's financial condition in all material respects.  Thus, the BDO Defendants made express misstatements regarding the financial position of the Funds without examining evidence supporting the amounts and disclosures in the financial statements.

209.    The BDO Defendants further failed to obtain reasonable assurances about whether the financial statements audited were free of material misstatement.  Thus, the BDO Defendants' statements were made without a genuine belief in their truth or a reasonable basis therefor.

210.    As a direct and proximate result of the BDO Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests and shares in the Ascot Fund, Gabriel Fund and Ariel Fund during the Class Period.  The BDO Defendants knew that investors

would rely upon the audited financial statements of the Funds in making their investment decisions. The losses of the investors in the Funds was the foreseeable result of the extreme recklessness of the BDO Defendants.

211. By virtue of the foregoing, the BDO Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### Breach of Fiduciary Duty Against Defendants Merkin, GCC and the Fortis Defendants

212. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

213. Plaintiffs and other Class members entrusted assets to Merkin and to GCC by purchasing limited partnership interests and shares in the Ascot Fund, Gabriel Fund and Ariel Fund, and reposed confidence in Merkin and GCC with respect to the management of those assets. The superior position of both Merkin and GCC as to the management and control of those assets, as well as their superior access to confidential information about the investment of the assets and about Madoff, required investors in all the Funds to place trust and confidence in Merkin and GCC which together had full managerial, administrative and overall control of the three Funds. Merkin held himself out as providing superior client investment services and as having appropriate policies and procedures in place governing investments so as to ensure the safety of class members' assets and that transactions would be properly conducted.

214. Merkin and GCC owed fiduciary duties to Ascot Fund, Gabriel Fund and Ariel Fund investors. These investors reasonably and foreseeably relied on the representations of Merkin and GCC and trusted in their expertise and skill. Merkin and GCC therefore owed a

fiduciary duty to Plaintiffs and the Class with respect to their management and protection of the assets of all three Funds.

215. The Fortis Defendants owed fiduciary duties to Ariel Fund investors. These investors reasonably and foreseeably relied on the representations of the Fortis Defendants and trusted in their expertise and skill. The Fortis Defendants therefore owed a fiduciary duty to Plaintiffs and the Class with respect to their management and protection of the assets of the Ariel Fund.

216. Merkin, GCC and the Fortis Defendants were obligated to deal fairly and honestly with Plaintiffs and all investors in the Ascot Fund, Gabriel Fund and Ariel Fund; to act with loyalty and good faith toward these investors, to avoid placing themselves in situations involving a conflict of interest with these investors; to manage and operate Fund investments exclusively for the best interest of the Funds; to use due care in the handling of the assets of the Funds; and to oversee the investment of the assets of the Ascot Fund, Gabriel Fund and Ariel Fund to confirm they were maintained in a prudent and professional manner.

217. Merkin, GCC and the Fortis Defendants breached their fiduciary duties to Plaintiffs, and acted in reckless disregard of those duties:

a. by publishing and releasing materials that contained false and misleading descriptions of the care taken by the Merkin and GCC with respect to Fund assets, of the manner in which the assets of the Ascot Fund, Gabriel Fund and Ariel Fund were being invested, and of the financial performance of both Funds;

b. by failing to act with reasonable care in ascertaining that the information set forth in the written materials provided to investors were accurate and did not contain misleading statements or omissions of material facts;

  c.  by failing to perform adequate due diligence, before investing with Madoff;

  d.  by failing to monitor the assets of the Funds after investing them with Madoff;

  e.  by failing to monitor the activities of Madoff, to whom a material portion of the Funds' assets had been entrusted, on an ongoing basis to any reasonable degree;

  f.  by failing to take adequate steps to analyze, test or otherwise confirm Madoff's purported account statements, transactions and holdings; and

  g.  by profiting handsomely from management and incentive fees paid by the Funds.

218. As a result of the breaches of fiduciary duty of Merkin, GCC and the Fortis Defendants, investors in the Ascot Fund, Gabriel Fund and Ariel Fund have been damaged in an amount to be determined at trial. Class members have lost all, or substantially all, of their respective investments in the Ascot Fund, Gabriel Fund and Ariel Fund, and have been forced to pay excessive investment and management fees in exchange for investment services that were promised but never provided.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
### Against the BDO Defendants and the Fortis Defendants

219. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

220. Defendants Merkin, GCC and the Fortis Defendants owed Plaintiffs and the Class fiduciary duties as alleged herein.

221. By committing the acts alleged herein, Merkin, GCC and the Fortis Defendants have breached their fiduciary duties owed to Plaintiffs and the Class.

222. The BDO Defendants aided and abetted Merkin, GCC and the Fortis Defendants in breaching their fiduciary duties owed to Plaintiffs and the Class. BDO Defendants knowingly or recklessly ignored information that indicated or should have indicated that the assets invested by Plaintiffs and the Class in the Ascot Fund, Gabriel Fund and Ariel Fund were being invested with Madoff and BMIS and that Merkin and GCC did not have a genuine belief or a reasonable basis for the financial statements sent to Plaintiffs and the Class or for other statements made to Plaintiffs and other investors.

223. The BDO Defendants provided substantial assistance to this fiduciary breach by issuing clean audit opinions that were prepared in clear violation of GAAP and GAAS.

224. As a result of the breaches of fiduciary duty of Merkin, GCC and the Fortis Defendants, as aided and abetted by the BDO Defendants, investors in the Ascot Fund, Gabriel Fund and Ariel Fund have been damaged in an amount to be determined at trial.

225. To the extent that the Fortis Defendants owed no fiduciary duty to investors in the Ariel Fund, the Fortis Defendants aided and abetted the breaches of fiduciary duty of Merkin and GCC by disseminating financial and other statements on behalf of the Ariel Fund that misrepresented the net asset value of the Ariel Fund and contained other misstatements and/or omissions of fact. The Fortis Defendants knowingly or recklessly ignored information that indicated or should have indicated that the assets invested by Plaintiffs and the Class in the Ariel Fund were being invested with Madoff and BMIS and that Merkin and GCC did not have a genuine belief or a reasonable basis for the financial statements sent to Plaintiffs and the Class or for other statements made to Plaintiffs and other investors.

# COUNT VI

## Gross Negligence Against Merkin, GCC and the Fortis Defendants

226. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

227. Merkin, GCC and the Fortis Defendants, as the managers and administrators of both the Ascot Fund, Gabriel Fund and Ariel Fund, and with absolute control over their assets, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of the assets invested in the three Funds, and in the selection and monitoring of third-party managers. Merkin, GCC and the Fortis Defendants knew or should have known that Plaintiffs were relying on them to manage the investments entrusted to them with reasonable care, and that investors reasonably and foreseeably relied on them to exercise such care by entrusting assets to them.

228. Merkin, GCC and the Fortis Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs and all investors in the Funds. Merkin, GCC and the Fortis Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional. Merkin, GCC and the Fortis Defendants failed to perform adequate due diligence before investing with Madoff, failed to monitor Madoff on an ongoing basis to any reasonable degree and failed to take adequate steps to confirm Madoff's purported account statements, transactions and holdings of Fund assets.

229. If Merkin, GCC and the Fortis Defendants had not been grossly negligent with respect to the assets that were invested with them, they would not have entrusted the entirety of the Ascot Fund's assets and a material portion of the Gabriel and Ariel Funds' assets to Madoff.

230. As a direct and proximate result of Defendants' gross negligence with respect to the assets of the Funds, Plaintiffs and the Class have been harmed.

## COUNT VII

### Unjust Enrichment Against All Defendants

231. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

232. All Defendants were enriched at the expense of Plaintiffs and all investors in the Funds through the payment of management, administrative, professional and incentive fees. Management fees were paid for management services that were not provided and incentive fees were paid for the purported, but in fact non-existent, capital appreciation of the assets of the Funds. The Fortis Defendants were paid professional and administrative fees for services that were performed with gross negligence

233. To the extent that the assets of the Funds were invested with Madoff, any profits purportedly generated from those investments were illusory. Thus, Merkin and GCC were overpaid by the portion of management and incentive fees that stemmed from assets invested with and profits generated by, Madoff.

234. The BDO Defendants have been paid substantial professional fees for audits that were not performed in a manner consistent with the standards of the auditing profession and as required by GAAS.

235. The performance of Merkin, GCC, the BDO Defendants and the Fortis Defendants was so far below the fiduciary, business and professional standards that Plaintiffs and the Class involuntarily conferred a benefit upon these Defendants without receiving adequate benefit or compensation in return. These Defendants have been unjustly enriched.

236.    Equity and good conscience require all incentive fees, management fees and professional fees that flowed from Fund investments with Madoff to be disgorged and refunded to the Ascot Fund, Gabriel Fund and Ariel Fund for the benefit of their limited partners and shareholders.

## COUNT VIII

### Common Law Fraud Against All Defendants

237.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

238.    Plaintiffs and other members of the Class, in reasonable and justifiable reliance upon the representations and statements made by Defendants, purchased limited partnership interests and shares in the Ascot Fund, Gabriel Fund and Ariel Fund.

239.    Plaintiffs and other members of the Class would not have purchased their limited partnership interests and shares in the Funds except for their reliance upon the representations made by Defendants, and would never have purchased them had they been aware of the material omissions and concealment by Defendants of the inadequate due diligence of Merkin, GCC and the Fortis Defendants, the absence of true monitoring by Merkin, GCC and the Fortis Defendants, and the failure of the BDO Defendants to conduct its audits in accordance with GAAS.

240.    At the time that Defendants made the statements and representations outlined herein, they knew or should have known them to be false, and Defendants intended to deceive Plaintiffs and the Class by making such statements and representations.

241.    At the time the statements and misrepresentations outlined here were made, Defendants intended that Plaintiff and the members of the Class would act on the basis of the

misrepresentations and omissions in determining whether to purchase limited partnership interests or shares in the Funds. Plaintiffs and the Class reasonably relied thereon to their detriment in making their investment decisions.

242. Had Plaintiffs and the other members of the Class known of the material facts that Defendants wrongfully concealed and misrepresented material facts, Plaintiffs and other Class members would not have purchased limited partnership interests or shares in the Ascot Fund, Gabriel Fund or Ariel Fund.

243. As a direct and proximate result of Defendants' wrongful concealments and misrepresentations, Plaintiffs and the members of the Class purchased limited partnership interests and shares have sustained damages in an amount to be determined at trial.

## COUNT IX

### Negligent Misrepresentation Against All Defendants

244. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

245. Defendants owed to Plaintiffs and other members of the Class a duty: (a) to act with reasonable care in preparing Offering Memoranda, financial statements, quarterly and other periodic reports and auditor's letters and making other representations relied upon by Plaintiffs and other Class members in deciding to purchase limited partnership investment interest or shares in the Ascot Fund, Gabriel Fund and Ariel Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Offering Memoranda and other communications to investors.

246. The BDO Defendants knew that their audited financial statement reports would be provided to limited partners and shareholders and potential investors in the Ascot Fund, Gabriel

Fund and Ariel Fund and would be relied upon by them in making investment decisions concerning the purchase of limited partnership interests or shares. The goal of the audit engagement was to provide an audit report to the limited partners and shareholders, who comprised a discrete and finite group of persons and entities whose identities were know to the BDO Defendants.

247. The BDO Defendants owed to Plaintiffs and the Class members a duty: (a) to act with reasonable care in preparing their audit reports of the financial statements of the Funds, which financial statements were relied upon by Plaintiffs and other Class members in deciding to purchase their limited partnership interests or shares; and (b) to use reasonable diligence in determining the accuracy of the information contained in the financial statements and in preparing the auditors' reports.

248. The Fortis Defendants owed to Ariel investors a duty (a) to act with reasonable care in providing administration services for the Ariel Fund, and (b) to use reasonable diligence in determining the accuracy of the information contained in periodic reports distributed to investors in the Ariel Fund, including the accuracy of the net asset value calculations set forth in those reports.

249. Merkin, GCC, the BDO Defendants and the Fortis Defendants each breached their duties to Plaintiffs and other Class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memoranda and other representations to investors, including the audited financial statements and quarterly reports of each of the Funds.

250. Neither the Offering Memorandum nor any other materials used in soliciting investments in the Funds ever disclosed that virtually all of the Ascot Fund's assets and at least

25% of the Gabriel and Ariel Funds assets were invested with Madoff or entities that he controlled. The offering materials for all three Funds instead misrepresented that controls were in lace to ensure that the Funds' assets were protected and that the Funds' assets were invested pursuant to a strategy that, in fact, was no strategy at all. The financial statements of the Funds likewise failed to reveal that the BDO Defendants and the Fortis Defendants had failed to probe the adequacy of Merkin's internal controls or the controls established by Madoff and BMIS, or the accuracy of the information received from Merkin and Madoff regarding the investments of the assets of the Funds.

251. As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Class members have sustained damages and have lost a substantial part (if not the entirety) of their respective investments in an amount to be determined at trial.

## COUNT X

### Professional Negligence Against the BDO Defendants and the Fortis Defendants

252. Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

253. BDO's audit reports were specifically addressed to the Partners of the Ascot Fund and the Gabriel Fund. BDO Tortuga's audit reports were specifically addressed to the shareholders of the Ariel Fund.

254. The BDO Defendants expected and intended the Partners of the Ascot Fund and the Gabriel Fund and the shareholders of the Ariel Fund to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of its audits.

255. The BDO Defendants assumed professional responsibility for independently auditing the financial reports of the Ascot Fund, Gabriel Fund and Ariel Fund, undertook to

exercise its professional skill and talent on behalf of and for the benefit of the Funds and their limited partners and shareholders and had a duty to exercise professional care in doing so.

256.    The BDO Defendants breached this duty of professional care and failed to provide to Plaintiffs the advice and services to which they were entitled. The BDO Defendant's audits failed to comply with GAAP and GAAS and the BDO Defendants failed to act as a professional auditor would act in auditing the financial reports of the Funds.

257.    The Fortis Defendants breached this duty of professional care and failed to provide to Ariel Class members the advice, information and services to which they were entitled.

258.    As a direct and proximate result of the BDO Defendants' and the Fortis Defendants' negligence and/or gross negligence, Plaintiffs and class members have lost all or a substantial portion of their invested capital, and thereby suffered damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding monetary damages against all Defendants, in favor of Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the wrongdoings alleged herein, together with interest thereon;

C.    Disgorging all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

D.    Awarding punitive damages as appropriate;

E.      Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys and experts; and

F.      Granting Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 1, 2010

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: _____

Arthur N. Abbey, Esq.
aabbey@abbeyspanier.com
Karin Fisch, Esq.
kfisch@abbeyspanier.com
Stephanie Amin-Giwner, Esq.
samin@abbeyspanier.com
Richard B. Margolies, Esq.
rmargolies@abbeyspanier.com
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Plaintiffs' Second Consolidated

Amended Class Action Complaint by causing true copies of same to be sent by e-mail on March

1, 2010 to counsel for Defendants as follows:

Howard Schiffman, Esq.
howard.schiffman@srz.com
Harry Sandick, Esq.
harry.sandick@srz.com
Eric A. Bensky, Esq.
eric.bensky@srz.com
SCHULTE ROTH & ZABEL, LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for Defendants*
*Ascot Partners, L.P. and Gabriel Capital, L.P.*

Andrew J. Levander, Esq.
andrew.levander@dechert.com
Gary J. Mennitt, Esq.
gary.mennitt@dechert.com
David Hoffner, Esq.
david.hoffner@dechert.com
Neil A. Steiner, Esq.
neil.steiner@dechert.com
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Attorneys for Defendant J. Ezra Merkin and Gabriel Capital Corporation*

Ira G. Greenberg, Esq.
igreenberg@eapdlaw.com
Robert Novack, Esq.
rnovack@eapdlaw.com
Charles W. Stotter, Esq.
cstotter@eapdlaw.com
EDWARDS ANGELL PALMER & DODGE, LLP
750 Lexington Avenue
New York, New York 10022
Telephone: (212) 308-4411
Facsimile: (212) 308-4844

*Attorneys for Defendants BDO Seidman, LLP*


David Esseks, Esq.
david.esseks @allenovery.com
ALLEN & OVERY
1221 Avenue of the Americas
New York, NY 10020
United States of America
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Attorneys for the Fortis Defendants*


_____
                    Richard B. Margolies