# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE J. EZRA MERKIN AND BDO SEIDMAN SECURITIES LITIGATION | 08 Civ. 10922 (DAB) |

## THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**ABBEY SPANIER RODD & ABRAMS, LLP**
212 East 39th Street
New York, NY 10016
(212) 889-3700

*Counsel for Co-Lead Plaintiffs*
*New York Law School and Scott Berrie*

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
(212) 545-4600

*Counsel for Co-Lead Plaintiff*
*Jacob Finkelstein CGM Rollover Custodian and*
*Named Plaintiff Nephrology Associates PC*
*Pension Plan*

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................2

JURISDICTION AND VENUE .......................................................................................6

THE PARTIES .................................................................................................................7

    Plaintiffs..........................................................................................................................7

    Defendants ......................................................................................................................7

    Relevant Non-Parties ...................................................................................................11

PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................................12

SUBSTANTIVE ALLEGATIONS ...............................................................................14

    The Madoff Ponzi Scheme ..........................................................................................14

    Merkin's Relationship With Madoff ...........................................................................15

    The Ascot Fund ...........................................................................................................16

    Ascot Offering Memoranda and Other Disclosures Were False and Misleading ....................17

    False and Misleading Statements in the Confidential Offering Memoranda ............................18

    False and Misleading Statements in Ascot Fund Quarterly Reports and
    Investor Presentations...................................................................................................25

    The Gabriel and Ariel Funds .......................................................................................27

    The Gabriel and Ariel Offering Memoranda and Other Disclosures Were
    False and Misleading....................................................................................................30

    False and Misleading Statements in the 2006 Gabriel Confidential
    Offering Memorandum..................................................................................................30

    False and Misleading Statements in the 2001 and 2002 Ariel Prospectuses and
    2006 Ariel Confidential Offering Memorandum..........................................................34

    False and Misleading Statements in Gabriel Fund and Ariel Fund Quarterly Reports
    and Investor Presentations ............................................................................................40

Merkin and GCC Failed To Perform a Due Diligence Review and Monitoring Despite Numerous "Red Flags" ............................................................................................44

Merkin Unjustly Reaped Hundreds of Millions of Dollars in Management and Incentive Fees ........................................................................................................58

The Merkin Fraud is Publicly Revealed ..............................................................60

The BDO Defendants ..........................................................................................63

Applicable Standards and the BDO Defendants' Duties with Respect to the Funds ...............66

The BDO Defendants' Deficient Audits ..............................................................70

The BDO Defendants' Duties with Respect to BMIS ..........................................76

COUNT I ...................................................................................................................80

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Defendants Merkin and GCC

COUNT II ..................................................................................................................82

Violation of Section 20(a) of the Exchange Act against Merkin and GCC

COUNT III .................................................................................................................83

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 against the BDO Defendants

COUNT IV .................................................................................................................85

Breach of Fiduciary Duty against Defendants Merkin and GCC

COUNT V...................................................................................................................87

Breach of Fiduciary Duty against the BDO Defendants

COUNT VI .................................................................................................................88

Aiding and Abetting Breach of Fiduciary Duty against the BDO Defendants

COUNT VII................................................................................................................89

Gross Negligence against Merkin and GCC

COUNT VIII.................................................................................................................90

   Unjust Enrichment against All Defendants

COUNT IX ...................................................................................................................91

   Common Law Fraud against All Defendants

COUNT X.....................................................................................................................92

   Negligent Misrepresentation against All Defendants

Lead Plaintiffs New York Law School ("NYLS"), Scott Berrie ("Berrie") and Jacob E. Finkelstein CGM IRA Rollover Custodian ("Finkelstein") (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by the undersigned Lead Counsel, for their Third Consolidated Amended Class Action Complaint (the "Complaint") allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based, *inter alia*, on the investigation made by and through their attorneys, which investigation included among other things, a review of Ascot Partners, L.P., Gabriel Capital, L.P. and Ariel Fund Limited documents; complaints filed by the Securities and Exchange Commission ("SEC") (including the complaints filed in *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008) and *SEC v. David G. Friehling*, 09 Civ. 2467 (S.D.N.Y. Mar. 19, 2009)); the SEC Office of Inspector General report entitled "Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme dated August 31, 2009 (the "SEC OIG Report"); documents obtained by the Office of the Attorney General of the State of New York ("NYAG") in connection with the complaint filed in *Andrew M. Cuomo v. J. Ezra Merkin et al.*, Index No. 450879/2009 (Sup. Ct. N.Y. Co. Apr. 6, 2009) ("NYAG Complaint"); *In the Matter of: Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.*, Docket No. 2009-0028 (the administrative complaint filed by the Enforcement Section of the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts); *Andrew M. Cuomo v. Ivy Asset Management LLC, et al.*, Index No. 450489/2010, (Sup. Ct. N.Y. Co. May 11, 2010) ("NYAG Ivy Complaint"); *New York University v. Ariel Fund Ltd., et al.*, No, 603803/2008 (the "NYU Action"); the arbitration award in *Wiederhorn v. Merkin*, Case No. 13 148 Y 02937 08 (American Arbitration Association May 10, 2010); and other reports and interviews published in the financial press and information obtained by Plaintiffs.

## INTRODUCTION

1.      This case arises from a massive fraudulent scheme perpetrated by Bernard L.

Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC

("BMIS"), and others, in association with Defendant J. Ezra Merkin ("Merkin") and others

named herein, who, recklessly or negligently and/or in breach of fiduciary duties owed to

Plaintiffs and other class members, caused and permitted $1.8 billion, virtually the entire

investment capital of Ascot Partners, L.P. (the "Ascot Partnership" or the "Ascot Fund"), and at

least 25% of approximately $2.7 billion invested in both Gabriel Capital, L.P. (the "Gabriel

Partnership" or the "Gabriel Fund") and Ariel Fund Limited (the "Ariel Fund"), to be handed

over to Madoff to be "invested" for the benefit of Plaintiffs, the other limited partners of the

Ascot Fund and Gabriel Fund and the owners of shares of the Ariel Fund.[1]

2.      This action is brought as a class action on behalf of investors in the Ascot Fund,

the Gabriel Fund and the Ariel Fund to recoup losses caused by Defendants' violations of federal

and New York State law. The Ascot Fund and Gabriel Fund are each domestic hedge funds

organized as limited partnerships managed by the same general partner – Merkin. The Ariel

Fund is an off-shore hedge fund. Merkin is the sole shareholder and sole director of Gabriel

Capital Corporation ("GCC"), the Investment Advisor to the Ariel Fund. Thus, Merkin alone

had ultimate responsibility for the management, operations and investment decisions made on

behalf of all of the Funds. According to the offering materials of both the Ascot Fund and the

Gabriel Fund, GCC also provides administrative and managerial services to both the Ascot Fund

and the Gabriel Fund.

---

[1] The Ascot Fund, Gabriel Fund and Ariel Fund are sometimes collectively referred to as the "Funds" where it is appropriate.

2

3.      Plaintiff NYLS and other Ascot Fund class members are qualified investors that purchased limited partnership interests in the Ascot Fund. Plaintiff Berrie and other Gabriel Fund class members are qualified investors that purchased limited partnership interests in the Gabriel Fund. Plaintiff Finkelstein and other Ariel Fund class members are qualified investors who purchased redeemable participating preference shares in the Ariel Fund.

4.      On December 11, 2008, Madoff was arrested by federal authorities and both he and BMIS were charged with securities fraud and other federal offenses by the SEC after he confessed to running a $50 billion Ponzi scheme. The United States Attorney's Office for the Southern District of New York subsequently charged Madoff with securities fraud and other felony counts.

5.      On December 11, 2008, Defendant Merkin sent a letter to investors in the Ascot Fund and disclosed to Plaintiff NYLS and other class members for the first time that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) had been allocated to Madoff and were likely lost. That same day, Merkin advised Ariel investors that Madoff had been arrested by federal authorities "for perpetuating a massive securities fraud, alleged to have involved losses of $50 billion." Merkin also revealed for the first time to Ariel investors that he had invested Ariel funds with Madoff.

6.      On December 18, 2008, Defendant Merkin sent a letter to investors in the Gabriel Fund and disclosed to Plaintiff Berrie and other class members that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio, the Gabriel Fund would be dissolved and liquidated.

3

7.     The same day, Defendant Merkin also sent a letter to investors in the Ariel Fund and disclosed to Plaintiff Finkelstein and other class members that Madoff-related losses necessitated that he wind down the Ariel Fund and sell off its holdings.  According to the letter, the Ariel Fund suffered at least a 39% decline due in large part to Madoff.  Specifically, the letter stated that "our only realistic option is to wind down Ariel Fund Limited and engage in an orderly disposition of its portfolio positions."

8.     Prior to December 11, 2008, Ascot Fund investors were never informed that since the Ascot Fund's inception, nearly 100% of its assets were actually being funneled to and invested directly with Madoff.  Similarly, prior to December 18, 2008, neither Gabriel Fund investors nor Ariel Fund investors were ever informed that a significant portion of the assets of the Gabriel and Ariel Funds were invested directly with Madoff.

9.     Further, Merkin consistently represented to Plaintiffs and other class members in offering materials, periodic correspondence and other statements made to all investors, that he was actively managing the assets of the Funds and making investment decisions pursuant to specified investment strategies when, in truth, Merkin was doing nothing more than handing over a material portion of the assets of the Funds to Madoff.

10.     Defendant Merkin, in breach of his fiduciary duties to limited partners and investors in the Funds, invested the assets of the Funds with Madoff, who was allegedly using a trading strategy described as a "split strike conversion" strategy.  Madoff, in fact, did not employ the strategy at all.  Instead, he used the assets of the Funds to pay bogus returns as part of a massive Ponzi scheme.

11.     Defendant Merkin, as the General Partner and Manager of the Ascot and Gabriel Funds, and as the sole shareholder of GCC, the Investment Manager of the Ariel Fund, recklessly

4

failed to supervise, monitor and manage the investments of the Funds, in violation of his fiduciary duties, and contrary to his representations and affirmative statements that he, as the General Partner or through GCC, was exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Funds.

12.     The investments of Plaintiffs and other class members in the Funds have been decimated, as a direct result of: (a) Defendant Merkin's abdication of his responsibilities and duties as General Partner and Manager of the Ascot Fund and Gabriel Fund and principal of GCC, the Investment Advisor to the Ariel Fund; and (b) the complete failure of BDO Seidman, LLP, BDO Binder and BDO Tortuga (the independent auditors for the Funds) to perform audits and provide annual audit reports in conformance with generally accepted auditing standards or applicable international standards.

13.     Defendant Merkin has profited handsomely as he was charging and receiving from Ascot Fund investors an annual fee of between 1.0%-1.5% and from Gabriel and Ariel Fund investors an annual fee of 1% of their investments in exchange for his purported "management" services, which ultimately proved to be no more than turning money over to another investment manager.

14.     In addition to the management fees from the Gabriel and Ariel Funds, Merkin received 20% of the Gabriel and Ariel Funds' net income each year as an incentive award. These fees and incentive awards flowed from the Gabriel and Ariel Funds' profits, which now have shown to be illusory.

15.     From 1995 through 2007, Merkin received management fees of $169 million from the Ascot Fund.  From 1989 through 2007, Merkin collected annual management and incentive

fees from the Gabriel Fund that totaled approximately $277 million and from the Ariel Fund approximately $242 million.

16.     Pursuant to a deferred incentive fee arrangement with the Ariel Fund, between 1995 and 2007, Merkin purported "to earn" an astounding $323,235,465 in "incentive" fees from the Ariel Fund.  By the end of 2008, Merkin's deferred fees from the Ariel Fund totaled approximately $169 million.  A material portion of these fees were unearned because they were based on fictitious returns from Madoff.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5, as well as under the laws of the State of New York.  This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District, and most Defendants reside in and/or maintain principal executive offices in this District.

19.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

6

## THE PARTIES

### Plaintiffs

20.     Co-lead Plaintiff NYLS was first chartered by the State of New York in 1891. NYLS has approximately 1500 students to whom it offers a course of study leading to the J.D. degree through full-time day and part-time evening divisions, as well as joint degree programs with other educational institutions.   During the proposed class period, NYLS, through its endowment entity, invested $3 million in the Ascot Fund in 2006, and continues to own that investment, which is now worthless.  NYLS's investment in the Ascot Fund is in the form of a limited partnership interest.

21.     During the proposed class period, Co-lead Plaintiff Berrie invested $500,000 in the Gabriel Fund, and continues to own that investment, which is now worth substantially less. Berrie's investment in the Gabriel Fund is in the form of a limited partnership interest.

22.     During the proposed class period, Co-lead Plaintiff Finkelstein invested $500,000 to purchase shares in the Ariel Fund, and continues to own that investment, which is now worth substantially less.

23.     During the proposed class period, named Plaintiff Nephrology Associates PC Pension Plan ("NAPP") first invested over $1 million in the Ariel Fund, and continues to own that investment, which is now worth substantially less.

### Defendants

24.     Defendant Merkin is the founder, General Partner and Manager of the Ascot Fund and Gabriel Fund.  He is also the President, sole shareholder and director of GCC, the Investment Manager of the Ariel Fund.  Merkin has sole responsibility for the management, operations and investment decisions made on behalf of the Funds. On April 6, 2009, the NYAG charged Merkin with civil fraud for secretly steering at least $2.4 billion in client money into

7

Madoff's massive Ponzi scheme. Merkin maintains his business office at 450 Park Avenue, New York, New York 10022.

25.    Defendant GCC is a Delaware corporation with its principal place of business at 450 Park Avenue, New York, New York 10022. All of the outstanding capital stock of GCC is owned or controlled by Merkin. GCC was the Investment Manager of the Ariel Fund.

26.    Defendant BDO Seidman LLP ("BDO"), located at 135 West 50th Street, New York, New York 10020 and 330 Madison Avenue, New York, New York 10017, is a national accounting and consulting firm with full access to the support facilities of BDO International.[2] As a Member Firm of BDO International, BDO is required to adhere to uniform standards along with all other BDO Member Firms. During the proposed class period, BDO was the independent auditor for the Ascot Fund and Gabriel Fund and issued clean audit reports on the annual financial statements of the Ascot Fund and Gabriel Fund which were relied on by Plaintiffs and other class members. BDO knew that the audited financial statements would be provided to and relied on by Ascot Fund and Gabriel Fund limited partners. Upon information and belief, BDO also conducted audits of the Ariel Fund, working with BDO Binder and BDO Tortuga, purportedly in accordance with auditing standards that are generally accepted in the United

---

[2] BDO International (sometimes referred to as BDO Global Coordination B.V.) ("BDO International") is a worldwide network of public accounting firms, called "BDO Member Firms". With more than 1,000 offices in over 100 countries, BDO International is the fifth largest such network in the world. BDO International reports its revenues on a combined worldwide basis, including the revenue of the BDO Defendants (defined below). Furthermore, BDO International implements international quality control and training programs in all BDO Member Firms to support compliance with both local and international standards. Upon information and belief, BDO International manages and controls the business entities within its network of public accounting firms, including BDO, BDO Binder and BDO Tortuga. As set forth in its 2008 Annual Statement, "BDO International evaluates the quality of local and referred professional work carried out by BDO Member Firms through a Quality Assurance Review process. These reviews [are intended] to provide assurance that BDO Member Firms are adhering both to applicable professional standards and BDO International standards."

States and abroad, and, at all relevant times, issued clean audit reports on the annual financial statements of the Ariel Fund which were relied on by investors in the Ariel Fund. BDO knew that the audited financial statements would be provided to and relied on by investors in the Ariel Fund.

27.     Defendant BDO Binder (sometimes referred to as BDO Limited), located at Sea Meadow House, Tobacco Wharf, P.O. Box 34, Road Town, Tortola VG1110, British Virgin Islands, is a British Virgin Islands accounting and consulting firm with full access to the support facilities of BDO International. As a Member Firm of BDO International, BDO Binder is required to adhere to uniform standards along with all other BDO Member Firms. During the proposed class period, BDO Binder served as an independent auditor for the Ariel Fund, conducted annual audits of the financial statements of the Ariel Fund, purportedly in accordance with International Standards on Auditing, and, for all relevant times, issued clean audit reports on the annual financial statements of the Ariel Fund which were relied on by investors in the Ariel Fund. Upon information and belief, BDO Binder's audit reports for the Ariel Fund were based on audits conducted in whole or in part by BDO, which was the independent auditor for the Gabriel Fund, Ariel's domestic sister fund, and the Ascot Fund. BDO Binder knew that the audited financial statements would be provided to and relied on by Ariel shareholders. BDO Binder addressed its audit reports to investors in the Ariel Fund, many of whom were located in the United States.

28.     Defendant BDO Tortuga, located at Governors Square, 23 Lime Tree Bay Avenue, Grand Cayman KY1-1205, Cayman Islands, is a Cayman Islands accounting firm with full access to the support facilities of BDO International. Functioning as a sister office to Member Firm BDO Binder, BDO Tortuga is also required to adhere to uniform standards along

with all other BDO Member Firms.  During the proposed class period, BDO Tortuga served as an independent auditor for the Ariel Fund, conducted annual audits of the financial statements of the Ariel Fund, purportedly in accordance with International Standards on Auditing, and, at all relevant times, issued clean audit reports on the annual financial statements of the Ariel Fund which were relied on by investors in the Ariel Fund.  Upon information and belief, BDO Tortuga's audit reports for the Ariel Fund were based on audits conducted in whole or in part by BDO, which was the independent auditor for the Gabriel Fund, Ariel's domestic sister fund, and the Ascot Fund.  BDO Tortuga knew that the audited financial statements would be provided to and relied on by Ariel shareholders.  BDO Tortuga addressed its audit reports to investors in the Ariel Fund, many of whom were located in the United States.

29.     Defendants BDO, BDO Binder and BDO Tortuga are sometimes referred to herein collectively as the "BDO Defendants."  In the February 9, 2009 deposition taken of Defendant Merkin in the NYU Action, when asked whether he had any conversations with an auditor of the offshore BDO entity, Merkin testified that he "had a conversation with somebody at BDO Seidman.  Seidman, I can't tell you whether that conversation - whether the person with whom I had that conversation was in New York at the other end of the telephone or someplace else when the name of the BDO entity that audited our offshore funds changed and we went from a BDO something to a BDO something else."  Merkin further testified "BDO has been our only auditor other than for the changes in the name of their entities and [Michael Andreola, a partner at BDO] has been involved on our team and probably the one person who has been the constant name, some of the other names have changed over time, since the beginning."

30.     The BDO Defendants knew that Merkin would use its name to market the Ascot and Gabriel Funds, and BDO Binder and BDO Tortuga knew that Merkin would use their names

to market the Ariel Funds. Further, the BDO Defendants knew their audit reports would be provided to existing investors and would be made available to potential investors. They knew existing and potential investors would rely on the fact that a global auditing firm was the auditor of the Funds, had conducted proper audits of the Funds, and issued clean audit reports for the Funds.

31.    Defendants GCC, Merkin, BDO, BDO Tortuga and BDO Binder are sometimes referred to herein collectively as "Defendants."

**Relevant Non-Parties**

32.    Non-party Ascot Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on August 17, 1992 to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons, including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), other entities exempt from payment of U.S. Federal income tax, and entities wherein substantially all of the ownership interests which are held by Tax-Exempt U.S. Persons.

33.    Non-party Gabriel Fund, located at 450 Park Avenue, New York, New York 10022, is a Delaware limited partnership formed on January 1, 1991 to operate as a private investment partnership for the benefit of U.S. taxable investors.

34.    Non-party Ariel Fund, located c/o Fortis Prime Fund Solutions (Cayman), 802 West Bay Road, P.O. Box 2003, Grand Pavilion Commercial Centre, George Town KYI-1104, Cayman Islands, is an offshore hedge fund in the Cayman Islands formed on December 22, 1988 to undertake business as a corporate open-ended investment fund. Prospective shareholders in the Ariel Fund must be non-U.S. persons or U.S. persons subject to ERISA, or otherwise exempt from paying Federal Income Tax. The Ariel Fund is essentially a separate but parallel fund to the Gabriel Fund that is open to foreign investors and others not subject to U.S. taxes.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased limited partnership interests of the Ascot Fund and Gabriel Fund and shares of the Ariel Fund between December 11, 2003 and December 11, 2008 for claims arising under the Securities Exchange Act (the "Exchange Act Class Period"), and between January 20, 1994 through and including December 11, 2008 for claims arising under common law and state law (the "State Law Claims Class Period") (collectively, the "Class Period"), and who were injured thereby (the "Class"). Excluded from the Class are the Defendants, members of the immediate family of Defendant Merkin, any affiliate of the Funds, Merkin, GCC, executive officers of the Funds, partners of the BDO Defendants, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

36.     This action is properly maintainable as a class action because:

a.     The members of the proposed Class in this action are dispersed geographically and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds;

b.     Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws and New York law as alleged herein;

c.      Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seeks to represent;

d.      A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it virtually impossible for Class members to redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

e.      Plaintiffs anticipate no unusual difficulties in the management of this action as a class action; and

f.      The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.      whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

ii.     whether Defendants' Class Period representations to Plaintiffs and the other class members misrepresented and/or omitted material facts;

iii.    whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

iv.     whether Defendants' conduct alleged herein was intentional, reckless, grossly negligent or in violation of fiduciary duties owed to Plaintiffs and other Class members; and

v.      to what extent the members of the Class have sustained damages and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Madoff Ponzi Scheme

37.    On December 10, 2008, Bernard Madoff confessed to running the largest Ponzi scheme in history, a fraud that Madoff himself admitted could have taken as much as $50 billion from investors.  According to Madoff, he was "finished," and had "absolutely nothing."  Madoff also admitted that his entire business was "just one big lie."

38.    On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud for a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on advisory clients of BMIS.  Those clients included the Funds.  Unbeknownst to Plaintiffs and other Class members and contrary to representations made to Plaintiffs and the Class, Merkin and GCC had entrusted virtually all of the investment capital of the Ascot Fund and at least 25% of the investment capital of the Gabriel Fund and Ariel Fund (capital provided by Plaintiffs and the Class through their purchase of investment interests in the Funds) to Madoff.

39.    Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office of the Southern District of New York with securities fraud. According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.

40.    On December 12, 2008, the SEC was granted emergency relief to halt the ongoing Madoff fraud and preserve any assets for injured investors, including orders freezing assets, appointing a receiver, appointing a Trustee pursuant to SIPA, allowing expedited discovery and preventing destruction of documents.

41.     On February 20, 2009, Irving Picard, the court-appointed Trustee liquidating Madoff's assets, stated that he had found no evidence that, from at least 1996 to the present, any stocks or options were purchased or traded by Madoff for investors.

42.     On March 12, 2009, Madoff pleaded guilty to securities fraud charges, admitting that beginning in the early 1990s, he stopped purchasing securities for his investment management clients and began operating a Ponzi scheme.

43.     On March 18, 2009, the SEC charged BMIS's auditors David G. Friehling ("Friehling") and his firm, Friehling & Horowitz, CPAs, P.C. ("F&H"), with securities fraud by representing that they had conducted legitimate audits, when in fact they had not.  Mr. Friehling pled guilty to these charges at the end of November 2009.

44.     On June 29, 2009, Judge Denny Chin sentenced Madoff to 150 years in prison and condemned his crimes as "extraordinarily evil."

**Merkin's Relationship With Madoff**

45.     Madoff, by the 1970s and 1980s, had pioneered electronic trading and founded his own trading firm, BMIS, which became a major market-maker for stocks and options.  BMIS was both a broker-dealer and, as of 2006, an investment advisor registered with the SEC.

46.     Madoff's purported trading strategy was known as a "split strike conversion" strategy.  The strategy was to (a) buy stocks of selected corporations that were included in the blue-chip Standard & Poor's 100 Index (the "Index"), and simultaneously (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options.  The call options would also, to some degree, limit any gains that would be earned on the underlying stocks. Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined.  Madoff's description of his

15

purported strategy evolved only slightly over time.  He soon began to claim that he was using a larger "basket" of stocks selected from the Index, combined with put and call options on the Index itself rather than options on individual stocks.  The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated.  Madoff claimed to execute the "split strike conversion" strategy six to eight times per year.  At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries").

47.    In the late 1980s, Defendant Merkin began running his own investment funds. Through his extensive professional network, connections in the community and the philanthropic world, Merkin marketed several funds to numerous individuals and charities. Merkin's primary role was to raise money for the funds and discretely feed the funds to third parties to actually manage the investment activity.

48.    Sometime in the very early 1990s, Merkin met Madoff and they started doing business together.   Thereafter, Merkin started raising large sums of money from investors, including Plaintiffs and Class members, who were unaware that their investments were being fed to Madoff and BMIS and who believed, as they were told by Merkin, that their investments were being managed by him pursuant to stated investment strategies and were being placed in a diverse portfolio of securities.  Merkin's business relationship with Madoff and BMIS helped earn Merkin and his investment firm millions of dollars in management and incentive fees.

**The Ascot Fund**

49.    In 1992, Defendant Merkin created the Ascot Fund, a private investment partnership.  The sole purpose of this investment fund (which was undisclosed to investors) was to serve as a feeder to Madoff and BMIS.  According to the complaint filed by the NYAG, Merkin testified that he formed the Ascot Fund "largely" for the purpose of investing with

Madoff, and that, from the beginning, "substantially all" of the assets of the Ascot Fund were tendered to Madoff.

50.    Investors in the Ascot Fund, like NYLS, are limited partners of the Ascot Partnership. According to a Confidential Offering Memorandum dated October 2006 (the "2006 Offering Memorandum"), the Ascot Partnership had three different classes of limited partnership interests:

- Class A limited partnership interests issued to certain investors prior to February 1, 2006.

- Class B interests held by the Ascot Fund Limited, an investment vehicle created to facilitate investments by foreign investors in the Ascot Partnership.

- Class C limited partnership interests issued to certain Ascot Fund investors after October 2006.

51.    As general partner of the Ascot Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Ascot] Partnership." As Merkin acknowledged in testimony before the NYAG, "I had fiduciary responsibilities [to investors] for oversight of the portfolio."

52.    As of the end of the third quarter of 2008, the Ascot Fund had at least 300 investors with a total of approximately $1.8 billion under management.

**Ascot Offering Memoranda and Other Disclosures**
**Were False and Misleading**

53.    Throughout and prior to the Class Period, Merkin offered participation in the Ascot Fund to qualified investors such as NYLS and other Class members, through a series of Confidential Offering Memoranda issued in 1992, 1996, 2002, and 2006 (the "Confidential Offering Memoranda"). While these documents were prepared, amended or revised from time to time, they were the same in all material respects relevant hereto. Through these Confidential

Offering Memoranda, Merkin provided assurances to Ascot Fund investors, upon which they reasonably and foreseeably relied when deciding to invest in the Ascot Fund. The Confidential Offering Memoranda remained consistent with respect to the material information they concealed. Indeed, the Confidential Offering Memoranda used to solicit investments in the Ascot Fund never disclosed that the majority of the Ascot Partnership's assets were invested with Madoff, or BMIS.

**False and Misleading Statements in the Confidential
Offering Memoranda**

54.     Plaintiff NYLS, like other investors in the Ascot Fund, relied on the identity and role of the manager of the Ascot Partnership. Plaintiff NYLS and other Class members invested in the Ascot Fund based on the understanding that Merkin was the day-to-day manager of the Fund and that he would devote the majority of his time to managing the Ascot Partnership.

55.     The Confidential Offering Memoranda were misleading in that they falsely stated that Merkin was involved in the Fund's management on a day-to-day and transaction-by-transaction basis, and that the success of the Fund depended on Merkin's abilities as a money manager. Merkin led Ascot Fund investors to believe that it was Merkin, not a third party, who was actively managing their investments. However, in truth, Merkin did very little other than ministerial bookkeeping tasks because he was actually feeding all assets invested in the Ascot Partnership directly to Madoff.

56.     By way of example, the December 2002 Confidential Offering Memorandum (the "2002 Ascot Offering Memorandum") and the 2006 Ascot Confidential Offering Memorandum (the "2006 Ascot Offering Memorandum") stated, among other things, under the heading "Dependence on the Managing Partner" that: "All decisions with respect to the management of the capital of the [Ascot] Partnership are made exclusively by J. Ezra Merkin. Consequently, the

18

[Ascot] Partnership's success depends to a great degree on the skill and experience of Mr. Merkin." This was of course untrue, as the investment strategies and performance of the Ascot Fund were entirely in the hands of Madoff.

57.    The Confidential Offering Memoranda were also false and misleading because they represented to investors that Merkin personally was spending the majority of his time managing the assets of the Ascot Fund. For example, the 2002 Ascot Offering Memorandum stated, "The Managing Partner is required to devote substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the [Ascot] Partnership." Similarly, the 2006 Ascot Offering Memorandum stated, "The General Partner has agreed to devote substantially his entire time and effort during normal business hours to the management of the [Ascot] Partnership ...."

58.    In truth, Merkin's management of the Ascot Fund was minimal at best and consisted only of a few monthly conversations with Madoff each year. Merkin admitted in his deposition with the NYAG that his "monitoring" of the Ascot Fund, equally applicable to the Gabriel and Ariel Funds, consisted of:

> It was monitoring. It was talking to [Madoff]. It was a very long relationship. I spoke to him ten or 15 time[s] a year. I spoke to or saw him 10 or 12 times a year. It might have been as often as once a month depending on what was going on. It wasn't so much second guessing. . . . Fifteen would be high in a given year, ten could be low in a given year, and my guess it was more in the beginning[,] then a bit less, and then it developed back up again.

59.    Merkin's purported personal attention to individual trades is repeatedly touted in the risk disclosures that take up a large portion of each memorandum:

- "The Partnership also may take positions . . . in options on stock of companies which may, *in the judgment of the managing partners*, be potential acquisition candidates ...." (Emphasis added).

- "Such purchases may include securities which *the Managing partner believes* to be undervalued." (Emphasis added).

- "Investments in debt claims and the securities of companies that have filed for bankruptcy . . . may be made at various stages in the bankruptcy process *based on the Managing partner's judgment that there is sufficient profit potential.*" (Emphasis added).

- The imposition of controls by governmental authorities might also limit such forward (and futures) trading to *less than that which the General Partner would otherwise recommend ....*" (Emphasis added).

- Merkin has *"ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership."* (Emphasis added).

60.     Ascot Fund investors were led to believe that Merkin's role was so central to the management of the Ascot Fund that the entire Partnership would need to be terminated in the event of his death or incapacity.  Under a heading in the 2006 Ascot Offering Memorandum entitled "Outline of the Partnership Agreement", it stated in relevant part:

> "The Partnership will continue indefinitely the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days ...."

This representation was of course misleading, as the management of the Ascot Fund was entirely in the hands of Madoff.

61.     The Confidential Offering Memoranda were also false and misleading because they gave Ascot Fund investors the perception that Merkin was actively managing their investments with a very specific strategy.  By way of example, the 2006 Ascot Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Ascot] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

20

- Generally, the [Ascot] Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities;

- The [Ascot] Partnership primarily follows a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the [Ascot] Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the [Ascot] Partnership's long portfolio. The purchase of the put option allows the [Ascot] Partnership to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the [Ascot] Partnership to partially finance the purchase of the put option while at the same time partially hedging the [Ascot] Partnership's portfolio against any downward movement in the S&P 100;

- The [Ascot] Partnership will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the [Ascot] Partnership's;

- The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely; and

- The General Partner reserves the right to alter or modify some or all of the [Ascot] Partnership's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk.

62.     These representations about the Ascot Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Ascot Fund would certainly have wanted to know. In particular, the representations that the Ascot Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was following "a strategy in which the [Ascot] Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100"; and was making

21

investments through "third-party managers using managed accounts" all falsely indicated that Merkin was actively pursuing a specific strategy for the Ascot Fund, in a prudent manner, and was using multiple third-party managers with varying execution strategies, thereby avoiding the risk of concentrating capital in too few investments or managers.

63.    In stark contrast, the investment strategies of the Ascot Fund were a sham and the General Partner, Defendant Merkin, had abandoned any diversification strategy because he had given a single third-party manager, Madoff, complete and total management responsibility and discretion over the Ascot Fund.  Merkin admitted in his deposition before the NYAG that substantially all of the assets of the Ascot Fund were invested with Madoff:

Q.    And from the time that Ascot started to invest with Mr. Madoff, [  ] were substantially all of the assets of Ascot with Madoff?

A.    Substantially all, yes.

64.    The section of the 2006 Ascot Offering Memorandum entitled "Risk Factors" also mentioned a wide variety of investment strategies that had nothing to do with the Ascot Fund's actual trading strategy (*i.e.*, Madoff's "split strike conversion" strategy).  The risk warnings included, among others, "Arbitrage Transactions", "Options Transactions", "Futures Contracts", "Forward Trading", "Swap Agreements", "Short Selling", and "Derivatives".  Despite this litany of potential risks, there was no disclosure to Ascot Fund investors of the far greater risk, that Merkin had entrusted a single third-party manager with custody and trading discretion for the entire capital of the Ascot Fund.

65.    The statement in the 2006 Ascot Offering Memorandum that the General Partner (Merkin) "intends to adopt a selective approach in evaluating potential investment situations" so "he can follow more closely" relatively fewer transactions was also false and misleading because

22

it omitted to state that Merkin had, with no or inadequate due diligence or oversight, abdicated his responsibility and entrusted the assets of the Ascot Fund to Madoff.

66.     As acknowledged during testimony given to the NYAG, Merkin always intended for the Ascot Fund to serve solely as a conduit to Madoff and as a result none of the affirmative representations regarding purported investment strategies described in the Confidential Offering Memoranda were true.   Despite this admission to the NYAG, Merkin never disclosed this important fact to Ascot Fund investors.

67.     In the 2006 Ascot Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," Defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Ascot Fund's assets to multiple independent money managers.   As part this disclosure, Merkin assured investors that he would exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and will *monitor the results of those money managers* and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities .... (Emphasis added).

Notwithstanding the false assurances that Merkin would exercise reasonable care in selecting independent money managers and would monitor their reported results, these statements were false and misleading because: (1) all of the Ascot Partnership's assets were entrusted to one single manager, Madoff; and (2) Merkin never exercised any care in delegating such investment discretion to Madoff, or in monitoring his results.

68.    During his deposition taken by the NYAG, Merkin was asked whether the Ascot

Fund Confidential Offering Memoranda disclosed Madoff's role in the Ascot Fund.   Merkin

directed the NYAG to certain statements made in Ascot Fund Offering Memoranda and claimed

that Madoff's role was disclosed:  "Bernie playing a role of prime broker" for the Ascot Fund

and that this description "would certainly convey some sense that the accounts were custodied"

with Madoff.  The disclosure to which Merkin was referring was in the 2006 Ascot Offering

Memorandum:

> The Partnership will execute its trades through unaffiliated brokers, who may be
> selected on a basis other than that which will necessarily result in the lowest cost
> for each trade. Clearing, settlement and custodial services will be provided by one
> or more unaffiliated brokerage firms. Morgan Stanley & Co., Inc. and Bernard L.
> Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the
> principal prime brokers and custodians for the Partnership, and clear (generally on
> the basis of payment against delivery) the Partnership's securities transactions that
> are effected through other brokerage firms. The Partnership is not committed to
> continue its relationship with the Prime Brokers for any minimum period and the
> General Partner may select other or additional brokers to act as prime brokers for
> the Partnership.

This disclosure is in fact completely false and misleading.  The disclosure only describes

Madoff's involvement in the Ascot Fund as a "principal prime broker," a purely administrative

function.  The disclosure also creates the impression that the Ascot Fund had established a

separation between the entity that cleared trades and kept custody of the securities on the one

hand, and the investment managers making investments decisions on the other.  There is no

disclosure that all Ascot Fund assets had been entrusted to Madoff or that Madoff was the person

making all purported investment decisions for the Ascot Fund.

69.    The 2006 Ascot Offering Memorandum also misrepresented the role of Morgan

Stanley & Co. by referring to it also as a "principal prime broker."  In fact, in 2006,

approximately 98% of the Ascot Fund's transaction were both effected and cleared by Madoff,

not Morgan Stanley.   According to the NYAG Complaint, from at least 1999 through 2008,
Madoff, not Morgan Stanley, maintained custody of virtually all securities purportedly acquired
by the Ascot Fund.  The account statements for the Ascot Fund's Morgan Stanley accounts show
that Morgan Stanley's role was almost entirely limited to acting as a bank to transfer cash
between the Ascot Fund and investors, and between the Ascot Fund and Madoff's Chase
Manhattan Bank account.   The disclosure in the 2006 Offering Memorandum, describing
Morgan Stanley as a prime broker, was just another way for Merkin to conceal the fact that he
was simply feeding the assets of the Ascot Partnership directly to Madoff.

**False and Misleading Statements in Ascot Fund**
**Quarterly Reports and Investor Presentations**

70.   In addition to the false and misleading statements in the Confidential Offering
Memoranda, Merkin and others made false statements to Ascot Fund investors through
fraudulent quarterly reports and investor presentation materials and concealed and
misrepresented the role Madoff played in managing the Ascot Fund.

71.   During the Class Period, Defendant Merkin sent quarterly account statements to
Ascot Fund investors purporting to reflect the investments and returns of those limited partners.
The quarterly statements disclosed only the value of each investor's account and the purported
appreciation during the prior quarter.  Annual audited financial statements for the Ascot Fund
were also sent to investors.  The quarterly and annual statements sent to Ascot Fund investors
were, of course, completely false and never revealed that all assets of the Ascot Fund were held
in an account managed by Madoff.

72.   Throughout the Class Period, Plaintiffs and other Class members met with
Defendant Merkin and, based on his representations, thought they were entrusting their money to
him.  This was not the case.

25

73.     Prior to their investing in the Ascot Fund, Merkin made presentations to Plaintiff NYLS and other Class members. Based on these presentations, investors were led to believe that Merkin would be managing the Partnership and that he would be protecting the assets of the Ascot Fund. In a 2008 PowerPoint document used by Merkin in making presentations to potential investors, Merkin described the Ascot Fund as having "Actively Managed Strategies." That presentation never disclosed that it was actually Madoff who was actively managing the strategies of the Ascot Fund.

74.     Merkin told several investors, concerned about rumors that the Ascot Fund was being managed by Madoff, that only a small or insubstantial portion of the Ascot Fund's assets were held by Madoff. For example, in 2005, an investor was told by an employee at another hedge fund that the assets of the Ascot Fund were invested with Madoff. When that investor asked Merkin about Madoff's role, Merkin acknowledged that when he started the Ascot Fund, it was managed by Madoff, but after Merkin and his staff learned about Madoff's strategies, they were able to produce the same results without Madoff. Merkin also claimed that while a small amount of the Ascot Fund was still being managed by Madoff, the majority of it was being managed in-house by Merkin and his staff.

75.     Similarly, in 2007, Merkin told two investors, during a meeting they requested after hearing rumors that Madoff managed the Ascot Fund, that all but an insubstantial portion of the Ascot Fund was managed directly by Merkin and that Madoff did not play any role in the investments of the Ascot Fund.

76.     Sometimes Merkin outright denied Madoff's role in the Ascot Fund. For example, a member of the Investment Committee of a non-profit organization noticed that the Ascot Fund's returns were similar to those reported by another hedge fund that was known to be

26

a feeder to Madoff.  After being told by a Merkin employee that Ascot assets were "held" at

Madoff's firm and that Madoff had some management role, the committee member directly

asked Merkin if he was investing Ascot funds with Madoff.  Merkin responded that he was not,

but that Ascot used a strategy similar to Madoff's.

77.   During a November 14, 2006 meeting of the finance committee of Plaintiff

NYLS, Merkin made a presentation concerning the Ascot Fund.  The minutes of this meeting

reflect a number of Merkin's false statements, including the following:

| False Statements by Merkin | Truth |
|---|---|
| "Ezra explained that he tries to exploit short-term pricing discrepancies in the options market. Proprietary, computer driven models guide him and his team . . . ." | Neither Merkin nor any "team" of his was involved in the Ascot Fund's trading, and Merkin did not have any "computer-driven" models relating to the Ascot Fund's strategy. |
| "About 15% of the fund utilizes longer duration options ('Leaps') which he trades through Bernie Madoff." | In his testimony before the Attorney General, Merkin admitted that "we were not doing any Leaps traded through Bernie Madoff." |
| "Ezra noted that up to 60% of Ascot's assets come from his personal family trusts." | In his testimony given to the Attorney General, Merkin admitted that "nothing like 60 percent of Ascot's total assets" came from those trusts. |
| [     ] asked why Merkin's strategy "is not exploited by other banks and competitors" and "Ezra replied that the strategy is not scaleable." | Merkin knew that Madoff purported to exploit the strategy on a far larger scale than just Ascot's assets. |

**The Gabriel and Ariel Funds**

78.   In 1988, Merkin created the Gabriel Fund (known at first as Ariel Capital, L.P.) a

domestic fund for U.S. investors and what has been called its "offshore twin" the Ariel Fund.

79.   Investors in the Gabriel Fund are limited partners of the Gabriel Partnership.

According to a Gabriel Fund Confidential Offering Memorandum dated March 2006 (the "March

2006 Gabriel Offering Memorandum"), the Gabriel Partnership had two different classes of limited partnership interests:

- Class A limited partnership interests were issued to certain investors prior to February March 2006.  The Class A limited partnership interests had different redemption rights and less exposure to certain investments than the other limited partners.

- Class B limited partnership interests were issued to certain investors after March 2006.

80.    As general partner of the Gabriel Fund, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the [Gabriel] Partnership."

81.    Merkin created the Ariel Fund in 1988, an offshore fund organized in the Cayman Islands for foreign investors and others, including non-profit organizations, not subject to certain U.S. taxes.

82.    Investors in the Ariel Fund are purchasers of redeemable participating preference shares ("Participating Shares") offered in series, with each investor being issued a different series.   Existing investors purchasing additional Participating Shares received shares in a different series.

83.    GCC, which Merkin has owned and managed since January 1989, was the Investment Advisor to the Ariel Fund.  According to the Ariel Fund Prospectus dated October 2001 (the "2001 Ariel Prospectus"), GCC had "full discretionary authority to invest the assets of the [Ariel] Fund."

84.    In 1990, Merkin started giving Madoff and other outside managers some of the capital of the Gabriel Fund and Ariel Fund.  From 1990 to 1992, he gave a significant portion of the assets to Madoff to manage.  In 1993, after creating the Ascot Fund as a feeder fund to

Madoff, Merkin temporarily discontinued placing Gabriel Fund and Ariel Fund assets with Madoff, and entered into an agreement with Cerberus Capital Management ("Cerberus") under which Cerberus would manage a large portion of the Gabriel Fund and Ariel Fund (the "Cerberus Account"). All due diligence, research, and trading decisions for the Cerberus Account were made by Cerberus with little input from Merkin other than occasional conversations between Merkin and the principals of Cerberus. Cerberus also incurred millions of dollars in legal fees and other expenses in managing assets in the Cerberus Account, which Merkin reimbursed from the Gabriel Fund and Ariel Fund.

85.    Based on information contained in the NYAG Complaint, between 2002 through 2008, between 80-95% of the Gabriel Fund and the Ariel Fund assets were managed by just three outside money managers: Cerberus, Madoff, and Cohanzick Capital, L.P. ("Cohanzick").

86.    As of the end of the third quarter of 2008, the Gabriel Fund had at least 200 investors with a total of at least $1.4 billion under management and the Ariel Fund had at least 78 investors with a total of at least $1.3 billion under management.

87.    The incentive Merkin had to invest the monies from the Gabriel Fund and the Ariel Fund with Madoff is apparent. Madoff charged no management or incentive fee; rather, his $.04 brokerage commission per share was already built into the reported stock and option prices for his trades. Consequently, Merkin could retain his 20% incentive fee on top of the 1% management fee. Cerberus, by contrast, charged Merkin an annual management fee of 1% for the assets it managed, plus an annual incentive fee of 9% of the profits. Cohanzick charged an annual management fee of 1% for the assets it managed, plus an incentive fee of 10% less the current money market return.

**The Gabriel and Ariel Offering Memoranda and Other
Disclosures Were False and Misleading**

88.   Throughout and prior to the Class Period, Merkin offered participation in the
Gabriel Fund and Ariel Fund to qualified investors through Prospectuses and Confidential
Offering Memoranda.  While these documents were prepared, amended or revised from time to
time, they were the same in all material respects relevant hereto.  Through these materials,
Merkin provided assurances to Gabriel Fund and Ariel Fund investors, upon which they
reasonably and foreseeably relied when deciding to invest in the Gabriel Fund and Ariel Fund.
The offering documents remained consistent with respect to the material information they
concealed.

**False and Misleading Statements in the 2006 Gabriel
Confidential Offering Memorandum**

89.   Plaintiff Berrie, like other investors in the Gabriel Fund, relied on the identity and
role of the manager of the Gabriel Fund.  Plaintiff Berrie and other Class members invested in
the Gabriel Fund based on the understanding that Merkin was the day-to-day manager and that
he would devote the majority of his time to managing the Gabriel Fund.

90.   The Gabriel Fund Confidential Offering Memoranda were misleading in that they
falsely stated that Merkin was involved in the Gabriel Fund's management on a day-to-day and
transaction-by-transaction basis, and that the success of the fund depended on Merkin's abilities
as a money manager.  Merkin led Gabriel Fund investors to believe that it was Merkin, not a
third party, who was actively managing their investments.  However, in truth, Merkin did very
little other than bookkeeping as he was feeding at least 25% of the investments from the Gabriel
Partnership directly to Madoff and the remainder to two other third party money managers.

91.   By way of example, the March 2006 Gabriel Fund Confidential Offering
Memorandum (the "2006 Gabriel Offering Memorandum") stated, among other things, that:

- Merkin personally managed the Gabriel Fund's assets on a day-to-day basis and would devote "substantially his entire time and effort during normal business hours to the management of the [Gabriel] Partnership."

- "The management of the [Gabriel] Partnership will be vested exclusively in the General Partner."

- Merkin's personal attention to individual trades is also repeatedly touted in the risk disclosures. The March 2006 Offering Memorandum specifically stated that: "The General Partner will attempt to assess risk in determining the nature and extent of the investment the [Gabriel] Fund will make in specific securities."

- Gabriel Fund investors were led to believe that Merkin's role was so central to the management of the Gabriel Fund that the Gabriel Partnership would need to be terminated in the event of his death or incapacity. Under a heading in the 2006 Offering Memorandum entitled "Dissolution", it stated in relevant part: "The Partnership will dissolve upon the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days...."

In truth, all of these representations were false and misleading because Merkin was not the day-to-day manager, and was devoting little if any time to managing the investments of the Gabriel Fund as he was simply feeding a substantial portion of the assets of the Gabriel Fund to Madoff and two other third party managers.

92.    The Gabriel Fund Offering Memoranda were false and misleading because they gave Gabriel Fund investors the perception that Merkin was actively managing their investments with a very specific strategy. The 2006 Gabriel Offering Memorandum stated, among other things, under the heading "Investment Program" that:

- The [Gabriel] Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities;

- Generally, the [Gabriel] Partnership will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed

31

companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts;

- The [Gabriel] Partnership will invest in the securities of corporations believed to be fundamentally undervalued;

- The [Gabriel] Partnership will also make indirect investments with third-party managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles, which engaged in similar investment strategies as the [Gabriel] Partnership;

- The [Gabriel] Partnership expects to invest in private and restricted securities;

- From time to time, the General Partner may, in his sole discretion, acquire assets or securities that the General Partner believes lack a readily ascertainable market value or otherwise lack sufficient liquidity; and

- The General Partner will not permit more than the greater of 50% of the [Gabriel] Partnership's capital and 25% of the [Gabriel] Partnership's total assets to be invested in a single investment. Moreover, it will not be permit more than 10% of the [Gabriel] Partnership's capital to be placed at risk in a single investment. The General Partner will have discretion to determine how much is at risk for purposes of this test.

These representations about the Gabriel Fund "Investment Program" were materially false and misleading and omitted to state material facts that all investors in the Gabriel Fund would certainly have wanted to know. In particular, the representations that the Gabriel Partnership was investing in a "diverse portfolio of securities"; was engaging primarily "in the practice of index arbitrage"; was generally investing in "marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, future contracts and forward contracts"; was investing in the "securities of corporations believed to be fundamentally undervalued"; was making investments through "third-party managers" engaging "in similar investment strategies" as the Gabriel Fund, all

falsely implied that Merkin was actively pursuing a specific strategy for the Gabriel Fund in a prudent manner. In truth, the investment strategies of the Gabriel Fund were a sham as Merkin was not managing the assets of the Gabriel Fund and was simply feeding Gabriel Fund investments to Madoff and two other third party managers.

93.    The statements in the 2006 Gabriel Offering Memorandum that the General Partner (*i.e.*, Defendant Merkin) "will not permit more than the greater of 50% of the Partnership's capital and 25% of the Partnership's total assets to be invested in a single investment", that "it will not permit more than 10% of the Partnership's capital to be placed at risk in a single investment" and that "the General Partner will have discretion to determine how much is at risk for purposes of this test" were also false and misleading because during the Class Period, Merkin was handing over at least 25% of the Gabriel Fund's assets to Madoff.

94.    The section of the 2006 Gabriel Offering Memorandum entitled "Risk Factors" covered a wide variety of investment strategies that had nothing to do with the Gabriel Fund's actual trading strategy.    The risk warnings included, among others, "Non-marketable Obligations", "Arbitrage Transactions", "Proxy Contests", "Options Transactions", "Futures Contracts", "Forward Trading", "Participation in Unfriendly Transactions", "Short Selling" and "Derivatives". Despite the warning of these risk factors, there was no disclosure to Gabriel Fund investors of the far greater risk, that Merkin had entrusted Madoff with custody and trading discretion for at least 25% of the assets of the Gabriel Fund and the remainder of the assets with two other third party managers.

95.    In the 2006 Gabriel Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," Defendant Merkin disclosed that he had authority to delegate investment discretion for all or a portion of the Gabriel Fund's assets to multiple