independent money managers.  As part this disclosure, Merkin assured investors that he would

exercise reasonable care in selecting such managers:

> The General Partner may delegate investment discretion for all or a portion of the
> Partnership's funds to money managers, other than the General Partner, or make
> investments with Other Investment Entities.  Although the General Partner *will
> exercise reasonable care* in selecting such independent money managers or Other
> Investment Entities and will *monitor the results of those money managers* and
> Other Investment Entities, the General Partner may not have custody over the
> funds invested with the other money managers or with Other Investment
> Entities…. (Emphasis added).

This representation and assurance that Merkin would exercise reasonable care in selecting

independent money managers was false and misleading because in truth Merkin never exercised

any care or conducting any due diligence in his delegation of at least 25% of the Gabriel

Partnership's assets to Madoff.

### False and Misleading Statements in the 2001 and 2002 Ariel Prospectuses and 2006 Ariel Confidential Offering Memorandum

96.    Plaintiff Finkelstein, like other investors in the Ariel Fund, relied on the identity

and role of the manager and Investment Advisor of the Ariel Fund.  Plaintiff Finkelstein and

other Class members invested in the Ariel Fund based on the understanding that GCC, and

therefore Merkin, was the day-to-day manager and Investment Advisor and that Merkin would

devote the majority of his time to managing the Ariel Fund.

97.    According to the 2001 Ariel Prospectus and to an Investment Advisory

Agreement (the "Advisory Agreement") between the Ariel Fund and GCC, GCC (and therefore

Merkin) made all of the investment and executive decisions for the Ariel Fund and

communicated through quarterly reports with Ariel Investors about the Ariel Fund's financial

performance. According to the 2001 Ariel Prospectus, the success of the Ariel Fund "depends

primarily upon Gabriel Capital Corporation, Investment Advisor to the Fund;" the "death or

incapacity of J. Ezra Merkin . . . would result in the required redemption of all Participating Shares;" and the "Participating Shares must rely on the Investment Advisor with respect to the management and investment decisions of the Fund."

98.     The arrangement with GCC as described in the 2001 Ariel Prospectus provided that Merkin could place monies invested in the Ariel Fund in indirect investments, including with other money managers, but that he would "retain overall investment responsibility for the portfolio," and would conduct "periodic reviews" of the indirect investments; and would "exercise reasonable care in selecting independent money manager," and would "monitor the results of those money managers."

99.     The statements made in the 2001 Ariel Prospectus were repeated in other Prospectuses and offering materials during the relevant time period, including the Prospectus disseminated by the Ariel Fund dated November 2002 (the "2002 Ariel Prospectus") (collectively, the "Ariel Fund Prospectuses") and the March 2006 Ariel Confidential Offering Memorandum (the "2006 Ariel Offering Memorandum"). The Ariel Fund Prospectuses and 2006 Ariel Offering Memorandum were similar in all material respects, containing the same or similar misrepresentations and omitting similar material facts.

100.    The Ariel Fund Prospectuses and the 2006 Ariel Offering Memorandum falsely stated that GCC, through Merkin, was involved in the Ariel Fund's management on a day-to-day and transaction-by-transaction basis, and that the success of the Ariel Fund depended on Merkin and his abilities as a money manager. Merkin told investors in the Ariel Fund that he, and not a third party, was actively managing their investment. Merkin, however, did very little other than bookkeeping. In actuality, he was feeding a significant portion of the Ariel Fund directly to Madoff and the remainder to two other third party money managers.

101.   By way of example, the 2001 Ariel Prospectus states, among other things:

- "Under the Amended and Restated Investment Advisory Agreement, the Investment Advisor has full discretionary authority to invest the assets of the Fund."

- "The Investment Advisor will attempt to assess risk in determining the nature and extent of the investment the Fund will make in specific securities."

- "... The Investment Advisor will retain overall investment responsibility for the portfolio of the Fund...."

- Ariel Fund investors were led to believe that the success of the Fund depended primarily on GCC, and therefore on Merkin. The Prospectus states that the death or incapacity of Merkin would result in the required redemption of all shares.

The Prospectuses also tout Merkin's credentials listing his previous job history as well as his educational background. The 2006 Ariel Offering Memorandum expressly states that the "Investment Advisor has ultimate responsibility for the management, operations and investment decisions made on behalf of the Fund."

102.   All of these representations were false and misleading because Merkin was not the day-to-day manager, and was devoting little if any time to managing the investment of the Ariel Fund as he was simply feeding a substantial portion of the assets of the Ariel Fund to Madoff and to two other third party managers. If anything, Merkin was acting solely as a marketer looking to raise additional capital from unsuspecting investors and charities.

103.   The Ariel Prospectuses and the 2006 Ariel Offering Memorandum were false and misleading because they told Ariel Fund investors that GCC, through Merkin, was actively managing their investments with a very specific strategy. The Ariel Prospectuses stated, among other things, that:

- The Fund will engage primarily in investing and trading in marketable securities and instruments of companies or other entities which are the subject of a Reorganization.

- The securities and other instruments in which the Fund primarily invests include common stock, preferred stock and other evidences of ownership interest; bonds, trade creditor claims and other evidences of indebtedness and put and call options on securities. The Fund will endeavor to purchase these securities at a discount to their anticipated value upon consummation of the Reorganization.

- The Fund also may make other types of investment, including the purchase of securities and other instruments which appear to be undervalued and selling short securities which appear to be overvalued and, subject to the further provisions of this Prospectus, commodity contracts.

- The Fund also may make indirect investments, including investments in mutual funds, private investment partnerships, closed end funds and other pooled investment vehicles which engage in similar investment strategies.

- In addition, from time to time, the Fund may acquire assets or securities which Gabriel Capital Corporation (the "Investment Advisor") believes lack a readily ascertainable market value or otherwise lack sufficient liquidity.

- The Fund may invest in restricted securities.

- The Fund may on occasion itself initiate or actively participate in acquisition or restructuring transactions or in proxy contests.

- The Investment Advisor will not permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets (on a cost basis, giving consideration to hedging techniques utilized) to be invested in a single investment. Moreover, it will not be permit more than 10% of the Fund's capital to be placed at risk in a single investment. The Investment Advisor will have the discretion to determine how much is at risk for purposes of this test.

104.   These representations about the Ariel Fund's investment policy, however, were materially false and misleading and omitted to state material facts that all investors in the Ariel Fund would certainly have wanted to know. In particular, the representations detailed above all falsely implied that GCC, through Merkin, was actively pursuing a specific strategy for the Ariel Fund in a prudent manner. In truth, the investment policies of the Ariel Fund were a sham as Merkin was not managing the assets of the Ariel Fund and was simply feeding assets to Madoff and two other third party managers.

105.    According to the NYAG, by the middle of 2002, one-third of the Ariel Fund's

$385,703,794 assets under management were with Madoff ($125,089,730), and 48% with

Cerberus ($203,947,900). As of the end of 2002, more than 80% of Ariel's assets were managed

by Madoff, Cerberus and Cohanzick. By the middle of 2008, that figure had increased to over

95%. Of the three outside managers Merkin used, Madoff was the least expensive and allowed

Merkin to keep more of the management and incentive fees he charged to the Ariel Fund and its

investors. As set forth above, Cerberus charged Merkin an annual management fee of 1% and an

annual incentive fee of 9% of profits and Cohanzick charged an annual management fee of 1%

and an incentive fee of 10% (less a money market return). Madoff charged no management or

incentive fee. Thus, Merkin kept all of the management and incentive fees attributable to the

assets he funneled to Madoff.

106.    The statements in the Ariel Prospectuses that the Investment Advisor "will not

permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets …

to be invested in a single investment", that "it will not permit more than 10% of the Fund's

capital to be placed at risk in a single investment" and that "the Investment Advisor will have the

discretion to determine how much is at risk for purposes of this test" were also false and

misleading because during the Class Period, Merkin was handing over at least 25% of the Ariel

Fund's assets to Madoff.

107.    The section of the Prospectuses entitled "Risk Factors" covered a wide variety of

investment strategies that had nothing to do with the Ariel Fund's actual trading strategy. The

risk warnings included, among others, "Reorganizations", "Non-marketable Obligations",

"Proxy Contests", "Options Transactions", "Commodities", "Participation in Unfriendly

Transactions", "Short Selling" and "Derivatives". Despite the warning of these risk factors,

there was no disclosure to Ariel Fund investors of the far greater risk, that Merkin had entrusted Madoff with custody and trading discretion for at least 25% of the assets of the Ariel Fund and the remainder of the assets with two other third party managers.

108.    The 2006 Ariel Offering Memorandum, under the heading "Risk Factors" and subheading "Independent Money Managers," discloses that GCC had authority to delegate investment discretion for all or a portion of the Ariel Fund's assets to money managers.  As part this disclosure, Merkin assured investors that GCC would exercise reasonable care in selecting such managers:

> The Investment Advisor may delegate investment discretion for all or a portion of the Fund's funds to money managers, other than the Investment Advisor, or make investments with Other Investment Entities.  Although the Investment Advisor *will exercise reasonable care* in selecting such independent money managers or Other Investment Entities and *will monitor the results of those money managers* and Other Investment Entities, the Investment Advisor may not have custody over the funds invested with the other money managers or with Other Investment Entities.... (Emphasis added).

This representation and assurance that the Investment Advisor would exercise reasonable care in selecting independent money managers and would monitor their reported results was false and misleading because in truth Merkin never exercised any care or conducting any due diligence in his delegation of at least 25% of the Ariel Fund's assets to Madoff, or monitored his results.

109.    The Ariel Prospectuses and 2006 Ariel Offering Memorandum were also false and misleading because they included statements inconsistent with the fact that Madoff managed and had custody of a significant portion of Ariel's assets.  In particular, the offering documents stated that Ariel did not use any self-clearing money managers when, in fact, Madoff managed, executed and had custody of a significant portion of Ariel's assets.  The 2002 Ariel Prospectus stated that brokers who effected transactions for the Ariel Fund "will not perform managerial or policy-making functions for the Fund."  The 2006 Ariel Offering Memorandum stated that

Morgan Stanley served as the prime broker for the Ariel Fund and cleared trades effected by other brokerage firms when, in fact, Morgan Stanley was not the custodian for the securities managed by Madoff and did not clear Madoff's trades. These statements in the Ariel offering materials concealed Madoff's role and the fact that Madoff was self-clearing.

**False and Misleading Statements in Gabriel Fund and Ariel Fund Quarterly Reports and Investor Presentations**

110.   In addition to the false and misleading statements in the Gabriel Fund and Ariel Fund Offering Memoranda, Defendants made misstatements to Gabriel Fund and Ariel Fund investors through fraudulent quarterly reports and investor presentations by concealing the role Madoff played in managing the Gabriel Fund and Ariel Fund and by misrepresenting the purported investment strategies being used by Merkin for the Funds.

111.   During the Class Period, Defendant Merkin sent quarterly account statements to Gabriel Fund and Ariel Fund investors purporting to reflect the investments and returns of those limited partners and shareholders. These quarterly statements usually were accompanied with a written report by Merkin describing the investment strategies and performance of the Gabriel Fund and Ariel Fund. Since the Gabriel Fund and Ariel Fund purportedly consisted of very similar portfolios, the text of Merkin's reports was usually the same for both of these Funds. In those reports, Merkin made specific representations about the allocations of the Funds' assets among those strategies. The quarterly reports were misleading to Gabriel Fund and Ariel Fund investors because they gave investors the impression that: (1) Merkin and his staff were directly managing the Gabriel Fund and Ariel Fund assets; and (2) the assets of the Gabriel Fund and Ariel Fund were being invested in specific types of securities. In truth, the Gabriel Fund and Ariel Fund portfolios were being managed by Madoff, and two other third party managers.

112.    The quarterly issued reports, signed by Merkin and printed on GCC's stationery, consistently made it appear that Merkin was responsible for all investment strategy and decisions of the Gabriel Fund and Ariel Fund.  For example, Merkin stated in a January 20, 2007 report that, "Our effort has been to migrate from increasingly efficient markets to our private positions, where we enjoy both much more complete information about our investments and, thanks to our sourcing network, much less competition for our ideas. There, we have worked diligently to establish a reputation for creativity and reliability, which further enhances the access to ideas conferred by our sourcing advantage."  Similarly, in an October 20, 2008 report, Merkin stated, "Our favorite hedge is to sell some of a position and thereby reduce risk. We prefer that to finding and selling a vaguely corresponding short that increases the aggregate broad exposure of the fund while weakening the power of an idea."

113.    Many of the quarterly reports disseminated to Gabriel Fund and Ariel Fund investors also represented that the Gabriel and Ariel Funds were investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage.  Starting in 2004, Merkin provided a detailed table in each quarterly report showing the precise percent distribution of the Gabriel or Ariel Fund's assets which were allocated into the following seven categories: "Distressed Debt," "Debt or Equity Subject to a Deal or Legal Process," "Credit Opportunities," "Arbitrage of Related Securities," "Long-term Equity," "Short Securities Outright and Portfolio Hedges," and "Cash (Including Proceeds From Short Sales)." The percentages reported always added up to 100% and thus purported to fully describe the portfolios. Accompanying the reports was an Appendix defining each of the categories of investments. All of the categories, with the exception of "Cash," were directly related to a strategy of investing in distressed companies or companies involved with a reorganization.  None

41

of the investment categories described in these written materials encompassed or was at all consistent with Madoff's "split strike conversion" strategy.

114.   In a January 2001 quarterly report entitled "Arbitrage and Distressed Investing Some Year-End Thoughts," Merkin stated, among other things, that the Gabriel and Ariel portfolio consisted of "approximately 60% distressed positions and 40% [merger] arbitrage." He also proclaimed that "we see ourselves as specialists in distressed investing who maintain an arbitrage portfolio in order to maintain performance and liquidity standards."

115.   In an April 2005 report entitled "We Do Beans", Merkin described in detail the current state of his investment strategy for the Gabriel and Ariel Funds as "a tapestry of six threads of different colors, each representing one of the full range of debt-related asset classes in our repertoire."   The six "threads" were described as: (a) "'dented' high-yield bonds"; (b) "public distressed names"; (c) "asset-based lending"; (d) "'private' distressed" debt; (e) "private equity, usually with a distressed flavor"; and (f) "U.S. distressed credits sourced in Japan." He also proclaimed that "we bring to the table over thirty years combined experience in bankruptcy investing."

116.   In the quarterly report for the period ended March 31, 2006, dated April 24, 2006, sent to investors in the Ariel Fund, Merkin falsely touted the Ariel Fund's diversification across the same "tapestry of asset classes" and that Merkin "spen[t] a lot of time quantifying, preparing and analyzing the numbers."   Similarly, in the quarterly report for the period ended June 30, 2006, dated July 20, 2006, Merkin continued to misrepresent that he was actively managing the Ariel Fund by shifting assets from shorter maturities to longer maturities, and that he was employing proprietary investment ideas and strategies on behalf of investors.

117.    The quarterly report for the Ariel Fund for the period ending September 30, 2006, dated October 20, 2006, similarly represented that Merkin was actively managing risk, and touted the purported "fiduciaries" entrusted with the Fund's assets.  Specifically, the report stated that "we intend to remain similarly vigilant about risk.... We will have good fiduciaries for your capital, and that has a certain nobility of its own."

118.    The quarterly reports for subsequent periods all perpetuated the false impression that GCC and Merkin were actively managing the Gabriel and Ariel Funds:

- "We want our [investors] to have a sense of ... the approach we take to investing, and how we try to control risk. (March 31, 2004 Report);

- "We are particularly enthusiastic about some large position that we put on at the end of the first quarter." (June 30, 2006 Report);

- "Our effort has been to migrate from increasingly efficient markets to our private positions ....  We have worked diligently to establish a reputation for creativity and reliability..." (December 31, 2006 Report);

- "As we've been telling investors forever, we try to build a portfolio of high-risk, high-reward ideas in a conservative style." (June 30, 2007 Report);

- "We have to structure our portfolio with a view toward protecting your capital in case the existing maps, like the maps of the Northwest Passage, fail to represent reality accurately once again....  While we wait for markets to stabilize, we take that the deals we play hold a low correlation to broad markets." (December 31, 2007 Report);

- "Our hedging strategies helped to mitigate the effects of global decline in securities prices....  We've often made the point that we are conservative in our marks, pricing in bad news promptly but waiting for the chickens to hatch before marking up position in good news....  Therefore we are careful about maintaining this discipline.  We are confident in the accuracy -- indeed, conservatism -- of our marks, thus preserving the upside you have in these positions should they recover, not to mention the benefits you can enjoy from appreciation in other current and future positions."  (June 30, 2008 Report);

- "We take risk on the position sheet and manage risk on the balance sheet, that is, we run money in high-margin ideas that are managed in a very conservative way.  As such, we are very different from the typical levered long/short hedge fund.  Rather, in the simple English language use of the term, we hedge ideas. Our favorite hedge is to sell some of a position and thereby reduce risk." (September 30, 2008 Report).

119.   The representations by Merkin in the quarterly reports misled Gabriel and Ariel investors into believing that the purported primary strategy of the Gabriel and Ariel Funds was investing in businesses that were distressed, involved with reorganizations or involved with merger arbitrage.  The quarterly reports were false and misleading in failing to disclose that a material portion of the Funds' assets were invested with Madoff and overly concentrated in those investments; in falsely stating that Merkin was engaged in active and thorough due diligence designed to minimize risk and presence and grow capital; and in falsely leading investors to believe that Merkin personally and actively managed the Funds and executed strategies based upon proprietary investment ideas and his expertise.

120.   In addition, Merkin would often give Gabriel Fund and Ariel Fund investors presentations relating to the strategies and performance of the Funds.   During these presentations, Merkin usually described the Gabriel and Ariel Funds as consisting of distressed debt and securities of companies subject to reorganization.  He never disclosed that a material portion of the funds were invested with Madoff or that the funds were invested in Madoff's "split strike conversion" trading strategy.

**Merkin and GCC Failed To Perform a Due Diligence**
**Review and Monitoring Despite Numerous "Red Flags"**

121.   Against the backdrop of Merkin's complete management and investing control over the Funds, and despite Defendants' due diligence obligations and representations, Merkin blindly invested all of the Ascot Fund's capital and at least 25% of the Gabriel Fund's capital and 25% of the Ariel Fund's capital with Madoff.  Given the level of control that Merkin ceded Madoff over the Funds, Merkin's and GCC's failure to conduct proper due diligence and blatant disregard of the various known red flags that existed is shocking.

44

122.   Defendants Merkin and GCC had a duty to establish due diligence procedures for all fund managers with whom they invested client assets. However, despite their representations that they were doing so, Merkin and GCC failed to perform even a minimal level of due diligence regarding the activities of Madoff and BMIS to safeguard the investments of Plaintiffs and other Class members in the Funds.

123.   Merkin's and GCC's disclosures regarding their investment of Plaintiffs' money, including information disseminated both in various offering memoranda and the statements of monthly investment returns, led Plaintiffs and the Class to believe that Merkin and GCC conducted thorough investigations into the "managers" with whom they invested when indeed no due diligence at all was undertaken and in fact, all of the Ascot Fund's investments and at least 25% of the Gabriel and Ariel Fund's investment were with one manager, Madoff.

124.   In the days and weeks following Madoff's arrest (and his being charged with crimes by both the SEC and the US Attorney's office for the Southern District of New York), information became known to the general public that was or should have been known to investment professionals such as Merkin and GCC.

125.   However, despite numerous red flags and the fairly simple methods available to test Madoff's most basic numbers, Merkin and GCC failed to conduct adequate due diligence that would have alerted any competent financial professional that Madoff's "investment strategy" could not produce the results reported by Madoff and that his entire operation was suspect. The numerous red flags that Merkin and GCC failed to uncover or blatantly disregarded include, but are not limited to:

- The description of Madoff's split-strike strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses in a 14 year period despite market fluctuations. Moreover, the strategy's returns could never be replicated by quantitative analysts who attempted to do so.

Investment professionals who conducted reasonable due diligence immediately recognized that Madoff's purported strategy could not produce steady results that consistently outperformed the market.

- Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in the documents.

- The options contracts that Madoff would have had to trade did not show up on any of the options exchanges. Even if the trading was being done over-the-counter ("OTC") - outside of the exchanges - a good number of those trades would still have to have been offset in the listed market, and there was no evidence that they ever were.

- At one point in time, the entire value of listed index call options was $9 billion, which was insufficient to allow Madoff to hedge the exposure of the $50 billion of assets Madoff claimed. Even in Madoff purchased and sold options through the OTC market, this market is not several times larger than the exchange listed market, especially for these traditional derivative products. Moreover, OTC options are more expensive than listed options and the bid-ask spreads would be so wide as to preclude earning of any profit.

- BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.

- Madoff initiated trades in the accounts, executed the trades and custodied and administered the assets through discretionary brokerage agreements, a clear conflict of interest.

- Madoff's auditor, F&H, had three employees, a 78 year-old living in Florida, a secretary and a 47 year-old accountant. This operation was suspiciously minuscule given the scale and scope of Madoff's activities. Moreover, the comptroller of BMIS was based in Bermuda, despite the fact that most mainstream hedge fund investment advisers have their comptroller in-house.

- BMIS audit reports showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker -- not a firm with $17 billion in customer accounts.

- Despite his "success," Madoff operated under a veil of secrecy and he did not allow outside performance audits by investors.

- Key positions at BMIS were held by members of Madoff's family: Peter Madoff (director of trading and general counsel); his sons Mark and Andrew (directors of

46

trading) and his niece Shana (a compliance lawyer).  Only Madoff's family was privy to his investment strategy.

- Investors had no electronic real-time access to their accounts at Madoff.  Thus, Madoff had the ability to manufacture paper trade tickets that confirmed fictitious results.

- Madoff settled for charging undisclosed commissions on all of the trades done in investors' accounts rather than collecting larger standard hedge fund fees.

- Madoff chose to fund at a high implied interest rate even though cheaper money was available in the highly regulated short-term credit markets.  This provided a way to promise lucrative returns in an unregulated area of capital markets.

126.    Merkin admitted in his testimony before the NYAG that he was aware of a number of people who were suspicious of the returns Madoff claimed to achieve, stating that "[t]here were over time persons who expressed skepticism about one or another aspect of the Madoff strategy or the Madoff return."  Moreover, according to the NYAG Complaint, at least two of Merkin's most trusted colleagues repeatedly told Merkin that Madoff's returns were too good to be true – one warning that it could be a Ponzi scheme.

127.    According to media reports, Madoff was the subject of constant SEC investigations – commenced in 1992, 2005, and 2007 – into the legitimacy of his business. Madoff was also the subject of scrutiny by members of the investment community who understood that his business was suspect and could be a fraud.

128.    Defendants Merkin and GCC invested all of the assets of the Ascot Fund and at least 25% of the Gabriel Fund and 25% of the Ariel Fund with Madoff despite these numerous known "red flags," indicating that Madoff did not employ a split strike conversion strategy and actually could be a fraudulent enterprise.  While collecting substantial fees, Merkin and GCC ignored these red flags in violation of their duties to the limited partners and shareholders that had invested in the Funds.

129.   In 1999, Harry Markopolos, wrote a letter to the SEC which stated that: "Madoff Securities is the world's largest Ponzi Scheme." Markopolos, who years ago worked for a rival firm, researched Madoff's stock-options strategy and, based upon publicly available information, was convinced that the results were phony. Markopolos was not alone. In 2000, Credit Suisse warned its clients to pull their investments from Madoff, due to suspicions concerning his operations.

130.   In a May 2001 article, Michael Ocrant, managing editor of MAR/Hedge, a New York-based hedge fund publication, also eyed Madoff's success with skepticism because of the unrealistic nature of Madoff's returns and their consistency. Specifically troubling to Ocrant was Madoff's determined reluctance to justify or explain his firm's strategy or success:

(a)   "As for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.' He reiterates the undisputed strength and advantages the firm's operations provide that make it possible."

(b)   "The inability of other firms to duplicate his firm's success with the strategy, says Madoff, is attributable, again, to its highly regarded operational infrastructure. He notes that one could make the same observation about many businesses, including market making firms."

(c)   "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

131.   In the same month, *Barron's* published an article discussing the remarkably steady returns purportedly achieved by Madoff. The *Barron's* article discussed the belief of many hedge fund professionals and options strategists that Madoff could not achieve the returns he reported – an average annual return of 15% for the preceding decade – using the strategy that Madoff described. In addition to the suspicious consistency of Madoff's high returns, the article

discussed several other warning signs that suggested Madoff might be committing fraud, including Madoff's secrecy and the inability of "more than a dozen hedge fund professionals, including current and former Madoff traders" to duplicate Madoff's returns using his strategy.

132.   Merkin's in-house counsel e-mailed Merkin a copy of the *Barron's* article on May 6, 2001 and Merkin also had a copy of the MAR/Hedge article.  Seven years later, according to the NYAG Complaint, Merkin still had copies of both of these articles in his files.

133.   In addition, Merkin, to a greater extent than many of Madoff's direct investors, had personal knowledge of the many warning signs of fraud:

(a)   Merkin knew that Madoff reported trades using paper trade confirmations sent to investors by mail, without providing any form of electronic real-time access, even though Madoff's firm pioneered electronic screen-based trading in the 1970s and 1980s and claimed that it used the most advanced technology.

(b)   Merkin knew Madoff's family, and knew that Madoff family members occupied the most senior positions in Madoff's firm.

(c)   Merkin knew that Madoff maintained strict secrecy about his management of money entrusted to him.

(d)   Merkin knew that Madoff consistently converted all holdings to Treasuries at the end of each quarter, a practice that, in light of Madoff's claim that his strategy depended on entering and exiting the market when the conditions were likely to render his strategy profitable, had no legitimate purpose other than to reduce transparency.

(e)   Merkin knew of the unusual long-term stability of Madoff's alleged returns, and that other sophisticated investors had themselves been unable to achieve those returns using Madoff's stated strategy.

(f)   Merkin knew the identity of Madoff's accounting firm, and knew (or was reckless in not knowing) that it was a small, unknown accounting firm in Rockland County occupying a 13' by 18' office rather than a recognized audit firm.

(h)   Merkin knew that Madoff was self-clearing, a failure to segregate responsibilities that increased the risk of fraud.

134.     Merkin also knew that Madoff charged no fees of any kind for his money management services and that Madoff claimed that his only compensation was the normal commissions generated by his trades, commissions that he could have earned if his clients directed the trading themselves. Merkin, who himself charged the standard hefty management and incentive fees for the money he purported to manage, should have recognized that Madoff's willingness to do something for nothing was suspicious.

135.     In 2002, investment advisor Acorn Partners blacklisted Madoff as a result of the countless red flags uncovered during routine due diligence.

136.     In early 2003, Société Générale similarly blacklisted Madoff after performing routine due diligence and strongly discouraged its clients from investing with him:

> What [Société Générale] found that March was hardly routine:  Mr. Madoff's numbers simply did not add up.  Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him and also strongly discouraged wealthy clients at its private bank from its investments.
>
> The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

137.     *Business Week* reported that:

> managers of [a] Fort Worth pension fund, who first [invested indirectly with Madoff in 2003], started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio.  The [Madoff investments] raised red flags almost immediately.  Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid [Madoff].  In July, the pension board voted unanimously to dump its [Madoff Investments].

138.     Drago Indjic, a project manager at the Hedge Fund Center of the London Business School, noted that "Madoff did not pass due diligence for many European hedge fund

50

companies. Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

139.    In 2005, Harry Markopolos wrote another letter to the SEC detailing numerous red flags which indicated that Madoff's fund was a fraud. In his November 7, 2005 letter (the "November 7 Letter") to the SEC entitled "The World's Largest Hedge Fund is a Fraud", based on the same information that was available to Defendants herein, Markopolos concluded that Madoff's operation was a fraud and identified 29 "red flags" to prove it.

140.    The very first "red flag" set forth in the November 7 Letter noted that Madoff's fee structure made no sense, because, while Madoff was running a hedge fund, he did not charge the standard fees a hedge fund would charge (1% management fee and 20% profits) and instead charged only a commission on the purported trades his company was making with investors' money. Regardless of whether the November 7 Letter was available to Merkin and GCC, they were aware of Madoff's fee structure and failed to investigate.

141.    The November 7 Letter also stated that various third party "funds of funds" obtain investors who "pony up the money" and "don't know that [Madoff] is managing their money," the exact practice perpetrated by Merkin and GCC herein.

142.    Among the other 28 red flags raised by the letter are:

(a)     The lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

(b)     Madoff's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

(c)     The inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

51

(d)     Madoff acted as his own prime broker, while most hedge funds use large
        banks such as Goldman Sachs and Morgan Stanley as their prime
        brokers;

(e)     Monthly account statements sent to Madoff's investors did not support the
        returns they reported;

(f)     The exchanges upon which Madoff purportedly conducted options trades had
        insufficient volume to support such trades and the trades could not be
        independently verified or replicated;

(g)     BMIS was audited by a small accounting firm, unlike the majority of single
        strategy hedge funds that are audited by one of the top 10 audit firms; and

(h)     Madoff insisted the he and BMIS not be referenced in the offering materials
        which Plaintiffs and other members of the Class relied upon.

143.   Defendants Merkin and GCC knew, or should have known had they conducted
the due diligence and risk management they purported to conduct, of the existence of each of
these red flags.

144.   Indeed, Merkin and GCC could have discovered many red flags had they
conducted any due diligence at all. In a January 15, 2009 article entitled "Madoff Might not
Have Made Any Trades," the *Boston Globe* reported that, on many client account statements (to
which Merkin and GCC had access but Plaintiffs did not), Madoff reported making trades that
were worth more than the entire amount the clients had invested with Madoff. The same article
revealed that Madoff had reported investments in Fidelity's Spartan US Treasury Money Market
fund -- a fund which did not exist.

145.   By early 2007, the research department of Union Bancaire Privée, a Swiss bank,
raised concerns about Madoff's legitimacy and recommended that Madoff be stricken from the
list of managers with which UBP invested.

146.   Robert Rosenkranz, the principal of a major investment advisor to wealthy clients,
Acorn Partners, was reported in the financial press to have stated that his firm's earlier due

diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by Madoff and in part on inconsistencies between customer account statements and audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.

147.    Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, reported that it had concluded that Madoff was a fraud and, in 2007, advised clients not to invest with him.    Aksia had concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC were too small to support the size of the assets Madoff claimed to be managing. "There were no smoking guns, but too many things that didn't add up," Mr. Fludgate said. The likely reason for this was publicly revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff had been operating a secret, unregistered investment vehicle from his office.

148.    Similarly, the *Financial Times* reported on January 22, 2009, that two simple risk management techniques, available at low cost during the Class Period, would have alerted Merkin and GCC to the Madoff fraud.  The article stated, in part:

> Two simple risk management techniques, available to investors at low cost, could have shown the hedge fund run by Bernard Madoff, which is at the centre of allegations of a $50bn fraud, was claiming investment returns that were all but impossible.

> A study to be published today by Riskdata, a risk management specialist, argues that Mr. Madoff's returns are called into question by the bias ratio - a mathematical technique that identifies abnormalities in the distribution of a series of investment returns.

> Forensic accountants use a similar method - known as Benford's law - to identify potential accountancy fraud.

> In addition, the study says that comparing the risk profile of Mr. Madoff to his peer group would have shown it to be inconsistent with his claimed investment style.

149.   Importantly, these and other "red flags" were detected by many investment professionals in the industry.   Indeed, many managers of hedge funds of funds ("FOFs"), investment advisors, investment banks, and pension funds, who, unlike Merkin and GCC here, took the time and effort to conduct proper due diligence reviews, and, chose *not* to invest with Madoff or any of his affiliated funds as a result of these warning signs.  For example, the SEC OIG Report detailed these investment professionals' due diligence – some of whom, unlike Merkin and GCC here, had access only to publicly available information – and their explanation of why they would not entrust their clients' money to Madoff.  The SEC OIG Report concluded that the SEC employees, had they properly examined the red flags and took basic steps to determine if Madoff was operating a Ponzi scheme, would have recognized the significance of the red flags that the investment professionals heeded, and would have discovered the fraud "well before Madoff confessed."  Merkin and GCC failed to conduct even a rudimentary due diligence review, which, if conducted, would have alerted them to Madoff's fraudulent scheme, or at least that he could not possibly achieve the returns he claimed.

150.   The SEC OIG Report, for example, describes how many other investors avoided Madoff through their due diligence:

> Many of the private entities that conducted due diligence of Madoff and declined to invest with him because of significant red flags that arose during the routine review of his operations felt that the SEC could have uncovered the fraud. [One investor] thought a regulator could have verified whether Madoff was trading by asking Madoff who his counterparty was and then verifying with the counterparty that the trade took place. . . . [Another investor named] Broder would have performed the same verification process whether Madoff claimed his counterparty was in the United States or in Europe. . . .

> Broder explained his reasoning as follows:

> [S]omewhere in the marketplace, either in an exchange-traded marketplace or an OTC marketplace, exactly those trades which were on the client account statement should exist on someone else's books, you know. . . Somewhere in the

marketplace, either OTC or exchange-traded, those trades were taking place. And it seems to me a very simple set of steps to verify that those volumes [existed]. . . . I don't see how that could have possibly been missed. I mean, this is a very simple verification. I mean this guy is trading – this is a cash account. So he's turning over $10 billion of stocks each particular month. I mean, you've got to be [able to see it] in the marketplace.

*      *      *

[Another investor stated that if he] were investigating Madoff, he . . . would have asked Madoff to show me the other side of your trades whether he claimed to trade in the United States or Europe: "I need to see the other side of those trades in Europe. If they're in Europe, that's fine, but you're doing them with someone. There's got to be somebody on the other side of the trade."

151.   The SEC OIG Report discussed the decisions of the managers of certain FOF, which were basically in the same position as Merkin, to avoid investing in Madoff and his feeder funds after looking into his organization:

[One] registered fund of funds evaluated potential investments with Madoff feeder funds in 1998 and 2003. It considered an investment with Fairfield in 1998. As part of their standard due diligence process, the Hedge Fund Manager and his unidentified CIO met with Madoff. The CIO, a former options trader, pressed Madoff for information about his options trading. To the CIO's surprise, Madoff claimed to trade options through the Chicago Board of Options Exchange (CBOE). The CIO stated: "Well I found something exceptionally odd about that .... [I]mmediately what I asked Madoff was: How are you doing that? Because I don't think there's enough volume on the Chicago Board of Options Exchange for you to get that sort of coverage for the amount that you're managing."

The CIO's suspicions triggered, he called CBOE to find out how much daily volume traded on the exchange. He described his call to CBOE, as follows: "And the problem is . . . that the volume was never there for Madoff. So that was problem No. 1 for me. Problem No. 2 was . . . I called up buddies of mine around the street who were now running the equity derivatives departments of a number of firms, and I asked them all if they were trading with Madoff. And nobody was. Nobody was doing these OEX options. And in fact, the funny part about it was they all said, yeah. You know, I hear that he's doing all these trades but, you know, we don't see it anywhere . . . And so things just began to, you know, not match up. And so for me, the biggest issue was – the biggest issue was the fact that I couldn't reconcile a big part of that strategy. And the information that was being told to me on the surface seemed to be false." Because of the unanswered questions, they passed on the investment.

152.   Another FOF manager, George Stahl, whose firm considered a Madoff feeder fund for a possible investment in 2005, stated that he found it odd that the strategy that the Madoff feeder fund described "was a relatively common strategy":

> According to Stahl, the split-strike conversion strategy Madoff purportedly was using "usually produces a pretty consistent return," but in Madoff's case, the "level of consistency exhibited by [Madoff's] strategy relative to other strategies we knew that did similar things was much, much better." Stahl said that strategy worked well for several years, but in 2004 and 2005, because the "volatility levels in the market had fallen off so dramatically" the returns from that strategy fell off. Stahl said Madoff's "strategy has been around forever" and he knew of a mutual fund that adopted the same strategy, but while that mutual fund's returns got weaker as the overall market got weaker, Madoff's returns "remained very high."

153.   An unidentified CEO of a FOF, who was interviewed by the SEC during the course of its investigation into Madoff stated that:

> when it came to Madoff, "[m]arket's down, markets didn't really matter," explaining that "[y]ou can construct a strategy like that where you'll make money most of the time but you cannot construct a strategy where you make money all the time." The CEO said he had seen consistent strategies before, but "every once in a while, they trip up, while Madoff "didn't have that every once in a while."
>
> The CEO was suspicious and obtained copies of an investor's last few account statements from Madoff Securities, and compared a sample of trades on the statements with what was actually going on in the markets on the day Madoff was trading. The CEO stated he found this "pattern which really seemed weird where the -- where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day," noting that "of course, nobody can do that." His "suspicion was that the fact pattern that [he] had seen seemed consistent with a Ponzi scheme." The CEO said he "didn't conclude that that was the case, but [he] certainly thought there was enough of a risk that that was the case that, you know, *[he] certainly wouldn't touch it with a 10-foot pole."*

154.   The SEC OIG Report described the due diligence of other financial professionals who subsequently avoided Madoff. One such professional, James Hedges, IV, who was the president and Chief Investment Officer of a global investment firm, stated that:

> he utilized a due diligence questionnaire, which sought basic information about the firm, the principals and the assets under management that the firm had. . . . Hedges explained that he looked at the inception of the business, the product lines, the different types of funds or separate accounts or other investment

56

vehicles that were offered, the stated investment philosophy as well as the peer group and competition. . . . Hedges also stated that he looked at the business strategy, not just the investment strategy, including associated entities, and the various directors, officers, staff, their respective backgrounds, tenures and responsibilities. . . . Hedges stressed that his due diligence was "an iterative multi-phased process" to be contrasted with what he termed "a box-checking consultant" that asks "question 1, 2, 3, down to question 653, and then get all the answers and then have a yes or no answer on making an investment." . . . Hedges also explained the necessity of speaking with "people throughout all aspects of the organization," noting that "meeting CFOs, back office people, traders, analysts, et. cetera [are important], because they give you perspective on the business that you don't get from just meeting the boss."

*   *   *

The investment professionals interviewed by the OIG, who conducted due diligence immediately had significant questions about Madoff's trading strategy. Hedges stated that a "substantial red flag" was the "consistency of [Madoff's] returns that was not in keeping with the type of strategy that we understood him to be implementing because we felt that there were -- that the track record did not correlate to what we saw as either market factors, volatility factors, or other exogenous factors that would have otherwise affected the track record one way or another." The CEO of the research firm stated immediately he was "cynical" because, "The returns were impossible. Absolutely impossible in my opinion. No financial strategy could produce those sort of returns."

155.   The SEC OIG Report further described a statement given to them in an interview by Michael Ocrant, a financial journalist who authored the article entitled, "Madoff tops Charts; Skeptics Ask How." Ocrant described how he:

> gave the terms and strategies [utilized by Madoff] to a guy who ran a quantitative analysis with a Japanese bank for a Fund to funds they ran and I said can you take this data and can you -- have you crunch it and let me know what you think and I didn't give any further information and I said this is the strategy. He got back to me like a week to 10 days later and he said, "Well, the team came back and they said this could be done by a market-maker, probably have to use front money to do it," and I said, "Oh, that's interesting," and I said, "What would you say if I told you this guy was managing maybe $5-6-7 billion?" He said, "Impossible. It has to be a Ponzi scheme."

156.   Merkin and GCC recklessly failed to supervise, monitor and manage the investments of the Funds, in violation of their fiduciary duties, and contrary to their

representations that they were exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Funds.

157.    Merkin and GCC acted with knowledge that they had abdicated responsibility for the management of the Funds, and with gross negligence in failing to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations and financial reporting of Madoff.

158.    Merkin and GCC were aware, or should have been aware, of the many red flags described above.  At the very least, these red flags should have caused Merkin to lessen his reliance on Madoff by moving funds and/or to fully disclose the nature and extent of his reliance on Madoff to Plaintiffs and the Class.

159.    Merkin and GCC knew, or reasonably should have known, that Madoff's investment holdings and returns had not been verified, and that investors' capital was not being safeguarded by a reliable custodian.

160.    Merkin's and GCC's lack of scrutiny into Madoff and BMIS and their carelessness with Plaintiffs' assets falls far short of the representations made to Plaintiffs and other Class members to induce their investments in the Funds and their legal duties to Plaintiffs and the Class.

**Merkin Unjustly Reaped Hundreds of Millions of
Dollars in Management and Incentive Fees**

161.    During the Class Period, Merkin pocketed hundreds of millions of dollars in management and incentive fees from investors in the Funds in return for his purported services as manager of the Funds.  However, Merkin did absolutely nothing to earn these fees as he simply acted as a marketer and a middleman for Madoff whom Merkin failed to adequately oversee, audit, or investigate.

162.    Merkin had a major incentive to avoid asking questions about Madoff's strategies because he collected annual management fees equal to 1% of the capital invested in the Ascot Fund prior to 2002. In 2002, Merkin decided to raise the management fees he received from the Ascot Fund, as of January 1, 2003, from 1% to 1.5% (a difference of $5.3 million per year based on the $1.06 billion under management in 2003). This change required investor approval. To obtain approval, Merkin made false or misleading statements to justify the increase. In a letter to investors seeking approval of the increase, Merkin vaguely cited "rising expenses." This misrepresentation perpetuated and reinforced Merkin's falsehood that he was doing work related to the management of the Ascot Fund. In testimony before the NYAG, Merkin similarly claimed that the fee increase was due to increased general operating costs, but during his deposition with the NYAG, he could not give specific reasons for the increase.

163.    Merkin's fees from managing the Ascot Fund for the years 1995 to 2007, totaled more than $169 million. In 2008, Merkin received annual income of approximately $25.5 million from fees he generated through the Ascot Fund.

164.    Similarly, Merkin's compensation under his agreements with the Gabriel and Ariel Funds included an annual management fee of 1% of assets under management, and, in addition, an incentive fee of 20% of any profits. From 1989 to 2007, Merkin's fees from Gabriel totaled approximately $277 million and from Ariel, $242 million. The incentive fee Merkin collected included 20% of the profits reported by Madoff, which, of course, were fictitious. Even after subtracting expenses and fees paid to other outside managers, Merkin's fees for the Gabriel and Ariel Funds totaled more than $280 million. Merkin elected to defer the fees payable from the Ariel Fund, and, as of the end of 2008, his deferred fee account with the Ariel Fund had a stated value of approximately $169 million.

165.   On March 2, 2009, *New York Magazine* reported in a news article entitled "The Monster Mensch," that at the height of Defendant Merkin's hedge-fund business he earned approximately $35 million a year simply for funneling money to Madoff.

166.   Merkin's management fees were incredibly egregious when one looks at the fact that if an investor wanted to place money with Madoff, Madoff did not charge any advisory fees because he claimed he was content with merely earning the trading commissions in his broker-dealer business that were generated by his trades on behalf of clients whose money he managed. Basically, if an Ascot Fund, Gabriel Fund or Ariel Fund investor wanted Madoff to manage their money, they could have gotten that service for free rather than paying a fee to Merkin who was merely handing over the money to Madoff.

167.   To the extent that the computation of Merkin's fees were based on fictitious assets and profits of the Funds, the payments to Merkin resulted in his unjust enrichment, for which Plaintiffs and other Class members are entitled to disgorgement.

168.   In addition, according to the NYAG Complaint, Merkin commingled his personal funds, including his management fees from the Funds, with the funds of his management company, GCC. Merkin used GCC funds to make purchases for his personal benefit, including purchases of over $91 million of artwork for his apartment.

**The Merkin Fraud is Publicly Revealed**

169.   On December 11, 2008, Defendant Merkin sent a letter to investors in the Ascot Fund and disclosed *for the first time* that "substantially all" of the investment assets of the Ascot Fund (approximately $1.8 billion) were managed by Madoff. The letter from Merkin also stated, in part, "[a]t this point, it is impossible to predict what recovery, if any, may be had on these assets."

170.   One week later, on December 18, 2008, Defendant Merkin sent a follow-up letter to investors in the Ascot Fund and informed them that the Ascot Fund would need to be dissolved. That same day, Defendant Merkin also sent a letter to investors in the Gabriel Fund and disclosed *for the first time* that the Gabriel Fund had suffered substantial losses "related to the Madoff managed account" and that as a result of the devastating impact on the Gabriel Fund's portfolio that the Gabriel Fund would be dissolved and liquidated. A similar letter was sent by Merkin to Ariel Fund investors on December 18, 2009, and disclosed that Madoff related losses necessitated that he wind down the Ariel Fund and sell off its holdings.

171.   Ascot Fund, Gabriel Fund and Ariel Fund investors were shocked by the news that their investments had been entirely and substantially invested with Madoff. Several investors sent Defendant Merkin e-mails to express their disbelief and anger with the news that they were now exposed to the Madoff Ponzi scheme. One e-mail stated that, "We never knew that ASCOT FUND was not [itself] investing its money [but] giving it to third-party people to invest." Another person wrote "Are you serious? Why was Ascot trading with one fund?" Another e-mail dated December 19, 2008 said, "Please inform us since when ARIEL FUND invested with MADOFF 27% of its capital? ARIEL FUND invests in DISTRESSED securities. What MADDOF [sic] has to do with DISTRESSED DEBT?" Another investor, a personal friend of Merkin's, could not believe that Merkin had deceived him. He wrote on December 14, 2008, "It would be dishonest of me to hide our deep sense of shock, disappointment and frustration in you and your fund but we cannot accept the basis of the claims that are being bandied about." After speaking with Merkin on the phone, this investor learned the truth and took a different view of Merkin, writing on January 7, 2009: "[Y]ou took substantial management fees when you

61

were not managing the funds; you were nothing more than a glorified mailbox who took upside payments when there simply wasn't any upside."

172.    As a result of the exposure to Madoff, the investors in the Funds have lost approximately $2.4 billion.

173.    On January 15, 2009, the *Financial Times* reported that the NYAG had issued subpoenas to three investment funds (including the Ascot Fund, the Gabriel Fund and the Ariel Fund) run by Merkin, as part of a probe related to the Madoff Ponzi scheme.

174.    On February 9, 2009, Defendant Merkin sent a letter to investors in the Ariel Fund conveying plans for the wind-down of the fund and confirming that he expected no recovery on the portion of Ariel's assets (approximately 25%) invested in "strategies managed by Madoff."

175.    On February 27, 2009, Defendant Merkin sent a letter to investors in the Ascot Fund confirming that all investments in the Ascot Fund were worthless.

176.    On April 6, 2009, the NYAG announced charges against Merkin and the funds he controlled for violating New York's Martin Act by concealing from his clients the investment of more than $2.4 billion with Madoff.  The NYAG's Complaint charges Merkin with violations of the Martin Act, General Business Law § 352 et seq., for fraudulent conduct in connection with the sale of securities, Executive Law § 63(12) for persistent fraud in the conduct of business, and New York's Not-For-Profit Corporation Law §§ 112, 717, and 720 for breaches of fiduciary duty in connection with Merkin's service on the boards of certain non-profit organizations.  The NYAG's lawsuit seeks payment of damages and disgorgement of all fees by Merkin, restitution and other equitable relief.  The Honorable Richard Lowe of the Supreme Court of the State of New York recently denied the motion to dismiss filed by Defendants Merkin and GCC.

177.    Pursuant to a stipulation and order signed by the Honorable Richard B. Lowe, III,

on or about June 10, 2009, the Gabriel and Ariel Funds were placed into receivership (the

"Receivership Order") and Bart M. Schwartz was appointed as receiver (the "Receiver").  The

Ascot Fund was placed into receivership soon thereafter.

**The BDO Defendants**

178.    The 2006 Ascot Offering Memorandum explained that the Ascot Partnership

would provide unaudited financial statements to limited partners of the Ascot Fund within 35

days after the end of each calendar quarter and an annual financial statement, audited by BDO,

within 90 days after year end:

> BDO Seidman, LLP serves as the Partnership's auditor.  The Partnership will
> provide to the Limited Partners unaudited financial statements within 35 days
> after the end of each calendar quarter (other than the last) and will furnish to them
> annual audited financial statements within 90 days after year end, and tax
> information as soon thereafter as practicable.  Certain Limited Partners may have
> access to certain information regarding the Partnership that may not be available
> to other Limited Partners.  Such Limited Partners may make investment decisions
> with respect to their investment in the Partnership based on such information.

The 2003 Offering Memorandum for the Gabriel Fund contained identical language.

179.    The 2001 Ariel Prospectus contained similar language explaining that "within 120

days of the last day of each fiscal year, the [Ariel] Fund will provide each shareholder an audited

financial statement of the [Ariel] Fund for such fiscal year.  At that time the Ariel Fund's

auditors were BDO Binder.  The 2006 Ariel Offering Memorandum similarly provided that the

Ariel Fund will furnish to shareholders "annual audited financial statements with 120 following

the end of each fiscal year.  At that time the Ariel Fund's auditors were BDO Tortuga.

180.    BDO consistently represented that it had conducted GAAS compliant audits and

that the financial statements of the Ascot Fund and Gabriel Fund were presented in conformity

with GAAP.  For example, in Ascot's Financial Statements for the year ended December 31, 2007, BDO stated in its letter to the Partners of the Ascot Fund:

> We have audited the accompanying statement of assets and liabilities of Ascot Partners, L.P. (the "Partnership"), including the condensed schedule of investments, as of December 31, 2007, and the related statements of income, changes in partners' capital, and changes in net assets for the year then ended. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audit.

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting.  Accordingly, we express no such opinion.  An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ascot Partners, L.P. as of December 31, 2007, and the results of its operation and changes in its net assets for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

> BDO Seidman LLP
> March 27, 2008

181.  This same letter to the Gabriel Fund partners was contained in the Financial Statements of the Gabriel Fund for the years ended December 31, 2006 and December 31, 2007.

182.  Upon information and belief, identical letters (but for the dates) were included in the annual audited Financial Statements of the Ascot Fund and Gabriel Fund during the relevant time period.

183.   BDO Binder and BDO Tortuga also consistently represented that they conducted audits compliant with International Standards on Auditing and that the financial statements of the Ariel Fund were presented in accordance with International Financial Reporting Standards ("IFRS"). For example, in Ariel's Financial Statements for the year ended December 31, 2003, BDO Tortuga stated in its letter to the shareholders of the Ariel Fund:

> We have audited the accompanying statement of assets and liabilities of Ariel Fund Limited ("Fund") as of December 31, 2003, and the related statements of income, cash flows and changes in equity for the year then ended. These financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these financial statements based on our audit.
>
> We conducted our audit in accordance with International Standards on Auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2003, and the results of its operation, cash flows and changes in equity for the year then ended in accordance with International Financial Reporting Standards.
>
> BDO Cayman Islands
> Grand Cayman, Cayman Islands
> August 4, 2004

184.   Upon information and belief, identical letters (but for the dates) were included in the annual audited Financial Statements of the Ariel Fund during the relevant time period.

185.   In their annual audit reports, the BDO Defendants represented that they had examined evidence supporting the amounts and disclosures in the financial statements and that their audits provided them with a reasonable basis to conclude that the financial statements were

65

not materially misstated. These statements were false, as the BDO Defendants' audits did not comply with professional standards.

### Applicable Standards and the BDO Defendants' Duties with Respect to the Funds

186.   The American Institute of Certified Public Accountants ("AICPA") promulgates national standards of the auditing profession known as Generally Accepted Auditing Standards ("GAAS") for the audit of non-public companies, which set the minimum level of performance and quality that auditors are expected, by clients and the public, to achieve. Under GAAS, the auditor must plan and perform the audit to obtain reasonable assurance that the financial statements examined are free of material misstatement, whether caused by error or fraud. Through its Auditing Standards Board, the AICPA has codified its interpretation of GAAS in the Statements of Accounting Standards. The International Auditing and Assurance Standards Board ("IAASB") promulgates international standards of the auditing profession known as International Standards on Auditing, or "ISA". Those standards are consistent with GAAS in all material respects.

187.   Generally Accepted Accounting Principles ("GAAP") are principles recognized by the accounting profession as uniform rules, conventions and procedures necessary to define generally accepted accounting principles in the United States. IFRS govern the structure for the preparation of financial statements adopted by the International Accounting Standards Board. The IFRS are consistent with GAAP regarding the form and content of the Funds' financial statements.

188.   The AICPA and the IAASB prohibit members from expressing an opinion that financial statements or other financial data "present fairly ... in conformity with generally

accepted accounting principles," if such information departs from applicable accounting principles.

189.    There are ten Generally Accepted Auditing Standards established by the AICPA which the BDO Defendants had a duty to follow in the audits of the Funds:

> General Standards
>
> 1. The auditor must have adequate technical training and proficiency to perform the audit.
>
> 2. The auditor must maintain independence in mental attitude in all matters relating to the audit.
>
> 3. The auditor must exercise due professional care in the performance of the audit and the preparation of the report.
>
> Standards of Field Work
>
> 1. The auditor must adequately plan the work and must properly supervise any assistants.
>
> 2. The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.
>
> 3. The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.
>
> Standards of Reporting
>
> 1. The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).
>
> 2. The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3. When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

4. The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report.  When the auditor cannot express an overall opinion, the auditor should state the reasons therefore in the auditor's report.  In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report.

AU § 150.02; *see also* ISA 200.

190.   The BDO Defendants were required to exercise due professional care "to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02, ISA 240; *see also* AU §§ 230.01-03, ISA 300.  In order to state an opinion on an audited entity's financial statements, "the auditor must obtain a sufficient understanding of the entity and its environment, including its internal controls, as to assess the risk of material misstatement of the financial statements, whether due to error or fraud." AU § 314.01; ISA 310, ISA 315.

191.   "Audit risk and materiality, among other matters, must be considered together in designing the nature, timing, and extent of audit procedures and in evaluating the results of those procedures." AU § 312.01.  An auditor must use professional judgment and professional skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud. AU §§ 230.07-09, 316.13, 150.04; *see also* ISA 315, ISA 330, ISA 400.  "In exercising professional skepticism, the auditor should not be satisfied by less that persuasive evidence because of a belief that management is honest." AU § 230.09.  Further, it is explicitly required under GAAS that the auditor consider the

possibility of fraud when conducting the audit.  AU § 316.  An auditor must consider the competency and sufficiency of the audit evidence, and, because, audit evidence is gathered and evaluated throughout the course of the audit, an auditor must have professional skepticism throughout the audit.  AU § 230.08; *see also* ISA 200, ISA 500.

192.   Under GAAS, the audit of an entity with securities investments, such as the Funds here, requires special procedures, because "[t]he inherent risk for an assertion about a derivative or security is its susceptibility to a material misstatement, assuming there are no related controls."  AU § 332.08.  Accordingly, in such situations, auditors should perform substantive procedures, such as confirming the transaction with the issuer of the entity; confirming with the holder of the security, including securities in electronic form, or with the counterparty to the derivative; confirming settled transactions with the broker-dealer or counterparty; physically inspecting the security or derivative contract; reading executed partnership or similar documents; inspecting underlying agreements and other forms of supporting documents, in paper or electronic form, for amounts reported and evidence that would preclude sales treatment of a transfer; inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period; and performing analytical procedures.  AU § 332.21.

193.   As member firms, the BDO Defendants were bound by the foregoing standards and guidelines.  The BDO Defendants failed to perform their work as auditors of the annual financial statements of the Funds in a manner consistent with these standards.  The BDO Defendants therefore violated GAAS in a variety of ways including by failing to use due professional care in performing their work, failing to properly plan audits, failing to maintain an appropriate degree of skepticism during the audits, failing to assess internal controls, failing to obtain sufficient competent evidentiary matter to support the conclusions of the audit reports, and

failing to audit investments in securities. For the same reasons, BDO Binder and BDO Tortuga violated ISA.

## The BDO Defendants' Deficient Audits

194.   While GAAS requires the auditor to use professional judgment and skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud, the BDO Defendants clearly did not do so here.

195.   As part of the process of obtaining an understanding of the Funds and their environment, the BDO Defendants were required to obtain an understanding of the hedge fund industry, regulatory or other factors, the nature of the Funds and their objectives, strategies, and related business risks that could result in a material misstatement in the financial statements of the Funds. This included obtaining an understanding of the Funds' operations, ownership, governance, structure, how they were financed, and the types of investments they made. AU §§ 314.21, 314.26.

196.   In order to understand the nature of the Funds and their objectives, strategies and related business risks, the BDO Defendants should have read relevant documents. Had BDO Seidman read the Ascot Fund's and the Gabriel Fund's offering memoranda, based on the information it had, it would have known that the Ascot Fund's assets and the Gabriel Fund's assets were not invested as set forth in their respective offering memoranda. BDO Seidman would have discovered that the Ascot Fund was not managed by Merkin and multiple outside managers, as stated, but that 100% of its assets were invested with a single outside manager, Madoff. In the case of the Gabriel Fund, BDO Seidman would have discovered that, instead of employing diversified restructuring and other investment strategies, 25% of the Fund's assets were invested with Madoff, who traded in securities and options contracts. BDO Binder and

70

BDO Tortuga, which audited Gabriel's sister fund, the Ariel Fund, would have seen the same thing. These were red flags that should have alerted the BDO Defendants that there were significant risks of material misstatement due to fraud.

197.    Because the BDO Defendants knew or recklessly disregarded that all or some of the assets of the Funds they were auditing were conduits to Madoff, who controlled the investments, the BDO Defendants were required to conduct audits that confirmed the existence of the Funds' investments.   The BDO Defendants were required to understand the Funds' "information systems" for derivatives and securities, including the securities and options traded and held by BMIS (AU § 332.05), because, if the Funds did not have reliable internal controls, the Funds could not verify the existence or the value of the assets entrusted to BMIS.

198.    The BDO Defendants knew or should have known that the Funds had no internal controls, because the only information about the trading supposedly conducted by Madoff came from BMIS in the form of monthly statements and trade confirmations.   Since the BDO Defendants knew the Funds had no effective internal controls, a serious risk factor, they were required to use substantive procedures in auditing the Funds, which they knew had securities investments with BMIS.   "The auditor should use the assessed levels of inherent risk and control risk for assertions about derivatives and securities to determine the nature, timing, and extent of the substantive procedures to be performed to detect material misstatements of the financial statement assertions."   AU § 332.19.   They either failed to use the requisite substantive procedures altogether, or, if they did, they were extremely reckless in not recognizing that the returns reported by Madoff could not be accurate and that his entire operation was likely to be a fraudulent enterprise.