199. For example, a simple review of the back-up of the Funds' financial statements, which included the trading confirmations and monthly statements sent by Madoff, would have revealed that the BMIS statements and trade confirmations were suspect.   The account statements came from "Bernard L. Madoff Securities, Inc.," which, as a broker-dealer, clears trades electronically.  Yet, investors had no electronic real-time access to their accounts at BMIS, which the BDO Defendants knew or could have known by simply asking Merkin or GCC's financial staff.  Further, BMIS provided paper trading tickets, instead of contemporaneous electronic trade confirmations.  Investment professionals who were not auditors recognized these as warning signs, concluding that Madoff thus had the ability to report fictitious results.

200. In addition, financial professionals who saw the trade tickets were struck by the fact that Madoff always appeared to be purchasing and selling securities at the right time, a consistency that they concluded was indicative of fraud.  As described in the SEC OIG Report, a CEO of a fund of funds who compared a sample of trades on Madoff statements with what was actually going on in the markets that day saw a "pattern which really seemed weird where the – where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day." He concluded the "fact pattern that [he] had seen seemed consistent with a Ponzi scheme." Had the BDO Defendants made a similar comparison, even on a sampling of the purported trades, they would have noticed the same inconsistency.

201. On May 11, 2010, the NYAG filed an action captioned *Andrew M. Cuomo v. Ivy Asset Management LLC, et al.*, Index No. 450489/2010, against Ivy Asset Management ("Ivy"), a New York investment advisor now owned by Bank of New York Mellon, and its managers, Larry Simon and Howard Wohl, who, like Merkin, acted as investment advisor to funds invested with Madoff. The NYAG's complaint cited an internal Ivy memorandum that noted the

inconsistencies between Madoff's claimed trades and market records, and described it as "a clear example of our inability to make sense of Madoff's strategy and one where his trades for accounts are inconsistent with the independent information that is available to us."

202.   Further, the BDO Defendants knew or were reckless in not knowing that there was not enough options trading on the exchanges or over the counter to support the number of options Madoff purported to be trading. As early as 1997 and 1998, Ivy's managers recognized this as a sign that Madoff could not be trading the volume of options to support his purported split-strike strategy. At that time, Ivy estimated that Madoff had more than $2 billion under management, but the volume traded on the market would support Madoff's purported strategy for only $1 billion. When asked about this, Madoff gave Simon and Wohl inconsistent and not credible explanations for the discrepancy, including that he traded 30-50% of his options over the counter, which Wohl knew was impossible, because OEX options (options on the Index), which Madoff claimed to use, did not trade over the counter. Indeed, according to the NYAG Ivy Complaint, the Chief of Investment Management at Ivy testified "that it is 'unusual for an account, a customer, to be able to trade at a price ... substantially outside what's reported as being the range of that security for that day.'" This same discrepancy was recognized as a warning sign by other investment professionals, including Markopolos, during the Class Period.

203.   The BDO Defendants also failed to verify the assertions made in the financial statements they were hired to audit with sufficient supporting evidentiary documentation. Claims made in the financial statements of the Funds about purchase and sale transactions, dividends, interest and realized gains and investment assets were not supported by persuasive audit evidence. The BDO Defendants should have obtained evidence directly from third parties about assertions made in the financial statements of each of the Funds including, among others,

assertions regarding the existence of security purchases and sales, interest and realized gains, and the investment assets held at year end.  GAAS also cautions the auditor that if the third party providing evidence is the custodian of a material amount of his client's assets, the auditor should exercise a heightened degree of professional skepticism.  Given that 100% of the Ascot Fund's assets and a material portion of the Gabriel and Ariel Fund's assets had been entrusted to Madoff and that BMIS was functioning as prime broker, the BDO Defendants should have approached the audit with skepticism.

204.    At some point, Madoff claimed to hold all of its investment advisory clients' assets in Treasuries at the end of each reporting period.  However, an auditor having access to BMIS's books and records easily could have sought to corroborate the existence of these U.S. Treasuries by requesting confirmations from the depository institutions or clearing institutions at which book entries for these assets should have existed.  This simple check would have revealed that the Treasuries listed on the account statements did not exist.

205.    As Madoff admitted in his plea allocution, Madoff and BMIS held no investment advisory clients' assets in Treasuries; rather, the Ponzi scheme was perpetrated from an account at Chase Manhattan Bank that held only cash.  Had they sought confirmations from depository institutions, which were available, the BDO Defendants would have discovered that the BMIS account statements, and therefore the Funds' financial statements, were suspect.

206.    According to the NYAG Complaint, Merkin told an investor that he required Ascot's auditor, BDO, to visit Madoff's offices two or three times a year to perform standard operational due diligence.  However, this representation was false.  BDO did not perform standard operational due diligence, or any other kind of appropriate examination of Madoff's operation, and Merkin had no reason to believe otherwise.

207.   In his deposition in the NYU Action, Merkin testified that he spoke to Michael Andreola, the BDO partner who Merkin described as the "constant name" at BDO on "our team," about the Madoff strategy, and that there "were persons at BDO Seidman who were familiar with our strategy, familiar with the returns, familiar with their risks...."

208.   Significantly, the BDO Defendants, as Merkin and other investment professionals knew, had to have known that BMIS itself was audited by a small, obscure accounting firm, F&H, located in a strip mall in Rockland County, New York that had no experience auditing entities of the apparent size and complexity of BMIS.  The BDO Defendants, as member firms of BDO International, one of the leading global auditing firms, knew that a firm of F&H's size could not possibly undertake such a task, and knew or were extremely reckless in not recognizing that this was a red flag.  Because Madoff liquidated all his accounts and placed their assets in Treasuries at year-end, in order to conduct a proper audit of BMIS, F&H would have had to allocate the Treasuries to each of Madoff's accounts based on the securities held in each account prior to its liquidation.

209.   Thus, at the time of its audits, the BDO Defendants either knew or recklessly disregarded: (a) the concentration of the Funds' investments in a single third party investment manager, Madoff; (b) the violation of the Funds' stated policies of investment diversity; (c) the materially heightened risk to the assets of the Funds from such reliance on Madoff, especially given the lack of transparency of Madoff's operations; (d) the abnormally high and stable positive investment results reportedly obtained by Madoff; (e) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as the Funds; and (f) the fact the BMIS itself was audited by F&H, as described above.

75

210.   By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, the BDO Defendants' audits of the financial statements of the Funds and reports thereon during the Class Period contained false statements, were grossly negligent, in violation of GAAS and/or ISA, and constituted an extreme departure from the BDO Defendants' standards of accounting and auditing industry.

**The BDO Defendants' Duties with Respect to BMIS**

211.   The BDO Defendants knew that the amounts reported in the financial statements of the Funds were premised upon internal accounting and reporting coming from entities other than the Funds including internal controls purportedly designed and implemented by Merkin and Madoff.  In order for the BDO Defendants to perform an audit in accordance with GAAS, they were required to obtain an understanding of the internal controls not only of the Funds, but also of Merkin as General Partner and Madoff as an investment advisor to whom a material portion of the assets of the Funds had been entrusted.

212.   For these reasons, the BDO Defendants should have treated BMIS as a "service organization" because its services were part of the Funds' information system for derivatives and securities that affected (1) how the Funds' derivatives and securities transactions were purportedly initiated and (2) the accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of the Funds' derivatives and securities transactions.  AU §§ 332.11, 332.20 and 324; *see also* ISA 402.

213.   Thus, the BDO Defendants were required to consider the controls put in place by BMIS, including how BMIS's derivatives and securities transactions were initiated, and the accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of BMIS's derivatives and securities transactions.  *See* AU § 332.11.

214.   The BDO Defendants were also required to perform additional procedures where, as here, there is a lack of segregation of duties at a service organization.  AU § 332.20.  With respect to the Funds, BMIS initiated the securities transactions held and serviced the securities as custodian and prepared trading and account information.  This heightened risk required the BDO Defendants to perform additional procedures to opine on the financial statements of the Funds.  Confirmations from service organizations are not sufficient audit evidence.  AU § 332.16.

215.   Moreover, where, as here, BMIS both initiated the transactions and held and serviced the securities, the greater risk of fraud requires the auditor to perform additional procedures, including site visits to inspect documentation, and identification of controls by the service organization.  AU § 332.18-20.

216.   Given the Funds' circumstances, the BDO Defendants had an obligation, at a minimum, to review the reports of BMIS's independent auditor for the relevant period.  AU §§ 324.02, 324.12, 332.14.  The BDO Defendants also had an obligation to discuss with BMIS's independent auditor the result of its most recent audit of BMIS.  AU § 324.19; *see also* AU §§ 324.02, 324.12, 324.14.   The BDO Defendants were required to examine the control environment at BMIS and, where necessary, as was the case here, should have either requested BMIS's auditor to perform, or should have themselves performed relevant procedures regarding BMIS.  AU § 324.19.  Because, here, F&H's auditor reports were not satisfactory, the BDO Defendants should have requested BMIS to have "another auditor [including the BDO Defendants themselves] apply appropriate auditing procedures to such [BMIS] financial statements, considering the materiality of the investment in relation to the financial statements of the investor [i.e., the Funds]."  AU § 332.30.

217.    Thus, the BDO Defendants were required to assess the accounting performed by Madoff as an investment advisor to whom a material portion of the assets of the Funds had been entrusted.  The BDO Defendants were required, but failed, to assess BMIS's accounting for the purchase and sale of securities, collection and distribution of income, maintenance of security records and the pricing of securities.  At the very least, the BDO Defendants were obligated to verify that the securities held by the Funds actually existed and were appropriately valued.  The BDO Defendants failed to take appropriate steps to assess these issues despite knowledge that, among other things, Madoff refused to allow electronic access to relevant information and that Madoff's own financial statements were audited by an obscure three-person accounting firm with no other clients.  The BDO Defendants knew further that Madoff, through BMIS, was the principal prime broker for the Funds; these overlapping roles should have been a warning sign to the BDO Defendants leading to enhanced scrutiny and skepticism.

218.    The BDO Defendants could also have sought to corroborate Madoff's purchases and sales of equities by instructing Madoff and BMIS to request confirmation of these trades from depository or clearing organizations or counterparties to the trades, and reconciling the trades to settlement reports from these organizations or counterparties.  Such procedures would have revealed either that no such trades had occurred, or that the amounts were inconsistent with the trades that the Funds reported Madoff made.

219.    With respect to the over-the-counter option trades Madoff and/or BMIS claimed to make for their investment advisory clients, Madoff testified to the SEC on or about May 19, 2006 that the counterparties to his purported option contracts were "basically European banks," and that there is "an affirmation that's generated electronically" and an electronic "master option agreement" that is attached to the affirmation that documented these option trades.  Madoff

admitted in his plea allocution that these option trades never occurred. Thus, had the BDO Defendants sought to confirm this nonexistent documentation with these European bank (and any other) counterparties, they would have been immediately alerted to the fraud.

220.   In short, any meaningful attempt to confirm the existence of assets and occurrence of trades through third parties would have uncovered the fraud. The SEC OIG Report details how, after Madoff confessed to his fraud, a single call to the DTC confirmed that Madoff had not executed any trades for clients. Further, within "a few hours" of getting F&H's work papers, it was apparent that F&H did not audit BMIS. Because the BDO Defendants issued unqualified audit opinions on the Funds' financial statements, it is clear that they did not seek to obtain any kind of independent corroboration.

221.   The BDO Defendants failed to exercise due professional care in the performance of their audits of the financial statements of the Funds during the relevant time period. The BDO Defendants failed to adhere to professional auditing standards by, among other things, failing to understand the internal control structure of the Funds, failing to obtain sufficient competent evidentiary matter, failing to conduct an effective confirmation process and failing to extend its audit procedures in light of the warning signs of fraud.

222.   The BDO Defendants conducted their audits in a reckless manner, ignoring obvious areas that required further inquiry. Had these areas of inquiry been pursued and had the BDO Defendants not recklessly violated GAAS, they would have discovered the fraudulent information underlying the false financial statements of the Funds. The BDO Defendants' reckless audits caused significant damages to Plaintiffs and the Class they seek to represent in that they have lost the full value of their investments in the Ascot Fund and substantial losses in the value of their investments in the Gabriel and Ariel Funds. Moreover, the BDO Defendants

and Merkin profited through the payment of professional fees to the BDO Defendants and management and incentive fees to Merkin. The asset values purportedly verified by the BDO Defendants in their audits were used by Merkin to calculate the fees owed to him by investors.

223.    According to Defendant Merkin's testimony in an individual action against him related to an investment in Gabriel, employees of BDO, despite its role as the purported independent auditor of the Funds, recommended the strategy of the Funds to BDO's own clients. One particular auditor asked whether he could send a client or other relationship of his to Merkin's office to discuss investing in Ascot.

224.    According to the receiver appointed to marshal and preserve the assets of the Gabriel and Ariel Funds, BDO and BDO Tortuga had indemnity agreements with the Gabriel and Ariel Funds prior to entry of the Receivership Order by Judge Lowe which purport to indemnify BDO and BDO Tortuga for losses sustained in connection with claims (other than for willful conduct or recklessness) arising out of their performance of services to the Gabriel and Ariel Funds, respectively. BDO and BDO Tortuga have also asserted unliquidated indemnity claims against the Funds they audited. The existence of the indemnity agreements, which Merkin and GCC agreed to, demonstrates that BDO and BDO Tortuga lacked independence while performing their audits because they knew they could be shielded.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Defendants Merkin and GCC

225.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

226.    During the Class Period, Defendants Merkin and GCC carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive

the investors of the Funds, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase limited partnership interests in the Ascot Fund and the Gabriel Fund and shares in the Ariel Fund. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

227. Defendants Merkin and GCC: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of limited partnership interests in the Ascot Fund and the Gabriel Fund and shares in the Ariel Fund in an effort to induce investment in the Funds in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Defendants Merkin and GCC are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

228. Defendants Merkin and GCC, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, and operations of the Funds as specified herein.

229. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs and the Class of the value of the limited partnership interests and shares they purchased, performance and continued substantial growth, which included the making of, or the participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Funds not misleading.

230.    Defendants Merkin and GCC had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inducing Plaintiffs and the Class to invest in the Funds.

231.    At the time of these misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class known the truth regarding the lack of due diligence performed by Defendants, the nature of the investments made by Merkin on behalf of the Funds, and the degree to which the Funds were invested with Madoff, all facts that were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their limited partnership interests and shares in the Funds.

232.    By virtue of the foregoing, Defendants Merkin and GCC have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

233.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests and shares in the Funds during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act against Merkin and GCC

234.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.    Defendants Merkin and GCC acted as controlling persons of the Funds within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the power granted

to Merkin and to GCC under the relevant offering materials and underlying corporate documents,

these Defendants had the power to influence and control and did directly influence and control

all aspects of the business of the Funds, including the content and dissemination of the various

statements alleged to be false and misleading.  Defendants were provided with or had unlimited

access to all communications made on behalf of the Funds prior to and/or shortly after these

communications were issued and had the ability to prevent the issuance of any statements or

cause the content of any statements issued to be corrected.

236.    In particular, both Merkin and GCC had direct and supervisory involvement in the

day-to-day operations of the Funds and, therefore, are presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein,

and exercised the same.

237.    As set forth above, all Defendants violated Section 10(b) and Rule 10b-5 by their

acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling

persons, Merkin and GCC are also liable pursuant to Section 20(a) of the Exchange Act.

238.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

other members of the Class suffered damages in connection with their investments in the Funds

during the Class Period.

## COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 against the BDO Defendants

239.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

240.    During the Class Period, BDO was the auditor for both the Ascot Fund and the Gabriel Fund and BDO Tortuga and BDO Binder were auditors for the Ariel Fund.

241.    The BDO Defendants knowingly or recklessly misrepresented that they conducted their annual audits of the financial statements of the Funds in compliance with GAAS (or ISA, as applicable); that its audits provided reasonable bases for its opinions; and that the financial statements of the Funds presented fairly, in all material respects, the financial position of the Funds at the time of the audits.

242.    The BDO Defendants, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Funds, which resulted in misstatements and omissions of material facts in the audited financial statements disseminated by the Funds each year.   The BDO Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the financial statements disseminated by the Funds not misleading.

243.    As the BDO Defendants knew, or should have known, the audited financial statements issued by the Funds were materially false and misleading and did not fairly present the financial positions of the Funds as stated by the BDO Defendants in their Independent Auditors' Reports to the partners and investors of the Funds.  The BDO Defendants failed to perform their audits and reviews in accordance with accepted accounting principles and procedures.   The BDO Defendants failed to meet their professional obligations to obtain sufficient competent evidentiary matter necessary to satisfy an auditor that the Funds' financial

statements fairly presented the Fund's financial condition in all material respects. Thus, the BDO Defendants made express misstatements regarding the financial position of the Funds without examining evidence supporting the amounts and disclosures in the financial statements.

244. The BDO Defendants further failed to obtain reasonable assurances about whether the financial statements audited were free of material misstatement. Thus, the financial statements made by the BDO Defendants with respect to the Funds were made without a genuine belief in their truth or a reasonable basis therefor.

245. As a direct and proximate result of the wrongful conduct of the BDO Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of limited partnership interests and shares in the Funds during the Class Period. The BDO Defendants knew that investors would rely upon the audited financial statements of the Funds in making their investment decisions. The losses of the investors in the Funds were the foreseeable result of the extreme recklessness of the BDO Defendants.

246. By virtue of the foregoing, the BDO Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### Breach of Fiduciary Duty against Defendants Merkin and GCC

247. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

248. Plaintiffs and other Class members entrusted assets to Merkin and to GCC by purchasing limited partnership interests and shares in the Funds, and reposed confidence in Merkin and GCC with respect to the management of those assets. The superior position of both Merkin and GCC as to the management and control of those assets, as well as their superior access to confidential information about the investment of the assets and about Madoff, required

investors in all the Funds to place trust and confidence in Merkin and GCC which together had full managerial, administrative and overall control of the Funds. Merkin held himself out as providing superior client investment services and as having appropriate policies and procedures in place governing investments so as to ensure the safety of class members' assets and that transactions would be properly conducted.

249.    Merkin and GCC owed fiduciary duties to the Funds' investors. These investors reasonably and foreseeably relied on the representations of Merkin and GCC and trusted in their expertise and skill. Merkin and GCC therefore owed a fiduciary duty to Plaintiffs and the Class with respect to their management and protection of the assets of the Funds.

250.    Merkin and GCC were obligated to deal fairly and honestly with Plaintiffs and all investors in the Funds; to act with loyalty and good faith toward these investors; to avoid placing themselves in situations involving a conflict of interest with these investors; to manage and operate Fund investments exclusively for the best interest of the Funds; to use due care in the handling of the assets of the Funds; and to oversee the investment of the assets of the Funds to confirm they were maintained in a prudent and professional manner.

251.    Merkin and GCC breached their fiduciary duties to Plaintiffs, and acted in reckless disregard of those duties:

a.    by publishing and releasing materials that contained false and misleading descriptions of the care taken by the Merkin and GCC with respect to the Funds' assets, of the manner in which the assets of the Funds were being invested, and of the financial performance of both Funds;

86

b.      by failing to act with reasonable care in ascertaining that the information set forth in the written materials provided to investors were accurate and did not contain misleading statements or omissions of material facts;

c.      by failing to perform adequate due diligence, before investing with Madoff;

d.      by failing to monitor the assets of the Funds after investing them with Madoff;

e.      by failing to monitor the activities of Madoff, to whom a material portion of the Funds' assets had been entrusted, on an ongoing basis to any reasonable degree;

f.      by failing to take adequate steps to analyze, test or otherwise confirm Madoff's purported account statements, transactions and holdings; and

g.      by profiting handsomely from management and incentive fees paid by the Funds.

252.    As a result of the breaches of fiduciary duty of Merkin and GCC, investors in the Funds have been damaged in an amount to be determined at trial.  Class members have lost all, or substantially all, of their respective investments in the Funds, and have been forced to pay excessive investment and management fees in exchange for investment services that were promised but never provided.

## COUNT V

### Breach of Fiduciary Duty against the BDO Defendants

253.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

254.    The BDO Defendants owed fiduciary duties to the Funds' investors.  These investors reasonably and foreseeably relied on the representations of the BDO Defendants in the audited financial statements they issued with respect to the Funds and trusted in their expertise

87

and skill.  The BDO Defendants knew that these investors would rely on the representations in the audited financial statements they issued and, therefore, owed a fiduciary duty to Plaintiffs and other members of the Class.

255.    The BDO Defendants failed to adhere to applicable standards and guidelines, adequately investigate the Funds' investments and discover that the assets of the Funds were invested, in whole or in part, in a Ponzi scheme.  As a result of their failures, the BDO Defendants breached their fiduciary duties to Plaintiffs and other members of the Class.  The BDO Defendants acted in bad faith, with gross negligence and complete disregard of their duties and obligations to use due care.

256.    As a result of the breaches of fiduciary duty of the BDO Defendants, investors in the Funds have been damaged in an amount to be determined at trial.  Class members have lost all, or substantially all, of their respective investments in the Funds, and have been forced to pay excessive investment and management fees in exchange for investment services that were promised but never provided.

257.    The acts of the BDO Defendants were willful and wanton.  Plaintiffs and the other members of the Class are entitled to punitive damages.

## COUNT VI

### Aiding and Abetting Breach of Fiduciary Duty against the BDO Defendants

258.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

259.    Defendants Merkin and GCC owed Plaintiffs and the Class fiduciary duties as alleged herein.

260.    By committing the acts alleged herein, Merkin and GCC have breached their fiduciary duties owed to Plaintiffs and the Class.

261.   The BDO Defendants aided and abetted Merkin and GCC in breaching their fiduciary duties owed to Plaintiffs and the Class.  BDO Defendants knowingly or recklessly ignored information that indicated or should have indicated that the assets invested by Plaintiffs and the Class in the Funds were being invested with Madoff and BMIS and that Merkin and GCC did not have a genuine belief or a reasonable basis for the financial statements sent to Plaintiffs and the Class or for other statements made to Plaintiffs and other investors.

262.   The BDO Defendants provided substantial assistance to this fiduciary breach by issuing clean audit opinions that were prepared in clear violation of GAAP and GAAS.

263.   As a result of the breaches of fiduciary duty of Merkin and GCC, as aided and abetted by the BDO Defendants, investors in the Funds have been damaged in an amount to be determined at trial.

## COUNT VII

### Gross Negligence against Merkin and GCC

264.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

265.   Merkin and GCC, as the managers and administrators of both the Funds, and with absolute control over their assets, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the management of the assets invested in the Funds, and in the selection and monitoring of third-party managers.  Merkin and GCC knew or should have known that Plaintiffs were relying on them to manage the investments entrusted to them with reasonable care, and that investors reasonably and foreseeably relied on them to exercise such care by entrusting assets to them.

266.   Merkin and GCC grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs and all investors in the Funds.  Merkin

89

and GCC failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional. Merkin and GCC failed to perform adequate due diligence before investing with Madoff, failed to monitor Madoff on an ongoing basis to any reasonable degree and failed to take adequate steps to confirm Madoff's purported account statements, transactions and holdings of the Funds' assets.

267.    If Merkin and GCC had not been grossly negligent with respect to the assets that were invested with them, they would not have entrusted the entirety of the Ascot Fund's assets and a material portion of the Gabriel and Ariel Funds' assets to Madoff.

268.    As a direct and proximate result of Defendants' gross negligence with respect to the assets of the Funds, Plaintiffs and the Class have been harmed.

## COUNT VIII

### Unjust Enrichment against All Defendants

269.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

270.    All Defendants were enriched at the expense of Plaintiffs and all investors in the Funds through the payment of management, administrative, professional and incentive fees. Management fees were paid for management services that were not provided and incentive fees were paid for the purported, but in fact non-existent, capital appreciation of the assets of the Funds.

271.    To the extent that the assets of the Funds were invested with Madoff, any profits purportedly generated from those investments were illusory. Thus, Merkin and GCC were overpaid by the portion of management and incentive fees that stemmed from assets invested with and profits generated by, Madoff.

272. The BDO Defendants have been paid substantial professional fees for audits that were not performed in a manner consistent with the standards of the auditing profession and as required by GAAS.

273. The performance of Merkin, GCC, and the BDO Defendants was so far below the fiduciary, business and professional standards that Plaintiffs and the Class involuntarily conferred a benefit upon these Defendants without receiving adequate benefit or compensation in return. These Defendants have been unjustly enriched.

274. Equity and good conscience require all incentive fees, management fees and professional fees that flowed from the Funds' investments with Madoff to be disgorged and refunded to the Funds for the benefit of their limited partners and shareholders.

## COUNT IX

## Common Law Fraud against All Defendants

275. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

276. Plaintiffs and other members of the Class, in reasonable and justifiable reliance upon the representations and statements made by Defendants, purchased limited partnership interests and shares in the Funds.

277. Plaintiffs and other members of the Class would not have purchased their limited partnership interests and shares in the Funds except for their reliance upon the representations made by Defendants, and would never have purchased them had they been aware of the material omissions and concealment by Defendants of the inadequate due diligence of Merkin and GCC, the absence of true monitoring by Merkin and GCC, and the failure of the BDO Defendants to conduct its audits in accordance with GAAS.

91

278.   At the time that Defendants made the statements and representations outlined herein, they knew or should have known them to be false, and Defendants intended to deceive Plaintiffs and the Class by making such statements and representations.

279.   At the time the statements and misrepresentations outlined here were made, Defendants intended that Plaintiffs and the members of the Class would act on the basis of the misrepresentations and omissions in determining whether to purchase limited partnership interests or shares in the Funds.   Plaintiffs and the Class reasonably relied thereon to their detriment in making their investment decisions.

280.   Had Plaintiffs and the other members of the Class known of the material facts that Defendants wrongfully concealed and misrepresented material facts, Plaintiffs and other Class members would not have purchased limited partnership interests or shares in the Funds.

281.   As a direct and proximate result of Defendants' wrongful concealments and misrepresentations, Plaintiffs and the members of the Class purchased limited partnership interests and shares have sustained damages in an amount to be determined at trial.

## COUNT X

### Negligent Misrepresentation against All Defendants

282.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

283.   Defendants owed to Plaintiffs and other members of the Class a duty: (a) to act with reasonable care in preparing Offering Memoranda and Prospectuses, financial statements, quarterly and other periodic reports and auditor's letters and making other representations relied upon by Plaintiffs and other Class members in deciding to purchase limited partnership investment interest or shares in the Funds; and (b) to use reasonable diligence in determining the

92

accuracy of and preparing the information contained in the Offering Memoranda and other communications to investors.

284.    The BDO Defendants knew that their audited financial statement reports would be provided to limited partners and shareholders and potential investors in the Funds and would be relied upon by them in making investment decisions concerning the purchase of limited partnership interests or shares.  The goal of the audit engagement was to provide an audit report to the limited partners and shareholders, who comprised a discrete and finite group of persons and entities whose identities were know to the BDO Defendants.

285.    The BDO Defendants owed to Plaintiffs and the Class members a duty: (a) to act with reasonable care in preparing their audit reports of the financial statements of the Funds, which financial statements were relied upon by Plaintiffs and other Class members in deciding to purchase their limited partnership interests or shares; and (b) to use reasonable diligence in determining the accuracy of the information contained in the financial statements and in preparing the auditors' reports.

286.    Merkin, GCC, and the BDO Defendants each breached their duties to Plaintiffs and other Class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memoranda, Prospectuses and other representations to investors, including the audited financial statements and quarterly reports of each of the Funds.

287.    Neither the Offering Memorandum nor any other materials used in soliciting investments in the Funds ever disclosed that virtually all of the Ascot Fund's assets and at least 25% of the Gabriel and Ariel Funds assets were invested with Madoff or entities that he controlled.  The offering materials for all three Funds instead misrepresented that controls were

in lace to ensure that the Funds' assets were protected and that the Funds' assets were invested pursuant to a strategy that, in fact, was no strategy at all. The financial statements of the Funds likewise failed to reveal that the BDO Defendants had failed to probe the adequacy of Merkin's internal controls or the controls established by Madoff and BMIS, or the accuracy of the information received from Merkin and Madoff regarding the investments of the assets of the Funds.

288.   As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Class members have sustained damages and have lost a substantial part (if not the entirety) of their respective investments in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Declaring this action to be a proper class action and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding monetary damages against all Defendants, in favor of Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the wrongdoings alleged herein, together with interest thereon;

C.   Disgorging all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

D.   Awarding punitive damages as appropriate;

E.   Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys and experts; and

F.   Granting Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

     Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
       June 18, 2010

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: _____
     Arthur N. Abbey
     aabbey@abbeyspanier.com
     Karin Fisch
     kfisch@abbeyspanier.com
     Stephanie Amin-Giwner
     samin@abbeyspanier.com
     Richard B. Margolies
     rmargolies@abbeyspanier.com
     212 East 39th Street
     New York, NY 10016
     (212) 889-3700

     *Counsel for Co-Lead Plaintiffs*
     *New York Law School and Scott Berrie*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By: _____
     Gregory Mark Nespole
     nespole@whafh.com
     Malcolm T. Brown
     brown@whafh.com
     270 Madison Avenue
     New York, NY 10016
     (212) 545-4600

     *Counsel for Co-Lead Plaintiff*
     *Jacob E. Finkelstein CGM IRA*
     *Rollover Custodian and Named*
     *Plaintiff Nephrology Associates PC*
     *Pension Plan*

/579969

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE J. EZRA MERKIN AND BDO
SEIDMAN SECURITIES LITIGATION

08 Civ. 10922 (DAB)

## CERTIFICATE OF SERVICE

Malcolm T. Brown hereby certifies that, on June 18, 2010, true and correct copies of the

Third Consolidated Amended Class Action Complaint were caused to be served by e-mail and

first class mail upon the following counsel:

Andrew J. Levander
andrew.levander@dechert.com
Gary J. Mennitt
gary.mennitt@dechert.com
Neil A. Steiner
neil.steiner@dechert.com
Katherine Stroker
katherine.stroker@dechert.com
**Dechert LLP**
1095 Avenue of the Americas
New York, NY 10036

David C. Esseks
david.esseks@allenovery.com
Julie Withers
**Allen & Overy LLP**
julie.withers@allenovery.com
Rasika Rathi
rasika.rathi@allenovery.com
1221 Avenue of the Americas
New York, NY 10020

Ira G. Greenberg
igreenberg@eapdlaw.com
Florence A. Crisp
fcrisp@eapdlaw.com
**Edwards Angell Palmer &**
   **Dodge LLP**
750 Lexington Avenue
New York, NY 10022

Christopher R. Harris
christopher.harris@lw.com
Peter A. Wald
peter.wald@lw.com
**Latham & Watkins LLP**
885 Third Avenue
New York, NY 10022

Karen Yasmine Bitar
bitark@gtlaw.com
Adam David Cole
colea@gtlaw.com
**Greenberg Traurig, LLP**
200 Park Avenue
New York, NY 10166

Dated: New York, New York
       June 18, 2010

MALCOLM T. BROWN