# EXHIBIT J

FILED: NEW YORK COUNTY CLERK 05/07/2010

NYSCEF DOC. NO. 68

INDEX NO. 601052/2009

RECEIVED NYSCEF: 05/07/2010

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ HON. RICHARD B. LOWE, III
                                                          *Justice*

PART SC

CRT

- v -

Merkin

INDEX NO. 601052/09

MOTION DATE 11/17/09

MOTION SEQ. NO. 005

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

MOTION IS DECIDED IN ACCORDANCE WITH ACCOMPANYING MEMORANDUM DECISION

Dated: _____ 5/5/10

_____ HON. RICHARD B. LOWE, III
                                                          J.S.C.

Check one: ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART 56
------------------------------------------------------------------- x
CRT INVESTMENTS, LIMITED, and
MORTIMAR ZUCKERMAN,

                    Plaintiffs,

            -against-                              Index No.
                                                   601052/09

J. EZRA MERKIN, GABRIEL CAPITAL
CORPORATION, BDO SEIDMAN, LLP, and
BDO TORTUGA f/k/a BDO CAYMAN
ISLANDS,

                    Defendants.
------------------------------------------------------------------- x

**Hon. Richard B. Lowe, III:**

Motion sequence numbers 005, 006, and 007 are consolidated and are disposed of in

accordance with the following decision and order.

Defendants J. Ezra Merkin and Gabriel Capital Corporation (GCC) move to dismiss the

first and second claims in the complaint as against them for failure to state a claim and based on

documentary evidence. Defendant BDO Seidman, LLP (BDO Seidman) moves to dismiss the

third through seventh causes of action for failure to state a claim. Defendant BDO Tortuga

(Tortuga) moves to dismiss for lack of personal jurisdiction, and for failure to state a claim.

### BACKGROUND

Accepting the allegations of the complaint as true (*Leon v Martinez*, 84 NY2d 83 [1994]), the

following facts emerge. Plaintiff CRT is a Cayman Islands corporation owned by the Mortimer

Zuckerman Charitable Remainder Trust (the Trust), and plaintiff Mortimer Zuckerman is a

director of CRT (Complaint, ¶ 9). Defendant J. Ezra Merkin ("Merkin") is the sole shareholder

and president of defendant GCC, an investment management company. He also is the general

partner of Ascot Partners, L.P. (Ascot Partners), a domestic hedge fund, and is the controlling

person of Ascot Fund Limited (Ascot Fund), a Cayman Islands hedge fund, by virtue of his
control over GCC, which controls 100% of voting shares of Ascot Fund (*id.*, ¶ 11). All of Ascot
Fund's money flowed into Ascot Partners (*id.*). GCC serves as the investment manager of Ascot
Fund, and is completely controlled by Merkin (*id.*, ¶ 12). Merkin, through GCC, collected
management fees of 1.5% of each limited partner's capital account balance annually (Exh. D to
Defendant Merkin's Notice of Motion, Ascot March 2006 Offering Memorandum, Summary of
Terms, at 4).

Defendant BDO Seidman is a national accounting, auditing, and consulting firm with
offices and partners in New York. It audited the financial statements of Ascot Partners, and
issued clean opinions on those financials (*id.*, ¶ 13). Defendant Tortuga is a Cayman Islands
accounting and auditing corporation, with its principal place of business there. It audited the
financial statements of Ascot Fund, which attached and referenced Ascot Partners' financials,
and Tortuga issued clean opinions on Ascot Fund's financial statements (*id.*, ¶ 14).

During 2006, Merkin met with Zuckerman to convince him to invest in the Ascot and
Gabriel family of funds. He described Ascot Partners as a diversified fund, which engaged in
various diverse investment strategies, and made clear that the fund's performance was dependent
on his personal judgment and involvement (*id.*, ¶¶ 16-18). Merkin advised plaintiffs that the
Ascot family of funds would be best for CRT, a charitable trust, because of its conservative,
diversified philosophy and nature (*id.*, ¶ 21). Zuckerman received the Offering Memorandum
for both Ascot Partners and Gabriel Capital Partners, LLP, another hedge fund of Merkin's, and
reviewed them before investing (*id.*, ¶ 22). CRT invested $25 million in Ascot Fund. All money
invested by Ascot Fund shareholders was used to purchase limited partnership interests in Ascot
Partners (*id.*, ¶ 33). Zuckerman personally invested $15 million in Gabriel Capital Partners,

which invested in Gabriel Fund (*id.*, ¶ 34).

According to plaintiffs, the Ascot Offering Memorandum failed to reveal that 100% of Ascot Fund was invested with Madoff, a fact which was necessary to make the remainder of the information in that document not misleading. It falsely represented that the performance of the fund depended upon the investing acumen of Merkin (Exh. D to Merkin Notice of Motion, Ascot March 2006 Offering Memorandum, at 17: "[a]ll decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin,"), and that "consequently the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin" (Complaint, ¶ 24; Exh. A to Merkin Notice of Motion, Ascot Offering Memorandum, at 17). This, plaintiffs allege, was false, because the success of Ascot depended entirely on Bernard Madoff ("Madoff"), who made all investment decisions for Ascot Fund, and Merkin's skill or experience had nothing to do with it (*id.*).

The Ascot Offering Memorandum also falsely represented that the fund "will make investments through third-party managers," and that it "may delegate investment discretion" to "money managers." This was false and misleading, because, in fact, all funds were entrusted to a single manager, Madoff. In addition, this prospective language indicated that this might happen in the future, when Merkin admitted that, from its inception in 1992, Ascot Fund's sole investment strategy was to turn over all funds to Madoff. In addition, using the plural "managers" was misleading, because it indicated that the fund would use a variety of managers, when it only used one, Madoff (*id.*, ¶ 25).

Plaintiffs assert that the Ascot Offering Memorandum and the Subscription Agreement were misleading, because, while they disclosed that Ascot Fund was a feeder fund into Ascot Partners, they failed to disclose that Ascot Partners was a feeder fund for Madoff (*id.*, ¶ 26). The

Offering Memo also was false and misleading, because it stated that the fund would invest in a "diverse portfolio of securities," and that, while it disclosed that it would follow a strategy involving buying stocks from the S & P 100 and options tied to the S & P 100 (Madoff's split-strike conversion strategy), it also indicated that it would also invest in "futures contracts" for commodities, "swap agreements," "short selling," non-standardized "forward contracts," and derivitives. This was misleading, because it explicitly stated that the fund would invest in a diverse portfolio, but, in fact, Merkin gave control over all of Ascot Fund to Madoff. This was further misleading, because the disclosure of the other types of investments and their risks, when the fund never invested in them and Merkin and GCC had no intention of making such investments, hid that Ascot Fund 's sole investment strategy was investing with Madoff (*id.*, ¶ 27).

Plaintiffs also point to disclosures in the offering documents regarding the fund's use of brokers, and custodianship of the securities held by the fund. Usually, investment funds use different entities to serve as executing broker, clearing broker, and custodian for the securities that have been bought or sold. This division of responsibility prevents fraud by the broker, such as fake transactions. The Ascot Offering Memo indicated that it used different brokers by disclosing that trades were executed through unaffiliated brokers, and that "Morgan Stanley & Co., Inc. and Bernard Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the principal prime brokers and custodians," and that they clear transactions "that are effected through other brokerage firms" (*id.*, ¶ 28, quoting Ascot March 2006 Offering Memo, at 28). Plaintiffs assert that this was misleading, because it indicated that Madoff simply performed an administrative role, not that he was making all the investment decisions for the fund. In addition, the statement that Madoff cleared trades effected through other brokerage firms is false.

Madoff, in fact, effected and cleared over 99% of Ascot Fund's assets. It was further misleading, because Morgan Stanley had almost no involvement in the fund, creating the false impression that the fund was diversified in its employment of brokers. The fact that Madoff had custody of, effected and cleared all of the fund's assets allowed Madoff to perpetrate the fraud without detection (*id.*).

The Ascot Offering Memo also failed to disclose that there were numerous red flags of which Merkin was aware from his own adviser, Victor Teicher, and from others in articles in various publications about Madoff. The red flags were raised by the fact that Madoff only provided limited information about his strategy to Merkin and others, that Madoff used a tiny audit firm, and that Madoff self-cleared all his transactions (*id.*, ¶ 29).

Finally, the offering documents disclosed that Ascot Fund was audited by BDO Seidman. This representation gave comfort to plaintiffs to invest, because BDO Seidman was a reputable firm (*id.*, ¶ 30).

Plaintiff Zuckerman alleges that the Gabriel Offering Memo similarly failed to mention Madoff or his investment strategy, even though over 20% of the fund was invested with him. The documents similarly indicated that the fund was dependent upon Merkin's investing acumen, and that Merkin would play a central role, but that Gabriel was nothing more than a fund of funds for three managers, one of which was Madoff, and that Merkin was not involved in actively managing the fund. In addition, the Gabriel offering documents indicated that it would be investing in distressed companies, but that the Madoff strategy had nothing to do with that type of investing (*id.*, ¶ 32).

After meeting with Merkin and reviewing the offering documents, plaintiff Zuckerman decided to invest. First, on July 11, 2006, in his capacity as director of CRT, he invested $25

million of the Trust's money into Ascot, by using CRT, a foreign entity, to preserve the Trust's

tax status. Because Ascot Partners was only for domestic investors, CRT had to invest in Ascot

Fund, a Cayman Islands corporation (*id.*, ¶ 33). At the same time, Zuckerman personally

invested $15 million in Gabriel Capital Partners (*id.*, ¶ 34).

      After their investments, plaintiffs met regularly with Merkin, who continued to

perpetuate the impression that he was personally making the investment decisions for Ascot

Fund, the fund's investments were diversified, and the fund was not taking undue risks, without

ever mentioning Madoff's name. In 2007, Merkin received almost $30 million in fees from

Ascot alone (*id.*, ¶ 42). During this same time period, starting in early 2007, GCC repeatedly

sent out valuations of CRT's investments in Ascot Fund that falsely represented that the

investment was appreciating, and that Ascot Fund's holdings were investments made directly by

Ascot rather than simply what was a mirror of what was ostensibly held at Madoff (*id.*, ¶¶

37-38).

      With regard to BDO Seidman and Tortuga, plaintiffs allege that they were aware of

Merkin's fraudulent statements concerning Madoff's involvement with both the Gabriel and

Ascot Funds, because BDO Seidman audited both Ascot and Gabriel's financials, which

required BDO Seidman's review of the offering documents. Plaintiffs assert that BDO Seidman

and Tortuga issued clean audited financial statements, addressed to plaintiffs as investors, for

both Ascot and Gabriel Funds. The Ascot Fund financials, audited by Tortuga, indicated that

because Ascot Fund invested all its money in Ascot Partners, Ascot Partners' financial

statements, audited by BDO Seidman, were attached and addressed to CRT (*id.*, ¶¶ 44-49). The

financial statements of Ascot Fund, Ascot Partners and Gabriel Capital Partners all state that the

audits were conducted in accordance with auditing standards generally accepted in the United

States (GAAS), and prepared in accordance with generally accepted accounting principles (GAAP).

Based on these allegations, plaintiffs have asserted seven causes of action. The first and second claims are asserted only against Merkin and GCC for fraud and negligent and gross negligent misrepresentation. The third, fourth, and sixth claims by CRT are against BDO Seidman and Tortuga for fraud, aiding and abetting fraud, and negligent misrepresentation. The fifth and seventh claims by Zuckerman are against BDO Seidman also for fraud, and negligent misrepresentation.

## DISCUSSION

"The scope of a court's inquiry on a motion to dismiss under CPLR 3211 is narrowly circumscribed" (*P.T. Bank Cent. Asia v ABN AMRO Bank N.V.*, 301 AD2d 373, 375 [1st Dept 2003]). The court's task is to determine whether the complaint states a cause of action. The motion will be denied if, within the four corners of the pleading, factual allegations are discerned which, taken together, manifest a claim cognizable at law (*511 West 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 151-152 [2002]). The complaint will be liberally construed, and the court will accept as true all facts in the complaint and in plaintiff's submissions in opposition to the motion (*id.* at 152). Plaintiff will be accorded the benefit of all possible favorable inferences (*id.*). "Dismissal under CPLR 3211 (a) (1) is warranted 'only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law'" (*id.*, quoting *Leon v Martinez*, 84 NY2d at 88).

*Negligent/Gross Negligence Misrepresntation Claims*

The Martin Act, General Business Law Article 23-A, prohibits various deceitful and fraudulent practices in advertising, distributing, selling, exchanging, and purchasing securities

(*see* General Business Law §§ 352, 352-c, 353).  Under the Martin Act, the Attorney General has

the exclusive authority to enforce its provisions, and has been "granted various investigatory,

regulatory, and remedial powers aimed at detecting, preventing, and stopping fraudulent

securities practices" (*Caboara v Babylon Cove Dev., LLC*, 54 AD3d 79, 81 [2d Dept 2008],

citing *Kralik v 239 E. 79th St. Owners Corp.*, 5 NY3d 54, 58-59 [2005]; *CPC Intl., Inc. v

McKesson Corp.*, 70 NY2d 268 [1987]).  Under its provisions, unlike common-law fraud, the

Attorney General need not allege or prove either scienter or intent to deceive, or reliance to

establish liability for fraudulent practices (*id.*, citing *State of New York v Rachmani Corp.*, 71

NY2d 718 [1988]; *Kassover v UBS AG*, 619 F Supp 2d 28 [SD NY 2008]).

　　　In *CPC Intl., Inc. v McKesson Corp.* (70 NY2d 268, *supra*), the Court of Appeals

determined that there is no express or implied private right of action under the statute.  Instead,

exclusive enforcement power rests with the Attorney General with respect to claims which fall

within the Martin Act (*see Kerusa Co. LLC v W10Z/515 Real Estate Ltd. Partnership*, 12 NY3d

236 [2009]).  "[P]rivate plaintiffs [are not] permitted through artful pleading to press any claim

based on the sort of wrong given over to the Attorney-General under the Martin Act" (*Whitehall

Tenants Corp. v Estate of Olnick*, 213 AD2d 200, 200 [1st Dept], *lv denied* 86 NY2d 704 [1995]).

　　　The vast majority of state and federal courts have found that claims relating to a

plaintiff's securities fraud claim that do not include scienter as an essential element, including

claims for negligent misrepresentation and gross negligence are '"typically preempted by the

Martin Act, in contrast to a claim requiring intent, such as a claim for common law fraud'" (*In re

Bayou Hedge Fund Litigation*, 534 F Supp 2d 405, 421 [SD NY 2007], *aff'd sub nom South

Cherry St., LLC v Hennessee Group LLC*, 573 F3d 98 [2d Cir 2009] [citation omitted] [breach of

fiduciary duty claim preempted]; *see e.g. Rego Park Gardens Owners, Inc. v Rego Park Gardens*

*Assocs.*, 191 AD2d 621 [2d Dept 1993] [negligent misrepresentation preempted]; *Horn v 440 E.*
*57ᵗʰ Co.*, 151 AD2d 112 [1ˢᵗ Dept 1989] [negligent misrepresentation and breach of fiduciary
duty claims, omitting element of deceitful intent and substitute fiduciary relationship of trust,
dismissed as preempted]; *Castellano v Young & Rubicam, Inc.*, 257 F3d 171 [2d Cir 2001]
[breach of fiduciary duty claim preempted]; *Meridian Horizon Fund, LP v Tremont Group*
*Holdings, Inc.*, 2010 WL 1257567, *8, 2010 US Dist LEXIS 32215 [SD NY 2010]; *Heller v*
*Goldin Restructuring Fund, L.P.*, 590 F Supp 2d 603 [SD NY 2008] [breach of fiduciary duty
claim preempted]; *Gabriel Capital, L.P. v Natwest Fin., Inc.*, 137 F Supp 2d 251 [SD NY 2000]
[negligence claim dismissed as preempted]).  This is because allowing them to proceed would
be, in effect, allowing a private claim under the Martin Act (*see Dover Ltd. v A.B. Watley, Inc.*,
423 F Supp 2d 303, 330 [SD NY 2006] [negligent misrepresentation claim preempted];
*Nanopierce Technologies, Inc. v Southridge Capital Mgt. LLC*, 2003 WL 22052894, *6, 2003
US Dist LEXIS 15206 [SD NY 2003]).  Courts have permitted common-law fraud claims to
proceed (*see CPC Intl. v McKesson Corp.*, 70 NY2d at 284-286; *Caboara v Babylon Cove Dev.*,
*LLC*, 54 AD3d at 82-83 [common-law fraud claim not preempted]), so long as the fraud claim is
distinct from a Martin Act claim (*see e.g. Kerusa Co. LLC v W10Z/515 Real Estate Ltd.*
*Partnership*, 12 NY3d 236, *supra* [common-law fraud preempted because claim solely based on
defendant's failure to make disclosures required by Martin Act and regulations thereunder]).

Here, plaintiffs' claim for negligent/gross negligent misrepresentation against defendants
Merkin and GCC all arise in the securities context.  Fairly construed, this claim does not require
proof of deceitful intent.  Therefore, they are covered by the Martin Act and are preempted,
because to sustain them would be, in effect, to recognize a private right of action under that
statute (*see CPC Intl., Inc. v McKesson Corp.*, 70 NY2d 268, *supra*; *Horn v 440 E. 57ᵗʰ Co.*, 151

AD2d 112, *supra*).  In fact, the Attorney General is pursuing a Martin Act claim, as well as other

claims against these defendants with regard to both the Ascot and the Gabriel Funds (*see Cuomo

v J. Ezra Merkin and Gabriel Capital Corporation*, Index No. 450879/09 [Sup Ct, NY County]).

In opposition to the motion, plaintiffs rely on a non-binding decision from the Second

Department, *Caboara v Babylon Cove Dev., LLC* (54 AD3d 79, *supra*), to suggest that the

Martin Act has no preclusive effect on common-law claims.  However, in that case, the claims

that the Court held were not preempted were common-law fraud and breach of contract, not

negligent misrepresentation (*id.* at 82), and, in the face of binding First Department precedent,

plaintiffs' argument is unpersuasive.

For instance, in *Whitehall Tenants Corp. v Estate of Olnick* (213 AD2d 200, *supra*), a

cooperative, on behalf of its resident shareholders, was seeking to vindicate its shareholders for

information withheld or misrepresented by the sponsor.  Plaintiffs' claim did not include any

evidence of intent to defraud or reliance.  The Court held that this was exactly what the Martin

Act committed exclusively to the Attorney General, and that "private plaintiffs will not be

permitted through artful pleading to press any claim based on the sort of wrong given over to the

Attorney-General under the Martin Act" (*id.* at 200).

Similarly, in *Horn v 440 E. 57th Co.* (151 AD2d 112, *supra*), a buyer of shares in a

residential cooperative corporation brought suit against the seller, alleging fraud, negligent

misrepresentation and breach of fiduciary duty.  The court dismissed the claims for breach of

fiduciary duty and negligent misrepresentation, holding that "to sustain them would be, in effect,

to recognize a private right of action under the Martin Act contrary to case law" (*id.* at 120).

Thus, the plaintiffs' second cause of action for negligent/gross negligent

misrepresentation is dismissed.

*Common Law Fraud*

Plaintiffs' first claim for common-law fraud, however, survives defendants' motion. To properly plead a common-law fraud claim, a plaintiff must allege a misrepresentation of a material fact, falsity of the misrepresentation, scienter, plaintiff's reasonable reliance on the alleged misrepresentation, and injury resulting from the reliance (*Small v Lorillard Tobacco Co.*, 94 NY2d 43 [1999]; *see also P.T. Bank Cent. Asia v ABN AMRO Bank N.V.*, 301 AD2d 373, *supra*).

While New York law requires that fraud claims be pled with specificity (*see* CPLR 3016 [b] ["the circumstances constituting the wrong shall be stated in detail"]), CPLR 3016 (b) "requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of and is not to be interpreted so strictly as to prevent an otherwise valid cause of action where it may be "'impossible to state in detail the circumstances constituting a fraud'" (*P.T. Bank Cent. Asia v ABN AMRO Bank N.V.*, 301 AD2d at 377 [citations omitted]; *Kaufman v Cohen*, 307 AD2d 113, 120 [1st Dept 2003] [plaintiff need only provide "'sufficient detail to inform defendants of the substance of the claims'" (citation omitted)]). As set forth below, the complaint's allegations clearly satisfy CPLR 3016 (b) and CPLR 3211.

In support of their motion to dismiss, Merkin and GCC contend that the fraud claim fails for two reasons: (1) the offering documents expressly refute plaintiffs' assertions that defendants acted in an advisory capacity and that they relied on Merkin's representations, so that plaintiffs could not, as a matter of law, reasonably rely on statements made outside of those documents, and (2) plaintiffs fail to allege a misrepresentation or omission. Neither of these contentions has any merit.

First, defendants contend that CRT specifically represented at the time of its investment that its decision was an independent one and disclaimed reliance upon Merkin. They point to a representation in the Ascot Fund Subscription Agreement that CRT, as the investor, "acknowledges that it has made an independent decision to invest in the Fund and that, in making its decision to subscribe . . . [CRT] has relied solely upon the Fund Documents and independent investigations made by [CRT]" and that it was not relying upon the Fund or Merkin "with respect to the legal, tax and other economic considerations involved in this investment" (Mennitt Affidavit in Support, Exhibit C, Section II B). This disclaimer, however, while it may preclude reliance upon certain oral promises, it will not bar an assertion of fraud premised upon fraudulent misrepresentations in the offering documents themselves (*see JPMorgan Chase Bank v Liberty Mut. Ins. Co.* , 189 F Supp 2d 24, 27 [SD NY 2002]). The language that plaintiffs were not relying on Merkin regarding the legal, tax and other economic considerations does not disclaim reliance on defendants' factual representations about the fund itself. In addition, that same provision in the Ascot Fund Subscription Agreement provided that investors were given the opportunity to ask questions of, and receive answers from, the General Partner (Merkin and GCC) concerning matters pertaining to the investment (Mennitt Affidavit in Support, Exhibit C, Section II B). This essentially gives the investors the right to rely upon information Merkin and GCC conveyed to the investors, orally or otherwise (*see Heller v Goldin Restructuring Fund, L.P.*, 590 F Supp 2d at 615).

Moreover, this disclaimer does not prohibit plaintiffs' reliance upon written misrepresentations in the Offering Documents, which include the Ascot Offering Memo, repeatedly referenced in plaintiffs' fraud allegations. Finally, issues of reasonable reliance "are not subject to summary disposition" and should not be disposed of on a motion to dismiss (*see*

*e.g. Brunetti v Musallam*, 11 AD3d 280, 281 [1st Dept 2004] [issue of "reasonable reliance, (an)

essential element[] of a fraud claim, (is) not subject to summary disposition"]; *Talansky v*

*Schulman*, 2 AD3d 355, 361 [1st Dept 2003] [on fraud claim arising out of, among other things,

alleged misrepresentations that the investment was safe, resolution of reasonable reliance is

generally left to trier of fact]; *E\*Trade Fin. Corp. v Deutsche Bank AG*, 2008 WL 2428225,

2008 US Dist LEXIS 46451 [SD NY 2008] [reasonableness of reliance on misrepresentations is

a fact-specific inquiry not usually suitable to resolution on a motion to dismiss]).

   With respect to misrepresentation or omission, the complaint adequately alleges Merkin's

and GCC's false representations and omissions with regard to the Ascot Fund.  Plaintiffs have

alleged that Merkin and GCC concealed and failed to disclose Madoff's role, and misrepresented

Merkin's role in the fund's management.  The Offering Documents falsely represented that

Merkin was involved in the fund's day-to-day management, and that the success of the fund

depended upon Merkin's abilities as a money manager.  These documents could be construed as

misrepresenting that Merkin would be controlling and actively managing the funds, and

concealing that Ascot Fund was a feeder fund to Madoff (Complaint, ¶¶ 24, 26).  In addition, the

Offering Documents made partial disclosures that were misleading.  The Ascot Offering Memo,

for example, disclosed that Ascot Fund was merely a feeder into Ascot Partners, but then failed

to disclose that Ascot Partners was merely a feeder into Madoff (*id.*, ¶ 26).  Such misleading

partial disclosures can form the basis of a fraud claim (*see Williams v Sidley Austin Brown &*

*Wood, L.L.P.*, 38 AD3d 219, 220 [1st Dept 2007]).

   Plaintiff's allegations regarding the use of money managers, similarly supports a fraud

claim.  The Offering Documents indicated that multiple money managers might be used, but, in

fact, all the funds were entrusted to a single money manager, Madoff.  They used prospective

language, that the fund "may delegate" and "will use" outside managers, when, from its inception in 1992, Ascot Fund was almost completely turned over to Madoff. Thus, when the Ascot Offering Memo was given to plaintiffs, in 2006, Merkin had already delegated all investment discretion to Madoff, a fact of which Merkin was presently aware at the time of the Ascot Offering Memo. Defendants' reliance upon the fact that the Offering Documents indicated that Merkin and GCC might delegate their investment management duties to independent money managers without giving notice to, and obtaining the consent of investors, is misplaced. This cautionary language does not shield defendants from liability, as such cautionary language did not expressly warn of complete control by one outside manager. In addition, it was not a specific and factual prospective representation (*see Halperin v eBanker USA.com, Inc.*, 295 F3d 352, 357-359 [2d Cir 2002]). Plaintiffs' allegations involve misrepresentations of a present known fact – that Merkin had already delegated complete control and investment discretion over all of Ascot's funds to Madoff. This is an actionable misrepresentation.

The allegations regarding misrepresentations of Madoff's role as broker also support the fraud claim. The Ascot Offering Memo, while it mentioned Madoff's name, by indicating that, "Bernard Madoff Investment Securities LLC" was one of Ascot's two prime brokers, it misrepresented Madoff's role because he executed, cleared, and had custody of over 99% of Ascot's securities holdings, and the other identified broker really had nothing to do with Ascot's funds. This indicated that Madoff was simply performing administrative functions, not that he was actually making all investment decisions for the fund. It also failed to reveal that he controlled all sides of the securities transactions that Ascot was engaging in. These allegations must be accepted as true on this motion, and are misrepresentations of an existing fact that can be the basis of a fraud claim (*see Williams v Sidley Austin Brown & Wood, L.L.P.*, 38 AD3d 219,

*supra*).  Accordingly, the branch of the motion to dismiss the first cause of action for fraud

against Merkin and GCC is denied.

## Lack of Personal Jurisdiciton as to Tortuga

Defendant Tortuga's motion to dismiss for lack of personal jurisdiction is granted.  The

complaint alleges that Tortuga is a Cayman Islands corporation with its principal place of

business on Grand Cayman, in the Cayman Islands (Complaint, ¶ 14).  It further alleges that

Tortuga provided accounting, auditing, and consulting services to its clients, and that it audited

the financial statements of Ascot Fund, also a Cayman Islands corporation.  It alleges that these

audited financial statements expressly referenced the financial statements of Ascot Partners,

which were audited by BDO Seidman, allegedly in New York, where Ascot Partners has its

financial records and principal place of business.  Thus, it contends that Tortuga transacts

business in New York.  The complaint also asserts that by issuing misleading audited financials

that were sent to representatives of investors in Ascot Fund in New York, Tortuga committed a

tortious act outside of New York, which Tortuga should have reasonably expected to have

consequences in New York, and that it derives substantial revenue from international commerce.

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of

demonstrating satisfaction of the CPLR and due process jurisdictional requirements (*LaMarca v*

*Pak-Mor Mfg. Co.*, 95 NY2d 210, 214, 216 [2000]; *Stewart v Volkswagen of Am., Inc.*, 81 NY2d

203, 207 [1993]; *see* CPLR 3211 [a] [8]).

Under Section 302 of the CPLR, a court may exercise long-arm jurisdiction over a

non-domiciliary who transacts business within New York under certain circumstances.  Section

302 (a) (1) of the CPLR requires that the defendant conduct purposeful activity within the state,

and that there be a substantial relationship between that activity and the claim asserted

(*Ehrenfeld* v *Bin Mahfouz*, 9 NY3d 501, 508 [2007] [lack of jurisdiction where failed to show

defendant purposely availed self of privileges and benefits of New York's laws]; *Kreutter v*

*McFadden Oil Corp.*, 71 NY2d 460, 467 [1988]). Essential to determining that a defendant has

transacted business within New York, is a finding that the defendant has purposely availed itself

of the privilege of conducting activities here, thus invoking the benefits and protections of New

York laws (*id.*).

      The facts here do not permit this finding. Tortuga has submitted the affidavit of Glen

Trenouth, a managing partner of Tortuga, who attests that Tortuga is organized under the laws

of, and does business solely in the Cayman Islands (Affidavit of Glen Trenouth in Support, ¶ 2).

Its only office is in the Cayman Islands, where all of its partners reside, except for one who

resides in the British Virgin Islands, its property is there, and the vast bulk of its revenues are

earned in the Cayman Islands from Cayman Island entities. He attests that Tortuga has no

presence in New York, has no employees, offices, property, or bank accounts in New York, and

is not registered to do business, nor does it engage in any systematic course of business here (*id.*,

¶¶ 2-3). Tortuga's client, as relevant to this action, was Ascot Fund, a Cayman Islands

corporation with its place of business in the Cayman Islands, and all auditing services Tortuga

provided to Ascot Fund were performed in the Cayman Islands (*id.*, ¶ 4). He further attests that

Tortuga only transmitted the audited financial statements to the Cayman Islands governmental

agency that regulates Ascot Fund (*id.*, ¶ 5). Tortuga never sent, or caused to be sent, its audited

financial statements for Ascot Fund to any of its shareholders (other than to those who may have

been in management) or to the limited partners of Ascot Partners, and never had any

communications with any of them, including plaintiff CRT (*id.*, ¶ 7). BDO Seidman, a

completely separate entity and the United States member firm of BDO International, a

Netherlands corporation that engages in international marketing for its members, provided

Tortuga's audit to GCC in New York (*id.*).

Where the defendant submits an affidavit in support of its dismissal motion attesting to

where it conducts business, it is incumbent on the plaintiff to then come forward with evidence

to support a basis upon which to predicate the exercise of personal jurisdiction, or at least show

that such evidence may exist (*Roldan v Dexter Folder Co.*, 178 AD2d 589, 590 [2d Dept 1991]).

Plaintiffs' response is to argue that Tortuga fails to say where it delivered its auditing

engagement letter, arguing that it can be presumed that it was delivered to Merkin's office.

Tortuga, however, was engaged by Ascot Fund, the Cayman Islands entity with its offices in the

Cayman Islands. Plaintiffs also point to Trenouth's statement that Tortuga had a very limited

number of e-mail communications with anyone affiliated with Ascot Fund in New York, but that

those e-mails originated from its Cayman Islands offices. This also is insufficient to indicate that

Tortuga was purposely conducting activities here, and invoking the benefits and protections of

New York laws (*see Kimco Exchange Place Corp. v Thomas Benz, Inc.*, 34 AD3d 433, 434 [2d

Dept 2006]; *see also Grimaldi v Guinn*, __ AD3d __, 2010 NY Slip Op 00926 [2d Dept 2010];

*cf. Deutsche Bank Securities, Inc. v Montana Bd. of Investments*, 7 NY3d 65, *cert denied* 549 US

1095 [2006] [sophisticated institutional lender injected self into New York to transact business

by knowingly initiating and pursuing a negotiation with a Deutsche Bank employee in New York

that ended in the sale of $15 million in bonds]). The fact that BDO Seidman provided Tortuga's

audit of Ascot Fund to GCC similarly does not indicate Tortuga's transaction of business, or that

it was purposely injecting itself into the state. The center of gravity of Tortuga's auditing

services was not in New York, but was in the Cayman Islands. In addition, contrary to plaintiffs'

apparent argument, Tortuga does not assert that BDO Seidman performed all the audit work for

Ascot Fund's financials. Rather, it asserts that it performed the audit for Ascot Fund, and that BDO Seidman performed the audit for Ascot Partners, a separate entity. Further, contrary to plaintiffs' conclusory contention, there is absolutely no suggestion in the record that BDO Seidman was an agent of Tortuga at any relevant time. Plaintiffs' submission of Tortuga's website fails to show that Tortuga transacted business in New York (Exhibit B to Affidavit of Suyash Agrawal). The website only indicates that the firm originated in the British Virgin Islands, was first established in the Caymans in 2002, and that it provides services to its local clients, including local entreprenuers, local hotels and businesses, and to offshore mutual funds (*Id.*). Plaintiffs' reliance upon *Fischbarg v Doucet* (38 AD3d 270 [1st Dept], *affd* 9 NY3d 375 [2007]) is misplaced, as that case is factually distinguishable. In *Fischbarg*, out-of-state defendants retained a New York attorney. The plaintiff attorney performed over 200 hours of work in New York. The defendants called, faxed and e-mailed the attorney in New York, as well as discussed their case and made payments to plaintiff attorney in New York (38 AD3d at 272-275). Based on these contacts, the court found that defendants had transacted business. Here, there is nothing even close to that kind of contact by Tortuga with New York.

Tortuga did not perform or contract to perform this audit in New York. It conducted its audit in the Cayman Islands, and provided it to its Cayman Islands client and to a Cayman Islands governmental body. The totality of Tortuga's contacts with New York fail to support any finding that Tortuga projected itself into New York to indicate the transaction of business under CPLR 302 (a) (1) (*see Barrett v Tema Dev. [1988], Inc.*, 463 F Supp 2d 423, 429 [SD NY 2006], *affd* 251 Fed Appx 698 [2d Cir 2007]). Plaintiffs' conclusory assertions fail to demonstrate a basis for granting them jurisdictional discovery with regard to this defendant.

Plaintiffs have similarly failed to come forward with any basis for jurisdiction under

CPLR 302 (a) (3), and have not even made a sufficient start to warrant jurisdictional discovery.

Section 302 (a) (3) requires that (1) the defendant commit a tortious act without the state, (2) the

claim arises from the act, (3) the act caused injury to a person or property in New York, (4) the

defendant expected or reasonably should have expected the act to have consequences in New

York, and (5) the defendant derived substantial revenue from interstate or international

commerce (*LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d at 214; *see also O'Brien v Hackensack

Univ. Med. Ctr.*, 305 AD2d 199 [1st Dept 2003]). In addition to these requirements under the

CPLR, constitutional due process considerations require that the defendant's contacts with New

York be sufficient to make the imposition of jurisdiction reasonable and just according to

traditional notions of fair play and substantial justice (*Asahi Metal Indus. Co. v Superior Ct. of

Calif., Solano County*, 480 US 102, 113 [1987]; *International Shoe Co. v State of Washington,

Office of Unemployment Conpensation and Placement*, 326 US 310, 316 [1945]). In the context

of a commercial tort, where the damage is solely economic, the situs of the commercial injury is

where the original critical events associated with the action or dispute took place, not where any

financial loss or damages occurred (*see O'Brien v Hackensack Univ. Med. Ctr.*, 305 AD2d 199,

*supra*; *Weiss v Greenburg, Traurig, Askew, Hoffinan, Lipoff, Quentel & Wolff, P.A.*, 85 AD2d

861, 862 [3d Dept 1981]; *see also Polansky v Gelrod*, 20 AD3d 663, 664 [3d Dept 2005];

*Mid-Atlantic Residential Investors Ltd. Partnership v McGuire*, 166 AD2d 205 [1st Dept 1990];

*National Union Fire Ins. Co. of Pittsburgh v Davis, Wright, Todd, Reise and Jones*, 157 AD2d

571 [1st Dept 1990]). The location of financial consequences in New York due to the fortuitous

location of the plaintiffs in New York is insufficient where the underlying events took place

outside of New York (*see Whitaker v American Telecasting, Inc.*, 261 F3d 196, 208-209 [2d Cir

2001] [applying New York long-arm statute]).

Plaintiffs allege that Tortuga committed a tortious act outside the state in connection with auditing the financials of Ascot Fund, and that plaintiff CRT suffered injury in New York. First, CRT is a Cayman Islands, and not a New York corporation, and it is not clear that its location is in New York, as it appears to be arguing. In addition, the critical underlying events with regard to this defendant occurred where it conducted its audit – in the Cayman Islands. The claims against Tortuga are similar to professional misconduct cases, in which courts have found that the situs of the injury is where the professional performed the deficient work (*see e.g. Weiss v Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A.*, 85 AD2d 861, *supra* [diminution of value of mortgage located in New York not sufficient injury where acts of legal malpractice occurred in Florida]). The relevant original event which caused plaintiff CRT injury with respect to Tortuga was the conduct of its audit of Ascot Fund's financial statement, which occurred outside of New York (*see Whitaker v American Telecasting, Inc.* , 261 F3d at 209; *United Bank of Kuwait, PLC v James M. Bridges, Ltd.*, 766 F Supp 113, 116 [SD NY 1991]). CRT's claim that it was sold the investment in New York is irrelevant, because the injury did not arise out of its purchase of the investment here, but, rather, out of Tortuga's alleged failure to appropriately perform its audit services.

With regard to the element of deriving substantial revenue from interstate or international commerce, the evidence submitted by Tortuga shows that the vast bulk of its revenues, for example in 2007, 98% of Tortuga's total revenues ($8,036,000), were earned from Cayman Island domiciled entities (Trenouth Aff., ¶ 2; Reply Affidavit of Glen Trenouth, ¶ 4). Trenouth asserts that, with regard to the remaining 2% ($147,050), 41% of that ($60,290) was earned from entities domiciled in the British Virgin Islands (Trenouth Reply Aff., 4). Therefore, the record shows that significantly less than 2% of Tortuga' s revenues may possibly be earned outside of

the Cayman and British Virgin Islands. This figure is insubstantial in relation to a firm with annual revenues of over $8 million (*see United Bank of Kuwait, PLC v James M. Bridges, Ltd.*, 766 F Supp at 117 [collecting cases]). The requirement that the defendant derive substantial revenue from international commerce "was meant to exclude businesses whose operations are local in nature" (*id.* [citation omitted]). Thus, plaintiff has failed to make a prima facie showing of facts to establish jurisdiction over Tortuga. Plaintiffs' request for jurisdictional discovery is denied, as plaintiffs have failed to make a sufficient start as to warrant such discovery. Therefore, the complaint is dismissed as against defendant Tortuga.

*Negligent Misrepresentation Claims as to BDO Seidman*

In the claims against BDO Seidman for negligent misrepresentation, plaintiffs allege that BDO Seidman knew about the false representations Merkin was making in the offering documents, and exercised complicity in Merkin's misdeeds by issuing clean audited financial statements for both the Ascot and Gabriel Funds (Complaint, ¶¶ 43-52). Plaintiffs allege that the financials were not conducted in compliance with generally accepted accounting principles (GAAP), and that the audits were not conducted in accordance with generally accepted auditing standards (GAAS), as stated in the financials (*id.*, ¶ 54).

First, as discussed above regarding the negligent misrepresentation claim against Merkin, the negligent misrepresentation claims against BDO Seidman are also preempted by the Martin Act (*see* discussion *supra*). Even if they were not preempted, there is no basis for the claims because of a lack of privity.

A plaintiff pleading a negligent misrepresentation claim against an accountant with whom the plaintiff has no contractual relationship has a heavy burden. The plaintiff must establish three elements: (1) the accountant must have been aware that the audits would be used

for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3)

conduct by the accountant linking him or her to that known party (*see Credit Alliance Corp. v*

*Arthur Andersen & Co.*, 65 NY2d 536, 551 [1985]; *Serio v PricewaterhouseCoopers LLP*, 9

AD3d 330, 331 [1st Dept 2004]).

Plaintiffs, here, fail to allege "linking conduct" between BDO Seidman and themselves as

non-client investors in Ascot Partners and Gabriel Capital Partners.  To show linking conduct, a

plaintiff must demonstrate some form of direct contact between the accountant and the plaintiff,

"such as a face-to-face conversation, the sharing of documents, or other 'substantive

communication' between the parties" (*Securities Investor Protection Corp. v BDO Seidman,*

*LLP*, 222 F3d 63, 75 [2d Cir 2000] [applying New York law], citing *Prudential Ins. Co. v*

*Dewey, Ballantine, Bushby, Palmer & Wood*, 80 NY2d 377, 385 [1992] [linking conduct where

accountant sent opinion letter directly to plaintiff], and *Credit Alliance*, 65 NY2d at 554 [linking

conduct based on repeated communications between plaintiff and accountant discussing

financials of entity being audited]).  Where, like in the instant case, direct contact between the

accountant and the plaintiff is minimal or nonexistent, the plaintiff cannot recover for the

accountant's negligence (*see e.g. Security Pacific Bus. Credit, Inc. v Peat Marwick Main & Co.*,

79 NY2d 695, 706 [1992] [no linking conduct where accountant did not provide or agreed to

provide copy of audit directly to plaintiff, did not mention plaintiff in client engagement letter,

and had no awareness audit would benefit plaintiff primarily]).  Plaintiffs, here, have failed to

allege any direct contact between themselves and BDO Seidman.  The fact that they were

entitled to and received a copy of the audited financial statements, or that BDO Seidman knew

that the investors would rely upon the information contained in the financial statements, does not

establish the requisite linking conduct (*see Houbigant, Inc. v Deloitte & Touche LLP*, 303 AD2d

92, 94-95 [1ˢᵗ Dept 2003]). BDO Seidman's work in the course of the audit was performed pursuant to professional standards applicable in the context of any audit, and was not undertaken pursuant to any specific duty owed to plaintiffs (*Id.*). Therefore, plaintiffs cannot establish the direct nexus necessary to give them a claim against BDO Seidman for negligent misrepresentation. Thus, the sixth and seventh claims for negligent misrepresentation are dismissed.

*Fraud/Aiding and Abetting Fraud*

With regard to the fraud and aiding and abetting fraud claims (third and fifth causes of action), the court is constrained to dismiss these claims as plaintiffs fail to sufficiently allege scienter. The standard for pleading auditor fraud is demanding (*see Meridian Horizon Fund, LP v Tremont Group Holdings, Inc.*, 2010 WL 1257567, * 5; *In re IMAX Sec. Litig.*, 587 F Supp 2d 471, 483 [SD NY 2008]). Where plaintiffs allege violations of generally accepted auditing standards against an independent auditor, they must also allege corresponding fraudulent intent ( *Meridian Horizon Fund, LP v Tremont Group Holdings, Inc.*, 2010 WL 1257567, * 5 ). While a showing of recklessness will permit an inference that a fraud was in fact perpetrated, this recklessness must involve conduct that is highly unreasonable, and must "in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company" (*id.*, citing *Rothman v Gregor*, 220 F3d 81, 98 [2d Cir 2000]). The complaint must allege that the auditor's practices were so deficient as to amount to no audit at all, that there was "a refusal to see the obvious, a failure to investigate the doubtful" (*State St. Trust Co. v Ernst*, 278 NY 104, 112 [1938]), or the auditor's judgments were such that "'no reasonable accountant would have made the same decisions if confronted with the same facts'" (*Meridian Horizon Fund, LP v Tremont Group Holdings, Inc.*, 2010 WL 1257567, * 5, quoting *In re Scottish Re Group Secs. Litig.*, 524 F Supp

2d 370, 385 [SD NY 2007]). Simply alleging that the "auditor had access to the information by which it could have discovered the fraud is not sufficient" (*id.*; *see also Rothman v Gregor*, 220 F3d at 98). Rather, to meet this standard of recklessness, the complaint must allege specific red flags that the accountant disregarded that would place a reasonable accountant on notice that the audited fund was engaged in wrongdoing which is detrimental to the investors (*id.*).

In a case nearly identical on the facts, and involving some similar parties, the court in *Meridian Horizon Fund, LP v Tremont Group Holdings, Inc.*, 2010 WL 1257567, * 5 dismissed fraud claims against KPMG as the auditor for an investment fund which was a feeder fund into Madoff and his firm, Bernard Madoff Investment Securities (BMIS). As in the instant case, the plaintiffs, which were hedge funds that invested all of their assets in other hedge funds which served as the feeder funds, alleged that KPMG and KPMG Cayman misrepresented that they had performed audits that complied with GAAS. Plaintiffs alleged that if KPMG's audit had complied with GAAS, they would have discovered Madoff's scheme (*id.* at * 6). The plaintiffs asserted that the fact that the advisory, brokerage, and custodial functions were consolidated in Madoff required KPMG to use greater professional skepticism, and their failure to verify trades and Madoff's reported assets from independent sources "'in the face of known dangers' amounted to a meaningless audit" (*id.*, quoting complaint). The plaintiffs further alleged that Madoff's own audit firm's, Friehling & Horowitz's, unreliable audits were easily discoverable. Without KPMG's unqualified audit opinions, the plaintiffs alleged that they would not have invested.

In finding that plaintiffs failed to sufficiently plead scienter, the *Meridian Horizon* court determined that a shoddy audit that violates GAAS does not establish a sufficient intent to defraud. The court found that, while the concentration of functions with Madoff could have put

KPMG on notice, the offering documents disclosed that Madoff would use a firm in which he was principal to perform custodial and brokerage duties. The court also found that plaintiffs failed to allege that KPMG was aware of any concrete facts indicative of Madoff's fraud. The court noted that the more compelling inferences as to why Madoff's fraud went undetected for so long was his proficiency in covering up his scheme, fooling the SEC, as well as other professionals, and that the auditors were similarly in the dark. It found most critical that plaintiffs allegations of GAAS violations were "even less meaningful because neither KPMG nor KPMG Cayman was hired to audit Madoff's business or to issue an opinion on the financial statements of his firm BMIS. Rather, KPMG and KPMG Cayman's only role was to audit the financial statements of the XL Funds" (*id.*). The court reasoned that there was no basis, and it would be unprecedented, to require an audit firm engaged to audit the financials of one client, the funds, to conduct an audit of a third party that is not an audit client on whose financial statements the auditor expresses no opinion (*id.*).

Here, plaintiffs similarly allege that BDO Seidman failed to conduct its audit in accordance with GAAS and GAAP, by failing to disclose in its audits that all of Ascot Fund's assets were under Madoff's control, and that the terms "prime brokers" were misleading because there was only one broker. Again, as in *Meridian Horizon,* plaintiffs here contend that BDO Seidman should have detected problems with Madoff's internal controls, should have evaluated Madoff's auditing firm's work, and should have obtained independent audit evidence to corroborate the paper trade confirmations, facts which they claim were easily discoverable. While this court clearly does not countenance BDO Seidman's alleged shoddy auditing practices in this case, this court reluctantly finds that under the current law they do not rise to the level of an intent to defraud (*see Meridian Horizon Fund, LP v Tremont Group Holdings, Inc.*, 2010 WL

1257567, * 6) . Plaintiffs are merely alleging that BDO Seidman had access to the information

by which it could have discovered Madoff's fraud. This is insufficient. There are no allegations

that BDO Seidman was aware of any concrete facts indicating the fraud. Further, BDO

Seidman, like KPMG, was not hired to audit Madoff's business, or to issue an opinion on

Madoff's or BMIS's financial statements. Its only role was to audit the financial statements of

Ascot Partners and Gabriel Capital Partners. There is no rational basis for inferring that BDO

Seidman knowingly made misrepresentations.

Plaintiffs' reliance on *DaPuzzo v Reznick Fedder & Silverman* (14 AD3d 302 [1st Dept

2005]) and *Serio v PricewaterhouseCoopers LLP* (9 AD3d 330, *supra*]) is misplaced, as those

cases are clearly factually distinguishable. Both cases involved situations in which the auditor

knew, or had actual knowledge of facts that raised doubts as to the veracity of information from

its own client. In *DaPuzzo v Reznick Fedder & Silverman* , the accountant ignored and failed to

report its client's lack of internal controls, and gave into demands from the client's CFO to fix

the financial reports to represent a more favorable financial position (14 AD3d at 303). In *Serio*

*v PricewaterhouseCoopers LLP*, the accountant failed to undertake even the most minimal audit

to verify the client insurer's loss reserves, and had actual notice that many cases carried either no

reserves or reserves of only $1 (9 AD3d at 331). Here, plaintiffs fail to plead that BDO Seidman

knew or had actual knowledge of facts that would raise doubts as to the veracity of information

from its clients, Ascot Partners and Gabriel Capital Partners. Their allegations about a lack of

internal controls involves Madoff, who was not BDO Seidman's client.

The aiding and abetting fraud claim (the fourth cause of action) is similarly dismissed.

To state a claim for aiding and abetting fraud, the plaintiff must allege the existence of a fraud,

defendant's knowledge of the fraud, and its substantial assistance in advancing the fraud's

commission (*see National Westminster Bank USA v Weksel*, 124 AD2d 144, 147 [1st Dept],
*appeal denied* 70 NY2d 604 [1987]). Here, there is no allegation in the complaint permitting the
inference that BDO Seidman knew of or intended to aid Merkin and GCC in the commission of
fraud. The complaint does not plead what BDO Seidman did with the intention of advancing the
commission of Merkin and GCC's fraud (*see Lerner v Fleet Bank, N.A.*, 459 F3d 273, 292 [2d
Cir 2006]). Without allegations of actual knowledge or substantial assistance, an aiding and
abetting fraud claim cannot stand (*see International Strategies Group, Ltd. v ABN AMRO Bank
N.V.*, 49 AD3d 474, 474-475 [1st Dept 2008]).

Finally, the court notes that these types of allegations of scienter against auditors of
investment funds in these situations appear to be recurring, yet they cannot go beyond the motion
to dismiss stage and into discovery under the present state of the law. The inability to explore
the alleged wrongdoing any further and potentially hold these parties accountable is frustrating
to the court.

## Conclusion

Accordingly, it is

ORDERED that the motion to dismiss of defendants J. Ezra Merkin and Gabriel Capital
Corporation is granted only to the extent that the second claim is dismissed; and it is further

ORDERED that the motion to dismiss of defendant BDO Tortuga is granted and the
complaint is severed and dismissed as against it for lack of personal jurisdiction, with costs and
disbursements to defendant BDO Tortuga as taxed by the Clerk of the Court; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly; and it is further

ORDERED that the motion to dismiss of defendant BDO Seidman, LLP is granted, and
the complaint is severed and dismissed as against it, with costs and disbursements to defendant

BDO Seidman as taxed by the Clerk of the Court; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly; and it is further

ORDERED that the remainder of the action continues, and the defendants J. Ezra Merkin and Gabriel Capital Corporation are directed to serve an answer to the complaint within 10 days after service of a copy of this order with notice of entry.

Dated: May 5 , 2010

ENTER:

HON. RICHARD B. LOWE, III J.S.C.